## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BRIAN J. KAREM<br>2706 Media Center Drive<br>Los Angeles, CA 90065<br><br>*Plaintiff*,<br><br>   v.<br><br>DONALD J. TRUMP,<br>in his individual capacity and official capacity as<br>President of the United States<br>1600 Pennsylvania Avenue NW<br>Washington, DC 20500;<br><br>and<br><br>STEPHANIE A. GRISHAM,<br>in her individual capacity and official capacity as<br>White House Press Secretary<br>1600 Pennsylvania Avenue NW<br>Washington, DC 20500,<br><br>*Defendants*. | **Case No.** |

## COMPLAINT

Plaintiff Brian James Karem, for his complaint against Defendants Donald J. Trump and Stephanie A. Grisham, alleges, by and through his attorneys, as follows:

## INTRODUCTION

1. Plaintiff Brian James Karem is an award-winning journalist who has reported on politics for over thirty years.  Karem has covered the White House under six different Presidents.  He currently serves as the senior White House correspondent for *Playboy* and as a

political analyst for CNN.  Karem is known for his fiercely independent, aggressive, and unsparing coverage of those who exercise government power—including those in the current Administration.  He is the President of the Maryland, Delaware, and District of Columbia Press Association and an outspoken defender of the First Amendment.  He won the National Press Club's Freedom of the Press Award after he chose to go to jail rather than disclose the identity of a confidential source.

2.      This case arises from events that occurred in the White House's Rose Garden on July 11, 2019 and were captured on numerous videos that have been widely circulated.  On that day, the President convened a "Social Media Summit" for 200 conservative bloggers and various social media celebrities who have been supportive of the President.  It was a colorful and eclectic and controversial group of Trump social media loyalists whose voices the White House was seeking to amplify, and the post-summit gathering in the Rose Garden was spirited.  During the summit, the President praised the group of what he called "journalists and . . . influencers" for supporting and "working with" his Administration, declaring triumphantly that "the crap you think of … is unbelievable."  As the Rose Garden event concluded and the President began to leave, Karem asked if he would be willing to entertain questions.  The President did not respond and returned into the White House.  At that point, the conservative social media activists taunted the White House press.  One responded to the White House journalists who tried to question the President, "He talked to us, the real news."  Another turned on Karem and began taunting him for having been rebuffed by the President, saying "Don't be sad, don't be sad."  Karem sought to defuse the situation with humor.  He remarked, "This a group of people that are eager for demonic possession"—a comment that elicited laughter throughout the crowd.  One member of the audience, however, reacted differently.

3.     Sebastian Gorka is a conservative commentator who was an editor at Breitbart News and served briefly in the Trump Administration, leaving, reportedly, after his security clearance was revoked.  He is a controversial figure.  He was once arrested for bringing a gun to a Reagan National Airport security checkpoint and has a reputation for being aggressive towards journalists.  In 2018, he was videotaped shoving a *Mediaite* reporter at the Conservative Political Action Conference.  Gorka attended the Social Media Summit as an invited guest of the White House.  When he heard Karem's comment, he acted as though it incensed him, yelling at Karem in a fury across the Rose Garden, asking him if he was a "journalist," while making air quotes with his hands.  Karem tried to de-escalate the situation, inviting Gorka to "come on over here and talk to me, brother, or we can go outside and have a long conversation."  Karem's words did not pacify Gorka.  He made a beeline for Karem, marching rapidly across the Rose Garden to confront the journalist, who remained in the press area behind the rope line.  Gorka loudly accused Karem of "threatening" him, and hollered in his face, "You are a punk!  You're not a journalist!  You're a punk!"  The crowd of conservative activists began cheering, "Gorka!  Gorka!"  One woman yelled, "Hit him, Gorka!  Hit him!"  One attendee loudly stated to Karem, "Just for the record, [Gorka] would kick your punk ass."  When it was over, Gorka and the President celebrated Gorka's attack on Karem.  Gorka declared on his podcast that he "took on the fake news industrial complex" and on Twitter that he "read [Karem] the riot act."  The President wrote on Twitter that Gorka "wins big—no contest!"—a tweet that Gorka has now pinned to the top of his Twitter page.

4.     More than three weeks later, with no forewarning she was even thinking of imposing punishment for his conduct of July 11, White House Press Secretary Stephanie Grisham sent Karem a letter, advising that she had made a "preliminary decision," approved by the President, to suspend Karem's hard pass for 30 days.  A hard pass is the credential that gives

journalists access to the White House.  Without a hard pass, it is effectively impossible to do the job of White House correspondent.  The ostensible basis for the suspension was that Karem had insulted guests at the Social Media Summit, and had "escalated" the conflict with Gorka.  On August 16, Grisham announced that her decision was final, claiming that Karem had violated unpublished yet purportedly "widely-shared understandings and norms of media professionalism." Grisham did not indicate that her "final" decision was approved by the President.

5.      This Court should vacate the suspension and order that Karem's hard pass be immediately restored.  The suspension is arbitrary, unlawful, and unconstitutional.

6.      The suspension violates the Due Process Clause of the Fifth Amendment.  As the D.C. Circuit has made very clear, the White House may deny, revoke or suspend a press pass based only on "explicit and meaningful standards" that have been "publish[ed]" so as to afford fair notice to reporters, and to avoid arbitrary or discriminatory punishments.  *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977).  Here, Ms. Grisham did not cite any legal authority authorizing her to order the suspension of a hard pass and admitted that Mr. Karem did not violate any published rule or standard; instead, she rested the suspension on his purported violation of what she claimed were generic unwritten "understandings."  Moreover,  these unwritten understandings—that reporters maintain "decorum" and "professionalism"—are too ill-defined, subjective and vague to satisfy the due process standards articulated by the D.C. Circuit in *Sherrill*.  Moreover, Karem lacked fair notice of such standards because the President has regularly breached any standard of "decorum" by insulting, demeaning, and yelling at journalists at the White House and elsewhere.  In addition, Grisham stated that the purported standards she relied on apply only to "press events," but she admitted that "Mr. Karem's conduct occurred after the press event had ended."

7.     Defendants also deprived Karem of a fair opportunity to rebut the charge against him, and the "process" invoked does not comport with the only process established to govern hard passes and that is reflected in the Secret Service regulations promulgated to comport with *Sherrill*. *See* 31 C.F.R. §§ 409.1, 409.2.  Grisham's "preliminary" decision was nothing of the sort; it was for all intents and purposes final because it was approved by the President, and was made without giving Mr. Karem any chance to respond.   Nor was Karem given a fair opportunity to challenge the preliminary decision, as Grisham is a biased decision maker who works for a President at war with what he calls the "Lamestream media" that are the "enemy of the people."  She gave Mr. Karem an unreasonably short time to respond given the important liberty and property rights at stake and then refused to share with him  all of the evidence she relied on in imposing the suspension or even to define the scope of  his rights in the process.

8.     The suspension also violates the First Amendment.  Grisham does not (and cannot) cite any "compelling reason" that justifies Mr. Karem's suspension, rendering it unconstitutional under *Sherrill*.  569 F.2d at 129.   And in light of the arbitrary nature of Grisham's actions and against the backdrop of the President's open hostility to the press, the suspension is clearly meant to punish and deter his reporting on the Administration rather than based on anything he said in the Rose Garden in July.  As such, the suspension is an impermissible content-based regulation of speech, and an attempt to censor the press and exclude from the White House reporters who challenge and dispute the President's point of view.

9.     The D.C. Circuit has held that "the protection afforded newsgathering under the first amendment's guarantee of freedom of the press requires that . . . access [to White House press facilities] not be denied arbitrarily or for less than compelling reasons."  *Sherrill*, 569 F.2d at 129.  Karem brings this action to enforce this constitutional guarantee and to vindicate our

"profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964).

## PARTIES

10.     Plaintiff Brian James Karem is the senior White House correspondent for *Playboy* magazine and a political analyst for Cable News Network, Inc. ("CNN").

11.     Defendant Donald J. Trump is the President of the United States.  He is sued in his official capacity and his individual capacity.

12.     Defendant Stephanie A. Grisham is the White House Press Secretary.  She is sued in her official capacity and her individual capacity.

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1).  A substantial part of the events giving rise to this claim occurred in this District, and Defendants are officers of the United States sued in their official capacities.

## FACTS

15.     Plaintiff Karem is a journalist with over thirty years of experience as a political reporter.  Over the course of his career, he has covered wars, international terrorism, natural disasters, and other major events; has worked as an investigative journalist for both newspaper and television; and has covered six presidential administrations, beginning in 1986 with President Reagan.

16.     Karem began working as a journalist at WKYT-TV in Lexington, Kentucky and at KMOL-TV in San Antonio, Texas.  In 1990, Karem was imprisoned for contempt of court after refusing to disclose the name of confidential sources who helped him arrange a telephone interview with a jailed murder suspect, after which he was awarded the National Press Club's Freedom of the Press award.  He was the first American reporter allowed inside Pablo Escobar's prison outside of Bogota, Colombia following Escobar's escape, and was one of the first reporters to enter Kuwait City after its liberation during the first Gulf War.  Karem has also worked at the *Courier Journal* in Louisville, the *Louisville Times*, the *Indianapolis Star*, and *People* Magazine.  He was executive editor of The Sentinel Newspapers in Maryland and as producer and television correspondent for *America's Most Wanted*.

17.     Karem is currently the senior White House correspondent for *Playboy* magazine, for which he regularly covers presidential press conferences.  Karem is also a political analyst for CNN and hosts the *Just Ask the Question* podcast.

18.     Like Karem, *Playboy*, Karem's principal employer, also has a long history of fighting for and advocating for First Amendment rights.  In 2000, *Playboy* convinced the Supreme Court to invalidate a section of the Telecommunications Act of 1996 that limited the transmission of sexually-oriented channels as an impermissible content-based restriction.  *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000).  Playboy founder Hugh Hefner was also a well-known champion of free speech, publishing *Fahrenheit 451* in serialized form in Playboy in 1954, and later starting the Hugh M. Hefner Foundation, a non-profit organization committed to the support of First Amendment freedoms.

19.     Karem is a member of the White House press corps, a group of reporters who cover the President, the White House, and executive functions in Washington, around the country, and

around the world.  White House reporters ensure that the public knows what is happening within the executive branch and that federal officials remain accountable to the public.

20.     Karem is known for defending journalists and First Amendment freedoms, and for his tough questioning of the current Administration.  On June 14, 2018, Karem had a widely reported exchange with then-White House Press Secretary Sarah Huckabee Sanders in the White House briefing room when, in response to a question from CNN reporter Jim Acosta about the detention of immigrant children, Sanders stated that it is "biblical to enforce the law."  Karem followed up by asking Sanders whether she had empathy for the children, given that she herself is a parent.  Later that day, Fox News host Jesse Watters said that Karem and Acosta "don't belong" in the briefing room and that the White House "need[s] to start ripping press passes away."

21.     Karem's reporting and political analysis—in *Playboy*, on CNN, and in other outlets—has regularly been critical of the Trump Administration.  For example, on June 18, 2019, Karem wrote an article critiquing Sanders's tenure upon her departure from the White House. Karem wrote that she "lied to the public . . . proudly and with impunity" and "was never qualified to hold the post of Press Secretary.  She is naïve, inexperienced and didn't know the purpose of the office or how to deal with the press in a functional way."  Karem has also been critical of the Administration in televised appearances on *CNN Tonight with Don Lemon* and MSNBC's *Morning Joe*.

## The Importance of a Hard Pass

22.     In 2018, Karem sought and obtained White House press credentials and a security clearance in order to obtain what is called a "hard pass."  Karem underwent a Secret Service background check and was granted a hard pass, which is valid for renewable two-year periods.

23.     A hard pass is essential for White House reporters because it provides access to the White House grounds and press complex, to Air Force One, and to other secured areas during presidential trips, which are routinely covered by the White House press corps.  Without this credential, a White House correspondent like Karem cannot do his or her job.

24.     The hard pass allows immediate access to the White House grounds and its press offices.  Without a hard pass, a reporter must ask for advance approval each time he or she wishes to enter the White House.  Such access often needs to be requested at least 24 hours in advance.  Since many White House news events, briefings, or appearances are frequently announced day-of, reporters without a hard pass are effectively unable to cover these events.  This is especially true in the Trump Administration, which has done away with the daily briefing and not held a formal news conference for months.  Further, the White House may decline to admit a reporter requesting daily access.  Even if admitted, the reporter must wait in a security line with the general public and be screened before entering the White House and then be escorted by security around the press offices.

25.     A hard pass thus enables a reporter to cover fast-developing, important news stories at the White House.  Without a hard pass, a reporter may well miss newsworthy events, particularly the many important events that occur on short notice.  A hard pass is tantamount to a job requirement for a White House correspondent:  the job simply cannot be done without one.

**President Trump's Attacks on the Press**

26.     This suspension of Karem's hard pass occurred against the backdrop of the President's ridicule of, and vocal support for confrontations with, the press.  He frequently calls the free press "fake news," "the enemy of the people," and "the opposition party."  In fact, he tweeted the first two of those insults at the press on August 16, 2019, the day Grisham announced

her "final determination" to suspend Karem's pass.  On August 18, 2019, he further tweeted, "'Journalism' has reached a new low in the history of our Country. It is nothing more than an evil propaganda machine for the Democrat Party. The reporting is so false, biased and evil that it has now become a very sick joke...But the public is aware! #CROOKEDJOURNALISM."  By one study's count, "over 11 percent" of the President's tweets have "insulted or criticized journalists and [news] outlets."  The President has previously explained why he attacks and demeans the press:  "You know why I do it?  I do it to discredit you all and demean you all so when you write negative stories about me, no one will believe you."

27.     The President has repeatedly made clear his dislike of CNN, one of Karem's employers.  For example, at a news conference on January 11, 2017, then-President-elect Trump told CNN's Acosta, "Your organization is terrible."  On February 17, 2017, he stated that "the FAKE NEWS media (failing @nytimes, @NBCNews, @ABC, @CBS, @CNN) is not my enemy, it is the enemy of the American people!"  On July 2, 2017, he tweeted a video depicting him tackling and punching a man with a CNN logo superimposed on his face, adding the comments "#FraudNewsCNN" and "#FNN."  On December 11, 2017, he published a tweet calling CNN "Fake News" and called one CNN journalist "the 'dumbest man on television!'"  On June 13, 2018, he tweeted, "Crazy Jim Acosta of Fake News CNN."  On July 13, 2018, at a press conference in England, in response to Acosta's attempt to ask a question, the President stated, "CNN is fake news, I don't take questions from CNN."  At a campaign rally on August 30, 2018, he complained about CNN's coverage and said that CNN and its reporters are "just dishonest, terrible people."  Also in August 2018, President Trump barred CNN White House correspondent Kaitlan Collins from attending a Rose Garden press conference in retaliation for asking questions the President deemed impertinent.  And on November 7, 2018, during a White House press conference, the

President inveighed against CNN, telling Acosta, "I think you should let me run the country. You run CNN.  And if you did it well, your ratings would be much better," and "[w]hen you report fake news, which CNN does, a lot, you are the enemy of the people."  After that press conference, the White House sought to revoke Acosta's hard pass but was enjoined from doing so by this Court on due process grounds.

28.     The President has publicly resisted and rebuffed tough questioning by Karem.  On February 21, 2019, after Karem asked the President where he got his statistics about border violence, Trump told Karem: "Sit down. Sit down. Sit down!"  A few months later, on June 11, 2019, when Karem tried to ask the President a question, Trump turned and glared at Karem and said, "Quiet! Quiet! Quiet!"  On July 24, 2019, the President called Karem and other journalists "fake news" while pointing his finger at Karem.

29.     President Trump has also repeatedly expressed support for physical retaliation against and punishment of journalists whose reporting he dislikes.  For example, in October 2018, he praised Republican congressman Greg Gianforte for body-slamming *Guardian* reporter Ben Jacobs, calling Gianforte a "tough cookie" and "my kind of guy."  In February 2019, President Trump banned four American journalists from the Associated Press, Reuters, the *Los Angeles Times*, and *Bloomberg News* from covering his dinner with North Korean dictator Kim Jong Un, purportedly because they had shouted questions at previous meetings with the President.  In June 2019, President Trump told a *Time* magazine journalist who tried to photograph a letter that President Trump said was hand written by Kim Jong Un: "You can go to prison . . . if you use the photograph you took of the letter."  He recently joked in a meeting with Vladimir Putin—who has reportedly ordered the murder of journalists—at the G20 summit in Japan about "get[ting] rid of" journalists.  And he refused to condemn the murder and dismemberment of *Washington Post*

columnist Jamal Khashoggi, which American intelligence officials have concluded was ordered by Saudi Crown Prince Mohammed Bin Salman.

30.     Reporters are frequently the targets of ridicule and threats of physical violence at President Trump's rallies and campaign events, often with the President's encouragement.  Just last week, at a rally in New Hampshire, the President launched broadsides at the media, with the crowd directing their middle fingers at the journalists after each attack.  Beyond mere taunts and insults, the President's supporters have actually attacked and spat on journalists at campaign rallies, and one even sent a bomb to CNN.  A statement from the United Nations expressed concern that the President's rhetoric has "increase[d] the risk of journalists being targeted with violence."  Karem has experienced this first-hand; he and his CNN colleague Acosta were once threatened by a Trump supporter while covering one of the President's rallies in West Virginia.  And Karem and his family have received numerous threats, especially in the weeks since the July 11 Rose Garden event.

31.     President Trump has a history of using the revocation or threatened revocation of a hard pass to try to stifle speech and reporting he does not like.  On November 7, 2018, President Trump and his Press Secretary revoked Jim Acosta's hard pass after Acosta questioned the President about comments he had made suggesting immigrants from Central America were "inva[ding]" the country.  Acosta's hard pass was restored only after he filed suit in this District and obtained a temporary restraining order.  On November 9, 2018, President Trump warned that there could be "others also" whose press passes would be revoked.  The suspension of Karem's hard pass is now part of a pattern.

**The July 11, 2019 Rose Garden Event**

32.     On Thursday, July 11, 2019, President Trump hosted a "Social Media Summit" at the White House, attended by approximately 200 conservative social media activists, whom the President called "online journalists and influencers," who were supportive of the Administration, including Sebastian Gorka, a conservative radio host and former White House advisor.  While only a portion of the summit was open to the White House press "pool," the White House announced that the President would hold an open press conference in the Rose Garden at the conclusion of the summit.

33.     Although billed as a "Social Media Summit," no one from the largest social media platforms – Twitter, Facebook and Google – attended the event.  Instead, according to a National Public Radio report, "the guest list included far-right extremists, many of whom use the Internet to try to spread false conspiracy theories and racist tropes."  A White House correspondent for the *New York Times* commented, "It was the closest thing to a campaign rally that I have seen inside the White House."  According to another press report, the President stated to the "200 conservative social media firebrands" in attendance that "[t]he crap you think of . . . is unbelievable."  Regarding the press, the President explained that he did not "think that the mainstream media is free speech . . . because it's so crooked. It's so dishonest."

34.     The President's invited guests included a social media activist who goes by "Carpe Donktum" and creates fake videos to attack the President's enemies; one who recently tweeted that Senator Kamala Harris is "*not* an American Black" because she "is half Indian and half Jamaican" (which the President's son retweeted); and others with ties to white nationalists.

35.     Karem used his hard pass to enter the White House as he does most days the President is in town.  He stayed to attend the scheduled press conference.

13

36.     After the event concluded, President Trump appeared in the Rose Garden with the Attorney General.  The "Social Media Summit" attendees were seated in rows of chairs assembled facing the podium, while the White House press corps was directed to stand in roped-off areas behind and adjacent to them.  As Gorka entered the Rose Garden along with the other social media activists, he demeaned the assembled journalists arrayed behind the rope line, loudly proclaiming "Fake news panorama" as he took a photograph of them.

37.     Although reporters had been told the President would hold a press conference, he did not.  Instead, after he and the Attorney General had delivered prepared statements, they turned to leave.  Karem called out to the President, asking if he would take questions.  But the President ignored his request and walked back into the White House.

38.     At this point, the press event was over and people began to leave.  But some of the activists began taunting Karem for having his request rebuffed.  One said: "He talked to us, the real news."  Another activist, singer Joy Villa, said to Karem, "If you weren't fake news, [the President] would have taken questions; try not being fake news."  (In a later interview, Villa bragged that she had "started the mess" that ensued by taunting Karem.)  Another attendee said sarcastically to Karem, "Don't be sad, don't be sad," mocking Karem in front of the assembled press for having been ignored by the President.

39.     Karem tried to defuse the situation with humor, doing his Rodney Dangerfield impression and saying, "This a group of people that are eager for demonic possession," while smiling and saluting the group.  As the many videos of the incident make clear, Karem's joke was well received by the assembled activists, many of whom laughed in response.  Gorka then shouted an insult at Karem from across the Rose Garden—"And you're a 'journalist,' right?"—using air quotes to mock Karem by suggesting that he was not a real journalist.

40.     In response to Gorka's shouted insult, Karem stated calmly, "Come on over here and talk to me, brother, or we can go outside and have a long conversation."  Karem was suggesting that, rather than having Gorka hurl insults at him across the Rose Garden in front of dozens of people, he and Gorka could have a conversation at the rope line, where Karem was standing, or outside the Rose Garden in a calmer environment.  Over the years, Karem has found that people act differently in public, especially in places where for political or other reasons they may feel as though they are on stage and need to deliver a performance.  But in a different and calmer environment – a private conversation, or even a public conversation in a different forum, such as on Karem's podcast – people holding strongly divergent political views can often be much more thoughtful, reasonable, and measured.

41.     Karem's suggestion that Gorka speak to him, or that they have a conversation outside the politically charged environment, only further enraged Gorka, who charged across the Rose Garden at Karem, shouting that Karem was "threatening" him.  Karem calmly responded that he had not made a threat and had said, "I'd be happy to *talk* to you."  Ignoring Karem's clarification and attempt to de-escalate the situation, Gorka approached to within a foot or two of Karem, separated only by the rope line, and yelled at him, "You are a punk!  You're not a journalist!  You're a punk!"  According to nearby reporters, Andrew Feinberg and Ksenija Pavlovic McAteer, spit was flying from Gorka's mouth as he yelled at Karem.  As Gorka screamed in Karem's face, Karem remained behind the rope line and calmly stood with his arms folded, demonstrating that he had no interest in a physical confrontation.  Below is a photograph of Gorka's verbal attack.



42.     As Gorka unleashed on Karem, the crowd of activists started cheering, "Gorka! Gorka!" One woman yelled, "Hit him, Gorka! Hit him!"  Fox News commentator Jim Hanson then loudly exclaimed, "Just for the record, [Gorka would] kick your punk ass," eliciting gasps and laughter from the group.  Continuing to avoid violence, Karem responded to Hanson by questioning "And that's the measure of everything, isn't it?"  One reporter, Ksenija Pavlovic McAteer, defended Karem, shouting: "You should not be attacking journalists like this!"  And "this is assault on the press!"  After Gorka finished berating Karem and walked away, Karem said, "Go home" and "get a job."

43.     The activists also heckled and insulted other White House journalists, including CNN's Acosta.  For example, after Gorka screamed at Karem and walked away from the press area where Karem was standing, Villa, identifying herself and the summit invitees as "citizen journalists," lectured the reporters from established news organizations, announcing that "fake news is over" and "you gotta stop reporting fake news."  As Karem sought to engage in a civil discussion with Villa about what constitutes legitimate journalism, another summit guest

interrupted to falsely accuse Karem of having "threatened Gorka."  Karem made clear again that had only said he wanted to "talk" to Gorka and had not threatened him, to which the individual responded that Karem was "an embarrassment."

44.     On his way out of the Rose Garden, Gorka insulted another member of the White House press, calling Voice of America's White House Bureau Chief an "ass hat."

45.     Upon information and belief, no attendees at the event other than Karem suffered any repercussions or discipline from the White House or the Secret Service following the event. This includes Gorka, who was the instigator; Hanson, who announced to the crowd that Gorka would "kick [Karem's] punk ass;" the activists who clamored for Gorka to "hit" Karem; or any of the "Summit" attendees who identified themselves, and were identified by the President, as journalists.

46.     As they filed out, Karem saw Gorka lingering in the Palm Room, and approached him to resolve the situation and make peace.  Karem offered to shake Gorka's hand, but Gorka rebuffed these efforts and refused to engage with Karem, other than insisting repeatedly that Karem was "done."  When Gorka accused Karem again of having threatened to "fight" him in the Rose Garden, Karem made clear that he had not done so and had merely "said I would talk to you."

47.     Gorka celebrated the confrontation, bragging on his podcast that he took on the "fake news industrial complex" and on Twitter that he "read [Karem] the riot act."  In an interview, he called on others to follow his "example" in confronting journalists.  Karem has since received threats against his life and those of his family.

48.     The President, for his part, applauded Gorka and made light of the confrontation, tweeting, "@SebGorka Wins Big, No Contest!"  The tweet is now pinned at the top of Gorka's Twitter profile.

### After a Three-Week Delay, Grisham Suspends Karem's Hard Pass

49.     Karem continued to cover the White House over the next three weeks.  He entered the White House using his hard pass numerous times and performed his job as usual, without incident or anyone mentioning the events in the Rose Garden.  Karem also asked questions of President Trump and members of his staff on numerous occasions during that period.

50.     Karem contacted Grisham's office in the days after the July 11 event to schedule a meeting and interview at which he planned to discuss what had happened and the steps she might take to protect the journalists working in the White House.  But Karem was told repeatedly that the Grisham was unavailable.

51.     On August 1, 2019, Karem asked the President to respond to presidential candidate Bernie Sanders's contention that the President was a pathological liar, a question the President ignored.

52.     At no point prior to August 2, 2019 did President Trump, Grisham, or any other White House representative inform Karem that his hard pass was in jeopardy, that they were considering punishing him, nor did they seek to discuss with Karem his conduct on July 11.  None of this Administration's Press Secretaries or their staff had ever informed Karem that his conduct at the White House violated any rules, standards, or norms in any way.

53.     On August 2, 2019, Karem received a letter from Grisham stating that she had "made a preliminary decision to suspend [his] hard pass for 30 days due to [his] conduct at the press event in the Rose Garden on July 11, 2019."  Grisham added that "[t]he President is aware of this preliminary decision and concurs."  The letter further purported to set forth the "factual basis" for the preliminary decision.

54.     Grisham's letter informed Karem that his "disruptive behavior at the press event in the Rose Garden on July 11, 2019 violated the basic standards governing such events," while also conceding that the White House had not issued "a set of explicit rules . . . to govern behavior by members of the press at White House press events."   Nonetheless, the letter claimed that "it had previously been a widely shared understanding that (1) members of the press, at all times at White House press events, must act professionally, maintain decorum and order, and obey instructions from White House staff, and (2) disruptive behavior that interferes with the conduct of a press event or is otherwise a breach of professional decorum—including but not limited to taunting other members of the press, White House officials, or guests in an effort to provoke a confrontation—is prohibited."   In fact, there has been no such widely shared understanding.

55.     The letter identified as the factual bases for the suspension the allegations that Karem (a) "openly insulted the President's invited guests" through his "demonic possession" comment, and (b) "verbally accosted Mr. Gorka in an apparent attempt to escalate your verbal taunts to a physical confrontation" through his suggestion to Gorka that the two talk in the Rose Garden or "go outside and have a long conversation."

56.     The numerous videos of the incident either refute or seriously undermine both allegations.   Karem clearly did not "verbally accost[]" Gorka or anyone else.   Gorka was the instigator who attempted to escalate the situation even in the face of Karem's efforts to defuse the tension and make peace.   And Karem's comically delivered "demonic possession" comment was certainly not intended to be an "open[] insult," nor was it perceived that way, as the lighthearted laughter in response demonstrates.

57.     Grisham's letter gave Karem one business day to respond in writing.

58.     Gorka immediately celebrated the suspension on Twitter, thanking Defendants "[o]n behalf of Americans who've had enough of FakeNews punks like @BrianKarem."

59.     On August 5, 2019, Karem's counsel submitted a written response on his behalf, informing Grisham of the constitutional violations that would result from the White House's suspension of Karem's hard pass and requesting a meeting before any final decision would be made.

60.     On August 8, 2019 counsel for Karem met with Press Secretary Grisham and a deputy White House counsel.  At that meeting, the deputy White House counsel informed Karem's counsel that Grisham intended to rely on a witness statement obtained from a Secret Service official who observed the July 11 events.  The deputy White House counsel read aloud two sentences from the Secret Service agent's statement but refused to read the statement in its entirety, to provide a copy of it, or to identify the agent.  Grisham also confirmed that neither she, nor other White House officials, spoke with any other witnesses to the July 11 events.  Karem's counsel asked repeatedly what procedural rights Karem had in the process, but neither Grisham nor the deputy White House counsel would or could identify any.  Nor did they identify anyone else who had suffered any repercussions as a result of the events on July 11, 2019.

61.     On August 9, 2019, counsel for Karem submitted another letter to Grisham along with a signed statement from Karem, providing his account of the events in the Rose Garden, and confirming that he did not intend his comments to insult anyone or suggest a physical confrontation with Gorka.

62.     By letter on August 16, 2019, Grisham announced her "final determination" to suspend Karem's hard pass for 30 days, "effective immediately."  Grisham's letter stated that the suspension was a "sanction" intended to "punish[]" and "deter" Karem and other journalists.

63.     The letter confirmed that Karem had not violated any explicit and meaningful standards for conduct at press events, which Grisham admitted in her August 2 letter do not exist. Rather, in the August 16 letter, Grisham asserted that Karem had violated purportedly "widely-shared understandings and norms of media professionalism" requiring that "at White House press events, members of the press must act professionally, maintain decorum and order, and obey instructions from White House staff." Contrary to Grisham's assertion, no such "widely-shared understandings" exist.

64.     According to the letter, Karem "(1) insulted invited guests of the White House, (2) threatened to escalate a verbal altercation into a physical one to the point that the Secret Service deemed it prudent to intervene, and (3) re-engaged with Mr. Gorka in what quickly became a confrontational manner while repeatedly disobeying a White House staffer's instructions to leave."

65.     The letter relies on a skewed and erroneous second-by-second account of Karem's purported conduct, focusing on minute details such as Karem's alleged "noticeably cocked eyebrow," in concluding that Karem violated the unwritten yet supposedly "widely-shared understandings and norms of media professionalism." Indeed, for all its exhaustive detail, the letter misrepresents much of what occurred on July 11 and is squarely refuted by the numerous videos of the event.

66.     For example, the letter falsely claims that, after being berated by Gorka, Karem "then left the designated press area and paced in front of other members of the press." But as the videos show, the press rope had fallen when Karem inadvertently stepped slightly beyond it, and his menacing "pace" was actually a casual step or two in one direction following by a step or two in the other as he was being heckled.

67.     Grisham's letter also claims that Karem's conduct "prompted a Secret Service agent to intervene due to a perceived risk of a physical altercation."  But as the videos make clear, the Secret Service agent did not do anything when Karem made his purported threat ("we can go outside and have a long conversation"), and intervened only *after* Gorka had shouted in Karem's face ("You're a punk!") and walked away.  The agent began following Gorka, suggesting that he thought Gorka was the risk.  Only after Fox News contributor Jim Hanson made his vulgar comment ("he'd kick your punk ass"), did the Secret Service agent turn around and walk back towards Karem and engage him briefly in discussion as Karem had inadvertently taken a step over the fallen rope.  Karem then said something to the agent like, "It ain't me, brother," to which the agent nodded in agreement.

68.     Grisham further falsely accuses Karem of "renewing the confrontation" and "repeatedly disobeying a White House staffer's instructions to leave" when he tried to shake Gorka's hand and make peace inside the White House after the Rose Garden event.  But Karem was on his way out when he tried to shake Gorka's hand and left within seconds, after his efforts were rebuffed.  While the staffer stated, "All press is leaving now," there were no "instructions to leave" that Karem could possibly have disobeyed.

69.     That Grisham must rely on a 13-page analysis of Karem's every movement, comment, gesture, and facial expression in reaching her determination is a reflection of the absence of any clear, published, pre-existing standards of conduct that Karem violated.  In the absence of such standards, the determination to suspend Karem's pass came down to the unbounded post hoc discretion of one person regarding what conduct amounts to a breach of "decorum," eyebrow movements and all.

70.     Press associations have already registered public support of Karem and disapproval of Defendants' suspension of Karem's hard pass.  The White House Correspondents' Association stated on August 17, "The WHCA is deeply concerned about a decision by the White House Press Secretary to suspend a member's hard pass for 30 days. Such a move could have a chilling effect on working journalists. As we have said before, we believe *everyone* should conduct themselves professionally at the White House."   After the "preliminary decision" on August 2, the Legal Director of the Reporters Committee For Freedom Of The Press said, "The Reporters Committee is concerned by the White House's 'preliminary decision' to suspend journalist Brian Karem's hard pass for 30 days. The law is clear that the White House cannot suspend or revoke a journalist's hard pass without due process, or as a pretext to punish or silence certain reporters or news outlets for their coverage."

## FIRST CAUSE OF ACTION
### Violation of the Fifth Amendment

71.     Karem repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

72.     Defendants' decision to suspend Karem's hard pass violates the Fifth Amendment right to due process.

73.     Karem has protected First Amendment liberty and property interests in his hard pass and the access it affords to the White House.  The hard pass allows Karem to do his job effectively; absent his hard pass, he cannot serve as a White House correspondent.

74.     Defendants' suspension of Karem's hard pass violates his right to due process because, in the absence of pre-existing, published, explicit, and meaningful standards, there was no fair notice of the conduct that could subject Karem or any other reporter to the punishment of a hard pass suspension or revocation.

75.     The unwritten but purportedly "widely-shared understandings" on which Defendants relied are unconstitutionally vague on their face, and therefore cannot justify the suspension of *any* reporter's hard pass.

76.     Defendants did not provide Karem an opportunity to be heard before making the "preliminary decision" to suspend his hard pass.  The decision was improperly predetermined, as Grisham sought and obtained presidential approval for the sanction before even notifying Karem of the charge, let alone hearing his defense.  Defendants provided no neutral arbitrator to determine whether Karem should be stripped of his hard pass.  And in making their "final decision," Defendants refused to share with Karem all of the purported evidence on which they relied, thus depriving him of a fair opportunity to respond to and rebut that evidence.

77.     As a result of Defendants' actions, Karem has suffered and continues to suffer irreparable harm.

### SECOND CAUSE OF ACTION
### Violation of the First Amendment

78.     Karem repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

79.     Defendants' decision to suspend Karem's hard pass violates the First Amendment in at least six ways: (i) there is no "compelling reason" to suspend Karem's hard pass; (ii) as unconstitutional viewpoint discrimination; (iii) as an unconstitutional restriction on Karem's right of access to the limited public forum areas of the White House that have long been held open to bona fide journalists who reside in Washington, D.C., and who pass Secret Service background checks; (iv) as an unconstitutional restriction on Karem's rights under the First Amendment's guarantee of freedom of the press; (v) as unconstitutional retaliation for activity protected under

the First Amendment; and (vi) as a retroactive penalty imposed as a result of unconstitutionally vague standards that serve only to chill First Amendment activity.

80.     Karem's access to the White House, his coverage of the July 11, 2019 press event, and his questions to President Trump before, during, and after that event are and were all protected activities under the First Amendment of the United States Constitution.

81.     Defendants have deprived Karem of his right to freely access the White House grounds by suspending his White House hard pass.  Without that hard pass, Karem cannot freely access the White House and cannot effectively serve as a White House correspondent.

82.     Defendants' explanations for impeding Karem's First Amendment rights are pretextual, disproved by the numerous videos of the July 11 event, and cannot justify the suspension of Karem's hard pass.  The videos of the July 11, 2019 event confirm that Karem neither "insulted" anyone, nor "verbally accosted Mr. Gorka in an attempt to escalate [his] verbal taunts to a physical confrontation," nor "disobey[ed] instructions from White House staff," as the White House alleged, thus refuting the factual bases on which Defendants' decision was made. Consequently, the only reasonable inference from Defendants' conduct is that they have suspended Karem's hard pass as a form of content- and viewpoint-based discrimination and in retaliation for Karem's exercise of protected First Amendment activity.

83.     The sole justification for Defendants' conduct is their dislike for Karem's questioning and coverage of the Administration and critique of the President.  But that is insufficient to justify such a substantial restriction on Karem's First Amendment rights.

84.     As a result of Defendants' actions, Karem has suffered and continue to suffer irreparable harm.

## THIRD CAUSE OF ACTION
### Damages Pursuant to *Bivens*
### (Against Defendants in Their Individual Capacities)

85.     Karem repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

86.     Karem has constitutionally protected rights under the First and Fifth Amendments. Defendants infringed upon those rights by restricting Karem's ability to gather and report the news; by unconstitutionally limiting Karem's right to access areas of the White House open generally to bona fide members of the press who pass background checks; by attempting to suppress and chill Karem's speech; and by stripping Karem of property and liberty interests without due process of law.

87.     Defendants are federal actors who each acted under color of law in depriving Karem of his rights.

88.     Both President Trump and Grisham were personally involved in the deprivation of Karem's constitutional rights and remain involved in the continued constitutional violations.

89.     Defendant Grisham signed the August 2, 2019 letter announcing the preliminary decision to suspend Karem's press credentials.  In that letter, she stated that President Trump "concurs" in her preliminary decision.

90.     Defendant Grisham signed the August 16, 2019 letter announcing the "final determination" to suspend Karem's hard pass for 30 days.

91.     Karem lacks a statutory cause of action by which he could achieve monetary compensation for these harms, and Defendants are not immune from liability to remedy their patently unconstitutional conduct—conduct prohibited by clearly established governing law. *F.C.C. v. Fox Television*, 567 U.S. 239 (2012); *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir.

1977); *CNN v. Trump*, No. 1:18-cv-02610-TJK, Dkt. 22 (Tr. of Motion Hearing) (D.D.C. Nov. 16, 2018).

92.     Karem has suffered and continues to suffer damages in an amount to be determined at trial.

93.     Karem is therefore entitled to monetary damages pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

## FOURTH CAUSE OF ACTION
### *Ultra Vires* (Against Defendant Grisham)

94.     Karem repeats, realleges, and incorporates the allegations in the paragraphs above as though fully set forth herein.

95.     Grisham's "final determination" to suspend Karem's hard pass was made without legal authority and was therefore *ultra vires*.

96.     Executive branch officials such as Grisham may only exercise power granted by Congress or delegated by the President.

97.     There is no statutory or regulatory authorization for the White House Press Secretary to suspend hard passes, and the President has not delegated such authority.

98.     The only delegation of power regarding control of access to hard passes is that made to the Secret Service under Title 31, Part 409 of the Code of Federal Regulations.

99.     As a result of Grisham's actions, Karem has suffered and continues to suffer irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Karem respectfully requests that the Court enter each of the following forms of relief:

a.       Immediate restoration of Karem's hard pass so that he may continue to report from White House briefings and perform his job on White House grounds and at other presidential events;

b.       In the alternative, immediate restoration of Karem's hard pass pending "due process," including but not limited to an opportunity for Karem to be heard before a neutral arbiter, and a final written decision;

c.       A declaration that the suspension of Karem's hard pass was unconstitutional, in violation of the First Amendment and the Due Process Clause of the Fifth Amendment;

d.       A declaration that the suspension of Karem's hard pass was *ultra vires*;

e.       Damages in an amount to be proved at trial, including but not limited to punitive damages; and

f.       An order granting Karem costs, fees, and disbursements incurred in connection with these proceedings and such further relief as this Court deems just and proper.

**JURY DEMAND**

Karem hereby demands a jury trial.

Dated: August 20, 2019

Theodore J. Boutrous, Jr., (D.C. Bar No. 420440)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Ave.,
Los Angeles, California 90071
Tel:  (213) 229-7804
tboutrous@gibsondunn.com

Thomas H. Dupree Jr. (D.C. Bar No. 467195)
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel:  (202) 955-8547
tdupree@gibsondunn.com

Anne Champion (*pro hac vice forthcoming*)
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166-0193
Tel:  (212) 351-5361
achampion@gibsondunn.com

*Counsel for Plaintiff Brian J. Karem*