**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BRIAN KAREM,

              Plaintiff,

    v.

DONALD J. TRUMP, in his individual capacity and
official capacity as President of the United States; and
STEPHANIE GRISHAM, in her individual capacity
and official capacity as White House Press Secretary,

              Defendants.

**Case No.**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTIONS FOR A TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

**CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ........................................................................................................ 7

ARGUMENT ........................................................................................................... 20

   I. Mr. Karem Is Likely To Succeed On The Merits............................................ 21

      A. The Suspension of Mr. Karem's Hard Pass Was Unlawful Because It Was Not Based On Any Previously Articulated and Published Explicit Standards. ............ 22

      B. Ms. Grisham's Newly-Minted, Retrospective, Generalized "Decorum And Professionalism" Standard Is Unconstitutionally Vague And Cannot Be Used As The Basis For Punishment. ................................................................................. 25

      C. Mr. Karem Was Not Afforded Procedural Due Process. ........................................ 30

      D. The Suspension of Mr. Karem's Hard Pass Violates the First Amendment. .......... 32

   II. Mr. Karem Will Be Irreparably Injured Absent Injunctive Relief. ................................. 37

   III. The Balance of Equities And The Public Interest Strongly Favor Injunctive Relief. ....................................................................................................................... 39

CONCLUSION ........................................................................................................ 41

# TABLE OF AUTHORITIES

**Cases**

*Am. Broad. Cos. v. Cuomo*,
   570 F.2d 1080 (2d Cir. 1977)......................................................................32, 38, 39

*Am. Sch. of Magnetic Healing v. McAnnulty*,
   187 U.S. 94 (1902)...........................................................................................23

*Anderson v. Cryovac, Inc.*,
   805 F.2d 1 (1st Cir. 1986)................................................................................33

*Arthur Andersen LLP v. United States*,
   544 U.S. 696 (2005).........................................................................................26

*BMW of N. Am., Inc. v. Gore*,
   517 U.S. 559 (1996)....................................................................................24, 25

*Boos v. Barry*,
   485 U.S. 312 (1988)....................................................................................27, 35

*Borreca v. Fasi*,
   369 F. Supp. 906 (D. Haw. 1974)....................................................................34

*Brandenburg v. Ohio*,
   395 U.S. 444 (1969).........................................................................................36

*Branzburg v. Hayes*,
   408 U.S. 665 (1972).........................................................................................32

*\*Cable News Network, Inc. v. Am. Broad. Cos.*,
   518 F. Supp. 1238 (N.D. Ga. 1981)..........................................................33, 38, 41

*\*Cable News Network, Inc. v. Trump*,
   No. 18-cv-2610 (D.D.C.) .......................................................................... *passim*

*Caperton v. A.T. Massey Coal Co.*,
   556 U.S. 868 (2009).........................................................................................30

*Chamber of Commerce v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996).........................................................................22

*Chaplinsky v. New Hampshire*,
   315 U.S. 568 (1942).........................................................................................35

*Cinderella Career & Finishing Sch., Inc. v. FTC*,
   425 F.2d 583 (D.C. Cir. 1970).........................................................................30

*Citizens United v. Fed. Election Comm'n*,
　　558 U.S. 310 (2010)................................................................34

*City of Chicago v. Morales*,
　　527 U.S. 41 (1999)............................................................25, 29

*City of Lakewood v. Plain Dealer Publ'g Co.*,
　　486 U.S. 750 (1988)..........................................................26, 29

*Connally v. Gen. Constr. Co.*,
　　269 U.S. 385 (1926)................................................................27

*Consol. Edison Co. v. Pub. Serv. Comm'n*,
　　447 U.S. 530 (1980)................................................................34

*Dart v. United States*,
　　848 F.2d 217 (D.C. Cir. 1988)................................................23

*DeGuiseppe v. Vill. of Bellwood*,
　　68 F.3d 187 (7th Cir. 1995) ...................................................38

*E-Bru, Inc. v. Graves*,
　　566 F. Supp. 1476 (D.N.J. 1983) ...........................................36

*Elrod v. Burns*,
　　427 U.S. 347 (1976) (plurality opinion) ...............................6, 37

*FCC v. Fox Television Stations, Inc.*,
　　567 U.S. 239 (2012)........................................................ *passim*

*Gertz v. Robert Welch, Inc.*,
　　418 U.S. 323 (1974)................................................................24

*Giaccio v. Pennsylvania*,
　　382 U.S. 399 (1966)..........................................................25, 27

*Grayned v. City of Rockford*,
　　408 U.S. 104 (1972)..........................................................26, 27

*Hartman v. Moore*,
　　547 U.S. 250 (2006)................................................................33

*Hassay v. Mayor*,
　　955 F. Supp. 2d 505 (D. Md. 2013)........................................40

*Mills v. District of Columbia*,
　　571 F.3d 1304 (D.C. Cir. 2009)..............................................37

*Morgan Stanley DW Inc. v. Rothe,*
    150 F. Supp. 2d 67 (D.D.C. 2001) .....................................................................20

*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.,*
    675 F. Supp. 2d 411 (S.D.N.Y. 2009) ...............................................................32

*N.Y. Times Co. v. Sullivan,*
    376 U.S. 254 (1964) .....................................................................................25, 28

*Nat'l Treasury Employees Union v. Nixon,*
    492 F.2d 587 (D.C. Cir. 1974) ..........................................................................23

*Nwanguma v. Trump,*
    903 F.3d 604 (6th Cir. 2018) ............................................................................35

*Police Dep't of City of Chi. v. Mosley,*
    408 U.S. 92 (1972) .............................................................................................34

*Pursuing Am.'s Greatness v. Fed. Election Comm'n,*
    831 F.3d 500 (D.C. Cir. 2016) ..............................................................6, 20, 37

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) ...........................................................................................36

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.,*
    758 F.3d 296 (D.C. Cir. 2014) ..........................................................................32

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) ......................................................................................34

*Regan v. Time, Inc.,*
    468 U.S. 641 (1984) ...........................................................................................34

*Reno v. ACLU,*
    521 U.S. 844 (1997) ...........................................................................................26

*Rosenberger v. Rector and Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ...........................................................................................34

*\*Sherrill v. Knight,*
    569 F.2d 124 (D.C. Cir. 1977) ................................................................. *passim*

*Shuttlesworth v. City of Birmingham,*
    382 U.S. 87 (1965) .............................................................................................26

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,*
    502 U.S. 105 (1991) ...........................................................................................34

*Stevens v. N.Y. Racing Ass'n, Inc.*,
    665 F. Supp. 164 (E.D.N.Y. 1987) .......................................................................33

*Stewart v. D.C. Armory Bd.*,
    789 F. Supp. 402 (D.D.C. 1992) ...........................................................................20

*Telemundo v. City of Los Angeles*,
    283 F. Supp. 2d 1095 (C.D. Cal. 2003) ...............................................................40

*United States v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000) ...............................................................................................7

*Westinghouse Broad. Co., Inc. v. Dukakis*,
    409 F. Supp. 895 (D. Mass. 1976) .......................................................................37

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008) ..................................................................................................20

**Rules**

Local Civil Rule 65.1(d) ...................................................................................................1

**Regulations**

31 C.F.R. § 409.1 ....................................................................................5, 22, 23, 35

31 C.F.R. § 409.2 ........................................................................................5, 23, 30

As part of his sustained and unprecedented attack on freedom of press, President Donald J. Trump and his administration have yet again violated the fundamental due process and First Amendment rights of a White House Correspondent by arbitrarily and without fair notice or compelling reason punished him by depriving him of the liberty and property interests that inhere in his "hard pass" press credential that is essential to covering the presidency.  That reporter, Plaintiff Brian Karem, therefore brings this motion for a temporary restraining order and a preliminary injunction against President Trump and his latest Press Secretary, Stephanie Grisham.  Pursuant to Local Civil Rule 65.1(d), Plaintiff requests that this motion be heard on an expedited basis so that his unconstitutionally inflicted irreparable harm may be enjoined as quickly as possible.

## PRELIMINARY STATEMENT

This case arises from the White House's efforts to chill freedom of the press and to punish a reporter whose coverage the President does not like, in flat violation of the due process and First Amendment principles established by the D.C. Circuit in *Sherrill v. Knight*, 569 F.2d 124, 129-131 (D.C. Cir. 1977).  Mr. Karem is an award-winning journalist who has covered every President since Ronald Reagan.  He currently serves as the White House correspondent for Playboy magazine and is a regular contributor to CNN.  He is known for his fearless, aggressive, independent reporting that is often critical of the Trump Administration.  This is the second time the Trump administration has tried to deploy the White House hard pass system as a weapon to punish and chill critical hard-hitting reporting and—like the first time—it should be swiftly enjoined by this Court.

On August 16, 2019, Stephanie Grisham, the White House Press Secretary, notified Mr. Karem that she was suspending his hard pass—the credential that gives Mr. Karem access to the White House—for 30 days.  The proffered basis for this unprecedented suspension was that Mr.

Karem had breached, not any meaningful or explicit pre-existing standard, but certain rather, in her words, general "understandings and norms of media professionalism" more than a month before, after the conclusion of a press event in the Rose Garden.  Ex. 10 at 8.[1]  Ms. Grisham cited no legal authority to impose this retroactive "sanction," which she said was intended to "punish[]" Mr. Karem and to "deter" him and other reporters, Ex. 10 at 8, based on what she admitted was an unwritten and unexplained standard of conduct that had never been made "explicit." Ex. 4, at 1.  And she reached this conclusion by distorting the events at issue—events that were captured by eyewitnesses on numerous videos that are submitted with this motion. Exs. 60-66.  These videos expose Ms. Grisham's account as fiction and establish that Mr. Karem did nothing wrong.  They show what happened in the Rose Garden—and why the suspension of Mr. Karem's hard pass is arbitrary, unlawful, and unconstitutional.

On July 11, 2019, the President convened what the White House called a "Social Media Summit" for 200 conservative bloggers and social media celebrities who have been supportive of the President.  It was a colorful, eclectic, and controversial group of Trump social media loyalists whose voices the White House was seeking to amplify.  When the Summit ended, the attendees were escorted outside to the Rose Garden to watch the President and the Attorney General give prepared statements.  As that event concluded and the President began to leave, Mr. Karem asked him if he would be willing to entertain questions.  The President did not respond.  At that point, a members of the audience turned on Mr. Karem and began heckling the credentialed White House press, who were corralled in a pen.

Mr. Karem sought to defuse the situation with humor.  *See* Feinberg Decl. ¶¶ 3-4, Pavlovic Decl. ¶¶ 7, 15.  He remarked, "This a group of people that are eager for demonic

---

[1]  Citations to "Ex. __" are to the exhibits to the Declaration of Theodore J. Boutrous, dated August 19, 2019.

possession"—a Rodney Dangerfield-style comment that elicited laughter throughout the crowd.  Feinberg Decl. ¶ 9; Pavlovic Decl. ¶ 15.  One member of the audience, Sebastian Gorka, acted differently.  When Mr. Gorka—a conservative commentator with a controversial past who served briefly in the Trump Administration, reportedly leaving after his security clearance was revoked, *see* Exs. 76-80; *see also* Exs. 39-40, 81-82—heard Karem's joke, he acted as though it incensed him.  He yelled in a fury across the Rose Garden, "You're a journalist, right?" while making mocking air quotes with his hands.  Mr. Karem tried to de-escalate, saying to Mr. Gorka, "come on over here and talk to me, brother, or we can go outside and have a long conversation."  But Mr. Karem's words did not pacify Mr. Gorka.  He made a theatrical beeline for Mr. Karem, marching rapidly across the Rose Garden to confront the journalist, who remained in the press area, standing behind the rope line.  Gorka literally got in Karem's face, loudly accusing Mr. Karem of "threatening" him, bellowing "You are a punk!  You're not a journalist!  You're a punk!"  The fired-up crowd of conservative activists began cheering "Gorka!  Gorka!"  One woman yelled "Hit him, Gorka!  Hit him!"  One attendee loudly announced to Karem, "Just for the record, [Gorka] would kick your punk ass," a comment that elicited gasps from the crowd.  Gorka even referred to other reporters as "ass hats."

For the next three weeks, Mr. Karem performed his job as usual.  Then, on August 2, with no forewarning whatsoever that Ms. Grisham was even thinking of imposing a punishment for this activity, she sent him a letter advising that she had made a "preliminary decision," approved by the President, to suspend Mr. Karem's hard pass for 30 days based on the events in the Rose Garden.  She gave Mr. Karem one business day to respond to her "preliminary decision."  Karem submitted a response, and several days later, his counsel met with Ms. Grisham and a deputy White House counsel.  During the meeting, the government officials

3

confirmed that Ms. Grisham had not spoken with a single eyewitness before reaching her

"decision," even though dozens of people had witnessed the event and could attest that Gorka

was the aggressor and Karem was blameless.  Moreover, although they revealed that they had

since obtained a statement from a Secret Service agent who was present, they refused to share

the entirety of his statement with Mr. Karem, or even to disclose the agent's identity.  Karem

submitted a statement as well as a letter from his counsel objecting further to the lack of due

process and explaining that the suspension of Karem's hard pass would be unconstitutional.

On August 16, Ms. Grisham announced that her decision was final and Mr. Karem's hard

pass was suspended for 30 days.  She stated that Karem had breached "understandings" that

"members of the press must act professionally, maintain decorum and order, and obey

instructions from White House staff," and cited her own August 2 letter as the source of these

"understandings."  Ex. 10 at 8 & n.40.  Ms. Grisham explained that the suspension of Mr.

Karem's hard pass was a "sanction" meant to "punish[]" Mr. Karem for his alleged misconduct

and to "deter Mr. Karem and other members of the press from disrupting White House events,"

*id.*, even as she did not dispute that his conduct occurred "after the press event had ended," *id.* at

13.

The suspension of Mr. Karem's hard pass is unconstitutional and unlawful, and this Court

should enjoin it because all the elements justifying injunctive relief are met here.  Mr. Karem is

likely to succeed on the merits; he will suffer irreparable harm absent injunctive relief; and the

balance of equities and the public interest cut strongly in his favor.

*First*, Mr. Karem is likely to succeed on the merits because the suspension violates the

Due Process Clause of the Fifth Amendment.  As the D.C. Circuit has made very clear, the

White House may deny, revoke, or suspend a press pass based only on "explicit and meaningful

standard[s]" that have been "publish[ed]" so as to afford fair notice to reporters, and to avoid arbitrary or discriminatory punishments.  *Sherrill*, 569 F.2d at 131.  Here, Ms. Grisham did not cite any legal authority authorizing her to order the suspension of a hard pass and admitted that Mr. Karem did not violate any published rule or standard; instead, she rested the suspension on his purported violation of what she claimed were generic unwritten "understandings."  Moreover, these unwritten understandings—that reporters maintain "decorum" and "professionalism" —are too ill-defined, subjective and vague to satisfy the due process standards articulated by the D.C. Circuit in *Sherrill.*

*Second*, Mr. Karem is likely to succeed on the merits because he lacked a fair opportunity to rebut the charge against him, and the "process" invoked does not comport with the only process established to govern hard passes and that is reflected in the Secret Service regulations promulgated to comport with *Sherrill*.  *See* 31 C.F.R. §§ 409.1, 409.2.  Ms. Grisham's "preliminary" decision was nothing of the sort; it was for all intents and purposes final because it was approved by the President, and was made without giving Mr. Karem any chance to respond.  Nor was Mr. Karem given a fair opportunity to challenge the preliminary decision, as Ms. Grisham is a biased decisionmaker who works for a President at war with what he calls the "Lamestream media" that are the "enemy of the people."  She gave Mr. Karem an unreasonably short time to respond given the important liberty and property rights at stake and then refused to share with him all of the evidence she relied on in imposing the suspension or even to define the scope of his rights in the process.

*Third,* Mr. Karem is likely to succeed on the merits because the suspension violates the First Amendment.  Ms. Grisham does not (and cannot) cite any "compelling reason" that justifies Mr. Karem's suspension, rendering it unconstitutional under *Sherrill*.  569 F.2d at 129.  And in

light of the arbitrary nature of Ms. Grisham's actions and against the backdrop of the President's open hostility to the press, Karem is likely prevail on his claim that the suspension is meant to punish and deter his reporting on the Administration rather than based on anything he said in the Rose Garden in July.  As such, the suspension is an impermissible content-based regulation of speech, and an attempt to censor the press and exclude from the White House reporters who challenge and dispute the President's point of view.

*Fourth*, the Supreme Court and the D.C. Circuit have held that the violation of constitutional rights, especially "First Amendment 'freedoms,' . . . unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (same).

*Finally*, the balance of the equities and public interest cut strongly in favor of temporary injunctive relief.  Indeed, while the suspension irreparably injures Mr. Karem every day it is in effect, the government cannot identify any injury it will suffer that justifies requiring the suspension to immediately go into effect while this case is litigated.  In fact, after the events in the Rose Garden occurred, the White House allowed more than three weeks to elapse before making its "preliminary decision" and then another two weeks before its final decision, negating any suggestion of the need for an immediate suspension.

Accordingly, the Court should grant a TRO.  Indeed, in *Cable News Network, Inc. v. Trump*, No. 18-cv-2610 (D.D.C.), Judge Timothy J. Kelly issued a temporary restraining order barring President Trump and his Administration from revoking CNN's Chief White House Correspondent Jim Acosta's hard pass on equally specious grounds.  *See CNN v. Trump*, Dkt. No. 22 (Nov. 16, 2019) at 5:16-15:1 (oral ruling), *attached hereto as* Ex. 30.  Relying on *Sherrill*, Judge Kelly held that Mr. Acosta had a "First Amendment liberty interest in [his] White

House press pass," that one of the "specific reasons for the revocation cited by the government—that Mr. Acosta laid his hands on [a] White House intern," *see* Exs. 91-92—"was likely untrue and was at least partly based on evidence that was of questionable accuracy," and that the government's process for revoking Acosta's hard pass was too "shrouded in mystery" to satisfy the Due Process Clause.  Ex. 30, at 6:14–15, 9:21, 11:5–11:8.  After the Court issued its order—finding that Acosta's loss of his press pass was irreparable and that the balance of equities tilted in Acosta's favor—the White House reversed its decision and restored Acosta's hard pass.  The same result is required here.

## BACKGROUND

Brian Karem has been a political reporter for almost 40 years; he is currently Playboy's senior White House correspondent and a political analyst for CNN.  Declaration of Brian Karem ("Karem Decl.") ¶ 1.  Playboy is Karem's principal employer and has a long history of fighting for and advocating for First Amendment rights.  Compl. ¶ 20.  In 2000, Playboy convinced the Supreme Court to invalidate a section of the Telecommunications Act of 1996 limiting the transmission of sexually-oriented channels as an impermissible content-based restriction.  *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000).  Compl. ¶ 20.  Playboy founder Hugh Hefner was also a well-known champion of free speech, publishing *Fahrenheit 451* in serialized form in Playboy in 1954, and later starting the Hugh M. Hefner Foundation, a non-profit committed to the support of First Amendment freedoms.  Compl. ¶ 20.

Mr. Karem has covered crime and wars and has run community newspapers.  Karem Decl. ¶ 2.  He has been jailed, shot at, beaten, and threatened for his reporting.  *Id.*  In 1990, he was jailed for contempt of court after refusing to disclose the name of confidential sources who helped him arrange a telephone interview with an imprisoned murder suspect, after which Mr. Karem was awarded the National Press Club's Freedom of the Press award.  *Id.*; Ex. 1.  He is a

widely respected journalist and is currently the president of the Maryland, Delaware, and District of Columbia Press Association.  Karem Decl. ¶ 1.

Mr. Karem has covered six Presidents and has held his current White House hard pass since 2018.  Karem Decl. ¶¶ 3, 9.  A hard pass is essential to covering the White House because it allows reporters and other journalists to bypass lengthy daily security screening to access areas of the White House open to the press.  Karem Decl. ¶¶ 10-11.  Declaration of Todd Joseph Gillman ("Gillman Decl."), at ¶¶ 9-16; Declaration of Andrew Feinberg ("Feinberg Decl.") ¶ 3 (explaining that, without a hard pass, one must "endure long waits . . . to access the White House complex").  As Karem has explained, without this credential, he cannot do his job of reporting on the administration—for Playboy, CNN, or any other news organization.  Karem Decl. ¶¶ 10-11; Gillman Decl. ¶ 16.  A hard pass lets Mr. Karem react to the spontaneous newsgathering opportunities that present themselves at the White House, from informal conversations with administration staff to surprise announcements by the White House.  Karem Decl. ¶ 11; Gillman Decl. ¶ 12–13; Feinberg Decl. ¶ 3.  The hard pass is particularly crucial in this Administration, where spontaneous gaggles with the President and other Administration officials are all reporters are afforded.  Karem Decl. ¶¶ 11, 15; Gillman Decl. ¶ 13.

Mr. Karem himself has earned the White House's ire for his tough but fair reporting and political commentary.  *See* Karem Decl. ¶ 17-21; *see also* Exs. 24-25.  Mr. Karem is a leading commentator and critic of the current administration, writing opinion pieces titled, among other things, "Trump Is A Racist," Ex. 46, and "Donald Trump Uses Faith to Fool Everyone," Ex. 47. *See also* Exs. 26, 57-59.  On June 14, 2018, Karem had a widely-reported exchange with then-White House Press Secretary Sarah Huckabee Sanders in the White House briefing room when, in response to a question from CNN reporter Jim Acosta about the detention of immigrant

children, Sanders stated that it is "biblical to enforce the law."  *See* Exs. 12-14, 55-56; *see also* Exs. 72.  Karem followed up by asking Sanders whether she had empathy for the children, given that she herself is a parent.  Later that day, Fox News host Jesse Watters said that Karem and Acosta "don't belong" in the briefing room and that the White House "need[s] to start ripping press passes away."  Ex. 13.  Mr. Karem has appeared on television and openly criticized the President and the administration.  Ex. 25.  When Ms. Sanders resigned, Mr. Karem stated on CNN that her legacy would be one of "sowing distrust, one of divisiveness, one of documented lying to the American public, and a complete breakdown of what has been a very vital role of the Press Secretary in a … Presidential administration."  Ex. 68; Karem Decl. ¶¶ 14, 19-21.

This has occurred against the backdrop of President Trump's incessant and dangerous attacks on the press.  *See* Exs. 15-16, 18-22, 51-54, 69, 89; Karem Decl. ¶ 7; *see also* Exs. 28, 29.  President Trump has regularly stated his desire to control and punish the press.  He frequently calls the free press "fake news," "the enemy of the people," and "the opposition party."  Compl. ¶ 26.  The President has repeatedly made clear his dislike of specific news outlets, *see, e.g.*, Compl. ¶ 28, Exs. 51-54, and whipped up his supporters to mock and attack journalists.  Mr. Karem and his family have been subjected to ugly threats, in particular in recent weeks.  Karem Decl. ¶¶ 7, 47; Pavlovic Decl. ¶ 21; *see also* Ex. 100.

The President has previously explained why he attacks and demeans the press:  "You know why I do it?  I do it to discredit you all and demean you all so when you write negative stories about me, no one will believe you."  Ex. 44; *see also* Ex. 45 ("If people don't cover me fairly, or if they actually make things up, I don't know why anybody should be allowed [into Trump campaign rallies].");  Compl. ¶ 3; *see also* Exs. 15-21, 93, 101.  By one study's count, "over 11 percent" of the President's Tweets have "insulted or criticized journalists and [news]

outlets." Ex. 96; *see, e.g.*, Exs. 89, 94.  During political rallies, reporters have faced both verbal

ire and physical hostility, spurred on by Mr. Trump's rhetoric.  Exs. 97-98, 101, 102.  One of the

President's supporters even sent a bomb to CNN.  Ex. 99.  The President has himself endorsed

violence aimed at reporters.  *See, e.g.*, Ex. 27 ("President Donald Trump on Thursday praised

Rep. Greg Gianforte's body slamming a reporter in 2017, saying that anyone who did such a

thing was 'my kind of guy.'"); Ex. 50; Ex. 93.  He joked with Russian President Vladimir Putin -

who is reputed to have ordered the murder of journalists—that they should "get rid of"

journalists, and refused to condemn the murder and dismemberment of Washington Post

columnist Jamal Khashoggi, which American intelligence officials have concluded was ordered

by Saudi Crown Prince Mohammed Bin Salman.  Ex. 94.

On July 11, 2019, this stirred-up anger toward the free press manifested itself in the Rose

Garden.  On President Trump's schedule that day was what the White House called a Social

Media Summit attended by 200 conservative social media activists and "influencers" who were

supportive of the administration.  *See, e.g.*, Exs. 35-36, 95; Karem Decl. ¶ 22.  Although the

event "was called a Social Media Summit, [] no one from the largest platforms - Twitter,

Facebook and Google - was included."  Exs. 35, 90; *see* Declaration of Ksenija Pavlovic

McAteer ("Pavlovic Decl.") ¶ 8.  Instead, the guest list included "people with a record of

creating and trying to spread false conspiracy theories and racist tropes."  Ex. 35; *see also* Ex. 2

(reporting that the President exhorted the group by proclaiming that "'[t]he crap you think of . . .

is unbelievable'" to the "200 conservative social media firebrands" in attendance); Exs. 83-87,

90.  One journalist described the event as "the closest thing to a campaign rally that I have seen

inside the White House."  Ex. 35.

The event was "pool only" and thus not open to the full White House Press Corps, but as the day wore on, the Press Office informed the press corps that the President would hold a press conference at 5 p.m. in the Rose Garden, at the conclusion of the Summit.  Karem Decl. ¶¶ 22-23.  Mr. Karem attended the event in the Rose Garden looking forward to the press conference and hoping to ask the President some questions.

The post-Summit gathering was far from a staid and traditional Rose Garden affair.  It had a raucous, circus-like atmosphere more akin to a Trump campaign rally than a White House press event, featuring the President speaking to some of his most boisterous supporters, one of whom was dressed as an American flag.  *See* Feinberg Decl. ¶ 7; Karem Decl. ¶ 24; Pavlovic Decl. ¶ 12.  The Summit attendees were seated in rows of chairs facing the podium, while the White House press was corralled in a roped-off area behind them.  Karem Decl. ¶ 24; Pavlovic Decl. ¶ 11; Ex. 37.  As the attendees filed in and spotted the reporters in the press pen, some began heckling and taunting them, calling members of the press "fake news."  Feinberg Decl. ¶ 8.

One of the taunters was Mr. Gorka, a former advisor to the President with a documented history of committing violent acts on reporters.  Ex. 76.  As Gorka entered the Rose Garden, he took a photo of the assembled White House press corps huddled behind the rope line, loudly announcing that his photo had captured the "Fake News panorama."  Pavlovic Decl. ¶ 12; Exs. 37, 70.

The promised press conference never materialized.  Instead, after the President and Attorney General delivered short prepared statements about the citizenship question on the census, the President turned to leave.  Ex. 37 ("Trump turned and walked back into the Oval Office without taking questions - even from members of the right-wing press.").  At that

moment, Mr. Karem—who was standing behind the rope line—called out, "Mr. President, do you mind sticking around to answer a few questions?"  The President ignored Karem's question and walked away, back into the White House.  Ex. 60, at 0:00-0:10; Karem Decl. ¶ 25.

At this point, the social media guests' harassment of the press began anew.  The crowd directed its jeers at Mr. Karem because the President had ignored his question.  Karem Decl. ¶ 26.  One person shouted: "He talked to us, the real news."  Ex. 60, at 0:08-0:12.  Another ridiculed Karem, imploring him sarcastically, "Don't be sad, don't be sad."  Ex. 60, at 0:10-0:18; Karem Decl. ¶ 26.  Conservative personality Joy Villa, the person dressed as an American flag, told Mr. Karem, "If you weren't fake news, [the President] would have taken questions; try not being fake news."  Ex. 60; https://bit.ly/2Z7VAyA.  (Villa later bragged on a talk show that she had "started the mess" by taunting Karem, Compl. ¶ 40; https://bit.ly/2Z7VAyA.)

Mr. Karem, in an attempt to defuse the insults and tension, responded to all the taunting by doing his Rodney Dangerfield impression.  He smiled, saluted the group, and stated that "this is a group of people that are eager for demonic possession."  The joke was well received by the assembled activists, many of whom smiled and laughed in response.  Ex. 60 at 0:08-0:25; Ex. 61 at 0:00-0:10; Ex. 63 at 0:00-0:09; Karem Decl. ¶ 27; Feinberg Decl. ¶ 9.

Mr. Gorka, however, had a very different response.  Even though he was sitting on the other side of the Rose Garden, at least 40 feet from Mr. Karem, Feinberg Decl. ¶ 12, and even though Karem's joke had not been directed at him, Gorka became infuriated—or at least sought to project that appearance.  Gorka began yelling at Mr. Karem, mocking him by shouting across the Rose Garden and asking Mr. Karem if he was a "journalist," meant as an insult, making mocking air quotes.  *See, e.g.*, Ex. 60 at 0:20-0:25; Ex. 63 at 0:10-0:12; Ex. 65 at 0:00-0:03; Karem Decl. ¶ 28.  Confronted with Gorka's public ridicule, and hoping to avoid a shouting

match across the Rose Garden in front of dozens of people, Mr. Karem said "Come on over here

and talk to me, brother, or we can go outside and have a long conversation."  Ex. 60 at 0:25-0:29;

Ex. 61 at 0:10-0:14; Karem Decl. ¶ 29; *see also* Ex. 38.

Gorka saw his opportunity.  He charged across the Rose Garden to confront Mr. Karem.

He yelled at Karem and accused Mr. Karem of "threatening" him.  See Feinberg Decl. ¶ 12;

Karem Decl. ¶ 29;  Ex. 60 at 0:27-0:36; Ex. 65 at 0:05-0:16.  Hoping to deescalate the situation,

Mr. Karem responded that he had said "I'd be happy to *talk* to you."  Ex. 61 at 0:16-0:25; Ex. 63

at 0:20-0:25; Karem Decl. ¶ 30; Pavlovic Decl. ¶ 20.  That did not mollify Gorka, who closed in

to within a foot or two of Mr. Karem, separated only by the rope line, and yelled at him again:

"You are a punk!  You're not a journalist! You're a punk!"  Ex. 61 at 0:16-0:25; Ex. 63 at 0:22-

0:25; Karem Decl. ¶ 29; Pavlovic Decl. ¶ 18.



Bystanders could see spit flying from his mouth.  Pavlovic ¶ 18; Feinberg Decl. ¶ 15.  Mr.

Karem crossed his hands and remained stationary behind the rope line.  Ex. 60 at 0:34-0:40; Ex.

62 at 0:00-0:03; Karem Decl. ¶ 30; Feinberg Decl. ¶ 15-16 ("Gorka was agitated and I could see

spit flying out of his mouth, while Brian, on the other hand stayed calm and reiterated his desire

to talk to Gorka. . . . Rather than escalate further, Brian told Gorka to 'go home' and 'get a job' as the latter angrily stormed off"); Pavlovic Decl. ¶ 18.

The crowd of activists joined Gorka's assault.  They started cheering "Gorka! Gorka!" One woman yelled, "Hit him, Gorka! Hit him!"  Karem Decl. ¶ 29; Ex. 60 at 0:30-0:38.  Fox News contributor Jim Hanson drew gasps from the crowd by announcing to Mr. Karem that "just for the record, [Gorka would] kick your punk ass."  Exs. 61 at 0:31-0:37; Ex. 63 at 0:33-0:37; Karem Decl. ¶ 32; *see also* Ex. 39.  Continuing to avoid violence, Karem responded to Hanson by questioning "And that's the measure of everything, isn't it?"  Ex. 60 at 0:48-0:53.  Some in the crowd, however, sprung to Mr. Karem's defense.  One woman, reporter Ksenija Pavlovic McAteer, yelled at Gorka: "You should not be attacking journalists like this!" and said he was conducting an "assault on the press!"  Pavlovic Decl. ¶ 18; Ex. 62 at 0:06-0:09; 0:34-0:36. At no time did any White House staffers or the Secret Service appear to step in to protect Mr. Karem or the other reporters targeted by the hostile crowd.  Feinberg Decl. ¶ 17 ("At no point during the exchange [between Karem and Gorka] did anyone from the White House Press Office or United States Secret Service intervene.").  Although a Secret Service agent spoke to Mr. Karem *after* Gorka left, the agent appears to have intervened because he thought Mr. Karem, not Fox News contributor Jim Hanson, had made the vulgar comment "he'd kick your punk ass."  Feinberg Decl. ¶ 18; Ex. 63 at 0:32-0:48.

As Mr. Karem later explained, his suggestion to Mr. Gorka that they talk by the rope line, or have a conversation outside the charged atmosphere of the Rose Garden, was an attempt to defuse a tense situation.  Karem Decl. ¶ 30.  Whatever Gorka's motives may have been in claiming to interpret Karem's statement as a barroom-style challenge to a fistfight, that is obviously not what Mr. Karem intended.  As he explained in his statement to Ms. Grisham and

14

his accompanying declaration, when he asked Gorka to come over to talk or to step outside to "have a conversation," he meant exactly that.  Karem Decl. ¶ 31.  In his decades covering Presidents, Mr. Karem has invited many people to go off campus with him and have a talk because privacy in the White House is hard to come by.  Karem Decl. ¶¶ 35-36.

After the Summit ended and Mr. Gorka was standing alone in the Palm Room area of the White House, Karem approached him and offered to shake his hand.  Karem Decl. ¶ 34.  Gorka rebuffed these efforts and refused to talk with Mr. Karem—other than curtly declaring that Mr. Karem was "done"—so Karem gave up and left.  Ex. 63 at 2:59-3:27; Karem Decl. ¶ 34.

Gorka immediately took to Twitter to brag about the confrontation.  He wrote that by challenging Karem, he had taken on the "fake news industrial complex," Ex. 67 at 4:25-4:33, and "read [Karem] the riot act," *see* Exs. 69, 69A.  He called on others to follow his "example" in confronting journalists.  Ex. 43.  They have done so, including by threatening Mr. Karem's life and family due to Mr. Karem's work as a member of the "Fake News" media.  Karem Decl. ¶ 47. For his part, President Trump applauded Gorka on Twitter, writing "@SebGorka Wins Big, No Contest!"  The tweet is now pinned at the top of Gorka's Twitter profile.  Ex. 41.

After the July 11 Social Media Summit, Mr. Karem heard nothing from the White House about the events in the Rose Garden.  Karem Decl. ¶ 38.  In fact, 22 days passed before Karem heard a word about the incident, even though Mr. Karem had contacted the Press Office to ask for a meeting with Ms. Grisham at which he planned, among other things, to discuss what had happened and to ask Ms. Grisham to help prevent attendees from threatening and heckling the working press.  *See* Ex. 11; Karem Decl. ¶ 39.  But neither Ms. Grisham nor anyone else from her office met with him or raised any issues with him about the Rose Garden event.  Karem Decl. ¶ 40.

Instead, on August 2, out of the blue Mr. Karem received a letter from Ms. Grisham advising that she had made a "preliminary decision" to suspend Mr. Karem's hard pass for 30 days.  Ex. 4; Karem Decl. ¶ 44.  Ms. Grisham had made the decision 22 days after the July 11 incident—but just hours after Mr. Karem had asked the President to comment on Bernie Sanders's assertion that the President was a "pathological liar," Ex. 42, and just 9 days after the President had shouted at Mr. Karem during a press conference, pointing at him and calling him "Fake News," Karem Decl. ¶ 43.

The suspension of Mr. Karem's hard pass is without precedent.  As Sam Donaldson has noted, in his nearly five decades as a reporter in Washington and two decades as a chief White House correspondent, "I know of no instance that any such action was taken or threatened against any reporter by any president because of the reporter's work product or alleged conduct during a press conference or other press event until President Trump took office."  Declaration of Sam Donaldson ("Donaldson Decl.") ¶ 5; *see also* Gillman Decl. ¶ 8 (prior to the Trump administration, "[t]o my knowledge . . . eligibility for a hard pass has never been denied, revoked or suspended for any reason other than an individual being reassigned from the White House beat," "failing to use the pass regularly," or failing a criminal background check).  Indeed, the only other instance in which the White House has attempted to revoke a hard pass was when the Trump administration attempted to suspend Jim Acosta's pass based on Acosta's attempt to ask a question in the East Room of the White House.  *See* Ex. 71; *see also* Exs. 23, 73.  Judge Kelly swiftly enjoined that suspension, however, and the White House reversed its decision shortly thereafter.  *See* Ex. 30 (*CNN* ruling), at 5:16-15:1.[2]

---

[2]  President Trump acknowledged that he had attempted to revoke the credentials at issue in that case because he believed that the reporter had failed to "treat the White House with respect" and "to treat the presidency with respect."  Ex. 31 at 6.  The President then threatened to take away the credentials of other allegedly

In fact, during the 2016 presidential campaign, then-candidate Trump recognized that it would be wrong for him to revoke the press credentials of White House reporters if he won the election, noting that banning reporters from campaign rallies (as he had done) is "a different thing.  In my case I'm a person running for office.  I rent these large arenas . . . so I have an option. . . .  *When I'm representing the United States I wouldn't do that.*"  Ex. 48 (emphasis added).

Ms. Grisham's August 2 letter set forth the basis for her "preliminary decision."  Ms. Grisham conceded that the White House does *not* have "explicit rules . . . to govern behavior by members of the press at White House Press events."  Ex. 4 at 1.  Instead, Ms. Grisham claimed there was an unwritten but "widely shared understanding that (1) members of the press, at all times at White House press events, must act professionally, maintain decorum and order, and obey instructions from White House staff, and (2) disruptive behavior that interferes with the conduct of a press event or is otherwise a breach of professional decorum including but not limited to taunting other members of the Press, White House officials, or guests in an effort to provoke a confrontation is prohibited."  *Id.*

Ms. Grisham's letter stated that at the July 11 Summit, Mr. Karem "failed to abide by these basic norms."  She asserted that he "insulted the President's invited guests" with his Rodney Dangerfield joke, and made "an apparent attempt to escalate [his] verbal taunts to a physical confrontation" by asking Gorka to speak with him by the rope line or outside the Rose Garden.  *Id.*  She concluded that these events provided a "sufficient factual basis to suspend

---

disrespectful reporters.  *Id.* ("Q. Mr. President, how long are you going to leave Jim Acosta in the penalty box?" A. "As far as I'm concerned, I haven't made that decision.  But it could be others also."); *see also* Ex. 13.

[Karem's] hard pass for 30 days." *Id.* at 2.  She said that the President had approved her

"preliminary decision" and gave Mr. Karem one business day to respond.  *Id.*

Mr. Karem responded on August 5 by disputing Ms. Grisham's slanted and erroneous

recitation of the facts, and by highlighting the many ways a suspension would violate the

Constitution.  Ex. 5; Karem Decl. ¶ 45.  Mr. Karem challenged "this Administration's

unprecedented and unconstitutional attempts to convert the hard pass system into a means of

censoring and penalizing the press" as a "dangerous path that we hope you"—the White

House—"will reconsider."  Ex. 5 at 1.  Mr. Karem's counsel also asked to meet with Ms.

Grisham to further understand the factual basis for the White House's decision and the process

out of which it arose.  *Id.* at 8; Karem Decl. ¶ 45.

That meeting occurred on August 8.  *See* Exs. 6-8; *see also* Ex. 34.  During that meeting,

the Press Secretary and a Deputy White House counsel explained that the government's

preliminary decision was based on YouTube videos and a statement from a Secret Service agent.

They read aloud two sentences from the agent's statement, but refused to read the statement in its

entirety, to provide or share a copy of it, or to identify the agent.  Mr. Karem's counsel

repeatedly asked the government to explain Mr. Karem's rights during this process and produce

documents relevant to the process and facts supporting the decision.  Ms. Grisham and the White

House counsel refused to provide any information.  They stated instead that they wanted to hear

a further recitation of the facts from Mr. Karem.  Mr. Karem submitted such a statement the next

day and counsel offered to have Mr. Karem come into the White House for a face-to-face

meeting in the event Ms. Grisham would find it helpful.  Exs. 8-9.

Eight days later, on August 16, Ms. Grisham issued her final decision.  Ex. 10; Karem

Decl. ¶ 45.  She again asserted that Mr. Karem had violated "widely-shared understandings and

norms of media professionalism" and "decorum." Ex. 10 at 8. She included her own amateur

frame-by-frame, Zapruder-style and highly one-sided account of the videos she watched, going

into extraordinary detail and rank speculation. *See id.* at 3-4 (concluding that Mr. Karem must

have wanted "a physical confrontation" because he had "noticeably cock[ed] his eyebrows").

The letter also falsely claims that, after being berated by Gorka, Mr. Karem "left the designated

press area and paced in front of other members of the press," making Mr. Karem's form of

ambulation sound threatening. *Id.* at 4. But as the videos show, the press rope had fallen when

Mr. Karem inadvertently stepped slightly beyond it, and his menacing "pace" was actually a

casual step or two in one direction followed by a step or two in the other as he was being

heckled. Ex. 60, at 0:45-0:52; *see* Karem Decl. ¶ 32. Ms. Grisham also claimed that Mr.

Karem's conduct "prompted a Secret Service agent to intervene due to a perceived risk of a

physical altercation." Ex. 10 at 8. But as the videos make clear, the Secret Service agent

intervened only after Gorka had shouted in Mr. Karem's face ("You're a punk!") and walked

away. Ex. 60 at 0:36-0:42. The agent began following Gorka, suggesting that he thought Gorka

was the risk. *See id.* at 0:38-0:48. Only after Fox News contributor Jim Hanson made his vulgar

comment ("he'd kick your punk ass") did the Secret Service agent turn around and walk back

towards Mr. Karem and engage him in discussion as Mr. Karem had inadvertently taken a step

over the fallen rope. *Id.* at 0:48-1:00; Karem Decl. ¶ 32.

Unlike her preliminary decision, Ms. Grisham did not state that the President had

concurred in her final decision, but in any event she announced that Mr. Karem's hard pass was

suspended "effective immediately." Ex. 10 at 1. That evening, counsel for Karem called

counsel for the government and requested a temporary stay of the suspension so as to allow for

expedited litigation. The government refused.

19

After Mr. Karem and his counsel publicly announced their intent to seek relief in federal court, the President tweeted: "'Journalism' has reached a new low in the history of our Country. It is nothing more than an evil propaganda machine for the Democrat Party. The reporting is so false, biased and evil that it has now become a very sick joke...But the public is aware! #CROOKEDJOURNALISM."  Ex. 103; *see also* Ex. 89 (tweeting on August 16 "Biggest crowd EVER, according to Arena people. Thousands outside trying to get in. Place was packed! Radical Left Dems & their Partner, LameStream Media, saying Arena empty. Check out pictures. Fake News. The Enemy of the People!").

This action ensued.

## ARGUMENT

A Plaintiff seeking a temporary restraining order or preliminary injunction must demonstrate: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable injury in the absence of preliminary relief; (3) that the balance of the equities tips in his favor; and (4) that an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001) ("The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction."); *Stewart v. D.C. Armory Bd.*, 789 F. Supp. 402, 404 (D.D.C. 1992).  As the D.C. Circuit has held, "[t]he loss of First Amendment 'freedoms,' . . . unquestionably constitutes irreparable injury."  *Pursuing Am.'s Greatness*, 831 F.3d at 511.  Thus, in First Amendment cases, "the likelihood of success 'will often be the determinative factor' in the preliminary injunction analysis."  *Id.*

Here, all four factors counsel strongly in favor of emergency relief, as they did in Jim Acosta's case.  *See* Ex. 30.  This Court should grant a temporary restraining order and preliminary injunction enjoining the suspension of Mr. Karem's hard pass.

## I.  Mr. Karem Is Likely To Succeed On The Merits.

The D.C. Circuit held in *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977), that "the interest of a bona fide Washington correspondent in obtaining a White House press pass is protected by the first amendment." *Id.* at 130.  Consequently, the Court held that "the protection afforded newsgathering under the first amendment guarantee of freedom of the press . . . requires that this access not be denied arbitrarily or for *less than compelling reasons*." *Id.* at 129 (emphasis added).  And it made clear that "[n]ot only newsmen and the publications for which they write, but also the public at large have an interest protected by the [First Amendment] in assuring that . . . individual newsmen not be arbitrarily excluded from sources of information." *Id.*  Accordingly, "[t]his first amendment interest undoubtedly qualifies as a liberty which may not be denied without due process of law under the fifth amendment." *Id.* at 130-31.[2]  Under *Sherrill*, due process requires both that the government "articulate and publish explicit and meaningful standard[s] governing denial of White House press passes" and that the government afford "notice . . . of the factual bases for denial [of access to White House press facilities] with an opportunity to rebut." *Id.* at 131.  As Judge Kelly concluded in *CNN*, the government's failure to comply with *Sherrill* requires a district court to enjoin the suspension of a reporter's hard pass. Ex. 30 at 6:6-9:24; *id.* at 9:4-7 ("But under *Sherrill* as I read it, the government must provide Mr. Acosta due process if it is to revoke his hard pass.").

---

[2]  Mr. Karem's property interests at issue in the suspension of his hard pass are also considerable.  A press pass is indispensable for his work; losing it makes it impossible for him to do his job.  *See* Karem Decl. ¶¶ 10-13; Gillman Decl. ¶¶ 9-16; Feinberg Decl. ¶ 3.  The West Wing and grounds of the White House are Mr. Karem's workplace, and his credentials—including his press pass—provide him necessary access to that workplace. Karem Decl. ¶¶ 10-13; Gillman Decl. ¶ 9.  Without a press pass, Mr. Karem cannot effectively report on the administration; he will miss formal press conferences and "impromptu events," as well as spontaneous newsgathering opportunities that arise unpredictably at the White House.  Karem Decl. ¶ 15; Gillman Decl. ¶ 12-13; Feinberg Decl. ¶ 3.

A.  **The Suspension of Mr. Karem's Hard Pass Was Unlawful Because It Was Not Based On Any Previously Articulated and Published Explicit Standards.**

As set forth in the declaration of Todd Joseph Gillman, member of the White House Correspondents' Association Board, a reporter may receive a hard pass if she (1) "reside[s] in the Washington, D.C. area"; (2) is "assigned to the White House on a regular basis"; (3) has "a congressional press credential"; and (4) passes a Secret Service background check.  Gillman Decl. ¶ 7.  *Sherrill* identifies the same four criteria.  *Sherrill*, 569 F.2d at 126.  To Gillman's knowledge, the sole reasons that a hard pass has been "denied, revoked, or suspended" is that a reporter was "reassigned from the White House beat or fail[ed] to use the pass regularly for extended periods, or a red flag on a criminal background check."  Gillman Decl. ¶ 7.

Ms. Grisham does not deny that Mr. Karem met all four criteria when his hard pass was issued and still meets those criteria.  Instead, she purports to suspend Mr. Karem's hard pass on the ground that he engaged in conduct that was unprofessional and indecorous. Ex. 10 at 8.  But she cites no statute or regulation giving her the authority to take such an action—*i.e.*, suspending a reporter from White House access even where the reporter satisfies the four criteria *Sherrill* and Mr. Gillman identify.

Indeed, the relevant regulations do not give her any such authority.  Instead, those regulations—enacted in the wake of *Sherrill*—provide only that the Secret Service's "granting or denying a request for a security clearance made in response to an application for White House press pass," must be "guided *solely* by the principle of whether the applicant presents a potential source of physical danger to the President and/or the family of the President so serious as to justify his or her exclusion from White House press privileges."  31 C.F.R. § 409.1.[3]  The Secret

---

[3]  Ms. Grisham cannot be allowed to arrogate to herself authority vested in the Secret Service.  *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("When an executive acts ultra vires, courts are

Service's regulations also identify a decisionmaker—the Special Agent in Charge of the Secret Service, Technical Security Division—and detail specific procedures, including providing "thirty days from the date of the mailing of" a "denial notification" for an applicant to respond—rather than the one business day Ms. Grisham gave Mr. Karem, Ex. 4, at 2.  *See* 31 C.F.R. § 409.2(c). It is undisputed that Ms. Grisham did not follow any of these procedures.  And—despite her attempt to suggest that Mr. Karem created a security risk by citing portions of a secret statement she claims to have obtained from an anonymous Secret Service agent, *see* Ex. 10 at 4 & n.27— there is no suggestion that Mr. Karem presented a "source of physical danger to the President and/or the family of the President," 31 C.F.R. § 409.1.  Nor would any such allegation be credible given the facts and that Mr. Karem's hard pass remained in effect for more than a *month* after the July 11 Rose Garden event.  *See* Ex. 10 at 13; Karem Decl. ¶ 38.

In her August 2 "preliminary decision," however, Ms. Grisham purports to suspend Mr. Karem's hard pass because he violated "widely shared understanding[s]" regarding "basic standards" governing press events.  Ex. 10 at 8.  She *concedes* that those standards have never been made "explicit," Ex. 4, at 2, but she intends to suspend him anyway.[4]  Such a suspension plainly contravenes *Sherrill*'s requirement that the White House must "articulate and publish []"

---

normally available to reestablish the limits on his authority."); *Dart v. United States*, 848 F.2d 217, 230-31 (D.C. Cir. 1988) (concluding Secretary of Commerce exceeded his statutory authority); *see also Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902) ("The acts of all its officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief."); *Nat'l Treasury Employees Union v. Nixon*, 492 F.2d 587, 604 (D.C. Cir. 1974) ("[T]he judicial branch of the Federal Government has the constitutional duty of requiring the executive branch to remain within the limits stated by the legislative branch.").

[4]  Ms. Grisham notes in her August 2 letter that the White House "had not previously thought that a set of explicit rules was necessary to govern behavior by members of the press at White House events." Ex. 4 at 1.  Mr. Karem agrees and believes that the longstanding tradition and practice of the White House working cooperatively with the press is preferable to using revocation and threats of revocation of hard passes as a tool to stifle journalistic activity.

explicit and meaningful standard[s] governing denial of White House press passes."  569 F.2d at

131.

     Ms. Grisham's August 16 final decision repeatedly makes clear that this suspension is a

"sanction" intended to *punish and deter*, Ex. 10 at 8, 9, 10 n.44, 12, 13, and it is thus subject to

exacting due process scrutiny.  The Supreme Court has held that "[e]lementary notions of

fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not

only of the conduct that will subject him to punishment, but also of the severity of the penalty

that a State may impose."  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996).  "This

constitutional concern, itself harkening back to the Magna Carta, arises out of the basic

unfairness of depriving citizens of life, liberty, or property, through the application, not of law

and legal processes, but of arbitrary coercion. Requiring the application of law, rather than a

decisionmaker's caprice, does more than simply provide citizens notice of what actions may

subject them to punishment; it also helps to assure the uniform general treatment of similarly

situated persons that is the essence of law itself."  *Id.* at 587 (Breyer, J., concurring).

     A regulation must inform "regulated parties . . . what is required of them so they may act

accordingly" and provide "precision and guidance . . . so that those enforcing the law do not act

in an arbitrary or discriminatory way."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253

(2012).  And when protected First Amendment activity is at issue—like a reporter's "First

amendment liberty interest in a White House press pass," Ex. 30 (*CNN* ruling) at 6:14-15—

"rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill

protected speech."  *Fox*, 567 U.S. at 253-54.  And for good reason.  It is well established that

even the threat of punishment will chill speech—let alone, as here, the actual imposition of a

penalty.  *See, e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974) ("[D]iscretion to award

punitive damages unnecessarily exacerbates the danger of media self-censorship"); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 278 (1964) ("Whether or not a newspaper can survive a succession of such judgments, the pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive.").

But there was no semblance of "fair notice" here because there were no standards established in advance identifying the grounds on which Ms. Grisham could suspend a hard pass—and no standards providing the range of punishments that could be imposed.  This flatly violates due process.  *Sherrill*, 569 F.2d at 131; *see also Fox*, 567 U.S. 253; *BMW*, 517 U.S. at 574.

## B.  Ms. Grisham's Newly-Minted, Retrospective, Generalized "Decorum And Professionalism" Standard Is Unconstitutionally Vague And Cannot Be Used As The Basis For Punishment.

The brand new standard announced after the fact in Ms. Grisham's August letters violates due process in another respect:  It is unconstitutionally vague and retroactive.  *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999) ("When vagueness permeates the text of such a law, it is subject to facial attack.").  "A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  *Fox*, 567 U.S. at 253.  "[O]ne of the basic purposes of the Due Process Clause has always been to protect a person against having the Government impose burdens upon him except in accordance with the valid laws of the land.  Implicit in this constitutional safeguard is the premise that the law must be one that carries an understandable meaning with legal standards that courts must enforce."  *Giaccio v. Pennsylvania*, 382 U.S. 399, 403 (1966).  "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries"—and Press Secretaries—"for resolution on an ad hoc and subjective basis, with the

attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). "'[A] fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.'" *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703 (2005)

As the Supreme Court has explained, the need for precision and concreteness is heightened "[w]hen speech is involved," as it is here; "rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 567 U.S. at 253-54. Simply put:

> Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech. *Without these guideposts,* post hoc *rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression.*

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988) (emphasis added); *see also Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90-91 (1965) ("The constitutional vice of so broad a provision needs no demonstration.  It 'does not provide for government by clearly defined laws, but rather for government by the moment-to-moment opinions of a policeman on his beat.' Instinct with its ever-present potential for arbitrarily suppressing First Amendment liberties, that kind of law bears the hallmark of a police state."); *see also Reno v. ACLU*, 521 U.S. 844, 871-72 (1997).

The "standards" Ms. Grisham announced for the first time after the Rose Garden event and seeks to apply are unconstitutionally vague on their face.  On August 2, the White House informed Mr. Karem that reporters would face sanction if they failed to "act professionally, maintain decorum and order, [or] obey instructions from White House staff," or if they exhibited

"disruptive behavior that interferes with the conduct of a press event or is otherwise a breach of

professional decorum."  Ex. 4.  On August 16, Ms. Grisham advised Mr. Karem that he was

being punished because he breached certain "widely-shared understandings and norms of media

professionalism," requiring the press to "act professionally, maintain decorum and order, and

obey instructions from White House staff."  Ex. 10 at 8.

  This articulation of implicit standards through generic platitudes is the antithesis of the

"explicit and meaningful standard" the D.C. Circuit required in *Sherrill*, 569 F.2d at 131.  *See

also Fox*, 567 U.S. at 253.  Indeed, in *Sherrill*, 569 F.2d at 130, the D.C. Circuit declared that

"we think that the phrase 'reasons of security' is unnecessarily vague and subject to ambiguous

interpretation."  Ms. Grisham's "decorum and professionalism" standard is even vaguer than the

"reasons of security" standard rejected in *Sherrill* and fails to provide "fair notice of what [is]

forbidden," *Fox*, 567 U.S. at 254, to enable reporters to conform their conduct and avoid

sanction.  It is no different from other standards the Supreme Court has rejected in similar

contexts, such as a far-too-"subjective" "dignity standard."  *Boos v. Barry*, 485 U.S. 312, 322

(1988); *accord Giaccio*, 382 U.S. at 404 (rejecting as too "loose and []limiting" "such general

abstract charges as 'misconduct,' or 'reprehensible conduct.'").  No one could know in advance

whether Ms. Grisham or one of her colleagues might deem particular actions to lack decorum or

to show an absence of professionalism, and this vague, general standard is precisely the kind of

license "for arbitrary [and] discriminatory" punishment that the Supreme Court has condemned.

*FCC*, 567 U.S. at 253; *Grayned*, 408 U.S. at 108-09; *Connally v. Gen. Constr. Co.*, 269 U.S.

385, 391 (1926).  This is especially true given our country's "profound national commitment to

the principle that debate on public issues should be uninhibited, robust, and wide-open, and that

27

it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Sullivan*, 376 U.S. at 270.

Indeed, the President himself has often endorsed and celebrated conduct involving reporters that some could conclude lacks decorum, thus depriving reporters of notice of what conduct this administration considers "unprofessional" or insufficiently "decorous." For example, the President has stated that a congressman who body-slammed a reporter is "[his] kind of guy." Ex. 27 (noting the President's praise of Greg Gianforte's body slam of a reporter: "Any guy that can do a body slam is my kind of guy."); *see also* Exs. 74-75, 93. Similarly, while Ms. Grisham concluded that Mr. Karem's "we can go outside and have a long conversation" statement lacked decorum because it could be construed as an invitation to violence, the President has urged his supporters to "knock the hell" out of protestors at his rallies. Ex. 49. And he has remarked about one protestor, "I'd like to punch him in the face." *Id*. ("Trump encouraged a few thousand supporters to beat up anyone who hurled a tomato at him . . . 'Just knock the hell — I promise you, I will pay for the legal fees. I promise. I promise. They won't be so much, because the courts agree with us too — what's going on in this country.'"); *see also* Ex. 32 ("Trump threatens Time journalist with prison over photo"). Ms. Grisham cites Mr. Karem's off-hand, parting comment to Mr. Gorka to "go home," Ex. 10 at 3, but the very night before she issued her final suspension letter, the President himself, after whipping the crowd at one of his campaign rallies into an anti-press frenzy, *see* Ex. 101, mocked a rally attendee for having a "serious weight problem" and bellowed that the attendee should "Go home. Get some exercise." Ex. 3.[5]

---

[5]  In addition to the many constitutional deficiencies in Ms. Grisham's "decorum and professionalism" standard, it does not even apply to this case. Ms. Grisham has explained that the newly-minted standard will apply to "press events." Ex. 4, at 1; Ex. 10 at 1. But she then admits that "Mr. Karem's conduct occurred *after the press*

In addition, Ms. Grisham's encouragement and tolerance—and refusal to criticize—the conduct of the "social media" crowd at the Rose Garden event shows just how indecipherable this "decorum" and "professionalism" standard is and why no reasonable person could understand what it means and what it prohibits.  The White House guests were a raucous, taunting, mocking circus-like assemblage, *see* Exs. 83-88, 90, including Mr. Gorka, the clear provocateur of his encounter with Mr. Karem.  Yet Ms. Grisham turns somersaults in her letter to avoid even a mild criticism of Gorka and the guests' conduct, indicating a tolerance and acceptance for behavior far more disruptive and offensive than Mr. Karem's good natured remarks and efforts to respond to their attacks.  *See* Ex. 10 at 4.

Ms. Grisham's actions underscore the inherent dangers in vague laws and standards: government officials will use them to develop "*post hoc* rationalizations" to deprive citizens of their rights through "shifting or illegitimate criteria."  *City of Lakewood*, 486 U.S. at 758.  Such standards make it "difficult for the courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression," *id.*, as is the case here.  *See Fox*, 567 U.S. at 254 ("[P]recision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."); *Morales*, 527 U.S. at 56 (vague standards "authorize and even encourage arbitrary and discriminatory enforcement").  Because the suspension was based on a vague and unenforceable "decorum and professionalism" standard, it must be vacated for this reason as well.

---

*event had ended.*"  Ex. 10 at 13 (emphasis added).  Thus, Ms. Grisham has punished Mr. Karem based on a standard that by its own terms does not even apply to his conduct.

### C.  Mr. Karem Was Not Afforded Procedural Due Process.

Even if Ms. Grisham *had* established constitutionally enforceable standards prior to the events at issue, the suspension would still need to be set aside because the process that led to the suspension was deficient in many ways.  Mr. Karem was denied a meaningful opportunity to confront the evidence, and to present his defense to a neutral decisionmaker, before the suspension was imposed.  In other words, the fix was in.

*First*, the Due Process Clause is violated when a "disinterested observer may conclude that [the decisionmaker] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it."  *Cinderella Career & Finishing Sch., Inc. v. FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970).  Even the "risk" of "prejudgment" can violate due process.  *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 884 (2009).  Here, Ms. Grisham obtained presidential approval of her "preliminary decision" before she even notified Mr. Karem of the charge against him, let alone hear his defense.  Then, after announcing her preliminary decision, which took her 22 days to reach after the Rose Garden event, she allowed Mr. Karem one business day to respond—an approach that contrasts sharply with the Secret Service process established in the wake of *Sherrill* to comport with due process.  *See* 31 C.F.R. § 409.2 (providing procedures to challenge denial of security clearance to receive hard pass, including authorizing 30 days to prepare an opposition, with an extension for 30 days upon written request and providing that decisionmaker will be the Special Agent in Charge of the Secret Service, Technical Security Division).  Although she ultimately accepted a second submission a few days after that deadline, and met with Mr. Karem's counsel, there never was any possibility that she would reverse a decision that had already been approved by the President.  Ms. Grisham had already adjudicated the case—and sought and obtained the presidential imprimatur—before she bothered to ask Mr.

Karem for his side of the story or even tell him she was considering imposing a serious
punishment against him.

Likewise, Ms. Grisham, as the Press Secretary for this White House—led by a President
who engages in consistent demonization of the press and has designated the media the
"opposition party," Ex. 96—neither appears nor can be a neutral decisionmaker as to whether
Mr. Karem's hard pass should be suspended.  The Press Secretary is not qualified to act as
prosecutor, judge and jury and to pick and choose which reporters are sufficiently "professional"
or "decorous" to be allowed to access the White House; nor is the Press Secretary qualified to
make credibility determinations in support of such a decision.  *See* Donaldson Decl. ¶ 4.
Administration officials who work in the Press Office generally have institutional incentives to
discourage critical coverage of the administration, rendering them incapable of serving as neutral
adjudicators of whether particular reporters should be allowed to cover the administration from
the White House grounds.  There is a significant risk that the Press Secretary would use this
power to give White House access to favored reporters while excluding disfavored reporters—
precisely what happened here.  *See infra* Pt. D.  Due process does not allow this.

*Second*, even after Ms. Grisham notified Mr. Karem of the charge and offered him the
opportunity to respond, she ensured that the opportunity would not be meaningful.  Her initial
letter made no mention of eyewitness testimony.  Then, during the August 9 meeting with
counsel, she revealed that she had obtained an eyewitness statement from a Secret Service agent.
At this point, the deputy White House counsel read two sentences from the statement, but when
Mr. Karem's counsel asked for the full statement, or for the identity of the agent, the lawyer
demurred and refused to provide any more information.  "Both the Supreme Court and [the D.C.
Circuit] have recognized that the right to know the factual basis for the action and the

31

opportunity to *rebut the evidence supporting that action* are *essential components of due process*." *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014) (emphasis added); *id.* at 320 (noting that "disclosure of unclassified evidence *is* required by the Due Process Clause").

To try to sidestep the due process problem, Ms. Grisham inserted footnotes in her letter saying that the agent's testimony was "not critical to my findings or decision" and "I would reach the same findings and decision without them."  Ex. 10 at 4 n.27; *see also id.* at 2 n.9 (denying existence of any "exculpatory" information in agent's statement).  But this footnoted qualification is contradicted by her letter itself, which repeatedly relies on the Secret Service agent's statement and perspective.  *See, e.g.*, Ex. 10 at 2 & n.9, 3, 4, 8.

### D.  The Suspension of Mr. Karem's Hard Pass Violates the First Amendment.

1.      The law is well settled that "arbitrary or content-based criteria for press pass issuance are prohibited under the first amendment." *Sherrill*, 569 F.2d at 129.  As the Court of Appeals has explained:

> [T]he White House has voluntarily decided to establish press facilities for correspondents who need to report therefrom.  These press facilities are perceived as being open to all bona fide Washington-based journalists, whereas most of the White House itself, and press facilities in particular, have not been made available to the general public. White House press facilities having been made publicly available as a source of information for newsmen, the protection afforded newsgathering under the first amendment guarantee of freedom of the press, requires that this access not be denied arbitrarily or for *less than compelling reasons*.

*Id.* (citing *Branzburg v. Hayes*, 408 U.S. 665, 681, 707 (1972)) (emphasis added); *Am. Broad. Cos. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977) ("[O]nce there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable."); *N.Y. Civil*

*Liberties Union v. N.Y.C. Transit Auth.*, 675 F. Supp. 2d 411, 431 (S.D.N.Y. 2009) (collecting cases); *Cable News Network, Inc. v. Am. Broad. Cos.* ["*CNN v. ABC*"], 518 F. Supp. 1238, 1244 (N.D. Ga. 1981) ("[T]he rights guaranteed and protected by the First Amendment include a right of access to news or information concerning the operations and activities of government.").

The government has no legitimate interest in refusing reporters access to the White House based on the content or viewpoint of their reporting. *Cable News Network*, 518 F. Supp. at 1245; *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 9 (1st Cir. 1986). "The danger in granting favorable treatment to certain members of the media is obvious: it allows the government to influence the type of substantive media coverage that public events will receive. Such a practice is unquestionably at odds with the first amendment." *Anderson*, 805 F.2d at 9.[6]

The First Amendment also "prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out," *Hartman v. Moore*, 547 U.S. 250, 256 (2006), and to discrimination "based upon the content of the journalist's publications," *Stevens v. N.Y. Racing Ass'n, Inc.*, 665 F. Supp. 164, 175 (E.D.N.Y. 1987). Even when a restriction is not content-based on its face, it is impermissible where circumstantial evidence demonstrates it was motivated by content or viewpoint. *See id.* (finding it likely that a restriction was content-based where official stated off the record that restriction was based on specific journalists' coverage detracting from attention to an event). When a government official's "criticism [of the press] transforms into an attempt to use the powers of a governmental office to intimidate or to

---

[6] To the extent the government argues, as it did in *CNN v. Trump*, that the President has the authority to engage in content-based discrimination on White House grounds, that position would contravene clearly-established Circuit law. The White House press area is a limited public forum, *see Sherrill*, 569 F.2d at 129, and the President cannot exclude reporters from that forum in a manner inconsistent with the First Amendment. And to the extent the government attempts to analogize the Press Area to the Oval Office or the President's residence, those areas are not limited public fora and are thus irrelevant to the question of whether Mr. Karem or any reporter can procure and keep a hard pass.

33

discipline the press or one of its members because of what appears in print, a compelling

governmental interest that cannot be served by less restrictive means must be shown for such use

to meet Constitutional standards." *Borreca v. Fasi*, 369 F. Supp. 906, 910 (D. Haw. 1974).

　　　Content-based and viewpoint-based restrictions "are presumptively unconstitutional and

may be justified only if the government proves that they are narrowly tailored to serve

compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015); *accord*

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("Premised on mistrust of

governmental power, the First Amendment stands against attempts to disfavor certain subjects or

viewpoints."); *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)

("Viewpoint discrimination is . . . an egregious form of content discrimination."); *Simon &*

*Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) ("[T]he

government's ability to impose content-based burdens on speech raises the specter that the

government may effectively drive certain ideas or viewpoints from the marketplace."); *Regan v.*

*Time, Inc.*, 468 U.S. 641, 648-49 (1984) ("Regulations which permit the Government to

discriminate on the basis of the content of the message cannot be tolerated under the First

Amendment."); *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 537-38 (1980) ("[T]he

First Amendment means that government has no power to restrict expression because of its

message, its ideas, its subject matter, or its content. . . .  To allow a government [to discriminate

based on viewpoint] would be to allow that government control over the search for political

truth." (citation and quotation marks omitted)); *Police Dep't of City of Chi. v. Mosley*, 408 U.S.

92, 96 (1972) ("Any [content-based restriction on speech] would completely undercut the

profound national commitment to the principle that debate on public issues should be

uninhibited, robust, and [wide]-open." (citation and quotation marks omitted)).

2.      The suspension of Mr. Karem's hard pass violates the First Amendment because the suspension is not supported by a "compelling reason."  *Sherrill*, 569 F.2d at 129.  Ms. Grisham has never asserted that Mr. Karem poses a physical danger to anyone on the White House grounds—let alone the President and his family.  *See* 31 C.F.R. § 409.1.  Indeed, Ms. Grisham waited nearly a month after July 11 to suspend Mr. Karem's hard pass, and all the while Mr. Karem was allowed access to the President and permitted to ask him questions.  Compl. ¶¶ 30, 51-53.  Because there is no compelling reason to suspend Mr. Karem's hard pass, the suspension must be enjoined.

Ms. Grisham suggests that Mr. Karem is subject to "punishment" because he "insulted" guests and used fighting words—*i.e.*, words that "threatened to escalate a verbal altercation into a physical one."  Aug 16 Ltr. at 8.  But this does not amount to a "compelling reason" necessary for a suspension.  First, even if Mr. Karem had insulted White House guests—and his Rodney Dangerfield act was hardly insulting—insults are protected First Amendment speech and thus cannot be the subject of punishment on their own.  *See Boos*, 485 U.S. at 322 ("[I]n public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide 'adequate 'breathing space' to the freedoms protected by the First Amendment.'").  So, too, were his comments to Gorka protected speech and not fighting words, as Ms. Grisham suggests.  The Supreme Court has described "fighting words" as "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace," *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942).  Mr. Karem's statement does not remotely approach that standard. *Nwanguma v. Trump*, 903 F.3d 604, 609 (6th Cir. 2018) (dismissing claims that then-candidate Trump incited violence at a campaign rally and holding that "only speech that explicitly or implicitly encourages the imminent use of violence or lawless action is outside the protection of

35

the First Amendment") (citing *Brandenburg v. Ohio*, 395 U.S. 444 (1969)).  There cannot

possibly, then, be any "compelling" reason to suspend Mr. Karem merely because of his speech.

*R.A.V. v. City of St. Paul*, 505 U.S. 377, 388-91 (1992) (constitutionally impermissible to single

out and punish content-based speech through prohibition on "fighting words").  President

Trump's own Tweet applauding Mr. Gorka ("@SebGorka Wins Big, No Contest!"), in fact,

demonstrates that he himself did not view Mr. Karem's conduct as threatening to the

administration or any of its guests, but rather thought it was humorous.  *See* Ex. 41.

Nor can the suspension be justified on the basis that Mr. Karem "disrupt[ed a] White

House event[ ]."  Aug. 16 Ltr. at 8.  Ms. Grisham acknowledges that Mr. Karem's conduct

occurred "after the press event had ended," *id.* at 13; *see also id.* at 3 (recognizing President left

before Mr. Gorka confronted Mr. Karem).

3.      The suspension of Mr. Karem's hard pass is also a content- and viewpoint-based

punishment that was imposed because the President and the administration do not like Mr.

Karem's reporting.  Although numerous Social Media Summit attendees were heckling and

taunting one another, yelling and screaming indecencies, only Mr. Karem has been singled out

for punishment.  Compl. ¶ 47; *see E-Bru, Inc. v. Graves*, 566 F. Supp. 1476, 1479 (D.N.J. 1983)

(granting preliminary injunction to company seeking to operate adult bookstore despite zoning

rule because there was "no clear evidence . . . establishing that any applicant" other than the

plaintiff "was ever rejected under" the zoning rationale in question).  Indeed, Ms. Grisham's

August 16 letter goes to great lengths to avoid even a hint of criticism of the behavior of Mr.

Gorka and the other attendees, who support President Trump through social media and other

media avenues, and who mocked and taunted Mr. Karem and other reporters, before, during and

after Mr. Gorka charged across the Rose Garden yelling at Mr. Karem.  She even goes so far as

36

to excuse Mr. Gorka's conduct because he "is a known media figure and such a response is to be expected."  Ex. 10 at 10 n.44.

Mr. Karem is a leading critic of the administration, and the President has publicly resisted and rebuffed tough questioning by Mr. Karem.  For example, on February 21, 2019, after Mr. Karem asked the President where he got his statistics about border violence, the President told Mr. Karem: "Sit down. Sit down. Sit down!"  Karem Decl. ¶ 17; Ex. 24.  A few months later, on June 11, 2019, when Mr. Karem tried to ask the President a question, the President turned and glared at Mr. Karem and said "Quiet! Quiet! Quiet!"  Karem Decl. ¶ 17; Ex. 25.  And on July 24, 2019, just days after Mr. Gorka confronted Mr. Karem in the Rose Garden, the President pointed at Mr. Karem during a press conference and called him "Fake News."  Karem Decl. ¶ 43.  Mr. Karem's coverage of the administration, when viewed in combination with the President's attacks on him and the press at large, *see supra* 8-10, 19-20; Ex. 44 ("I do it to discredit you all and demean you all so when you write negative stories about me, no one will believe you."), is more than enough to establish that Mr. Karem is likely to succeed in demonstrating that the suspension of his hard pass was motivated by unconstitutional content- or viewpoint-discrimination.

## II.  Mr. Karem Will Be Irreparably Injured Absent Injunctive Relief.

The loss of Mr. Karem's press pass for any period—even a day—would irreparably harm him.  As the Supreme Court has held, the loss of any "First Amendment freedoms . . . unquestionably constitutes irreparable injury."  *Elrod*, 427 U.S. at 373; *Pursuing Am.'s Greatness*, 831 F.3d at 511; *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (same); *Westinghouse Broad. Co., Inc. v. Dukakis*, 409 F. Supp. 895, 896 (D. Mass. 1976).  That includes First Amendment violations "for even minimal periods of time."  *Pursuing Am.'s Greatness*, 831 F.3d at 511.  The mere fact that First Amendment violations may chill

constitutionally protected speech is enough to satisfy the irreparable injury standard.
*DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995) ("[R]etaliation need not be
monstrous to be actionable under the First Amendment; it need merely create the potential for
chilling . . . speech on matters of public concern.").

For these reasons, the court in *CNN v. Trump* held that "[e]ach day [a reporter] is
deprived of" his "First Amendment liberty interest in a White House press pass" "without the
process prescribed by the court in *Sherrill*, he suffers a harm that cannot be remedied."  Ex. 30
(*CNN* ruling), at 6:14-15, 13:8-13.  The same is true here.  And *CNN v. Trump* is in accord with a
line of similar cases in which courts have held that restrictions on a reporter's coverage of White
House and government affairs, like the serious restrictions imposed on Mr. Karem here,
constitute irreparable injury—to the reporters themselves, to the outlets they work for, and to the
public at large.  In *Cable News Network, Inc. v. American Broadcasting Companies, Inc*., 518 F.
Supp. 1238 (N.D. Ga. 1981), for example, several television crews were excluded from White
House pool coverage.  *Id.* at 1245-46.  The court granted a preliminary injunction, noting that,
absent such relief, the plaintiffs would "suffer irreparable injury."  *Id*. at 1245.  The court
reasoned that by excluding these news outlets, "a complete visual record of the Presidential
activities covered by the press pools is lost forever"—a loss that "clearly constitutes irreparable
injury to [the news outlets], as well as the public."  *Id.* at 1246.  Similarly, in *American
Broadcasting Companies, Inc. v. Cuomo*, 570 F.2d 1080 (2d Cir. 1977)—a case involving the
ouster of ABC's television crew from several Democratic candidates' campaign headquarters—
the court concluded "[t]here [was] no question that irreparable harm [would] result if ABC
[were] not permitted to broadcast live coverage . . . not only to ABC but to the public which
views the events on its channel."  *Id.* at 1082.  The court explained that excluding ABC from

38

covering the election's events would limit the public's news-viewing options—and for some,

"such as people in hospitals or other institutions who have a single channel to watch," excluding

ABC would foreclose their ability to watch the news altogether, irreparably harming the news

station and public.  *Id.*

Just as in *CNN v. Trump*, the suspension of Mr. Karem's press pass irreparably harms Mr.

Karem and the public at large.  *See* Karem Decl. ¶¶ 49-50; Gillman Decl. ¶¶ 9-16; Feinberg Decl.

¶ 3; Ex. 33.  By withholding Mr. Karem's credentials for any period of time, Defendants are

preventing him from doing his job, foreclosing an essential source of news for the American

public.  *See* Karem Decl. ¶¶ 49-50; Gillman Decl. ¶ 9, 16; Pavlovic Decl. ¶ 22.  And every day

the suspension is allowed to stand, it further chills the entire White House press corps and the

press at large, whose ability and willingness to monitor and report on the center of American

public life is daily curtailed by the risk of losing, temporarily or permanently, the credential that

makes their jobs possible.  "[I]n suspending Brian Karem's credential, the President is not only

taking an unwarranted and in my opinion unconstitutional action; he is doing something that will

have a chilling effect on the press as a whole and thus on the public's need to receive objective

and accurate information. What reporter or news organization will feel safe from White House

retaliation should something they publish offend the President's supporters if this unjust action

against Karem is not reversed?"  Donaldson Decl. ¶ 19.

## III.  The Balance of Equities And The Public Interest Strongly Favor Injunctive Relief.

In light of the substantial due process and First Amendment violations here and the

irreparable harm to Mr. Karem, the balance of equities sharply tips in his favor.  As the court

held in *CNN v. Trump*, the harm to a journalist from the loss of a White House hard pass

outweighs "the government's interest in orderly, respectful press conferences," Ex. 30 (*CNN*

ruling), at 13:21-25—a holding which applies with even greater force to the "press event" at

issue here, in which the President did not take questions.  "Ordinarily, such a threatened injury to

the plaintiff will easily outweigh whatever burden the injunction may impose, because the

government is in no way harmed by issuance of an injunction that prevents the state from

enforcing unconstitutional restrictions."  *Hassay v. Mayor*, 955 F. Supp. 2d 505, 517 (D. Md.

2013) (citation and quotation marks omitted); *Telemundo v. City of Los Angeles*, 283 F. Supp. 2d

1095, 1103-04 (C.D. Cal. 2003) (where news outlet had initially been compelled to delay one of

its broadcasts in light of defendants' production, holding that "equitable considerations [did] not

weigh in favor of denying the preliminary injunction" on the ground that defendants'

"commercial interest in the production . . . [did] not outweigh [the news outlet's] First

Amendment rights and the public interest in diversity of coverage of newsworthy events").  And

indeed, the fact that Ms. Grisham waited *three weeks* after Mr. Karem's alleged "misconduct"

even to notify him of her "preliminary decision"—and then took another two weeks to issue her

final decision—demonstrates that the government will suffer no harm from temporary and

preliminary injunctive relief.

The public interest also strongly weighs in Mr. Karem's favor.  Courts have consistently

held that the public's unfettered access to news coverage is an interest warranting injunctive

relief.  *See, e.g.*, *Sherrill*, 569 F.2d at 129-30 (explaining that "the public at large have an interest

protected by the first amendment in assuring that restrictions on newsgathering be no more

arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of

information"); *Telemundo*, 283 F. Supp. 2d at 1104 (granting injunctive relief to Telemundo,

which had been faced with the threat of restrictions on one of its broadcasts, because "[t]he

public has an interest in viewing live coverage of the event").  Consistent with these cases, here,

"[t]he pending analysis should clearly indicate that the public interest will be significantly

benefitted, and in no way harmed, by the granting of the injunctive relief sought.  [Karem's]

participation in White House [] coverage benefits the public by informing it of the activities of its

government."  *CNN v. ABC*, 518 F. Supp. at 1246.

## CONCLUSION

For the foregoing reasons, Mr. Karem respectfully requests that this Court issue a

temporary restraining order and preliminarily enjoin Defendants, requiring them to restore Mr.

Karem's hard pass.

Dated: August 20, 2019

Theodore J. Boutrous, Jr., (D.C. Bar No. 420440)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Ave.,
Los Angeles, California 90071
Tel: (213) 229-7804
tboutrous@gibsondunn.com

Thomas H. Dupree Jr. (D.C. Bar No. 467195)
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 955-8547
tdupree@gibsondunn.com

Anne Champion (*pro hac vice forthcoming*)
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166-0193
Tel: (212) 351-5361
achampion@gibsondunn.com

*Counsel for Plaintiff Brian J. Karem*