# Exhibit 10

**THE WHITE HOUSE**

WASHINGTON

August 16, 2019

Theodore J. Boutrous Jr., Esq.
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197

Dear Mr. Boutrous:

I previously informed your client, Brian Karem, that I had preliminarily determined that his hard pass should be suspended for 30 days due to his conduct at the press event in the Rose Garden on July 11, 2019. As explained below, I have now made a final determination to suspend Mr. Karem's hard pass for 30 days, effective immediately through Saturday, September 14, 2019.

### Process

On August 2, 2019, I provided Mr. Karem with written notice that I had reached a preliminary decision to suspend his hard pass for 30 days due to his conduct at the press event in the Rose Garden on July 11, 2019.[1] That letter provided notice of the factual basis for my preliminary decision, explicitly provided Mr. Karem with the opportunity to contest that decision by submitting a written response to me by 5:00 PM on August 5, 2019, and explained that I would consider any timely written response before making a final determination.

On August 5, 2019, you submitted an eight-page written response on Mr. Karem's behalf.[2] That response did not include any supporting material, but did request, among other things, a meeting: "We further request that you meet with us prior to finalizing the decision so that Mr. Karem has a meaningful opportunity to respond to the evidence."[3] The next day, I acknowledged receipt of your response and informed you that my office would be happy to meet "with Mr. Karem and you or other counsel" on August 8, 2019.[4] In light of your complaint that you had not had sufficient time to prepare a written response and in light of this anticipated

---

[1] *See* 8/2/2019 Letter from S. Grisham to B. Karem (Preliminary Decision).
[2] *See* 8/5/2019 Letter from T. Boutrous Jr. to S. Grisham (Initial Response). Your initial response complained that "Mr. Karem was afforded *no* process before [I] reached this 'preliminary decision.'" Initial Response at 6. That complaint is fundamentally mistaken. The first step in providing process is providing notice, which is exactly what my August 2 letter provided. While Mr. Karem may be entitled to due process before his hard pass is suspended, my preliminary decision did not suspend his hard pass. My preliminary decision merely provided written notice to Mr. Karem that I intended to suspend his hard pass, informed him of the factual basis for that decision, and gave him an opportunity to respond. Preliminary Decision at 1–2. Mr. Karem's hard pass has not been suspended or restricted in any way pending this final decision.
[3] Initial Response at 8.
[4] 8/6/2019 Letter from S. Grisham to T. Boutrous Jr. (emphasis added).

meeting, I also explained that Mr. Karem could submit any supplement he wished to his written response by 5:00 PM on Friday, August 9, 2019.[5] The next morning, you stated that your "partners Thomas Dupree and Anne Champion are available to meet at 4 PM on Thursday, August 8, 2019."[6] I reiterated that I was "happy to meet tomorrow, August 8, 2019 at 4:00 PM *with Mr. Karem*, along with Mr. Dupree and Ms. Champion."[7] Mr. Dupree then responded that he and Ms. Champion would meet with me, but that "Brian will not be accompanying us."[8]

Despite Mr. Karem's decision not to attend the meeting he had requested, I met with Mr. Dupree and Ms. Champion at about 4:00 PM on August 8, 2019, along with attorneys from the Office of White House Counsel. During that approximately 45-minute meeting, I provided Mr. Dupree and Ms. Champion with the opportunity to present whatever facts and arguments they wished until they were finished, and we asked some clarifying questions as well. Mr. Dupree and Ms. Champion confirmed that there was no reason for Mr. Karem's absence other than a belief that he was not required to be there. They offered to have him come to *another* meeting if I wished to arrange a separate, second meeting to speak with him.

An attorney from the Office of White House Counsel also informed you of additional information that I would consider in making my final decision—the observations of the U.S. Secret Service agent who intervened and spoke to Mr. Karem during the incident. Because Mr. Karem was not present at the meeting, we invited you to respond to the agent's recollections in your supplemental response.[9] On August 8, 2019, I sent you an email outlining all of the information on which I would base my final decision.[10] You submitted a supplemental, four-page response on August 9, 2019 along with supporting materials, including a written statement by Mr. Karem.[11]

I have thus provided Mr. Karem with written notice and three opportunities to respond, in person and in writing, and the opportunity to submit any materials that he considers relevant.

**Facts**

As I confirmed on August 8, 2019,[12] I have based my final decision on the following:

---

[5] *Id.*
[6] Email from T. Boutrous Jr. to S. Grisham (Aug. 7, 2019 9:17 AM).
[7] Email from S. Grisham to T. Boutrous Jr. (Aug. 7, 2019 4:09 PM) (emphasis added).
[8] Email from T. Dupree Jr. to S. Grisham (Aug. 7, 2019 5:06 PM).
[9] *See* Email from S. Grisham to T. Dupree Jr. & A. Champion (Aug. 8, 2019 9:02 PM). Your supplemental response speculates that the Secret Service agent may have provided exculpatory information that is not included in this final decision. 8/9/2019 Letter from T. Boutrous Jr. to S. Grisham (Supplemental Response). Your speculation is factually incorrect. I have relied on the Secret Service agent's statement only for the point that the agent approached Mr. Karem because he grew concerned, after Mr. Karem's invitation to "go outside" and Mr. Gorka's response, that a physical altercation might break out and for the agent's recollection of what he said to Mr. Karem. The Secret Service agent did not provide any information "confirm[ing] that Mr. Karem did nothing wrong" as you hypothesize, *id.*
[10] Email from S. Grisham to T. Dupree Jr. & A. Champion (Aug. 8, 2019 9:02 PM).
[11] *See generally* Supplemental Response; 8/9/2019 Statement of B. Karem (Karem Statement).
[12] Email from S. Grisham to T. Dupree Jr. & A. Champion (Aug. 8, 2019 9:02 PM).

2

- Seven publicly available videos, which show multiple angles of the incidents involving Mr. Karem in the Rose Garden on July 11, 2019;[13]
- The observations of the U.S. Secret Service agent who intervened and spoke to Mr. Karem as shown on the videos and whose recollection concerning the incident we described during the August 8, 2019 in-person meeting;
- Mr. Karem's August 5, 2019 initial response; and
- The in-person discussion on August 8, 2019.

I have also relied on Mr. Karem's August 9, 2019 supplemental response, which includes a statement from Mr. Karem and several emails between Mr. Karem and my office. As I also confirmed to you on August 8, 2019,[14] I have not conducted, and have not relied on, interviews with any other witnesses. After considering the sources listed above, I find the following.

After the conclusion of the President's address in the Rose Garden to invited guests of the White House Social Media Summit, Mr. Karem attempted to ask the President a question as he walked away, but the President did not respond and continued walking. I credit Mr. Karem's assertion that, at this point, a couple of the invited guests made comments to Mr. Karem, such as "[h]e talked to us, the real news,"[15] and at least one video shows that a guest said "don't be sad, don't be sad."[16] In response, Mr. Karem, who was standing in the designated press area behind a rope line, insulted the President's invited guests, stating that "This is a group of people that are eager for demonic possession."[17] One of the guests, Sebastian Gorka, then asked, while gesturing sarcastically with air quotes, "And you're a journalist, right?"[18] In response, Mr. Karem escalated the exchange by calling to Mr. Gorka from across the Rose Garden, "Come on over here and talk to me, brother. We can go outside and have a long conversation."[19] Mr. Karem accompanied the suggestion that they "go outside" by gesturing with his right hand (closed hand, thumb extended, gesturing over his shoulder) and noticeably cocking his eyebrow—as if to indicate, "you know what I mean."[20] Under the circumstances, Mr. Karem's

---

[13] Bloomberg TicToc, *Sebastian Gorka Clashes with Journalist After Trump Refuses Media Questions*, YouTube (July 11, 2019), https://youtu.be/VNfPaZ4Ipsw (Video 1); Baxter, *Journalist Brian Karem picks a fight with Sebastian Gorka*, YouTube (July 11, 2019), https://youtu.be/HMVmkTFedUc (Video 2); Terrence Daniels, *Fights in The Rose Garden...*, YouTube (July 11, 2019), https://youtu.be/qQe2JFS08Rg (Video 3); Nicholas Ballasy, *Sebastian Gorka and Reporter Get Into Shouting Match at White House*, YouTube (July 11, 2019), https://youtu.be/mNySuQFh2YE (Video 4); Washington Post, *Gorka to Karem: 'You're not a journalist, you're a punk'*, YouTube (July 11, 2019), https://youtu.be/zRogWTuS5HI (Video 5); Washington Examiner (@dcexaminer), Twitter (July 11, 2019, 3:53 PM), https://twitter.com/dcexaminer/status/1149451612227887104 (Video 6); Reuters Top News (@Reuters), Twitter (July 11, 2019, 3:29 PM), https://twitter.com/Reuters/status/1149445607288950784 (Video 7).
[14] Email from S. Grisham to T. Dupree Jr. & A. Champion (8/8/2019 9:02 PM).
[15] Karem Statement at 2.
[16] *E.g.*, Video 1, https://youtu.be/VNfPaZ4Ipsw?t=13 (at 0:13–0:15); Video 4, https://youtu.be/mNySuQFh2YE (at 0:00–0:02).
[17] *E.g.*, Video 1, https://youtu.be/VNfPaZ4Ipsw?t=17 (at 0:17–0:20); Video 4, https://youtu.be/mNySuQFh2YE?t=4 (at 0:04–0:08).
[18] Video 1, https://youtu.be/VNfPaZ4Ipsw?t=23 (at 0:23–0:25).
[19] Video 2, https://youtu.be/HMVmkTFedUc?t=10 (at 0:10–0:14).
[20] *See id.*

3

words and gestures together created the impression to a reasonable observer that Mr. Karem was suggesting a physical confrontation.

Mr. Gorka then crossed the Rose Garden to approach Mr. Karem, shouting in response to Mr. Karem: "Are you threatening me now in the White House? In the Rose Garden? You're threatening me in the Rose Garden?"[21] As Mr. Gorka approached, Mr. Karem moved towards him, while staying within the rope line designating the press area.[22] The assertion in Mr. Karem's supplemental response that Mr. Karem "did not advance toward Mr. Gorka"[23] is belied by the video of the event. Mr. Karem and Mr. Gorka then traded insults face to face. Someone shouted "hit him, Gorka!"[24] After calling Mr. Karem a "punk," Mr. Gorka turned and walked away, and some guests briefly chanted, "Gorka, Gorka, Gorka." As Mr. Gorka turned to walk away toward the Palm Room, a U.S. Secret Service agent moved quickly from a position to Mr. Karem's right, approached Mr. Karem, placed the fingers of his right hand on Mr. Karem's right forearm and kept that position for a moment as Mr. Gorka continued to leave and as Mr. Karem shouted after him, "Go home!"[25]

As videos show,[26] the Secret Service agent then crossed in front of Mr. Karem and began to move in the direction that Mr. Gorka had gone. Mr. Karem yelled after Mr. Gorka: "Go home! Go Home!" and "Hey Gorka, get a job!" Mr. Karem then left the designated press area and paced in front of other members of the press and in front of the rope that marked the designated press area (which had partially fallen to the ground). One of the guests said, "Just for the record, he'd kick your punk ass." The Secret Service agent turned around and saw that Mr. Karem had stepped outside of the designated press area. The Secret Service agent approached Mr. Karem, put his hand on Mr. Karem's chest, and said something to Mr. Karem that is not audible on the videos, at which point Mr. Karem stepped back into the press area.

In an interview,[27] the Secret Service agent explained that he approached and intervened during Mr. Karem's exchange with Mr. Gorka because he believed there was a risk of a physical altercation. He also explained that when he approached Mr. Karem the second time, he said words to the effect of, "Take a look around, remember where you're at, and please step back into the press pen. Let's calm down a little bit."

---

[21] *E.g.*, Video 1, https://youtu.be/VNfPaZ4Ipsw?t=28 (at 0:28–0:35); Video 4, https://youtu.be/mNySuQFh2YE?t=15 (at 0:15–0:23).
[22] *E.g.*, Video 2, https://youtu.be/HMVmkTFedUc?t=17 (at 0:15–0:19).
[23] Supplemental Response at 3.
[24] *E.g.*, Video 2, https://youtu.be/HMVmkTFedUc?t=19 (at 0:19–0:20).
[25] *E.g.*, Video 1, https://youtu.be/VNfPaZ4Ipsw?t=28 (at 0:39–0:40); Video 5, https://youtu.be/zRogWTuS5HI?t=10 (at 0:10–0:13).
[26] *E.g.*, Video 1, https://youtu.be/VNfPaZ4Ipsw?t=40 (at 0:40–1:09); Video 2, https://youtu.be/HMVmkTFedUc?t=23 (at 0:23–0:33); Video 3, https://youtu.be/qQe2JFS08Rg?t=7 (at 0:07–0:16); Video 4, https://youtu.be/mNySuQFh2YE?t=25 (at 0:25–0:46); Video 5, https://youtu.be/zRogWTuS5HI?t=11 (at 0:11–0:31); Video 7, https://twitter.com/Reuters/status/1149445607288950784 (at 0:17–0:31).
[27] The facts in this paragraph are the only ones that came solely from the interview of the Secret Service agent. While these facts supplement my understanding of the events, they are not critical to my findings or decision. I would reach the same findings and decision without them.

4

As video shows,[28] after leaving the Rose Garden, Mr. Karem found Mr. Gorka in the Palm Room and again tried to engage with him. As he persisted in attempting to engage Mr. Gorka, Mr. Karem ignored a White House staffer's repeated directions to leave and instructions that "the press are leaving now." I credit Mr. Karem's assertion that he attempted to say some words to Mr. Gorka "to make peace with him" and that he "offered to shake his hand."[29] When Mr. Gorka made clear that he would not shake Mr. Karem's hand, however, Mr. Karem turned this exchange into a confrontation as well. Mr. Karem repeatedly said "you won't shake my hand," and then wagged his finger in Mr. Gorka's face. Mr. Karem asserts that he "shook [his] finger in disappointment at him, not aggression."[30] However, after a confrontation that included an invitation to "go outside" and shouted insults, a reasonable observer would view shaking a finger in another adult's face as only renewing the confrontation. Mr. Gorka then referred to the instructions to leave from the White House staffer, repeating "You're done!" and saying "Listen to him. Get out. Get out."[31] As he said this, Mr. Gorka gestured toward the staffer. Mr. Karem eventually left after Mr. Gorka rebuffed him.

In defense of Mr. Karem's conduct, you have not disputed the basic outline of events. Instead, you primarily argue that Mr. Karem's actions should be characterized as nothing more than a good-natured and humorous exchange with the invited guests and as an attempt to de-escalate aggression initiated by Mr. Gorka when he crossed the Rose Garden to Mr. Karem's spot. That argument depends on two assertions: (1) Mr. Karem's "demonic possession" comment was good natured and part of what you call Mr. Karem's "Rodney Dangerfield" routine, and (2) Mr. Karem's invitation to Mr. Gorka to "go outside and have a long conversation" was genuinely asking Mr. Gorka for a conversation and was an effort to de-escalate the situation. Based on the totality of the circumstances, I find that these assertions are not credible. Moreover, even if I found that these assertions were consistent with Mr. Karem's subjective intent, Mr. Karem still should have known how his actions would have been received by a reasonable observer.

*First*, Mr. Karem's "demonic possession" comment cannot credibly be understood as mere light-hearted comedy. Mr. Karem has asserted that he made that comment as a Rodney Dangerfield impersonation. I do not find that assertion credible. During our August 8, 2019 meeting, Mr. Dupree and Ms. Champion conceded that Mr. Karem's "demonic possession" comment is not a quotation (or a variation of one) from any Dangerfield movie or routine. And I do not believe that any reasonable observer would have seen anything about Mr. Karem's choice of words, mannerisms, or inflection that remotely evoked Rodney Dangerfield. In addition, Mr. Karem has asserted that "everyone" in the press pool knows that he does a Dangerfield impersonation, but, despite having the opportunity to do so, he has not provided any statement from press members familiar with his impersonation stating that Mr. Karem was performing that impersonation on this occasion. In any event, even if Mr. Karem had been doing an impression, it would not alter the fact that he insulted White House guests. An insult to guests is still an insult even if delivered while mimicking a comedian.

---

[28] Video 4, https://youtu.be/mNySuQFh2YE?t=173 (at 2:53–3:26).
[29] Karem Statement at 3.
[30] *Id.*
[31] Video 4, https://youtu.be/mNySuQFh2YE?t=186 (at 3:06–3:11); Video 4, https://youtu.be/mNySuQFh2YE?t=200 (at 3:20–3:24).

You have placed a great deal of weight on the fact that there was some laughter after Mr. Karem's comment about demonic possession. I do not believe that laughter in that situation somehow establishes that Mr. Karem was having nothing more than a good-natured exchange. Mr. Karem's comment was not light-hearted; it denigrated the mental state of the gathered audience. And the laughter in response was equally consistent with a reaction in disbelief at the bizarreness of Mr. Karem's taunt. In any event, the comment was certainly taken as an insult by some members of the audience, as evidenced by Mr. Gorka's response. That objective response, no matter Mr. Karem's subjective intent, reinforces the fact that the comment was inappropriate and unprofessional.

***Second***, Mr. Karem's invitation to Mr. Gorka to "go outside and have a long conversation" cannot objectively be understood as an effort to de-escalate by making a genuine invitation for a conversation in another forum. Any characterization of this comment as a neutral comment or an attempt to de-escalate the situation is belied by the facts shown on the videos. As a threshold matter, the videos plainly show that it was the suggestion to "go outside" that *escalated* the situation. Before that comment, Mr. Karem had made his "demonic possession" comment and Gorka had responded from across the Rose Garden by suggesting that Mr. Karem was a "journalist" only with air quotes. It was only after Mr. Karem invited Mr. Gorka to "go outside" that Mr. Gorka asserted that he had been threatened and began to cross the Rose Garden to confront Mr. Karem. In particular, any suggestion that the invitation to "go outside" was designed to defuse a situation *after* Mr. Gorka had acted aggressively is flatly contrary to the sequence of events.

In addition, when Mr. Karem made this comment, his body language did not remotely suggest an effort to defuse tension. Instead, Mr. Karem's hand gesture (a closed hand, thumb extended, gesturing over his shoulder), his noticeably cocked eyebrow, and his tone of voice[32] all indicate an aggressive posture inviting further confrontation—not someone trying to calm down the situation or genuinely interested in talking.

Consistent with Mr. Karem's body language, the videos show that other people contemporaneously understood Mr. Karem's comment as an invitation to a physical altercation. It appears that Mr. Gorka understood it as a threat and repeatedly asked Mr. Karem if he was "threatening him." Other individuals responded at the time as if it were a threat. One individual yelled, "hit him Gorka!"[33] A second individual told Mr. Karem that Mr. Gorka would "kick your punk ass."[34] A third individual, speaking to Mr. Karem just over a minute later, explicitly characterized it as a threat:

| | |
|---|---|
| Individual: | "You just threatened Gorka just a minute ago. You told him to go outside." |
| Mr. Karem: | "I said I would talk to him. I didn't threaten. I was standing right here." |
| Individual: | "Everybody knows what that means. What were you going to do?" |

---

[32] Video 2, https://youtu.be/HMVmkTFedUc?t=10 (at 0:10–0:14).
[33] *E.g.*, Video 2, https://youtu.be/HMVmkTFedUc?t=17 (at 0:17).
[34] *E.g.*, Video 2, https://youtu.be/HMVmkTFedUc?t=31 (at 0:31–0:34).

| | |
|---|---|
| Mr. Karem: | "No, it means talk." |
| Individual: | "You could talk to him right here. Why would you take him outside?" |
| Mr. Karem: | "I'd be happy to talk." |
| [cross-talk] | |
| Mr. Karem: | "I didn't threaten to kick his butt. I said I would talk to him." |
| Individual: | "We all know what that means."[35] |

Mr. Karem claims that he was "a little discombobulated by [Mr. Gorka's] aggression."[36] But the videos of the incident do not show Mr. Karem reacting in a manner that suggests discombobulation. Instead, Mr. Karem advances toward Mr. Gorka as he approaches, within the limits permitted by the rope line defining the press pen.[37]

Mr. Karem's further conduct also belies any claim that he was trying to de-escalate the situation. After he had invited Mr. Gorka to "go outside," after Mr. Gorka had asked if that was a "threat," after Mr. Gorka and Mr. Karem had exchanged words, and after Mr. Gorka had turned to walk away, Mr. Karem sought to continue the confrontation. As Mr. Gorka was leaving, Mr. Karem shouted loudly after him "Go home! Go home!" and "Hey Gorka, get a job!" and then stepped over the partially fallen rope line to pace in front of the other journalists.[38] Those taunts are inconsistent with any intent to de-escalate the situation.

Another factor also weighs against Mr. Karem's interpretation of the events. Because Mr. Karem's characterization of his words depends critically on the asserted sincerity of his invitation to talk and requires convincing me of his credibility with respect to that assertion, I find it significant that Mr. Karem chose not to meet with me in person to explain his conduct after I expressly invited him to do so.[39]

Finally, Mr. Karem's subjective intent is not, in any case, dispositive here. Even if I credited Mr. Karem's assertion that his sincere subjective intent was to de-escalate the situation, it would not alter the fact that his comments were objectively inappropriate to the circumstances. Even if Mr. Karem subjectively believed that his actions were non-threatening, he should have known how a reasonable observer would have reacted to these repeated confrontations, as many

---

[35] *E.g.*, Video 4, https://youtu.be/mNySuQFh2YE?t=133 (at 2:13–2:36); Video 6, https://twitter.com/dcexaminer/status/1149451612227887104 (at 0:50–1:12).
[36] Karem Statement at 3.
[37] Video 2, https://youtu.be/HMVmkTFedUc?t=17 (at 0:15–0:19).
[38] *E.g.*, Video 1, https://youtu.be/VNfPaZ4Ipsw?t=40 (at 0:40–1:09); Video 2, https://youtu.be/HMVmkTFedUc?t=23 (at 0:23–0:33); Video 4, https://youtu.be/mNySuQFh2YE?t=25 (at 0:25–0:46); Video 5, https://youtu.be/zRogWTuS5HI?t=11 (at 0:11–0:31); Video 7, https://twitter.com/Reuters/status/1149445607288950784 (at 0:17–0:31).
[39] I have noted that, at the August 8 meeting, Mr. Dupree and Ms. Champion said that Mr. Karem would be happy to come to a subsequent meeting if I wanted to speak with him. This, however, is beside the point. Mr. Karem, through counsel, asked to meet in person. I agreed to that meeting, specifically stated that I was happy to meet with Mr. Karem, the meeting was scheduled, and Mr. Karem did not attend, nor did he claim any conflict that prevented him from attending.

7

observers did, in fact, react at the time. His remarks had the predictable effect of offending and provoking White House guests, and constituted a significant lapse in judgment, regardless of Mr. Karem's intent. The objective fact is that Mr. Karem's words elicited a predictable response and that combination of events prompted a Secret Service agent to intervene due to a perceived risk of a physical altercation. It is inconsistent with widely-shared understandings and norms of media professionalism to yell statements that could reasonably be interpreted as insults or threats to guests in the Rose Garden, to repeatedly confront those guests afterward, and to disobey instructions from White House staff.

### Decision

Based on the facts described above, I conclude that Mr. Karem's actions, as viewed by a reasonable observer, (1) insulted invited guests of the White House, (2) threatened to escalate a verbal altercation into a physical one to the point that the Secret Service deemed it prudent to intervene, and (3) re-engaged with Mr. Gorka in what quickly became a confrontational manner while repeatedly disobeying a White House staffer's instructions to leave. Mr. Karem's conduct, taken as a whole, was unacceptable and disruptive, and requires a response to ensure that it does not happen again.

I have carefully considered a range of potential responses to Mr. Karem's actions, including permanently revoking his hard pass, temporarily suspending his hard pass, providing a written warning, and taking no action. In my judgment, a permanent revocation would be too great a punishment for the conduct involved here. Taking no action, on the other hand, would be insufficient to deter Mr. Karem and other members of the press from disrupting White House events.

I have concluded that a temporary suspension of Mr. Karem's hard pass is an appropriate response. It properly accounts for Mr. Karem's stated need for his press pass and it imposes no greater a restriction than is necessary for an effective sanction. The purpose of a hard pass is to provide day-to-day access to the White House campus so that a member of the press can report and ask questions of officials who are taking questions. But a hard pass must be used in a manner that is respectful of the White House property and grounds in light of the extensive access it provides. There is a widely-shared understanding that at all times at White House press events, members of the press must act professionally, maintain decorum and order, and obey instructions from White House staff.[40] Disruptive behavior, such as Mr. Karem's, is clearly prohibited. Moreover, I note that Mr. Karem did not use the access granted by his hard pass for the journalistic purposes for which it is granted. Instead, Mr. Karem used the access granted by his hard pass to insult invited guests, to make intemperate comments that threatened to escalate a verbal confrontation into a physical altercation, and to repeatedly disobey the instructions of White House staff to leave with the rest of the members of the press after the conclusion of the event. Mr. Karem's actions escalated the situation to the point that the Secret Service deemed it prudent to intervene to ensure that verbal confrontations involving Mr. Karem would not escalate into a physical one.

---

[40] Preliminary Decision at 1.

The only less restrictive alternative that you have proposed is a written warning. After considering that suggestion, I conclude that a written warning would be insufficient given the serious nature of Mr. Karem's misconduct and the ineffectiveness that a written warning would have in deterring similar misconduct by Mr. Karem or others in the future. On the present record, there is no indication that Mr. Karem would take to heart a written warning that his behavior was inappropriate. I base that conclusion on at least two factors. First, throughout the twelve combined pages of his two written submissions prepared by counsel and his five-page personal statement, Mr. Karem has nowhere acknowledged even the slightest indication of any regret for his conduct or recognition that it could, even possibly, have transgressed any boundaries of professional conduct for the press corps. Instead, Mr. Karem's statement suggests that, in his view, it *is* appropriate to "nearly [get] into blows with a guest in the Rose Garden."[41] In short, Mr. Karem seems to be oblivious to the fact that his conduct was wrong. Second, Mr. Karem has continued to insist that his invitation to Mr. Gorka to "go outside" was sincerely meant as a de-escalatory invitation for a genuine conversation. For all the reasons explained above, I find that assertion lacking in credibility. Mr. Karem's insistence on continuing to press a characterization of events that is plainly incompatible with his words, gestures, tone, and actions in the Rose Garden indicates to me that some form of sanction beyond a mere warning letter is warranted.

I have carefully considered your assertion that a 30-day suspension is too harsh, and I disagree. A warning would be insufficient for the reasons above. Although you have not suggested that a suspension of any lesser length would be appropriate, I have considered that alternative as well. In light of the seriousness of Mr. Karem's conduct, however, I do not believe that a suspension of fewer than 30 days would be proportionate to the nature of his conduct, which turned a Rose Garden event into a spectacle and risked a physical altercation.

You have raised several additional arguments on Mr. Karem's behalf, which I address below.

*First*, you argue that "there are no so-called 'widely understood understanding[s]'" that would have put Mr. Karem on notice that his conduct was improper.[42] I find that argument wholly insubstantial. Members of the press certainly understand that, in any professional context, trading insults with guests at a venue where a press event is taking place and escalating a verbal confrontation with an invitation to "go outside" is unacceptable behavior. Mr. Karem does not seriously contend that he lacked actual notice that it is prohibited conduct in the White House for a member of the press to disrupt a White House press event by threatening guests and escalating a verbal altercation with insinuations of physical violence such that the Secret Service deems it prudent to intervene, or to repeatedly disobey a staffer's instructions to leave. Indeed, Mr. Dupree and Ms. Champion explicitly confirmed during our in-person meeting that they were not second-guessing the White House's need to ensure basic decorum, order, and security.

---

[41] Karem Statement at 1 ("CBS White House Correspondent Bill Plante once, in a story widely told by his peers, nearly got into blows with a guest in the Rose Garden.").
[42] Initial Response at 5.

9

***Second***, you assert that I "failed to conduct a reasonable investigation before reaching [my] preliminary decision" because I "did not speak to a single witness."[43] That argument rests on a fundamentally flawed premise. There was no need for an investigation involving witness interviews here because Mr. Karem's words and conduct were caught on multiple videos recorded from several different angles. You have not provided any basis for believing that the imperfect recollections of witnesses would somehow provide a more accurate basis for assessing events than the video and audio recordings that capture exactly what happened second by second. Where there was one interaction that was potentially relevant but could not be heard on any of the videos—the Secret Service agent's interaction with Mr. Karem—the Secret Service agent was interviewed. Mr. Karem has not disputed the Secret Service agent's observations and recollection, nor have you identified any specific way in which additional investigation could uncover relevant facts that would be important to my decision. Indeed, as we explained to Mr. Dupree and Ms. Champion on August 8, Mr. Karem knows which members of the press witnessed events that day and he was free to provide statements from them if he believed they would be useful. You have neither provided any witness statements nor even provided any plausible basis for thinking that witness statements could possibly bring to light different information that would justify a different conclusion in this matter.

In that regard, it is worth noting that the subjective, after-the-fact "impressions" of witnesses would not be particularly relevant to my decision, because my decision here involves determining whether Mr. Karem breached standards of conduct based on an objective assessment of his actions, which can be determined from the objective facts recorded on tape.[44] Whether one individual or another might have believed that a particular comment was funny or light hearted is not the critical point. A poll of the opinions of everyone present is not required to determine the objectively reasonable understanding of Mr. Karem's statements and actions.

***Third***, you have made wholly unfounded accusations that taking action against Mr. Karem for his conduct on July 11 is actually a pretext for unconstitutional content-based and viewpoint-based discrimination against Mr. Karem. Those accusations are baseless. The content and viewpoint of Mr. Karem's reporting have played no role in this decision. Indeed, admissions in Mr. Karem's own submissions disprove the theory that there has been some effort to stifle his speech. Both Mr. Karem's initial response and his statement admit that the President has called on Mr. Karem and answered Mr. Karem's questions several times since the incident in the Rose Garden on July 11, 2019.[45] Indeed, as Mr. Karem admits, the President answered two questions from Mr. Karem, in what you admit was "a rather cordial exchange," on August 2, shortly before I issued notice of my preliminary decision.[46] These admissions confirm that the content and

---

[43] Supplemental Response at 1.
[44] You claim that I have "elected to ignore publicly-available evidence that Mr. Gorka has trumpeted his confrontation with Mr. Karem, bragging that he took on the 'fake news industrial complex,' as well as evidence that the President himself viewed the events as humorous." Supplemental Response at 2. I have not ignored these points. I have considered them, but I reject them. The fact that Mr. Gorka may have touted his response to Mr. Karem's taunts to spin the whole event to his advantage in the media is irrelevant. Mr. Gorka is a known media figure and such a response is to be expected. It does not alter the original impropriety of Mr. Karem's conduct. Similarly, the President's tweet suggesting that Mr. Gorka had the better of the exchange does not undercut my conclusion that Mr. Karem's conduct was improper and does not suggest that it was merely a "humorous" interlude that warrants no sanction.
[45] Initial Response at 7; Karem Statement at 4.
[46] Karem Statement at 4.

viewpoint of Mr. Karem's journalism have nothing to do with this decision. If the White House had been engaged in some effort to "silenc[e] a journalist known for tough questioning,"[47] as you claim, the President could have simply ignored Mr. Karem and refused to answer any of his questions. The very fact that the President has continued to call on Mr. Karem demonstrates that there has been no effort to silence his journalism.

***Fourth***, you have argued that Mr. Karem sought "multiple times" to discuss the July 11 incident with me and that when my office rescheduled a meeting with him it was done deliberately to delay speaking with him at all until after his hard pass had been suspended.[48] All of these assertions are false. Mr. Karem's initial submission claims that, after July 11, Mr. Karem "reached out to [my] office *multiple times to discuss the incident.*"[49] In his personal statement, Mr. Karem modified that claim to assert solely that he had been "trying to schedule an interview with" me "for some time" and that he had "hop[ed] to discuss" the events of July 11, 2019 with me.[50] The only contact from Mr. Karem of which I had been aware was an effort to schedule an off-the-record meeting as a get-to-know-you meeting after I started as Press Secretary on June 25. That meeting was scheduled and then canceled more than once, just as I have canceled similar meetings with more than a dozen other reporters due to other matters arising on my schedule as Press Secretary. At the meeting with Mr. Dupree and Ms. Champion on August 8, we explained that we were not aware of any contacts from Mr. Karem seeking to discuss the July 11 incident and asked you to provide any emails or other evidence showing that he sought to discuss the incident with me. The emails that Mr. Karem has submitted in response do not support your assertions.[51] None of them mentions or even hints at a desire to speak with me about the events of July 11, 2019, and they certainly do not suggest that Mr. Karem attempted "multiple times to discuss the incident" with me. One email chain simply thanks me for the format of a briefing with Secretary Mnuchin and provides no support whatsoever for your assertions.[52] The other set of emails involved an initial request made on July 8, 2019 for a ten-minute off-the-record meeting—before the events in the Rose Garden on July 11. That earlier request is then referenced and renewed in emails after July 11 when my schedule required rescheduling our meeting.[53] Those emails involved simply the request for a get-to-know-you meeting that I mentioned above. There is no indication in any of the emails, however, that in Mr. Karem's efforts to reschedule that meeting, which was initially requested on July 8, he was actually hoping to discuss with me the events of July 11.

***Fifth***, you have emphasized the fact that some of the invited guests made comments to Mr. Karem before Mr. Karem's "demonic possession" comment, such as, "don't be sad."[54] The assertion that "he started it first," however, is not a justification for a member of the press to insult invitees at the White House, nor is it a license to escalate the situation, and it certainly does not absolve Mr. Karem of responsibility for his conduct. In addition, your argument on this

---

[47] Initial Response at 7.
[48] *Id.* at 3.
[49] Initial Response at 3 (emphasis added).
[50] Karem Statement at 4.
[51] *See* 8/9/2019 B. Karem Emails in Supp. of Supplemental Response.
[52] *See* Email from B. Karem to S. Grisham (July 16, 2019 1:53 PM).
[53] *See* Email from B. Karem to A. LeHardy (July 9, 2019 6:40 PM); Email from B. Karem to S. Grisham (July 9, 2019 12:54 PM).
[54] Karem Statement at 2; Video 4, https://youtu.be/mNySuQFh2YE (at 0:00–0:02).

11

point ignores the fact that there is a fundamental difference between invited White House guests and the press. The press is present to cover events and to ask questions of those officials who are taking questions. Openly insulting a gathering of guests is never appropriate conduct for a member of the press at the White House, even if one of the guests has directed remarks to the press.

***Sixth***, for similar reasons, your complaint that I am not imposing consequences on others involved—by which I assume you mean Mr. Gorka or any guests who made comments to Mr. Karem—is misplaced. Mr. Gorka and other individuals were present in the Rose Garden as invited guests, not members of the press. My responsibility as Press Secretary involves credentialing members of the White House press and providing the press access to the White House campus so that they can do their jobs. In that role, I am responsible for ensuring that basic standards of conduct are maintained by the press so that White House events can proceed without disruption and with a basic level of decorum. I am not the behavior czar for everyone who enters the campus. I have no authority to dictate the conduct of all guests invited to the White House, nor do I have authority to revoke press passes for guests who did not use a press pass for access to the event. Mr. Gorka, in particular, does not hold a press pass. The assertion that Mr. Karem was "single[d] out"[55] is thus incorrect. You have not identified any members of the press whose conduct in the Rose Garden on July 11, 2019 was remotely comparable to Mr. Karem's or that warrants any sanction.

In addition, Mr. Karem's hard pass is not being suspended merely for a single insult that violates what you characterize as a "no-taunting rule." Instead, as explained above, it is the totality of the conduct in this case that warrants such a sanction, including disrupting the press event with a persistent series of comments that threatened to escalate a verbal altercation into a physical one to the point where the Secret Service had to intervene—and then disobeying staff instructions to leave while trying to re-engage with Mr. Gorka. You have not identified any member of the press who engaged in equivalently egregious and persistent conduct that day.

***Seventh***, you have speculated that this decision has been "potentially made in coordination with Mr. Gorka."[56] That is false. As I confirmed during the August 8, 2019 in-person meeting, I am the decision-maker in this matter. I have informed you of the materials on which my decision is based, and I can state categorically that I have not coordinated or communicated with Mr. Gorka at all about Mr. Karem or the events in the Rose Garden on July 11, 2019. Your request for discovery of any communications between anyone at the White House and Mr. Gorka is equally baseless, and you are not entitled to review White House communications based on unfounded speculation. However, even if Mr. Gorka had contacted me to complain about Mr. Karem's conduct and had requested that Mr. Karem be sanctioned in some way, there would not have been anything improper about such a request from a guest who had been insulted and who felt threatened, and it would have been perfectly appropriate for me to take such a request into account. As it happens, no such contact occurred.

***Eighth***, Mr. Dupree and Ms. Champion argued that Mr. Karem's conduct was less deserving of punishment than the conduct of Jim Acosta at a press event on November 7, 2018,

---

[55] Supplemental Response at 3.
[56] Initial Response at 6.

because Mr. Karem's conduct occurred after the press event had ended, the President was not present, and there was no physical contact here, whereas Mr. Acosta's conduct occurred during a press event while he was asking questions of the President and there was incidental physical contact with an intern. *See generally* Tr. of Mot. Hr'g, ECF No. 22, *Cable News Network, Inc. v. Trump*, No. 1:18-cv-02610-TJK (D.D.C. Nov. 16, 2018). I have considered these points, and I disagree. Mr. Karem's conduct in this case was completely different in kind from the event in November 2018, and it warrants a significant sanction. Persistently taunting others in a way that threatens to escalate a situation into a physical altercation and prompts Secret Service intervention is always prohibited. The fact that the press event had ended and Mr. Karem's conduct was not related in any way to asking questions during the press event serves only to reduce First Amendment concerns for imposing sanctions on his conduct. And to the extent there was physical contact involving Mr. Acosta and the intern, it appeared incidental and fleeting, whereas Mr. Karem's words and actions in this case were deliberate, intentional, and persistent, and threatened to escalate into an actual physical altercation.

\* \* \*

As explained above, Mr. Karem's White House hard pass is suspended effective immediately through Saturday, September 14, 2019. Please inform Mr. Karem that if Playboy has another correspondent they wish to send to the White House during his absence, they should contact me and we will arrange a press pass as swiftly as possible.

Sincerely,

Stephanie A. Grisham
Assistant to the President
White House Press Secretary

CC: Thomas Dupree, Esq.
Ann Champion, Esq.