**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BRIAN KAREM,

          Plaintiff,

   v.

DONALD J. TRUMP, in his official capacity
as President of the United States and in his
individual capacity; and STEPHANIE
GRISHAM, in her official capacity as White
House Press Secretary and in her individual
capacity,

          Defendants.

Case No.:  19-cv-2514 (KBJ)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A
<u>TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 5

  I.   White House Hard Passes and Conduct Guidance ............................................ 5

  II.  The July 11, 2019 Rose Garden Event............................................................. 6

  III. White House Process ...................................................................................... 9

  IV. Litigation Procedural History ....................................................................... 13

ARGUMENT .................................................................................................................. 14

  I.   Plaintiff Is Not Likely to Succeed in Demonstrating that Defendants
       Violated the  Due Process Clause. .................................................................. 14

       A.    The Press Secretary Provided Plaintiff with Ample Process. .............. 15

       B.    Plaintiff Had Sufficient Notice of the Standards of Decorum at
             the White House............................................................................... 22

       C.    The Standards for Decorum and Order at the White House are Not
             Unconstitutionally Vague. ................................................................. 25

       D.    The Press Secretary Has Authority to Regulate the Behavior at Issue
             in This Case...................................................................................... 27

       E.    The Process Provided Was Fair and Impartial.................................... 30

  II.  Plaintiff Is Not Likely to Succeed on His First Amendment Claim. ............... 34

       A.    Assuming that Mr. Karem has a Protectable First Amendment Interest in
             a Hard Press Pass, the Decision to Temporarily Suspend it was Permissible. ..... 34

       B.    The First Amendment Does Not Constrain The Discretion of The President
             and His Designees in Granting White House Access to Journalists..................... 41

  III. Plaintiff Cannot Demonstrate Irreparable Injury. ........................................... 43

  IV. The Balance of Harms and the Public Interest Weigh Against Injunctive Relief. ........... 45

# TABLE OF AUTHORITIES

## CASES

*Am. Tunaboat Ass'n v. Ross*,
  No. 19-cv-01011 (TNM), 2019 WL 3458641 (D.D.C. July 31, 2019) ......................... 37, 37-38

*American Broadcasting Co. v. Cuomo*,
  570 F.2d 1080 (2d Cir. 1977) ........................................................................................ 44, 45

*Ark. Educ. Television Comm'n v. Forbes*,
  523 U.S. 666 (1998) .............................................................................................................. 36

*Arnett v. Kennedy*,
  416 U.S. 134 (1974) .............................................................................................................. 16

*\*Baltimore Sun Co. v. Ehrlich*,
  437 F.3d 410 (4th Cir. 2006) ....................................................................... 36, 41, 41-42, 42

*Bellion Spirits, LLC v. United States*,
  335 F. Supp. 3d 32 (D.D.C. 2018) ....................................................................................... 28

*BNSF Ry. v. STV*,
  453 F.3d 473 (D.C. Cir. 2006) ............................................................................................. 28

*BNSF Ry. v. Surface Transp. Bd.*,
  526 F.3d 770 (D.C. Cir. 2008) ............................................................................................. 24

*Bowyer v. District of Columbia*,
  910 F. Supp. 2d 173 (D.D.C. 2012) ..................................................................................... 40

*Brady v. Office of Sergeant at Arms*,
  520 F.3d 490 (D.C. Cir. 2008) ............................................................................................. 40

*Brock v. Roadway Exp., Inc.*,
  481 U.S. 252 (1987) ........................................................................................................ 16, 33

*Cable News Network, Inc. v. American Broadcasting Companies, Inc.*,
  518 F. Supp. 1238 (N.D. Ga. 1981) ................................................................................ 44, 45

*Cause of Action Institute v. Eggleston*,
  224 F. Supp. 3d 63 (D.D.C. 2016) ....................................................................................... 29

*Chamber of Commerce of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ............................................................................................. 29

*Chang v. D.C. Dep't of Regulatory & Consumer Affairs*,
   604 F. Supp. 2d 57 (D.D.C. 2009) ................................................................ 20

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ................................................................... 43

*Chaplinsky v. New Hampshire*,
   315 U.S. 568 (1942) ................................................................................ 3

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
   58 F.3d 738 (D.C. Cir. 1995) .................................................................... 14

*Cleveland Bd. of Educ. v. Loudermill*,
   470 U.S. 532 (1985) .............................................................................. 16

*Cobell v. Norton*,
   391 F.3d 251 (D.C. Cir. 2004) ................................................................... 14

*Deters v. Schweikert*,
   No. 19-cv-0024, 2019 WL 2290650 (S.D. Ohio May 6, 2019) ......................... 35, 38

*Doolin Sec. Sav. Bank, F.S.B. v. FDIC*,
   53 F.3d 1395 (4th Cir. 1995) ................................................................... 32

*English v. District of Columbia.*,
   815 F. Supp. 2d 254 (D.D.C. 2011) ............................................................ 18

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) .............................................................................. 23

*FEC v. GOPAC, Inc.*,
   897 F. Supp. 615 (D.D.C. 1995) ............................................................... 44

*Fenceroy v. Morehouse Par. Sch. Bd.*,
   No. Civ. A. 05-0480, 2006 WL 39255 (W.D. La. Jan. 6, 2006) ......................... 39

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) .......................................................................... 14, 29

*Fuentes v. Shevin*,
   407 U.S. 67 (1972) ............................................................................... 16

*Getty Images News Services Corporation v. Department of Defense*,
   193 F. Supp. 2d 112 (D.D.C. 2002) ............................................................ 37

*Gibson v. Berryhill*,
411 U.S. 564 (1973) .................................................................................................. 32

*Goss v. Lopez*,
419 U.S. 565 (1975) .................................................................................................. 16

*Grannis v. Ordean*,
234 U.S. 385 (1914) .................................................................................................. 43

*Green v. McElroy*,
360 U.S. 474 (1959) .................................................................................................. 43

*Griffin v. Sec'y of Veterans Affairs*,
288 F.3d 1309 (Fed. Cir. 2002) ................................................................. 26, 38, 39

*Heath v. SEC*,
586 F.3d 122 (2d Cir. 2009) ..................................................................................... 26

*Illinois v. Allen*,
397 U.S. 337 (1970) ............................................................................................ 35, 38

*In re Beard*,
811 F.2d 818 (4th Cir. 1987) .................................................................................... 32

*In re Medaglia*,
52 F.3d 451 (2d Cir.1995) ......................................................................................... 23

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*,
933 F. Supp. 2d 58 (D.D.C. 2013) ........................................................................... 14

*Johnson v. United States*,
628 F.2d 187 (D.C. Cir. 1980) .................................................................................. 32

*Larson v. Dom. & Foreign Comm. Corp.*,
337 U.S. 682 (1949) .................................................................................................. 29

*Marine Mammal Conservancy, Inc. v. Dep't of Agric.*,
134 F.3d 409 (D.C. Cir. 1998) .................................................................................. 28

*\*Mathews v. Eldridge*,
424 U.S. 319 (1976) ............................................................................................ 15, 33

*Mississippi v. Johnson*,
71 U.S. 475 (1866) .................................................................................................... 14

*Morrissey v. Brewer*,
408 U.S. 471 (1972) ................................................................................................. 15

*Mullane v. Central Hanover Bank & Trust Co.*,
339 U.S. 306 (1950) ................................................................................................. 43

*NB ex rel. Peacock v. Dist. of Columbia*,
794 F.3d 31 (D.C. Cir. 2015) ................................................................................... 15

*Nichols v. Agency for Int'l Dev.*,
18 F. Supp. 2d 1 (D.D.C. 1998) ............................................................................... 44

*Nken v. Holder*,
556 U.S. 418 (2009) ................................................................................................. 45

*Norse v. City of Santa Cruz*,
629 F.3d 966 (9th Cir. 2010) ............................................................................. 26, 38

*Nuclear Energy Institute, Inc. v. EPA*,
373 F.3d 1251 (D.C. Cir. 2004) ............................................................................... 28

*Pell v. Procunier*,
417 U.S. 817 (1974) ............................................................................................ 15, 42

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984) ............................................................................................. 29, 30

*Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*,
58 F. Supp. 2d 619 (W.D. Pa. 1999) ....................................................................... 35

*Plummer v. Univ. of Houston*,
860 F.3d 767 (5th Cir. 2017) ................................................................................... 22

*Pursuing America's Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016) ................................................................................. 44

*Qwest Servs. Corp. v. FCC*,
509 F.3d 531 (D.C. Cir. 2007) ................................................................................. 24

*Robinson v. D.C. Hous. Auth.*,
660 F. Supp. 2d 6 (D.D.C. 2009) ............................................................................. 18

*SEC v. First City Financial Corp.*,
890 F.2d 1215 (D.C. Cir. 1989) ............................................................................... 32

*S.H.A.R.K. v. Metro Parks Serving Summit Cty.*,
    499 F.3d 553 (6th Cir. 2007) ........................................................................ 36

*Sataki v. Broadcasting Bd. of Governors*,
    733 F. Supp. 2d 54 (D.D.C. 2010) ............................................................... 32

*Schweiker v. McClure*,
    456 U.S. 188 (1982) ........................................................................... 3, 31, 32

*Seattle Mideast Awareness Campaign v. Kings Cty.*,
    781 F.3d 489 (9th Cir. 2015) ........................................................................ 39

*Sewell Coal Co v. Federal Mine Safety & Health Review Com'n*,
    686 F.2d 1066 (4th Cir. 1982) ...................................................................... 24

*2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*,
    444 F.3d 673 (D.C. Cir. 2006) ..................................................................... 41

*\*Sherrill v. Knight*,
    569 F.2d 124 (D.C. Cir. 1977) ............................................................ *passim*

*Student Aid Funds, Inc. v. Espinosa*,
    559 U.S. 260 (2010) ..................................................................................... 23

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) ..................................................................... 14

*Telemundo of Los Angeles v. City of Los Angeles*,
    283 F. Supp. 2d 1095 (C.D. Cal. 2003) ........................................................ 45

*Thomas v. Dist. of Columbia.*,
    407 F. Supp. 2d 102 (D.D.C. 2005) ............................................................. 32

*Timpinaro v. SEC*,
    2 F.3d 453 (D.C. Cir. 1993) ......................................................................... 25

*Trudeau v. FTC*,
    456 F.3d 178 (D.C. Cir. 2006) ..................................................................... 29

*United States v. Ali, 10-cr-187*,
    No. CRIM. 10-cr-187, 2012 WL 4128387 (D. Minn. Sept. 19, 2012) .................... 35

*United States v. Am. Library Ass'n*,
    539 U.S. 194 (2003) ..................................................................................... 36

*United States v, Bronstein*,
    849 F.3d 1101 (D.C. Cir. 2017) ................................................................................... 26, 38, 39

*United States v. Logan*,
    998 F.2d 1025 (D.C. Cir. 1993) ................................................................................... 32

*Wang v. Executive Office of the President*,
    No. 07-0891 (JR), 2008 WL 180189 (D.D.C. Jan. 18, 2008) ...................................... 29

*Watson v. Wakefield*,
    No. H-08-0903, 2009 WL 3151320 (S.D. Tex. Sept. 25, 2009) ................................... 35

*Whiteland Woods, L.P. v. Twp. of W. Whiteland*,
    193 F.3d 177 (3d Cir. 1999) ....................................................................................... 36

*Wilkinson v. Austin*,
    545 U.S. 209 (2005) .................................................................................................... 16, 20

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................................................ 14, 45

*Wisc. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ................................................................................... 43, 44

*Withrow v. Larkin*,
    421 U.S. 35 (1975) ...................................................................................................... 31

*Zemel v. Rusk*,
    381 U.S. 1 (1965) ........................................................................................................ 15, 42

## STATUTE

3 U.S.C. § 105(a)(1) ........................................................................................................ 29

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

31 C.F.R. § 409.1 ........................................................................................................... 15, 30

48 C.F.R. § 1.218(a)(14)(i) ............................................................................................ 26, 38

## OTHER AUTHORITIES

Remarks by President Trump in Press Conference (Feb. 16, 2017),
    https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-conference/
    (last visited Aug. 22, 2019) ........................................................................................ 40

Press Conference by President Trump (Sept. 27, 2018),
    https://www.whitehouse.gov/briefings-statements/press-conference-president-trump-2/ (last
    visited Aug. 22, 2019 ) ........................................................................................................ 40

Nov. 7, 2018, 9:34 AM, Tweet from @atrupar,
    https://twitter.com/atrupar/status/1060224009894350848 (last visited Aug. 22, 2019) ........... 40

Aug. 19, 2019, 5:21 AM, Tweet from @realDonaldTrump,
    https://twitter.com/realdonaldtrump/status/1163425829331841024 (last visited) ................... 40

Aug. 10, 2019, 4:40 AM, Tweet from @realDonaldTrump,
    https://twitter.com/realdonaldtrump/status/1160154025511280640 (last visited Aug. 22, 2019)
    ............................................................................................................................................. 41

Aug. 7, 2019, 3:32 AM, Tweet from @realDonaldTrump,
    https://twitter.com/realDonaldTrump/status/1159049603209158656 (last visited Aug. 22,
    2019) ...................................................................................................................................... 41

## INTRODUCTION

On July 11, 2019, following a Rose Garden event featuring the President of the United States, the Attorney General, and the Secretary of Commerce, Playboy's Senior White House Correspondent, Brian Karem, created an extraordinary disturbance at the White House. Mr. Karem taunted the White House's assembled guests as being "eager for demonic possession," challenged one of the guests to a fight by asking the guest to "go outside and have a long conversation" (after which a Secret Service agent briefly placed his right hand on Mr. Karem's arm), shouted at that same guest to "go home" and "get a job," and left the designated press area (at which point the Secret Service agent intervened with Mr. Karem a second time). Then, after all that, Mr. Karem resumed the encounter by confronting the guest in a different part of the campus despite White House staff asking the press to clear the area. These actions, which are captured on multiple publicly available videos, are clearly unacceptable. And now, rather than express any contrition for his conduct, Mr. Karem doubles down on it—claiming that he was constitutionally entitled to behave this way and that the White House's transparent, careful, and deliberate process for suspending his on-demand White House access for thirty days was not sufficient. That is an assertion that no court has come anywhere close to endorsing. This Court should not be the first.

Neither the Due Process Clause nor the First Amendment constrain the White House Press Secretary's authority to regulate journalists' access to the White House, but even if they did, their constraints were plainly satisfied here. On due process, the White House satisfied even the most demanding interpretation of *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977)—the principal authority Plaintiff invokes—by doing precisely what *Sherrill* prescribes: The Press Secretary provided Mr. Karem with "notice of the factual bases for denial, an opportunity . . . to respond to these, and a final written statement of the reasons for denial." *Sherrill*, 569 F.2d at 130. And Mr.

Karem actively participated in that process, sending two experienced attorneys to meet with the Press Secretary at the White House, providing two written submissions via that same counsel, and providing a lengthy written statement on his own behalf.  The Press Secretary considered all of this before rendering her thirteen-page "final written statement of the reasons for denial," which is an extraordinarily careful, detailed decision that amply supports the thirty-day suspension it imposes.  Final Decision, Pl.'s Ex. 10, ECF No. 3-10.  Indeed, that temporary suspension is a much lesser sanction than the outright denial of a press pass in *Sherrill*, such that the strictures of due process are diminished here rather than enhanced.  By any measure, *Sherrill* is satisfied.

Recognizing as much, Plaintiff focuses on marginal arguments, some of which he failed to raise during the initial White House proceeding and thus forfeited.  He contends that his temporary suspension was not based on explicit rules forbidding shouted insults and disruptive behavior.  But he never disputes the obvious—that he and other credentialed journalists at White House events know perfectly well they are not permitted to shout insults, start fights, or engage in disruptive behavior that would be inappropriate in any public setting, much less a professional one.  Plaintiff derides the requirement that reporters must "act professionally, maintain decorum and order, and obey instructions from White House staff" as impermissibly vague, but that is the same standard that applies in federal courtrooms and innumerable professional settings.  Countless adults abide daily by that simple standard, and it regularly passes constitutional muster.

Next, Plaintiff asserts that the White House Press Secretary lacks authority over press in the White House.  But Mr. Karem and his counsel forfeited this objection by failing to raise it during Plaintiff's suspension proceeding, and in any event, the President and his staff unquestionably have authority over who may enter the White House, as the Press Secretary would have explained at greater length had Plaintiff raised the point.  Finally, Plaintiff claims the Press

Secretary was too biased to make the decision at issue, but his allegations come nowhere close to overcoming the "presumption" that she is an "unbiased" decisionmaker for due process purposes. *Schweiker v. McClure*, 456 U.S. 188, 195 (1982). The Press Secretary had no involvement in the Rose Garden events and memorialized the bases for her decision in writing, demonstrating that her decision was methodical and unbiased.

Plaintiff also advances the astonishing argument that he has a First Amendment right to come onto the White House campus, loudly insult the President's invited guests, disrupt official events, and even instigate physical confrontations so long as he does not use "fighting words" as defined by *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). There is no support in any case for Mr. Karem's claim that his "insults are protected First Amendment speech and thus cannot be the subject of punishment on their own." Mem. in Supp. of Pl.'s Mot. for a Temp. Restraining Order and Prelim. Injunc. at 35, ECF No. 2-1 ("Pl.'s Br."). Certainly nothing in *Sherrill* suggests that the First Amendment gives credentialed journalists free rein to disrupt the White House; to the contrary, *Sherrill* was a purely procedural decision that did not subject the regulation of press passes to any substantive First Amendment scrutiny at all. And even if substantive review were proper, the bases for suspending Mr. Karem's hard pass for thirty days here are plainly not "arbitrary or for less than compelling reasons," *Sherrill*, 569 F.2d at 129—the standard, that, if applicable, would be used for the more-serious sanction of outright denying a hard pass—and are thus more than sufficient to justify Plaintiff's modest thirty-day suspension. Nor has Plaintiff provided any evidence that his suspension is based on his viewpoints, which do not materially differ from much of the White House press corps. Rather, the public record makes clear that Mr. Karem's suspension was based on his well-documented misconduct on the White House campus and the indisputable need to maintain basic standards of decorum at the White House.

Plaintiff fails on the other preliminary injunction factors as well.  In particular, Plaintiff has not demonstrated the type of irreparable injury necessary for emergency relief.  *Sherrill* granted only procedural relief via additional process, rather than order the White House to provide a hard pass, *see Sherrill*, 569 F.2d at 128 ("Although appellee requested the District Court to order appellants to grant him a White House press pass, the District Court determined, correctly we believe, that it had no occasion to pass on the merits of the press pass denial."), so that decision does not support emergency relief.  Plaintiff attempts to claim irreparable harm based on the alleged First Amendment violation, but his inability to show such a violation dooms that assertion.

Nor does the balance of equities favor Plaintiff, who asks this Court to issue an extraordinarily intrusive order that would require the White House to restore on-demand access to the White House complex, West Wing press offices, and other facilities in the President's official residence and personal office suite to someone who has been temporarily excluded for disruptive and inappropriate behavior following a thorough and fair decisional process.  The public interest also does not require that Mr. Karem be spared the relatively minor sanction of a thirty-day suspension, particularly when he has disclaimed any responsibility for his actions and declared that he did "nothing wrong," Pl's. Br. at 2, when he insulted White House guests and proposed a physical altercation.   Mr. Karem's refusal to admit wrongdoing—indeed, his assertion that the Constitution *entitles* him to behave as he did—strongly suggest that he will instigate further, similar incidents if he is permitted to retain his access without any sort of sanction.  The public's interest in a free press simply does not require that this Court countenance that.

In short, this case is not about freedom of the press or a journalist's right to report the news. It is about whether the White House has the ability to impose a modest sanction on a credentialed journalist who abused his broad access to engage in clearly and objectively inappropriate behavior.

4

The answer to that question in the specific circumstances of this case is clearly yes, and accordingly Plaintiff's request for a temporary restraining order and a preliminary injunction should be denied.

## BACKGROUND

### I.      White House Hard Passes and Conduct Guidance

Many reporters cover the White House for a range of local, national, and international news outlets.  A subset of those reporters have access to facilities within the White House complex—access that requires certain credentials.  After completing a Secret Service background check, a reporter may be eligible for a so-called "hard pass," which, if granted, allows on-demand access to the White House complex and briefing room.  The allocation of these limited passes is overseen by the White House Press Secretary, as Mr. Karem's own declarant agrees.  *See* Final Decision at 12; March 16, 2019 Memo to White House Correspondents' Association from the White House Press Office ("WHCA Memo"), Ex. 1; November 19, 2018 Letter from the White House Press Office to James Acosta ("Acosta Letter") at 2 (noting Press Secretary's "final determination in this process"), Ex. 2; Gillman Decl. ¶ 6, ECF No. 2-8 ("The process [for obtaining a hard pass] is managed by the White House Press Office" and "[a]pplications require approval by the press secretary[.]").

"The White House has issued written rules of conduct governing questions at press conferences," but, until early August 2019, "had not previously thought that a set of explicit rules was necessary to govern behavior by members of the press at White House press events."  Preliminary Decision at 1, Pl.'s Ex. 4, ECF No. 3-4.  The Press Secretary had previously acknowledged "that a more elaborate set of rules might be devised, including, for example, specific provisions for journalist conduct in the open (non-press room) areas of the White House and for Air Force One," but had explained the White House's expectation "that professional journalistic

5

norms will suffice to regulate conduct in those places." Acosta Letter at 2. Thus, leading up to the preliminary decision, there had been a "widely shared understanding that (1) members of the press, at all times at White House press events, must act professionally, maintain decorum and order, and obey instructions from White House staff, and (2) disruptive behavior that interferes with the conduct of a press event or is otherwise a breach of professional decorum—including but not limited to taunting other members of the press, White House officials, or guests in an effort to provoke a confrontation—is prohibited." Preliminary Decision at 1. "Such guidelines for behavior are necessary for orderly press events that are fair to everyone in attendance." *Id.*

## II.     The July 11, 2019 Rose Garden Event

On July 11, 2019, the President delivered an address in the White House's Rose Garden. Present for the event were a group of people the President had invited to attend a White House Social Media Summit earlier in the afternoon and then invited to also attend his Rose Garden address. *See* Final Decision at 1; *see also* Karem Statement at 2, Pl.'s Ex. 9, ECF No. 3-9; Pl.'s Br. at 11. One of the reporters covering that event was Brian Karem, who serves as the White House correspondent for Playboy. Karem Statement at 1.

As the invited guests were leaving, Mr. Karem, who was standing in the designated press area behind a rope line, insulted the President's invited guests, declaring "[t]his is a group of people that are eager for demonic possession." Final Decision at 3 (citing Bloomberg TicToc, Sebastian Gorka Clashes with Journalist After Trump Refuses Media Questions, YouTube (July 11, 2019), at 0:17-0:20, https://youtu.be/VNfPaZ4Ipsw [hereinafter "Video 1"]; Nicholas Ballasy, *Sebastian Gorka and Reporter Get Into Shouting Match at White House*, YouTube (July 11, 2019), at 0:04-0:08, https://youtu.be/mNySuQFh2YE [hereinafter "Video 4"]). One of those guests, Sebastian Gorka, then asked, while gesturing sarcastically with air quotes, "[a]nd you're a journalist, right?"

Final Decision at 3 (citing Video 1 at 0:23-0:25).  In response, Mr. Karem called to Mr. Gorka from across the Rose Garden, "Come on over here and talk to me brother.  We can go outside and have a long conversation."  Final Decision at 3 (citing Baxter, Journalist Brian Karem picks a fight with Sebastian Gorka, YouTube (July 11, 2019), at 0:10-0:14, https://youtu.be/HMVmkTFedUc [hereinafter "Video 2"]).  "Mr. Karem accompanied the suggestion that they 'go outside' by gesturing with his right hand (closed hand, thumb extended, gesturing over his shoulder) and noticeably cocking his eyebrow."  *Id.* (citing Video 2 at 0:10-0:14).  "Mr. Gorka then crossed the Rose Garden to approach Mr. Karem, shouting in response to Mr. Karem: 'Are you threatening me now in the White House?  In the Rose Garden?"  Final Decision at 4 (citing Video 1 at 0:28-0:35; Video 4 at 0:15-0:23).  The two men "traded insults," while certain members of the crowd yelled or chanted.  Final Decision at 4.

As Mr. Gorka walked away toward the White House's Palm Room, a Secret Service agent approached Mr. Karem.  Final Decision at 4 (citing Video 1 at 0:39-0:40; Washington Post, *Gorka to Karem: 'You're not a journalist, you're a punk'*, YouTube (July 11, 2019), at 0:10-0:13, https://youtu.be/zRogWTuS5HI [hereinafter "Video 5"]).  Photographs captured that moment:



(This photo, which the Press Secretary did not rely on, but which is offered here for illustrative purposes, is at https://talkingpointsmemo.com/news/wh-suspends-press-pass-of-reporter-who-argued-with-gorka.)  "The Secret Service agent then crossed in front of Mr. Karem and began to move to the other side of the Rose Garden in the direction that Mr. Gorka had gone.  Mr. Karem then yelled after Mr. Gorka: 'Go home!' and 'Hey Gorka, get a job!'  Mr. Karem then left the designed press area (which had partially fallen down).  One of the guests said, 'Just for the record, he'd kick your punk ass.'"  Final Decision at 4.  The agent then turned  around and, seeing that Mr. Karem had stepped outside of the press area, approached him a second time, put his hand on Mr. Karem's chest, and said words to the effect of, "Take a look around, remember where you're at, and please step back into the press pen.  Let's calm down a little bit."  Final Decision at 4.

After leaving the Rose Garden, Mr. Karem found Mr. Gorka in the Palm Room and resumed the confrontation.  Final Decision at 5 (citing Video 4 at 2:53-3:26).  During this time, Mr. Karem ignored a White House staffer's instructions that "the press are leaving now." Final Decision at 5.  Mr. Karem instead engaged with Mr. Gorka and tried to shake his hand.  When Mr. Gorka made clear that he would not shake Mr. Karem's hand, Mr. Karem repeatedly said "you won't shake my hand," and then wagged his finger in Mr. Gorka's face.  Mr. Gorka then referred to the instructions to leave from the White House staffer, repeating "You're done!" and saying "Listen to him.  Get out.  Get out," while gesturing to the staffer.  Final Decision at 5 (citing Video 4 at 3:06-3:11, 3:20-3:24.  Mr. Karem eventually left.  Final Decision at 5.

Mr. Karem continued to participate in other press events between July 11 and August 2, and the President answered two of his questions on August 2 (though the President did not respond to a question Mr. Karem posed on August 1, when he asked the President to respond to an allegation that he was a "pathological liar.").  Final Decision at 10-11; Karem Statement at 5.  Mr.

Karem also attempted to re-schedule a previously cancelled off-the-record meeting with Ms. Grisham, which he had initially requested *before* the July 11 events in the Rose Garden, but they were unable to set up a time because of scheduling constraints. *See* Final Decision at 11. Mr. Karem never indicated that he wanted to discuss the Rose Garden incident with Ms. Grisham or any other White House personnel. *Id.*

## III.  White House Process

On August 2, 2019, Stephanie A. Grisham, Assistant to the President and White House Press Secretary, notified Mr. Karem in writing that his "disruptive behavior at the press event in the Rose Garden on July 11, 2019 violated the basic standards governing such events and is, in our preliminary judgment, sufficient factual basis to suspend your hard pass for 30 days." Preliminary Decision at 2. The letter provided notice of the factual basis for the preliminary decision by explaining the widely-understood standards of decorum discussed above, *see supra* pp. 5–6, and detailing Mr. Karem's disruptive and unprofessional behavior at the July 11, 2019 press event. Preliminary Decision at 1. The letter noted that Mr. Karem "openly insulted the President's invited guests, stating that 'This is a group of people that are eager for demonic possession'"; "verbally accosted Mr. Gorka in an apparent attempt to escalate your verbal taunts to a physical confrontation, stating 'Come on over here and talk to me brother. Or we can go outside and have a long conversation'"; "loudly traded insults nose to nose" with Mr. Gorka; "continued to engage with and shout at other invited guests" "[e]ven after [a] U.S. Secret Service agent intervened"; "found, approached, and tried to again engage Mr. Gorka" after leaving the Rose Garden, "ignoring a White House staffer's repeated directions to leave and instructions that 'the press are leaving now.'" *Id.* As stated in the letter, Mr. Karem's "disruptive behavior at the press event in the Rose Garden on July 11, 2019 violated the basic standards governing such events." *Id.* at 2. Ms.

Grisham made clear, however, that this was only a "preliminary decision" and that "we would be pleased to consider any material you would like to submit." *Id.*

Mr. Karem responded through counsel on August 5, 2019. Preliminary Response, Pl.'s Ex. 5, ECF No. 3-5. He disagreed with the White House's factual characterization of the events of July 11, claiming that his reference to "a crowd eager to be demonically possessed," was part of a "Rodney Dangerfield impression." *Id.* at 3. He also stated that while he "never crossed the rope line separating the press corps from the event attendees, Mr. Gorka charged across the Rose Garden to confront Mr. Karem." *Id.* Following that encounter, Mr. Karem stated that he "approached Mr. Gorka after the confrontation in an attempt to de-escalate the situation and talk things out." *Id.* Mr. Karem also argued that the preliminary decision to suspend his hard pass violates his due process and First Amendment rights. *Id.* at 4–8. The letter also requested a meeting "prior to finalizing the decision so that Mr. Karem has a meaningful opportunity to respond to the evidence." *Id.* at 8.

The next day, on Tuesday, August 6, 2019, Ms. Grisham stated that she was happy to meet "with Mr. Karem and you or other counsel" at a meeting on Thursday, August 8, 2019. Letter from S. Grisham to T. Boutrous Jr., August 6, 2019 ("August 6 Letter"), Pl.'s Ex. 6, ECF No. 3-6. "In light of [Mr. Karem's] complaints that [he] had not had sufficient time to prepare a written response and in light of this anticipated meeting," Ms. Grisham also stated that she would consider any supplement to Mr. Karem's written response submitted by 5:00 PM on Friday, August 9, 2019. Final Decision at 1–2; August 6 Letter. The next morning, one of Mr. Karem's counsel, Mr. Boutrous, stated that his "partners Thomas Dupree and Anne Champion are available to meet at 4 PM on Thursday, August 8, 2019." Final Decision at 2. Ms. Grisham reiterated that she was "happy to meet tomorrow, August 8, 2019 with Mr. Karem along with Mr. Dupree and Ms.

Champion." *Id.* Mr. Dupree then responded that while counsel would meet with Ms. Grisham, "Brian [Karem] will not be accompanying us." *Id.*

On August 9, 2019, Mr. Karem's counsel, Ms. Grisham, and attorneys from the Office of the White House Counsel met for approximately 45 minutes, and Ms. Grisham provided counsel "with the opportunity to present whatever facts and arguments they wished until they were finished, and [the White House] asked some clarifying questions as well." *Id.* During the meeting, an attorney from the Office of White House Counsel informed Mr. Karem's counsel that Press Secretary Grisham would consider, amongst other things, the observations of the Secret Service agent who intervened and spoke to Mr. Karem during the July 11 incident. *Id.* Because Mr. Karem was not present at the meeting, Press Secretary Grisham and the attorneys from the Office of White House Counsel invited Mr. Karem and his counsel to respond to the agent's recollections in their supplemental response. *Id.* Later that day, Press Secretary Grisham sent Mr. Karem's counsel an email outlining all of the information on which she would base her final decision, stating:

> I will base my final decision solely on the following: the publicly available videos listed below (which show several angles of the incident), the observations of the U.S. Secret Service agent who intervened and spoke to Mr. Karem as shown on the videos and whose recollection concerning the event we described to you today, your initial August 6, 2019 response, our in-person discussion today, and any supplemental response you wish to submit (including any supporting documents or facts) in accordance with my August 6, 2019 letter. We have not conducted, nor will I rely on, interviews with any other witnesses to the event.

Email from S. Grisham to T. Dupree Jr. & A. Champion, August 8, 2019 ("August 8 Email"), Pl.'s Ex. 7, ECF No. 3-7. This August 8, 2019 email also contained links to the seven publicly-available videos on which Press Secretary Grisham would rely. Those online videos are available here:

- Bloomberg TicToc, Sebastian Gorka Clashes with Journalist After Trump Refuses Media Questions, YouTube (July 11, 2019), https://youtu.be/VNfPaZ4Ipsw (Video 1)
- Baxter, Journalist Brian Karem picks a fight with Sebastian Gorka, YouTube (July 11, 2019), https://youtu.be/HMVmkTFedUc (Video 2)
- Terrence Daniels, Fights in The Rose Garden…, YouTube (July 11, 2019),

https://youtu.be/qQe2JFS08Rg (Video 3)
- Nicholas Ballasy, Sebastian Gorka and Reporter Get Into Shouting Match at White House, YouTube (July 11, 2019), https://youtu.be/mNySuQFh2YE (Video 4)
- Washington Post, Gorka to Karem: 'You're not a journalist, you're a punk', YouTube (July 11, 2019), https://youtu.be/zRogWTuS5HI (Video 5)
- Washington Examiner (@dcexaminer), Twitter (July 11, 2019, 3:53 PM), https://twitter.com/dcexaminer/status/1149451612227887104 (Video 6)
- Reuters Top News (@Reuters), Twitter (July 11, 2019, 3:29 PM), https://twitter.com/Reuters/status/1149445607288950784 (Video 7).

Following that meeting, Mr. Karem's counsel continued to object to the suspension of Mr. Karem's hard pass.  Supplemental Response at 1, Pl.'s Ex. 8, ECF No. 3-8.  His counsel requested a full copy of a witness statement obtained from the Secret Service official, and objected to the fact that the White House "did not speak to a single witness."  *Id.*  Mr. Karem's counsel continued to state that Mr. Karem's "alleged insult was intended as a humorous remark," *id.* at 2, and criticized the President for having "used far stronger language and imagery" at various times, *id.* The letter concluded that "[a]ny reasonable viewer of the video of this event would conclude that Mr. Karem was not the aggressor and did nothing to escalate the situation," and alleged "that a suspension would amount to arbitrary, discriminatory, content-based punishment arising from Mr. Karem's viewpoint and the content of his reporting."  *Id.* at 3.

The White House issued its final decision on August 16, 2019.  In it, Ms. Grisham first recounted the procedural history of this matter, and then made a number of factual findings.  In particular, she concluded that "[u]nder the circumstances, Mr. Karem's words and gestures together created the impression to a reasonable observer that Mr. Karem was suggesting a physical confrontation [with Mr. Gorka]."  *Id.* at 3–4.  She also did not credit two of Mr. Karem's central assertions: (1) that his "demonic possession" comment was "light-hearted comedy," and (2) that his invitation to Mr. Gorka to "go outside and have a long conversation" was "an effort to de-escalate by making a genuine invitation for a conversation in another forum."  *Id.* at 5, 6.  She

noted that even if Mr. Karem subjectively believed both of those facts, they were not consistent with how a reasonable observer would have understood those remarks.  *Id.* at 5.

Ms. Grisham then concluded that "Mr. Karem's actions, as viewed by a reasonable observer, (1) insulted invited guests of the White House, (2) threatened to escalate a verbal altercation into a physical one to the point that the Secret Service deemed it prudent to intervene, and (3) re-engaged with Mr. Gorka in what quickly became a confrontational manner while repeatedly disobeying a White House staffer's instructions to leave."  *Id.* at 8.  She concluded that the appropriate punishment was a temporary suspension of Mr. Karem's hard pass for 30 days; in her judgment, a "permanent revocation would be too great a punishment for the conduct involved here," while "[t]aking no action . . . would be insufficient to deter Mr. Karem and other members of the press from disrupting White House events."  *Id.*  Press Secretary Grisham also concluded that a written warning would be insufficient, given the nature of the misconduct, the ineffectiveness of deterrence, and the fact that "[o]n the present record, there is no indication that Mr. Karem would take to heart a written warning that his behavior was inappropriate."  *Id.* at 9.  Finally, Ms. Grisham addressed a number of additional arguments which Mr. Karem had raised during the review process, including, among other things, his arguments that he could not respond without reviewing the full statement from the Secret Service agent, that Press Secretary Grisham failed to conduct a reasonable investigation, and that he was singled out because of his viewpoint and the content of his reporting.  Final Decision at 2 n.9, 9–13.

## IV.    Litigation Procedural History

Plaintiff filed a Complaint and motion for a temporary restraining order and preliminary injunction on August 20, 2019, naming as Defendants President Donald Trump and Press Secretary

Stephanie Grisham.[1]  ECF Nos. 1, 2.

## ARGUMENT

"The standard for issuance of the extraordinary and drastic remedy of a temporary restraining order or a preliminary injunction is very high." *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 75 (D.D.C. 2013) (citation omitted).  An interim injunction is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  A party moving for a temporary restraining order or a preliminary injunction "must demonstrate '(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.'" *Jack's Canoes*, 933 F. Supp. 2d at 75-76 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).  Because Plaintiff has not demonstrated these factors, his motion for a temporary restraining order should be denied.

## I.    Plaintiff Is Not Likely to Succeed in Demonstrating that Defendants Violated the Due Process Clause.

Plaintiff's due process claim is not likely to succeed because the Press Secretary provided a fair and open process that comports with any conceivably applicable constitutional requirements. In order to sustain a claim under the Due Process Clause, "a plaintiff must show (i) deprivation of a protected liberty or property interest; (ii) by the government; (iii) without the process that is 'due'

---

[1] The President is not a proper defendant in this case, and for that reason alone, no temporary injunctive relief can issue against him. *See Mississippi v. Johnson*, 71 U.S. 475 (1866); *Franklin v. Massachusetts*, 505 U.S. 788 (1992); *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996).

under the Fifth Amendment." *NB ex rel. Peacock v. Dist. of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015) (citations omitted).   This is a necessarily fact-sensitive inquiry, and "calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

Plaintiff's arguments in support of his Due Process claim rely in large part on the D.C. Circuit's decision in *Sherrill*.  *See* Pl.'s Br. at 21 (citing *Sherrill*, 569 F.2d at 124).   But Plaintiff does not seriously contend that Mr. Karem was denied the specific process that the D.C. Circuit prescribed in *Sherrill*, or that the district court required in *Cable News Network v. Trump*, 18-cv-2610-TJLK (D.D.C. 2018): (1) notice, (2) an opportunity to rebut the government's reasons, and (3) a written decision.  *Sherrill*, 569 F.2d at 130–31; *Cable News Network*, 18-cv-2610-TJLK (D.D.C. 2018), Tr. of Nov. 16, 2018 Mot. Hearing 9:9–11.   In contrast to those cases, it is essentially undisputed that each of those elements is satisfied here.   *See infra* pp. 15–22. Accordingly, Plaintiff is left to argue at the margins that, despite the extensive process he received, and the fact that the sanction he received was less severe than the action challenged in those cases, he was entitled to even more process.  He is mistaken.

### A.   The Press Secretary Provided Plaintiff with Ample Process.

As an initial matter, Plaintiff does not have a constitutionally protected liberty interest in access to the White House complex given that the public has no First Amendment right of "entry into the White House," *Zemel v. Rusk*, 381 U.S. 1, 17 (1965), and the Constitution does not "require government to accord the press special access to information not shared by members of the public generally," *Pell v. Procunier*, 417 U.S. 817, 834 (1974).[2]   *Sherrill* involved the Secret Service's

---

[2] The regulations that govern the grant or denial of a security clearance for a press pass by the Secret Service, 31 C.F.R. § 409.1, do not create any entitlement to a hard pass, nor do they govern the White House Press Office's judgment as to whether to issue a pass.

denial of an "otherwise eligible" reporter's application for a hard pass based on security reasons, 569 F.2d at 130, rather than the much different context of the White House ensuring decorum at press events.  But even though *Sherrill* should not apply here, it is clearly satisfied if it does.

The Press Secretary provided precisely what *Sherrill* requires:  "notice of the factual bases for denial, an opportunity … to respond to these, and a final written statement of the reasons for denial."  *Sherrill*, 569 F.2d at 130; *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case.") (citation omitted); *Wilkinson v. Austin*, 545 U.S. 209, 225–26 (2005) ("notice of the factual basis" for the decision "and a fair opportunity for rebuttal" are "among the most important procedural mechanisms for purposes of avoiding erroneous deprivations"); *Brock v. Roadway Exp., Inc.*, 481 U.S. 252, 265 (1987) (notice of "the substance of the evidence supporting the [decision]" and an opportunity to "submit a written response, including affidavits and supporting documents" and to "respond verbally to the . . . charges and present statements from the [rebuttal] witnesses satisfy the due process requirements for reliability) (citations omitted); *Goss v. Lopez*, 419 U.S. 565, 579 (1975) (due process requires "*some* kind of notice and . . . *some* kind of hearing") (emphasis in original); *Arnett v. Kennedy*, 416 U.S. 134, 164 (1974) ("Governmental deprivation of [a constitutionally-protected property or liberty interest] must be accompanied by minimum procedural safeguards, including some form of notice and a hearing."); *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) ("For more than a century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified") (citation omitted).  Another court in this district recently evaluated these standards in the context of an indefinite suspension of a hard pass,

explaining that what *Sherrill* requires is "notice, an opportunity to rebut the government's reasons and a written decision." *Cable News Network*, Tr. of Nov. 16, 2018 Mot. Hearing 9:9–11.[3]

The decisional process here satisfied these requirements. *First*, Mr. Karem received oral and written "notice of the factual bases for denial." *Sherrill*, 569 F.2d at 130. On August 2, 2019, Press Secretary Grisham provided Mr. Karem with written notice that she had reached a preliminary decision to suspend his hard pass for 30 days due to his conduct at the Rose Garden event on July 11, 2019. Preliminary Decision at 1–2. This August 2 Preliminary Decision detailed the factual bases for the decision and explained that there is a

> widely shared understanding that (1) members of the press, at all times at White House press events, must act professionally, maintain decorum and order, and obey instructions from White House staff, and (2) disruptive behavior that interferes with the conduct of a press event or is otherwise a breach of professional decorum—including but not limited to taunting other members of the press, White House officials, or guests in an effort to provoke a confrontation—is prohibited.

*Id.* at 1.

The August 2 Preliminary Decision further explained that Mr. Karem failed to abide by these basic norms ensuring decorum and order on July 11, 2019, as shown by several video recordings. *Id.* The letter detailed Mr. Karem's disruptive behavior at the July 11, 2019 press event and concluded that Mr. Karem's "disruptive behavior at the press event in the Rose Garden on July 11, 2019 violated the basic standards governing such events." Preliminary Decision at 2.

Press Secretary Grisham provided additional notice of the factual bases for the preliminary decision at the August 8, 2019 meeting with Mr. Karem's counsel. *See infra* pp. 11. During that approximately 45-minute meeting, an attorney from the Office of White House Counsel informed

---

[3] The *Cable News Network* court held that under *Sherrill*, a reporter has a liberty interest in a White House press pass, Tr. of Nov. 16, 2018 Mot. Hearing 6:6–15. But notably, the *Cable News Network* court itself expressed doubts about *Sherrill*'s reasoning. *See id.* at 6:15–17 ("Whether that's a holding I agree with or not is another thing[.]").

Mr. Karem's counsel that Press Secretary Grisham would consider, amongst other things, the observations of the Secret Service agent who intervened and spoke to Mr. Karem during the July 11 incident. Final Decision at 2. Later that day, Press Secretary Grisham sent Mr. Karem's counsel an email clearly outlining all of the information on which she would base her final decision, stating:

> I will base my final decision solely on the following: the publicly available videos listed below (which show several angles of the incident), the observations of the U.S. Secret Service agent who intervened and spoke to Mr. Karem as shown on the videos and whose recollection concerning the event we described to you today, your initial August 6, 2019 response, our in-person discussion today, and any supplemental response you wish to submit (including any supporting documents or facts) in accordance with my August 6, 2019 letter. We have not conducted, nor will I rely on, interviews with any other witnesses to the event.

August 8, 2019 Email. This August 8, 2019 email also contained links to the seven publicly-available videos on which Press Secretary Grisham would rely. *Id.* Mr. Karem thus received ample written and oral notice of the preliminary decision to temporarily revoke his hard pass and the factual bases for that decision, as well as the factual bases for any subsequent final decision. *See Sherrill*, 569 F.2d at 130–31; *English v. District of Columbia.*, 815 F. Supp. 2d 254, 266 (D.D.C. 2011) (dismissing procedural due process claim where notice received by plaintiff "provided him with sufficient information by which to know the basis on which the [deprivation was being made], and how to challenge such removal") *aff'd*, 717 F.3d 968 (D.C. Cir. 2013).

*Second*, Mr. Karem had multiple "opportunit[ies] to rebut" the allegations against him, *Sherrill*, 569 F.2d at 131, including through sophisticated legal counsel. *See, e.g.*, *Robinson v. D.C. Hous. Auth.*, 660 F. Supp. 2d 6, 21 (D.D.C. 2009) (requirements of due process satisfied where plaintiff received notice, had the opportunity to appear at a hearing, was represented by counsel, and was provided with a written decision). The August 2 Preliminary Decision explicitly provided Mr. Karem with the opportunity to contest it in writing by 5:00 PM on August 5, 2019. Preliminary Decision at 2. The letter further explained that Press Secretary Grisham would

consider any timely written response and any other materials that Mr. Karem submitted.  *Id.*  Mr. Karem availed himself of this opportunity to respond by submitting, through counsel, an eight-page written response on August 5, 2019.  Initial Response.

As part of that response, Mr. Karem asked to meet with Press Secretary Grisham before her final decision.  Initial Response at 8.  The following day, on August 6, 2019, Press Secretary Grisham informed Mr. Karem's counsel that she would be "happy to grant that request."  August 6, 2019 Letter.  On August 8, 2019, Press Secretary Grisham, along with attorneys from the Office of White House Counsel, met with counsel for Mr. Karem for approximately 45 minutes.  Final Decision at 2.  Press Secretary Grisham provided counsel for Mr. Karem "with the opportunity to present whatever facts and arguments they wished until they were finished, and [the White House] asked some clarifying questions as well."  *Id.*  The Press Secretary's Office specifically stated that Mr. Karem was invited to attend this meeting, which he had requested.  *Id.*; Email from S. Grisham to T. Boutrous Jr., August 7, 2019.  Mr. Karem nonetheless did not attend the meeting, nor did he claim that a conflict prevented him from doing so.  Final Decision at 2.

Press Secretary Grisham's August 6 letter also allowed Mr. Karem to supplement his written response with additional materials until 5:00 PM on Friday, August 9, 2019.  August 6 Letter.  On August 9, 2019, Mr. Karem submitted, through counsel, a four-page response, along with supporting materials, including a written statement by Mr. Karem.  Supplemental Response. In that response, Mr. Karem continued to object to the suspension of his hard pass and responded to the evidence that was presented at the in-person meeting and identified by the Press Secretary's August 8 email.  *Id.* at 1–2.

Mr. Karem thus had, at a minimum, three opportunities to respond in person or in writing to the bases for the Press Secretary's decision, as well as the opportunity to submit any evidence

or facts that he considered relevant.   This extensive back-and-forth—in which Mr. Karem's counsel participated and which included a face-to-face meeting with the decisionmaker—was more than sufficient to satisfy due process.   *See, e.g.*, *Wilkinson v. Austin*, 545 U.S. 209, 226 (2005) (explaining that a "second opportunity [to be heard in rebuttal prior to the final decision] further reduces the possibility of an erroneous deprivation"); *Chang v. D.C. Dep't of Regulatory & Consumer Affairs*, 604 F. Supp. 2d 57, 63 (D.D.C. 2009) (dismissing procedural due process claim because "[t]he allegations in plaintiff's complaint show that she received notice . . .  and the opportunity to be heard through a multi-level appeals process").

*Third*, Press Secretary Grisham provided a "final written statement of the reasons for denial."   *Sherrill*, 569 F.2d at 130.   On August 16, 2019, Press Secretary Grisham issued her final decision in a letter to Mr. Karem.   Final Decision.   In this final written decision, Press Secretary Grisham first recounted the procedural history of this matter, and then made a number of factual findings.   Ms. Grisham found that "Mr. Karem's actions, as viewed by a reasonable observer, (1) insulted invited guests of the White House, (2) threatened to escalate a verbal altercation into a physical one to the point that the Secret Service deemed it prudent to intervene, and (3) re-engaged with Mr. Gorka in what quickly became a confrontational manner while repeatedly disobeying a White House staffer's instructions to leave."   *Id.* at 8.   She then concluded that the appropriate punishment was a temporary suspension of Mr. Karem's hard pass for 30 days; as a "permanent revocation would be too great a punishment for the conduct involved here," while "[t]aking no action . . . would be insufficient to deter Mr. Karem and other members of the press from disrupting White House events."   *Id.*   Press Secretary Grisham further determined that a written warning would be insufficient, given the nature of the misconduct, the ineffectiveness of deterrence, and the fact that "[o]n the present record, there is no indication that Mr. Karem would

take to heart a written warning that his behavior was inappropriate." *Id.* at 9.  Finally, Ms. Grisham addressed a number of additional arguments which Mr. Karem had raised during the review process, including, among other things, his arguments that he required the full statement from the Secret Service agent, that Press Secretary Grisham failed to conduct a reasonable investigation, and that he was singled out because of his viewpoint and the content of his reporting.  Final Decision at 2 n.9, 9–13.

In sum, even assuming that Mr. Karem has a constitutionally protected liberty interest in the discretionary grant of a hard pass, this careful and transparent process more than satisfies, *Sherrill*, 569 F.2d at 130–31—particularly given that this case involves a thirty-day suspension, which is a much lesser sanction than the outright denial at issue there.  As the court explained in *Cable News Network*, when *Sherrill* applies, it requires "notice, an opportunity to rebut the government's reasons and a written decision."  *Cable News Network*, Tr. of Nov. 16, 2018 Mot. Hearing 9:9–11.  Here, the August 2 Letter, August 8 meeting, and August 8 email following the meeting "put [Mr. Karem] on notice of the government's intention" to temporarily suspend his hard pass.  *Id.* at 10:7–8.  And unlike in *Cable News Networks*, Press Secretary Grisham carefully considered Mr. Karem's written responses, his verbal submissions through counsel, and further "carefully considered a range of potential responses to Mr. Karem's actions" before concluding that a thirty-day suspension of his hard pass was an appropriate measure.  Final Decision at 8; *see also Cable News Network*, Tr. of Nov. 16, 2018 Mot. Hearing 11:13–18 (noting that there was no evidence concerning "whether [the decisionmaker] considered CNN's letter or whether they considered potential other responses by the government").  The Final Decision, in particular, carefully catalogued the information upon which it was based—all of which had been previously identified to Mr. Karem's counsel—and carefully responded to the arguments that Mr. Karem had

raised in his responses.  Far from irrational, it is a well-reasoned decision that amply safeguards against taking into account additional, undisclosed information.  *See Sherrill*, 569 F.2d at 131 ("The requirement of a final statement of denial and the reasons therefor is necessary in order to assure that the agency has neither taken additional, undisclosed information into account, nor responded irrationally to matters put forward by way of rebuttal or explanation.").

Further, it is unclear what benefit, if any, additional process would add under these circumstances.  Due process is meant to permit Plaintiff to tell his side of the factual story.  But here, there are multiple publicly-available videos capturing the events at issue, so the value of any additional process is diminished.  *See, e.g.*, *Plummer v. Univ. of Houston*, 860 F.3d 767, 775–76 (5th Cir. 2017) (no additional process was required additional testimony could not "have otherwise altered the impact of the videos and photo").

**B.  Plaintiff Had Sufficient Notice of the Standards of Decorum at the White House.**

Rather than directly dispute the adequacy of the process he was afforded, Plaintiff raises several arguments at the margins, none of which has merit.  Plaintiff first argues that he had not received explicit, written notice of the standards used to determine whether to suspend press passes. Pl.'s Br. 22–25. But that is not true.  Last year, the Press Secretary explained in a publicly released letter announcing specific rules for press conferences that, while "a more elaborate set of rules might be devised, including, for example, specific provisions for journalist conduct in the open (non-press room) areas of the White House and for Air Force One," the White House's expectation is "that professional journalistic norms will suffice to regulate conduct in those places."  Acosta Letter at 2.  Mr. Karem and his colleagues were thus on notice that the White House expected them to abide by "professional journalistic norms" when on White House grounds.

Due process also does not require the White House to publish explicit, written rules

instructing the press to follow the conventions of "acting professionally" and "maintaining decorum and order." The requirement that professionals act professionally in professional contexts—and that there may be consequences if they do not—is well-established. *See infra* pp. 34-35, 38-39. Indeed, Mr. Karem's counsel acknowledged this common-sense point during their meeting with the White House Press Secretary, wherein they "explicitly confirmed … that they were not second-guessing the White House's need to ensure basic decorum, order, and security." Final Decision at 9. Nor does Mr. Karem dispute that he had actual notice of the basic prohibition against shouting at guests or starting fights in the White House. *See U.S. Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010) (holding that "actual notice of the filing and contents of [a proposed bankruptcy plan] . . . more than satisfied [plaintiff's] due process rights"); *Rooms v.* SEC, 443 F.3d 12089, 1214 (10th Cir. 2006) (rejecting plaintiff's due process argument when he had "fair notice that his conduct was contrary" to accepted practices); *cf. also In re Medaglia*, 52 F.3d 451, 455 (2d Cir.1995) ("where a claimant demonstrated actual knowledge of the seizure of property in an administrative forfeiture proceeding the government's failure to provide published notice . . . did not violate due process") (citation omitted).[4] Further, Plaintiff does not contest that he had actual notice that the revocation of a journalist's press pass by the Press Secretary was a possible punishment for violations of professional conduct and decorum.

Nothing in *Sherrill* suggests that the White House cannot enforce any rule or standard professional conduct that has not been explicitly stated in advance at a granular level. Such a

---

[4] For this reason, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012), upon which Plaintiff principally relies, is inapplicable. *See* Pl.'s Br. 24. There, the Supreme Court recognized that articulable standards were important so that the parties have "sufficient notice of what is proscribed." *Fox*, 567 U.S. at 254. But Plaintiff does not dispute that he knew insulting guests, disrupting events, and defying instructions to leave is not acceptable conduct by journalists on White House grounds.

requirement would be entirely unworkable—particularly on topics as basic as behaving appropriately—as no guideline can be written comprehensively enough to address every possible violation of decorum.  It would also conflict with the White House's broad discretion to decide who is permitted on the campus.[5]  *See Sherrill*, 569 F.2d at 129.  Just as this Court's rules of professional conduct need not explicate every act that could conceivably constitute contempt of court, *see infra* pp. 25, the White House is not required to prospectively and specifically prohibit every breach of professional conduct, particularly for behavior that is clearly inappropriate, as Mr. Karem's was here.  Indeed, under Plaintiff's reasoning, unless this Court had written guidelines for reporter courtroom conduct, a federal judge could not temporarily exclude a reporter from a courtroom  or the courthouse for having behaved inappropriately—*e.g.*, for insulting courtroom personnel or making threatening remarks.  That cannot be the case.  And if a federal judge could exclude Mr. Karem from a courtroom for significant breaches of decorum, then surely the White House can temporarily suspend Mr. Karem's on-demand access to the White House campus.

Moreover, even if Mr. Karem was somehow unclear about whether his behavior was not appropriate for the White House, that would not mean that he was denied due process.  It is well-established that "[c]larifying the law and applying that clarification to past behavior are routine functions of adjudication," as the Press Secretary did throughout the extensive process provided here.  *Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 539 (D.C. Cir. 2007); *see also BNSF Ry. v. Surface Transp. Bd.*, 526 F.3d 770, 784 (D.C. Cir. 2008) (citation omitted); *see also Sewell Coal Co v. Federal Mine Safety & Health Review Com'n*, 686 F.2d 1066, 1070 (4th Cir. 1982) ("retroactive application of a novel principle expounded in an adjudicatory proceeding does not infringe the

---

[5] Indeed, *Sherrill* itself recognized that the Secret Service, in crafting rules of conduct, need not expressly define every potential disqualifying action.  569 F.2d at 130.

rights secured by the due process clause").

### C. The Standards for Decorum and Order at the White House are Not Unconstitutionally Vague.

Nor is the requirement that professionals behave in a professional manner at the White House unconstitutionally vague, particularly when the stakes are merely whether the White House will continue voluntarily providing a particular journalist with uninterrupted, on-demand access to its campus. "A vague rule denies due process by imposing standards of conduct so indeterminate that it is impossible to ascertain just what will result in sanctions." *Timpinaro v. SEC*, 2 F.3d 453, 460 (D.C. Cir. 1993). Here, not only was it widely-understood that a standard of decorum exists at the White House, but it was generally understood what that high standard entails. The requirement that journalists "act professionally, maintain decorum and order, and obey instructions from White House staff," and refrain from engaging in "disruptive behavior that interferes with the conduct of a press event or is otherwise a breach of professional decorum," Preliminary Decision at 1, is more than clear enough for journalists to "ascertain" what behavior could "result in sanctions." *Timpinaro*, 2 F.3d at 460. It is likewise sufficient to "specify in a meaningful way the basis upon which persons" will be penalized, "and therefore will allow meaningful judicial review of decisions" to temporarily revoke press passes. *Sherrill*, 569 F.2d at 130.

Dispelling any doubt about whether this standard is sufficiently clear, it is virtually identical language to that used by this Court to govern the conduct of individuals in its courtrooms. *See* D.D.C. Local Rules, Appendix B, District of Columbia Bar Voluntary Standards for Civility in Professional Conduct (lawyers "will not engage in conduct that offends the dignity and decorum of judicial proceedings, brings disorder or disruption to the courtroom or undermines the image of the legal profession."); Local Civil Rule 83.13 (judges of this Court have "such powers as are necessary for the Court to maintain control over proceedings conducted before it," including the

"inherent power of discipline for conduct committed in the presence of the Court."). And there is no question that this Court could sanction someone who behaved in its courtroom as Mr. Karem behaved in the Rose Garden. The same goes for other contexts, in which similar standards of decorum are routinely upheld. *See Norse v. City of Santa Cruz*, 629 F.3d 966, 967 (9th Cir. 2010) (en banc) (city can eject attendee at town meeting for disturbing or impeding a meeting); *Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309, 1325 (Fed. Cir. 2002) (Department of Veterans Affairs can promulgate regulations requiring the preservation of dignity and decorum at national cemeteries); *United States v. Bronstein*, 749 F.3d 1101 (D.C. Cir. 2017) (speech on Supreme Court grounds can be regulated); 48 C.F.R. § 1.218(a)(14)(i) (requiring that "[a]ll visitors are expected to observe proper standards of decorum and decency while on VA property").

Plaintiff claims that the White House's standards of decorum are unconstitutionally vague under *Sherrill*, but that decision was not as restrictive as Plaintiff suggests. To the contrary, the D.C. Circuit allowed the Secret Service "considerable leeway" in fashioning standards to govern security. It was "enough" in that context "that the Secret Service be guided solely by the principle of whether the applicant presents a potential source of physical danger to the President and/or his immediate family[.]" *Id.* at 130. This flexible standard was sufficient to "specify in a meaningful way the basis upon which persons will be deemed security risks, and therefore will allow meaningful judicial review of decisions to deny press passes." *Id.* Indeed, the D.C. Circuit *expressly rejected* the notion that the Secret Service must promulgate "narrow and specific standards." *Id.*; *see also Heath v. SEC*, 586 F.3d 122, 140-41 (2d Cir. 2009) (rejecting claim that general standard "barring conduct in breach of 'just and equitable principles of trade' is unconstitutionally vague because the [rulemaker] has never adopted rules specifying the prohibited acts") (citation omitted). This Court should do the same.

Plaintiff also attempts to deflect responsibility for his actions by pointing to the statements and actions of others.   For example, Plaintiff claims that other "White House guests" were disruptive at the same event.  Pl.'s Br. 29.  But those individuals were "invited guests, not members of the press," and, at least in Mr. Gorka's case, do not possess a "press pass."  Final Decision 12. Those individuals thus fall outside the Press Secretary's area of responsibility, as well as her authority to impose penalties for misconduct.  *Id.*  Indeed, Plaintiff's argument "ignores the fact that there is a fundamental difference between invited White House guests and the press.  The press is present to cover events and to ask questions of those officials who are taking questions." *Id.*  Accordingly, whatever standard might be applied to guests would not necessarily apply to the press.  *See id.* ("Openly insulting a gathering of guests is never appropriate conduct for a member of the press at the White House, even if one of the guests has directed remarks to the press."). More relevantly here, Plaintiff has not "identified any members of the press whose conduct in the Rose Garden on July 11, 2019 was remotely comparable to Mr. Karem's or that warrants any sanction."  *Id.*  Plaintiff also claims that the President has often "endorsed and celebrated" conduct "that some could conclude lacks decorum," Pl.'s Br. 28, but none of the miscellaneous political statements Plaintiff cites have anything to do with what constitutes appropriate behavior by journalists at the White House.   One of the Press Secretary's duties is to ensure "that basic standards of conduct are maintained *by the press* so that White House events can proceed without disruption and with a basic level of decorum."  Final Decision at 12 (emphasis added).  None of the President's various statements countermands the Press Secretary's establishment of those standards or otherwise blessed Mr. Karem's behavior.  They are thus irrelevant here.

   **D.  The Press Secretary Has Authority to Regulate the Behavior at Issue in This Case.**

For the first time in this litigation—but not in any of his submissions during the White

House's decisional process—Mr. Karem claims that the Press Secretary does not have the authority to suspend his hard pass, *i.e.*, that she has acted *ultra vires*. *E.g.*, Pl.'s Br. at 22-23; Compl. ¶¶ 94-99. But Mr. Karem failed to raise this argument before the White House Press Secretary, *see generally* Initial Response; Supplemental Response, and has thus forfeited it. In reviewing these sorts of decisional processes, courts generally refuse to consider arguments that are raised for the first time in litigation.[6] It is, for example, "a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review." *Nuclear Energy Institute, Inc. v. EPA*, 373 F.3d 1251, 1298 (D.C. Cir. 2004); *see also BNSF Ry. v. STV*, 453 F.3d 473, 479 (D.C. Cir. 2006) (failure to raise an argument before the agency results in forfeiture); *Marine Mammal Conservancy, Inc. v. Dep't of Agric.*, 134 F.3d 409, 413-14 (D.C. Cir. 1998) ("[e]xhaustion even of constitutional claims may promote many of the policies underlying the exhaustion doctrine"). This requirement makes sense, because the purpose of requiring process is to enhance the White House's ultimate decision—something that works only if Mr. Karem advances all of his arguments for consideration during that process. And indeed, had Plaintiff raised this objection during the White House's decisional process, the Press Secretary could carefully have considered it and addressed it at greater length as appropriate. Having failed to raise this objection, though, Plaintiff should not be permitted to ambush the White House with it in litigation.

But even if the Court were to consider this argument, it is without merit. This sort of *ultra vires* claim—one that is not based on a specific or general statutory review provision—is subject

---

[6] For these same reasons, the Court should not consider Plaintiff's belated declarations in its due process analysis, as they were not presented to the Press Secretary for consideration during the White House's decisional process. *See Bellion Spirits, LLC v. United States*, 335 F. Supp. 3d 32, 44 (D.D.C. 2018) (concluding that plaintiff could not submit evidence to the court that it had not submitted to the agency during the agency's decisionmaking process).

to review in only "narrow" circumstances that are absent here.[7]  *Cause of Action Institute v. Eggleston*, 224 F. Supp. 3d 63, 76 (D.D.C. 2016) (reviewing *ultra vires* claim against Office of the White House Counsel) (citing *Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006)).  The government employee must have taken "action that is clearly and completely outside of their authority or in violation of any statute," *id.* (citing *Larson v. Dom. & Foreign Comm. Corp.*, 337 U.S. 682, 689 (1949)); said differently, they must have acted "without any authority whatever." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984).  That is plainly not the case here.

The President and his staff unquestionably have authority over the operation of the White House campus, including who may enter the campus and on what terms.  And the White House Press Secretary unquestionably has authority to set rules governing press events, journalistic access to press events, and journalistic access to the White House—authority she wields on a regular basis by providing access to interviews, configuring press events, and otherwise supervising the relationship between the White House and the press corps.  *See generally*, 3 U.S.C. § 105(a)(1) (authorizing the President "to appoint . . . employees in the White House Office" and providing that "[e]mployees so appointed shall perform such official duties as the President may prescribe"); *see also* Preliminary Decision at 1 (confirming Press Secretary is acting with President's concurrence); Final Decision at 12 ("My responsibility as Press Secretary involves credentialing

---

[7] Plaintiff makes no attempt to invoke a statutory review provision, such as the Administrative Procedure Act.  Nor could he, as neither the President nor the White House Press Office, of which the Press Secretary is the head, is an "agency" subject to the APA. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992) (President is not an agency); *Wang v. Executive Office of the President*, No. 07-0891 (JR), 2008 WL 180189 (D.D.C. Jan. 18, 2008) (White House Press Office is not an agency).  Accordingly, his *ultra vires* action is of the "non-statutory review" character, subject to the limitations enacted by that doctrine. *See Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).

members of the White House press and providing the press access to the White House campus so that they can do their jobs.  In that role, I am responsible for ensuring that basic standards of conduct are maintained by the press so that White House events can proceed without disruption and with a basic level of decorum.");  WHCA Memo (establishing rules governing hard passes); Acosta Letter 2 (explaining Press Secretary's "final determination in this process").  Indeed, Plaintiff's own declarant recognizes that "[t]he process [for obtaining a hard pass] is managed by the White House Press Office" and that "[a]pplications require approval by the press secretary[.]"  Gillman Decl. ¶ 6.  There is no serious question the Press Secretary had the authority to issue the decision here.

Plaintiff's contrary argument is based entirely on Secret Service regulations that do not apply by their own terms.  These regulations explicitly apply only to "*officials of the Secret Service*" and establish procedures by which those "officials" will grant or deny "a request *for a security clearance* in response to an application for a White House press pass."  Pl.'s Br. at 22-23 (quoting 31 C.F.R. § 409.1) (emphases added).  The regulations Plaintiff invokes thus apply neither to the decisionmaker at issue (the Press Secretary is not an "official of the Secret Service"), nor to the decision at issue (which has nothing to do with a "request for a security clearance").  These regulations are therefore irrelevant and are certainly not enough to show that the Press Secretary acted here "without any authority whatever," which is what Plaintiff would need to show in order to prevail.  *Pennhurst*, 465 U.S. at 101 n.11.

**E.  The Process Provided Was Fair and Impartial.**

Finally, Plaintiff claims that the White House's process was constitutionally deficient because the Press Secretary had prejudged the outcome and was biased against Mr. Karem.  *See* Pl.'s Br. 30–32.  Plaintiff faults Press Secretary Grisham for "obtain[ing] presidential approval of

her 'preliminary decision,'" *id.* at 30, before providing Karem with ample notice and multiple opportunities to respond.  But the fact that the President was "aware of [the] preliminary decision and concur[red]," Preliminary Decision at 1, does not show that the process afforded Plaintiff was not meaningful or that Press Secretary Grisham made a final decision before considering Plaintiff's multiple written responses or the in-person meeting.  Indeed, the record here shows that the Press Secretary underwent a complete and fulsome decisional process *before* suspending Mr. Karem's hard pass.  *See supra* pp. 15-22.  Plaintiff also contends that "the fix was in" because the Press Secretary took 22 days to reach her preliminary decision and provided a short deadline to submit materials in response.  Pl.'s Br. at 30.  But *Sherrill* sets no timeline to satisfy Due Process.  And that makes sense, as a thoughtful, carefully-considered preliminary decision takes time.  Additionally, the Press Secretary promptly granted Plaintiff's request for an in-person meeting and provided him with additional time to submit materials, curing whatever prejudice there could have been.  Plaintiff identifies no materials he would have submitted had he been provided with additional time, and fails to reckon with the reality that the Press Secretary carefully considered the arguments he raised and prepared a thirteen-page decision addressing them.  *See generally* Final Decision; Initial Response, Supplemental Response.

Plaintiff next argues that Press Secretary Grisham was too biased to decide whether his conduct merited a sanction, but Plaintiff cannot carry the extremely heavy burden of establishing bias in this context.  The Supreme Court has explained that those challenging a decisionmaker for bias must overcome a "presumption" that the decisionmaker is "unbiased."  *Schweiker v. McClure*, 456 U.S. 188, 195 (1982) ("We must start, however, from the presumption that the hearing officers who decide Part B claims are unbiased."); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (discussing the "difficult burden of persuasion" to "overcome a presumption of honesty and integrity in those

serving as adjudicators").  Although "[t]his presumption can be rebutted by a showing of conflict of interest or some other specific reason for disqualification," *Schweiker*, 456 U.S. at 195, Plaintiff's speculation is insufficient to show the sort of "substantial countervailing reasons" indicating bias he would need to establish, *Thomas v. Dist. of Columbia.*, 407 F. Supp. 2d 102, 109 (D.D.C. 2005). *See United States v. Logan*, 998 F.2d 1025, 1029 (D.C. Cir. 1993) (concluding trial judge attempting to require counsel to comply with the Court's orders does not reflect bias); *SEC. v. First City Financial Corp.*, 890 F.2d 1215, 1222 (D.C. Cir. 1989) (rejecting claim of bias based on comments in the footnotes of a district court's opinion criticizing defendants' conduct); *Sataki v. Broadcasting Bd. of Governors*, 733 F. Supp. 2d 54, 65 (D.D.C. 2010) ("For the bias against the attorney to require disqualification of the trial judge, it must be of a continuing and personal nature and not simply bias against the attorney because of his conduct." (quoting *In re Beard*, 811 F.2d 818, 830 (4th Cir. 1987)); *cf. Gibson v. Berryhill*, 411 U.S. 564, 579 (1973) (pecuniary interest in proceedings sufficient to show bias); *Doolin Sec. Sav. Bank, F.S.B. v. FDIC*, 53 F.3d 1395, 1407 (4th Cir. 1995) ("Presumably all agencies inherently have some level of 'institutional bias,' but such an interest does not render all agencies incapable of adjudicating disputes within their own proceedings . . . .").  Indeed, it would be absurd to disqualify the White House Press Secretary from regulating the conduct of press in the White House—one of her most basic duties.

Plaintiff also complains that he was not provided the complete statement and identity of the Secret Service agent who intervened, but the Fifth Amendment requires only that "a person receive his 'due' process, not every procedural device that he may claim or desire." *Johnson v. United States*, 628 F.2d 187, 194 (D.C. Cir. 1980).  In *Sherrill*, the D.C. Circuit required only "notice of the factual bases" for the decision to deny a hard pass, an opportunity to respond, and a final written statement of the reasons for the decision; it did not direct a full in-person examination

of every individual involved in the decision.  569 F.2d at 130; *see also Mathews*, 424 U.S. at 340–

43 (explaining the "ordinary principle" that an evidentiary hearing is not required for due process);

*Brock*, 481 U.S. at 264 (examination of witnesses "need not be afforded" before a temporary

deprivation).  Nor can Plaintiff claim surprise, as the Press Secretary provided him ample notice

of her intent to rely on the account of the Secret Service officer, as well as the substance of that

account, as Plaintiff acknowledges.  Pl.'s Br. 31.  The Press Secretary also relied on the agent's

statement "only for the point that the agent approached Mr. Karem because he grew concerned,

after Mr. Karem's invitation to 'go outside' and Mr. Gorka's response, that a physical altercation

might break out," as well as "for the agent's recollection of what he said to Mr. Karem."  Final

Decision at 2 n.9.  Identifying the agent or permitting Mr. Karem's attorneys to confront or cross-

examine him would not have changed the events that are captured on video.  Besides, the Press

Secretary noted she "would reach the same findings and decision without" the facts from the

interview with the agent, making his statement ultimately irrelevant.  Final Decision at 4 n.27.  "In

assessing what process is due . . . , substantial weight must be given to the good-faith judgments

of the individuals [administering the process] that the procedures they have provided assure fair

consideration of the entitlement claims of individuals."  *Mathews*, 424 U.S. at 349.

Finally, it simply cannot be that the Constitution requires a full adversarial proceeding

whenever the White House takes steps to regulate the behavior of the journalists it has voluntarily

chosen to invite onto the campus.  The Supreme Court has long recognized the due process is a

flexible concept that adapts to the realities of each situation, *see Mathews*, 424 U.S. at 334, and

the process provided here was more than sufficient for this unique context.  White House officials

have busy jobs with innumerable time-sensitive duties; due process does not require that they erect

a formal adjudicative process for administering journalists' access to (voluntarily provided) hard

passes that is any more elaborate than the full and fair process the Press Secretary provided here.

## II.   Plaintiff Is Not Likely to Succeed on His First Amendment Claim.

Plaintiff is not likely to succeed on his First Amendment claim.  Whatever the scope of First Amendment scrutiny attendant to White House regulation of hard passes, it is clear that the Press Secretary's decision here was lawful.  Mr. Karem's conduct was inappropriate, prolonged, and well-documented.  And far from admit some fault in the incident, he has doubled down on his behavior by asserting a constitutional right to engage in it.  The facts here supply more than sufficient basis for Plaintiff's temporary suspension under even the most stringent interpretation of *Sherrill*.  And that is all the Court need conclude to reject Plaintiff's First Amendment claim.

### A.   Assuming that Mr. Karem has a Protectable First Amendment Interest in a Hard Press Pass, the Decision to Temporarily Suspend it was Permissible.

The temporary suspension here survives whatever First Amendment scrutiny *Sherrill* might require.[8]  Reading *Sherrill* as Plaintiff does, the government cannot deny or temporarily revoke hard passes "arbitrarily or for less than compelling reasons."  *Sherrill*, 569 F.2d at 129; *see also id.* at 131 (same).  Mr. Karem's suspension easily satisfies this standard.

There is no serious question that the government has a compelling interest in maintaining decorum and professionalism on the White House grounds and in ensuring that "a hard pass be used in a manner that is respectful of the White House property and grounds in light of the extensive access it provides."  Final Decision at 8; *see also id.* at 12 ("I am responsible for ensuring that basic standards of conduct are maintained by the press so that White House events can proceed without disruption and with a basic level of decorum.").  Courts have recognized that interest in other public contexts, including prisons, courthouses, and public educational institutions.  *See, e.g.,*

---

[8] In *Cable News Network*, Judge Kelly did not reach this issue.  *See Cable News Network*, Tr. of Nov. 16, 2018 Mot. Hearing 15:7-21.

*Watson v. Wakefield*, No. H-08-0903, 2009 WL 3151320, at \*10 (S.D. Tex. Sept. 25, 2009) ("compelling government interest in maintaining order, discipline, and security"); *United States v. Ali*, No. CRIM 10-cr-187, 2012 WL 4128387, at \*4 (D. Minn. Sept. 19, 2012) ("maintenance of order in the courtroom and public safety" was a compelling interest); *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 58 F. Supp. 2d 619, 624-25 (W.D. Pa. 1999) (there is "a compelling interest in maintaining a safe educational environment").  Even Mr. Karem's counsel appear to have acknowledged that the White House's interest in ensuring decorum is a compelling one.  *See* Final Decision at 9 ("Indeed, [Mr. Karem's counsel] explicitly confirmed during our in-person meeting that they were not second-guessing the White House's need to ensure basic decorum, order, and security.").

Plaintiff takes a much more aggressive position in his brief, however, and now argues that shouting at guests, hurling insults, and instigating physical confrontations are protected speech that journalists have a constitutional right to engage in when they are attending White House events on the White House campus.  Or in Plaintiff's words, "even if Mr. Karem had insulted White House guests . . . insults are protected First Amendment speech and thus cannot be the subject of punishment on their own."  Pl.'s Br. at 35. (describing also his "comments to Gorka" as "protected speech").  That is incorrect.  Government officials have far greater authority to restrict disruptive conduct by credentialed professionals in government facilities in connection with official events than they do to regulate speech by members of the public in public places.  That is why, for example, judges have broad authority to sanction individuals who disrupt judicial proceedings.  *E.g.*, *Deters v. Schweikert*, No. 19-cv-0024, 2019 WL 2290650, at \*7 (S.D. Ohio May 6, 2019) (citing *Illinois v. Allen*, 397 U.S. 337 (1970)); *see also* cases cited *infra* at 34-35.  Plaintiff was attending an official event as a credentialed journalist; he was not a protester on Pennsylvania

Avenue.  The First Amendment does not require that the former professional setting devolve into the latter public one, and Plaintiff has provided no authority remotely suggesting otherwise.

Instead, Plaintiff relies on a series of general citations concerning access to limited public forums, *see* Pl.'s Br. at 32-34—authorities that do not apply here because the White House campus is not a limited public forum.  Nor does the public forum doctrine have any bearing on this case. Among other reasons, forum analysis does not apply where, as here, the government possesses substantial discretion in determining whether to grant access.   And more fundamentally, the doctrine involves the use of public property for *speech*, not the right of access to government property—whether a courthouse or the White House—to obtain information.  *See, e.g.*, *Whiteland Woods, L.P. v. Twp. of W. Whiteland*, 193 F.3d 177, 183 (3d Cir. 1999) ("We are not convinced that forum analysis is necessary to resolve such restrictions on the right of [press] access."); *see also S.H.A.R.K. v. Metro Parks Serving Summit Cty.*, 499 F.3d 553, 559-60 (6th Cir. 2007); *United States v. Am. Library Ass'n*, 539 U.S. 194, 205 (2003) (plurality op.) (forum analysis was "incompatible with the discretion that public libraries must have to fulfill their traditional missions"); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 673 (1998) (analyzing whether forum analysis is "compatible with the intended purpose of the property").   As courts, including *Sherrill*, have recognized, decisions about press access are precisely the kinds of discretionary determinations about access to gather information that are not subject to forum analysis.  *Sherrill*, 569 F.2d at 124 (President may "grant interviews or briefings with selected journalists"); *The Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 413 (4th Cir. 2006).

Nor is there any question that imposing a thirty-day suspension of Mr. Karem's press pass was an appropriate, reasonable, and non-arbitrary way of furthering the government's compelling

interest in proper decorum. *Sherrill*, 569 F.2d at 131.[9]  After reviewing the evidence, the Press Secretary determined that a reasonable observer would conclude Mr. Karem "(1) insulted invited guests of the White House, (2) threatened to escalate a verbal altercation into a physical one to the point that the Secret Service deemed it prudent to intervene, and (3) re-engaged with Mr. Gorka in what quickly became a confrontational manner while repeatedly disobeying a White House staffer's instructions to leave."  Final Decision at 8.  The Press Secretary also "carefully considered a range of potential responses to Mr. Karem's actions," determining that "a permanent revocation would be too great a punishment for the conduct involved here," whereas taking "no action … would be insufficient to deter Mr. Karem and other members of the press from disrupting White House events," *id.*, particularly given that "Mr. Karem has nowhere acknowledged even the slightest indication of any regret for his conduct or recognition that it could, even possibly, have transgressed any boundaries of professional conduct for the press corps," *id.* at 9.  The Press Secretary's decision was thus well grounded in the evidence and evinces careful consideration to ensure it is no harsher than necessary to advance the government's interests.  And as detailed above, it was "reasonably explained," *Am. Tunaboat Ass'n v. Ross*, No. 19-cv-01011 (TNM), 2019

---

[9] The requirement that an action be reasonable is the same as saying that an action not be arbitrary—and this is a deferential standard.  *Sherrill* itself speaks of a First Amendment interest "that individual newsmen not be arbitrarily excluded from sources of information."  *Sherrill*, 569 F.2d. at 130.  And courts that have interpreted *Sherrill* have understood it to require only highly deferential review.  For example, in *Getty Images News Services Corporation v. Department of Defense*, 193 F. Supp. 2d 112 (D.D.C. 2002), the court evaluated a challenge to how the Department of Defense allocated access to Guantanamo Bay, a place, as with the White House, where "space is limited and that [the government] must allocate that space among numerous media organizations."  *Id.*  at 120.  There, the court cited *Sherrill* for the requirement that "in allocating limited spaces for media coverage, [the government] must make selections in a manner that is reasonable."  *Id.*  Such review is also consistent with the deferential standard that "reasonableness" review receives in other contexts.  *See, e.g.*, *Am. Tunaboat Ass'n v. Ross*, No. 19-cv-01011 (TNM), 2019 WL 3458641, at *3 (D.D.C. July 31, 2019) ("The arbitrary and capricious standard [under the APA] is deferential; it requires that agency action simply be reasonable and reasonably explained.") (quotation omitted).

WL 3458641, at *3 (D.D.C. July 31, 2019), thus satisfying any requirements that it be procedurally reasonable.  That decision fully satisfied even the strictest reading of *Sherrill*.

The rules that govern analogous circumstances dispel any doubt about whether the Press Secretary's decision comported with the First Amendment.  As noted in the due process discussion above, the District of Columbia Bar Voluntary Standards for Civility in Professional Conduct, attached as Appendix B of the Local Rules of this Court, states that lawyers "will not engage in conduct that offends the dignity and decorum of judicial proceedings, brings disorder or disruption to the courtroom or undermines the image of the legal profession."  Local Civil Rule 83.13 provides that the judges of this Court have "such powers as are necessary for the Court to maintain control over proceedings conducted before it," including the "inherent power of discipline for conduct committed in the presence of the Court."  Even in the context of judicial hearings where members of the public generally have a constitutional right of access—more than Mr. Karem has at the White House—courts have long held that individuals can be excluded if necessary to maintain dignity, order, and decorum, even if those standards are not expressly inscribed above the courtroom door.  *E.g.*, *Deters*, 2019 WL 2290650, at *7 (citing *Illinois*, 397 U.S. 337).

Regulations prohibiting disruptive conduct like Mr. Karem's routinely survive First Amendment scrutiny outside the judicial context, too.  *See Norse*, 629 F.3d at 967 (city can eject attendee at town meeting for actually disturbing or impeding a meeting); *Griffin*, 288 F.3d at 1325 (Department of Veterans Affairs can promulgate regulations requiring the preservation of dignity and decorum at national cemeteries); *Bronstein*, 849 F.3d at 1101 (speech on Supreme Court grounds can be regulated); 48 C.F.R. § 1.218(a)(14)(i) (requiring that "[a]ll visitors are expected to observe proper standards of decorum and decency while on VA property").  Same for statutes that restrict "speech that will foreseeably disrupt the intended function of government property,"

even in limited public forums.  *Seattle Mideast Awareness Campaign v. Kings Cty.*, 781 F.3d 489, 500 (9th Cir. 2015).  Indeed, "the need to avoid disruptions" has long been a non-arbitrary basis for government action.  *Fenceroy v. Morehouse Par. Sch. Bd.*, No. Civ. A. 05-0480, 2006 WL 39255, at *4 (W.D. La. Jan. 6, 2006).  Plaintiff provides no reason why the First Amendment would require that the White House tolerate more than municipal meetings, Department of Veterans Affairs facilities, courtrooms and courthouse grounds, or the myriad other contexts where courts have recognized authority to maintain basic standards of decorum.

Nor does it matter that Mr. Karem's conduct happened "after the press event had ended." Pl.'s Br. 36.  The conduct itself: insulting invited guests, threatening to exacerbate a verbal confrontation to a physical one, and ignoring a staffer's direction was inappropriate even if it happened after the official event.  *See, e.g.*, *Griffin*, 288 F.3d at 1325 (VA can regulate conduct at cemeteries, without reference to ongoing funerals); *Bronstein*, 849 F.3d at 1101 (speech on Supreme Court grounds can be regulated, without reference to ongoing hearings).  The rules of decorum do not lapse when the judge leaves the bench.  If anything, Mr. Karem's First Amendment interest in reporting the news is diminished when the press event is over, giving him *less* leeway to cause disruption, not more.  *See also* Final Decision at 8 ("I note that Mr. Karem did not use the access granted by hard pass for the journalistic purposes for which it is granted."); *id*. at 13 ("The fact that the press event had ended and Mr. Karem's conduct was not related in any way to asking questions during the press event serves only to reduce First Amendment concerns . . . .").

Finally, Plaintiff asserts that even if the Press Secretary's decision is justified on its face, her decision and decisional process is all a subterfuge for viewpoint discrimination, *see* Pl.'s Br. at 36-37, but Plaintiff offers no evidence to support this charge.  As the Press Secretary already has explained: "[t]he content and viewpoint of Mr. Karem's reporting have played no role in this

decision." Final Decision at 10.  The publicly available facts confirm as much, as the President continued to call on Mr. Karem even after the events of the July 11 event, *see id.* at 10-11, and Mr. Karem has failed to identify a single journalist who—at any time since the President took office— engaged in remotely comparable conduct at the White House.  *See also* Final Decision at 12 ("You have not identified any members of the press whose conduct in the Rose Garden on July 11, 2019 was remotely comparable to Mr. Karem's or that warrants any sanction.").  Plaintiff points the finger at various guests whom he says also behaved poorly at the event, Pl.'s Br. at 36, but those individuals were not credentialed journalists availing themselves of on-demand access to the White House to report news.  Plaintiff has thus not shown that the White House has "treat[ed] similarly situated [reporters] differently."  *Bowyer v. District of Columbia*, 910 F. Supp. 2d 173, 205 (D.D.C. 2012) (citing *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008)).

Nor is there anything unique about Mr. Karem's views or how he expresses himself that support his allegation that he is being punished for his viewpoints.  Far from being uniquely hostile to the President, Mr. Karem is indistinguishable from much of the White House press corps.  For example, Plaintiff says that the President told him to "sit down" after asking a question, but that puts him in substantial company.[10]  Pl.'s Br. at 37.  Nor does the fact that the President called Plaintiff "Fake News" differentiate him from many of his peers.[11]  The reality is that the White

---

[10] *See, e.g.*, Remarks by President Trump in Press Conference (Feb. 16, 2017), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-conference/ (last visited Aug. 22, 2019) (President says "sit down" after hearing "unfair" question); Press Conference by President Trump (Sept. 27, 2018), https://www.whitehouse.gov/briefings-statements/press-conference-president-trump-2/ (last visited Aug. 22, 2019 ) (President says "sit down" to reporter during press conference);    Nov. 7, 2018, 9:34 AM, Tweet from @atrupar, https://twitter.com/atrupar/status/1060224009894350848 (last visited Aug. 22, 2019) ("Trump repeatedly tells April Ryan to 'sit down' when she tries to ask him a question").

[11] *See, e.g.*, Aug. 19, 2019, 5:21 AM, Tweet from @realDonaldTrump, https://twitter.com/realdonaldtrump/status/1163425829331841024 (last visited) ("Despite all of

House press corps is populated by reporters who are aggressive questioners of the President and White House officials, many of whom are extremely critical of the President and his policies. Those reporters have not had their hard passes suspended, and that is because Mr. Karem's suspension was based on his conduct last month, as the Press Secretary's detailed final decision explains at length. *See, e.g.*, *2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 684 (D.C. Cir. 2006) (differential treatment can serve as evidence of pretext).

### B.   The First Amendment Does Not Constrain The Discretion of The President and His Designees in Granting White House Access to Journalists.

While the Court should deny Mr. Karem's Motion for the narrower reason detailed above, the First Amendment does not restrict the ability of the President or his designees to determine the terms on which they do, or do not, engage with particular journalists. As *Sherrill* recognized, the President may "grant interviews or briefings with selected journalists" and deny that opportunity to others, 569 F.2d at 129; any other result would "certainly be unreasonable." *Id.* The President may—free from First Amendment scrutiny—choose which journalists he invites to an interview in the Oval Office or to a press conference in the East Room.

If the rule were otherwise, courts would have to police the daily give-and-take between public officials and reporters—an arena where public officials *routinely* grant or deny interviews to specific reporters based on their judgment about the reporter's viewpoints. The Fourth Circuit has already recognized as much, upholding a governor's decision to prohibit everyone "in the Executive Department or Agencies" from speaking with two reporters. *Baltimore*, 437 F.3d at

---

the Fake News, my Poll Numbers are great."); Aug. 10, 2019, 4:40 AM, Tweet from @realDonaldTrump, https://twitter.com/realdonaldtrump/status/1160154025511280640 (last visited Aug. 22, 2019) (describing news story as "[f]ake reporting"); Aug. 7, 2019, 3:32 AM, Tweet                                          from                              @realDonaldTrump, https://twitter.com/realDonaldTrump/status/1159049603209158656 (last visited Aug. 22, 2019) (describing news article as "Fake News").

413.  The court explained that providing "relatively less information" to one reporter was allowed, even when done "on account of [that journalist's] reporting[.]"  *Id.* at 418.  Such decisions are "a pervasive feature of journalism and of journalists' interaction with government."  *Id.*

Nor is there is any First Amendment right of access to the White House that could overcome this general principle.  As the Supreme Court recognized decades ago, even though any restriction on a citizen's access to the White House "diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, . . . that does not make entry into the White House a First Amendment right."  *Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965).  And the First Amendment does not impose stricter requirements when journalists are granted or denied access to the White House.  *See Pell v. Procunier*, 417 U.S. 817, 834-35 (1974) (journalists do not have a First Amendment right to "information not available to members of the public generally").

Plaintiff's argument to the contrary rests primarily on *Sherrill*.  But even if *Sherrill*'s First Amendment analysis applies to this very different context, by its own terms that analysis does not subject press-pass revocations to substantive First Amendment scrutiny.  Rather than assess the substantive sufficiency of the Secret Service's basis for denying Mr. Sherrill's press pass, the court evaluated only the process through which it made its decision.  That is very different from First Amendment scrutiny, which generally investigates the strength of the government's interest (and the fit between the means the government is employing and the interest it is pursuing.  *Sherrill* disclaims any effort to conduct that sort of analysis.  *See Sherrill*, 569 F.2d at 128 ("Although appellee requested the District Court to order appellants to grant him a White House press pass, the District Court determined, correctly we believe, that it had no occasion to pass on the merits of the press pass denial.").  And the relief it required was not provision of a pass (as Plaintiff seeks)

but rather an improved process.  *Sherrill*, 569 F.2d at 132.

To be sure, *Sherrill* does note that access to the White House should "not be denied arbitrarily or for less than compelling reasons," *id.* at 129, but that reference comes in the course of its procedural due process analysis.[12]  Context makes clear that the court is simply explaining providing procedural due process is important because it enhances the quality of the final decision; the court was not, as Plaintiff claims, announcing a *sui generis* First Amendment standard for press-pass revocations.  Indeed, as the court put it two pages later, "[w]e think the notice to the unsuccessful applicant of the factual bases for denial with an opportunity to rebut is a minimum prerequisite for ensuring that denial is indeed in furtherance of Presidential protection, rather than based on arbitrary or less than compelling reasons." *Id.* at 131.  And that is why the cases the court cited to support that proposition were due process cases, not First Amendment ones.  *See id.* (citing *Green v. McElroy*, 360 U.S. 474 (1959) (procedures for terminating government contractor security clearance); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) (procedures for statutory notice with respect to judicial settlement of trust fund); *Grannis v. Ordean*, 234 U.S. 385 (1914) (procedures for mailing of summons in land dispute).  *Sherrill* thus provides no basis to question the substantive justification for suspending Mr. Karem's press pass.

## III.   Plaintiff Cannot Demonstrate Irreparable Injury.

Aside from the merits, Plaintiff cannot clear this Circuit's "high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C. Cir. 2006).  "[T]he injury must be both certain and great; it must be actual and not theoretical." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  Plaintiff focuses his argument on the notion that a

---

[12] The Court repeats this formulation several times, and these references are best read as being part of the Court's procedural due process analysis for the reasons detailed above.  But to the extent they suggest a new, substantive form of First Amendment scrutiny, they are dicta.

First Amendment violation is a *per se* irreparable harm.  Pl.'s Br. at 37 (citing *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).  But Plaintiff has not shown he is likely to succeed on his First Amendment and thus cannot demonstrate irreparable harm on that basis.  And Plaintiff has advanced no claim to preliminary injunctive relief based on his due process allegations.  *See* Pl.'s Br. at 37-39.

Nor has Plaintiff demonstrated irreparable harm independent from the presumed harm of a First Amendment violation.  Mr. Karem speculates that there could be a "chilling effect" from the sanction imposed on him, *see* Pl.'s Br. at 38, but that is merely "theoretical" speculation, not harm that is "both certain and great."  *Wisc. Gas*, 758 F.2d at 674; *see FEC v. GOPAC*, 897 F. Supp. 615, 618-19 (D.D.C. 1995); *Nichols v. Agency for Int'l Dev.*, 18 F. Supp. 2d 1, 5 (D.D.C. 1998).

Plaintiff also argues that "restrictions on a reporter's coverage of White House and government affairs . . . constitute irreparable injury," Pl.'s Br. at 38, but the cases he cites do not apply in this context.  In *Cable News Network, Inc. v. American Broadcasting Companies, Inc.*, 518 F. Supp. 1238 (N.D. Ga. 1981), a case challenging "the total exclusion of television media from limited coverage White House events," the court concluded that irreparable injury would occur "[i]f television crews are totally excluded from White House pool coverage, [because] the unique continuous visual element of television news coverage will be denied *to the public and the press*." *Id.* at 1245-46 (emphasis added).  Here, of course, there is no such comparable exclusion, as the American public will still have significant White House access through other reporters.  Likewise, in *American Broadcasting Co. v. Cuomo*, 570 F.2d 1080 (2d Cir. 1977), the court considered whether state actors could ban networks from election headquarters.  The court concluded that "irreparable harm will result if ABC is not permitted to broadcast live coverage of the post-election activities at the respective headquarters," particularly given that some "viewers

might be limited to a single channel." *Id.* at 1082.

## IV.   The Balance of Harms and the Public Interest Weigh Against Injunctive Relief.

A party seeking a temporary restraining order or preliminary injunction must also demonstrate "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.   "These factors merge when the Government is the opposing party." *Nken v. Holder,* 556 U.S. 418, 435 (2009).

Here, Plaintiff has not established that the *public*'s interest is harmed by temporarily denying on-demand access to one reporter while retaining (extensive) access for reporters from other outlets or even the same outlet that employs Mr. Karem. *See* Final Decision at 13 (offering to arrange a new pass if "Playboy has another correspondent they wish to send to the White House during [Plaintiff's] absence").   This basic fact distinguishes this case from those that Plaintiff cites in his brief. *See Telemundo of Los Angeles v. City of Los Angeles*, 283 F. Supp. 2d 1095, 1103-04 (C.D. Cal. 2003) (television network denied access); *American Broadcasting Companies*, 518 F. Supp. at 1245 (entire segment of news industry denied access).   None of these cases addressed the situation here, where one reporter was temporarily excluded while many other reporters remain.

Finally, Plaintiff fails to reckon with the extraordinarily intrusive nature of the judicial relief he seeks—a decree ordering access to the President's official residence and personal offices for a journalist who picked a fight in the Rose Garden and now claims a constitutional entitlement to do so.   At this preliminary stage, that hardship is far more significant than the minor hardship on Plaintiff of the relatively brief remainder of his thirty-day suspension.

## CONCLUSION

The Court should deny Plaintiff's Motions.

Dated: August 23, 2019          Respectfully submitted,

                                JOSEPH H. HUNT
                                Assistant Attorney General

                                JAMES BURNHAM
                                Deputy Assistant Attorney General

                                ERIC R. WOMACK
                                Assistant Branch Director


                                /s/  *Ashley A. Cheung*_____
                                ASHLEY A. CHEUNG (NY Bar No. 5405816)
                                JOSEPH E. BORSON (Va. Bar No. 85519)
                                Trial Attorneys, U. S. Dept. of Justice
                                Civil Division, Federal Programs Branch
                                1100 L St., NW
                                Washington, D.C. 20005
                                Tel.      (202) 616-8267
                                Ashley.Cheung@usdoj.gov
                                Joseph.Borson@usdoj.gov


                                *Attorneys for Defendants*

# Exhibit 1

March 16, 2019 Memo to White House Correspondents' Association

from the White House Press Office ("WHCA Memo")

**From:** <u>White House Press Office</u>
**To:** <u>Cantrell, Austin D. EOP/WHO</u>
**Subject:** Memo to the WHCA from the Press Secretary Regarding Press Access
**Date:** Saturday, March 16, 2019 4:51:47 PM



**Office of the Press Secretary**

FOR PLANNING PURPOSES ONLY

March 16, 2019

**ATTN:** Journalists covering the White House
**FROM:** Office of the Press Secretary
**RE:** PRESS ACCESS

Effective March 16, 2019, the White House Press Office will implement the following processes:

1. Journalists requiring an escort may enter the White House complex only between the hours of 8 a.m. and 6 p.m ET Monday – Friday.  Escorts will be provided outside of the designated window of time when the President's schedule requires it.  All foreign nationals will require an escort.  An escort will be provided on the hour. Any pass holder who requires an escort should plan accordingly.
2. Journalists requesting temporary access to cover the White House may apply for a day, week or six-month pass. To obtain a temporary press pass you will need to request access by 5PM ET the night prior to entry if you are domestic press and 24 hours prior to entry if you are a member of the foreign press. Journalists who will be covering the White House for an extended period or who are waiting approval of a hard pass may request a week or six-month pass. Please see guidelines below.

## <u>DAY PASS</u>

To obtain a day pass, you will need to request access by emailing whopress@who.eop.gov by 5PM ET the night prior to the date in which you are requesting access; foreign press will need to request 24 hours in advance. Requests after 5PM ET will NOT be accepted. Once your request is approved, you will receive an email from the White House Press Office confirming receipt of request and/or a request for your vitals via the WAVES template for USSS clearance.

**WEEK PASS**

To obtain a week pass you will need to submit your request by Friday at 5PM ET. Week passes are only for journalists who will be covering the White House for 4 or more days in a 7-day window. Please submit your vitals via the WAVES template provided by the Press Office.

**SIX-MONTH PASS**

To obtain a six-month pass you will need to submit your request by Friday at 5PM ET. Provided USSS clearance, your pass will take effect at 12AM the Monday following submission. Six-month passes are only for journalists who will be covering the White House for 60 or more days in a 180-day window. Please submit your vitals via the WAVES template provided by the Press Office.

**HARD PASS**

The hard pass is designed for those members of the media who need frequent access to the White House complex over an extended period of time. Consistent with the guidance the Press Office issued in February 2017 to all applicants for hard passes, to be eligible for a hard pass "you must cover the White House at least 50% of the time." In other words, to qualify for a hard pass, you need to be physically present at the White House for your job 90 or more days in a 180-day window of time. If your job duties will require you to be at The White House for 90 or more days you may submit your request for an application to the White House Press Office. Your outlet must provide a letter indicating an expectation that you will meet the standard requirements for a hard pass. Hard passes are valid for one year. At the end of the one-year period, a hard pass will not be renewed for any journalist whose badge-in records show that he or she was not present in the complex for at least 90 days in the 180-day window prior to expiration of the pass. Applications for new hard passes will be accepted and reviewed once a quarter. The Press Secretary retains discretion to issue hard passes for senior journalists serving as bureau chiefs or in a similar capacity whose responsibilities may not require their presence at the White House 50% of the time, but who are nonetheless consistently engaged in covering the White House. Furthermore, the Press Secretary retains discretion to review special circumstances, such as maternity leave, under which a journalist may qualify for an exception to the hard pass requirements.

### ###

Unsubscribe

**The White House · 1600 Pennsylvania Ave NW · Washington, DC 20500-0003 · USA · 202-456-1111**

# Exhibit 2

November 19, 2018 Letter from the White House Press Office

to James Acosta ("Acosta Letter")

# THE WHITE HOUSE
## WASHINGTON

November 19, 2018

Dear Mr. Acosta:

We received a letter from your counsel yesterday responding to our notice letter of November 16, 2018. That letter says, among other things, that "there are no so-called 'widely understood practices'" governing the conduct of journalists covering the White House. This statement impresses us as incorrect. Over many years, members of the White House press corps have attended countless press events with the President and other officials without engaging in the behavior you displayed at the November 7, 2018 press conference, which gave rise to the suspension of your hard pass.

We would have greatly preferred to continue hosting White House press conferences in reliance on a set of understood professional norms, and we believe the overwhelming majority of journalists covering the White House share that preference. But, given your insistence that shared practices be replaced by "explicit . . . standards," this letter attempts to convert into rules the widely understood practices described in our prior letter, and which your counsel's letter inexplicably concludes were non-existent.

Please be advised of the following rules governing future press conferences:

(1) A journalist called upon to ask a question will ask a single question and then will yield the floor to other journalists;

(2) At the discretion of the President or other White House official taking questions, a follow-up question or questions may be permitted; and where a follow up has been allowed and asked, the questioner will then yield the floor;

(3) "Yielding the floor" includes, when applicable, physically surrendering the microphone to White House staff for use by the next questioner;

(4) Failure to abide by any of rules (1)-(3) may result in suspension or revocation of the journalist's hard pass.

We are aware that Rules (2) and (4) afford the White House a degree of discretion in enforcing these rules and we see no substitute for reserving such discretion. A press conference is not a mechanical exercise. We are likewise mindful that a more elaborate set of rules might be devised, including, for example, specific provisions for journalist conduct in the open (non-press room) areas of the White House and for Air Force One. At this time, we have decided not to frame such rules in the hope that professional journalistic norms will suffice to regulate conduct in those places. If unprofessional behavior occurs in those settings, or if a court should decide that explicit rules are required to regulate conduct even there, we will be forced to reconsider this decision.

Until then, the view from here is that White House interaction with the press is, and generally should be, subject to a kind of natural give-and-take. President Trump believes strongly in the First Amendment and interacts with the press in just such a way. It would be a great loss for all if, instead of this give-and-take, and instead of relying on the professionalism of White House journalists, we were compelled to devise a lengthy and detailed code of conduct for White House events.

Having received a formal reply from your counsel to our letter of November 16, we have made a final determination in this process: your hard pass is restored. Should you refuse to follow these rules in the future, we will take action in accordance with the rules set forth above. The President is aware of this decision and concurs.

Happy Thanksgiving.

Very truly yours,

Bill Shine
Assistant to the President
Deputy Chief of Staff for Communications

Sarah Huckabee Sanders
Assistant to the President
White House Press Secretary

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BRIAN KAREM,

         Plaintiff,

   v.

DONALD J. TRUMP, in his official capacity
as President of the United States and in his
individual capacity; and STEPHANIE
GRISHAM, in her official capacity as White
House Press Secretary and in her individual
capacity,

         Defendants.

Case No.:  19-cv-2514 (KBJ)

## [PROPOSED] ORDER

     Plaintiff's Motions for a Temporary Restraining Order and Preliminary Injunction, ECF

No. 2, are hereby DENIED.

DATE:_____

                               _____
                               UNITED STATES DISTRICT JUDGE