# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BRIAN KAREM,<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States and in his individual capacity; and STEPHANIE GRISHAM, in her official capacity as White House Press Secretary and in her individual capacity,<br><br>Defendants. | **Case No. 19-cv-2514-KBJ** |

**BRIEF OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AS *AMICUS CURIAE* SUPPORTING PLAINTIFF'S MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ ii

INTEREST OF AMICUS CURIAE ........ 1

INTRODUCTION ........ 2

ARGUMENT ........ 3

I. The White House must provide meaningful due process before denying, suspending, or revoking a journalist's security credentials. ........ 3

II. The *Sherrill* requirement that suspensions of security credentials be pursuant to publicly known "explicit and meaningful" standards is essential for an informed electorate and an accountable executive branch. ........ 7

CONCLUSION ........ 12

# TABLE OF AUTHORITIES

**Cases**

*Branzburg v. Hayes*, 408 U.S. 665 (1972) ........ 4
*Cable News Network, Inc. v. Trump*, No. 18-cv-2610, Dkt. No. 22 (D.D.C. Nov. 16, 2018) (oral ruling) ........ 11
**City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988) ........ 6, 7
**F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ........ 4, 5, 6, 7
*Getty Images News Servs. v. Dep't of Defense*, 193 F. Supp. 2d 112 (D.D.C. 2002) ........ 4
*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ........ 6
*Grosjean v. American Press Co.*, 297 U.S. 233 (1936) ........ 11
**N.Y. Times v. United States*, 403 U.S. 713 (1971) ........ 9
*Pell v. Procunier*, 417 U.S. 817 (1974) ........ 4
**Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977) ........ *passim*
*United States v. Nixon*, 418 U.S. 683 (1974) ........ 9

**Statutes**

18 U.S.C. § 793 (2016) ........ 9

**Other Authorities**

*Br. Amici Curiae of the Reporters Committee for Freedom of the Press[,] the Officers of the White House Correspondents Association [and] the National Press Club in Support of Appellees at 8-9, *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977) ........ 8, 10
Gabe Rottman, *Government Leaks to the Press Are Crucial to Our Democracy. So Why Are We Suddenly Punishing Them So Harshly?*, TIME (Nov. 1, 2018) ........ 9
The Federalist No. 70 (Alexander Hamilton) ........ 8

**Regulations**

Exec. Order No. 13,526, 75 Fed. Reg. 707 ........ 9

## INTEREST OF AMICUS CURIAE

*Amicus curiae* is the Reporters Committee for Freedom of the Press (the "Reporters Committee"), an unincorporated nonprofit association of reporters and editors dedicated to defending the First Amendment and newsgathering rights of the news media.[1] Founded by journalists and media lawyers in 1970, when the nation's press faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources, the Reporters Committee today serves as a leading voice for the legal interests of working journalists and news organizations.

As an organization devoted to defending First Amendment freedoms, including the rights of journalists and media organizations to gather and report the news, the Reporters Committee has a powerful interest in ensuring that the White House does not deny, suspend, or revoke the security credentials of individual journalists without sufficient due process. Because decisions affecting such credentials have ramifications for all members of the news media, the issues presented in this case are of profound importance to the Reporters Committee. As such, the Reporters Committee coordinated an *amici* brief along with the White House Correspondents Association and the National Press Club in *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977), the case in this Circuit holding that, before security credentials may be denied, the White House must promulgate "explicit and meaningful" standards and must provide an aggrieved journalist notice and a hearing. *Id.* at 131.

The Reporters Committee respectfully submits this *amicus* brief pursuant to Local Civil Rule 7(o).

---

[1] No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amicus curiae* or its counsel made a monetary contribution to the preparation or submission of this brief.

## INTRODUCTION

This case concerns a question of fundamental importance to the rights of the press and public under the First and Fifth Amendments: whether the White House press secretary may suspend the security credentials of a journalist and bona fide member of the press based on vague, ad hoc standards never previously articulated, thereby depriving that journalist of his ability to report on the president of the United States. The Reporters Committee respectfully submits this *amicus* brief to inform this Court's understanding of the constitutional concerns posed by the suspension of a journalist's access to the White House without sufficient due process.

This case arises from the White House press secretary's thirty-day suspension of the security credentials (referred to herein and in Plaintiff's briefing as a "press pass" or "hard pass") of Plaintiff Brian Karem, White House correspondent for *Playboy* magazine and a regular CNN contributor. The press secretary issued her final decision on August 16, 2019, citing an incident that occurred more than a month earlier, on July 11, between Karem and Sebastian Gorka, a radio host and former advisor to the president, following a "Social Media Summit" in the Rose Garden. Boutrous Decl. Ex. 10 (Letter from Stephanie Grisham to Theodore Boutrous Jr., Aug. 16, 2019), Dkt. Ent. 3-10. The press secretary acknowledged the lack of "explicit rules" governing behavior by members of the press at White House events. Boutrous Decl. Ex. 4 at 1 (Letter from Stephanie Grisham to Theodore Boutrous Jr., Aug. 2, 2019), Dkt. Ent. 3-4. Nevertheless, she decided to suspend Karem's press pass based on her conclusion that his behavior was "disruptive" and violated an unwritten but "widely shared understanding" that members of the press "must act professionally, maintain decorum and order, and obey instructions from White House staff." Boutrous Decl. Ex. 10 at 8.

The Constitution recognizes both the need for the executive, legislative, and judicial branches to inform the public and the press about significant actions of government and the right of the press to gather and publish this information. When the White House chooses to have special facilities and employees devoted to the press, it must make these government press resources open to bona fide members of the press on a fair and equitable basis.

Suspending a journalist's security credentials and denying that journalist's access to the White House press facilities deprives the public of reporting on the administration and may only occur when First Amendment and due process requirements are satisfied. Under controlling law in this Circuit, due process requires clear, articulated standards that put journalists on notice of what conduct will result in denial of their security credentials. *Sherrill v. Knight*, 569 F.2d 124, 131 (D.C. Cir. 1977). In addition, the White House must provide a meaningful opportunity to challenge the denial, and its decision must set forth the reasons for the denial. *Id.* These standards must be viewpoint- and content-neutral and must not be applied in an arbitrary or discriminatory manner. *Id.* at 129.

These safeguards serve profound First Amendment interests in holding the executive branch accountable through an informed and engaged electorate. They also ensure transparency and fairness, preventing arbitrary and discriminatory decisions regarding press access to the White House. Given the clear lack of such due process here, the holding in *Sherrill* requires the prompt restoration of Plaintiff's security credentials.

## ARGUMENT

### I. The White House must provide meaningful due process before denying, suspending, or revoking a journalist's security credentials.

It is well-settled that courts must uphold not only the substantive rights protected by the First Amendment but also "rigorously" enforce due process requirements, particularly when

First Amendment rights are implicated. *See, e.g.*, *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012) ("When speech is involved, rigorous adherence to [due process] requirements is necessary to ensure that ambiguity does not chill protected speech."). Accordingly, the government may not restrict First Amendment rights with laws or policies that are vague; nor may it apply such laws or policies in an arbitrary or discriminatory manner. *Id.* at 253. Before depriving a person of liberty or property, the government must provide fair notice of the law or policy and a meaningful opportunity to challenge its application. *Id.*; *Sherrill*, 569 F.2d at 130–31.

The U.S. Court of Appeals for the D.C. Circuit has made clear that these long-standing due process principles apply with equal force when the White House denies press passes to bona fide journalists. In *Sherrill*, the D.C. Circuit held, as an initial matter, that since the White House has voluntarily decided to establish press facilities for correspondents who need to report from the White House, "the protection afforded newsgathering under the first amendment guarantee of freedom of the press requires that this access not be denied arbitrarily or for less than compelling reasons." 569 F.2d at 129 (citing *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972); *Pell v. Procunier*, 417 U.S. 817, 829-35 (1974)). The court found that because a journalist's interest in a White House press pass "is protected by the first amendment," it may not be denied "without due process of law" under the Fifth Amendment. *Id.* at 130–31.

As set forth in *Sherrill*, due process requires the White House to "articulate and publish an explicit and meaningful standard governing denial of White House press passes," in *advance* of any press pass denials. *Id.* at 131; *see also Getty Images News Servs. v. Dep't of Defense*, 193 F. Supp. 2d 112, 121 (D.D.C. 2002) ("[W]here public officials employ criteria

that are either vague or completely unknown, the party affected has no way of knowing how to achieve compliance with the criteria nor even of challenging them as being improper.") (internal citation, ellipses omitted). Although the White House need not give a "detailed articulation of narrow and specific standards or precise identification of all the factors which may be taken into account," vague and ambiguous justifications for denials, like general references to "decorum," do not suffice. *Id.* at 130 (rejecting Secret Service's proffered reason for denying press pass based on "reasons of security," finding that phrase "unnecessarily vague and subject to ambiguous interpretation"). Due process also requires the White House to provide "notice to the unsuccessful applicant of the factual bases for denial with an opportunity to rebut" and a "final statement of denial and the reasons therefore." *Id.* at 131. These requirements aim to ensure that the denial of a press pass is not "based on arbitrary or less than compelling reasons" and "that the agency has neither taken additional, undisclosed information into account, nor responded irrationally to matters put forward by way of rebuttal or explanation." *Id.* at 131.[2]

The Supreme Court's jurisprudence on the need for due process, particularly in First Amendment cases, illuminates the analysis in *Sherrill*. That is, "the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C.*, 567 U.S. at 253 (citing *Grayned v. City of Rockford,* 408 U.S.

[2] Importantly, the *Sherrill* rule requiring explicit standards and sufficient process is an additional First Amendment protection over and above the flat prohibition on "arbitrary or content-based criteria for press pass issuance." 569 F.2d at 129. In other words, were a court to find that the suspension or denial of a hard pass was based on favor or disfavor for a journalist's reporting, even an explicit, public standard, and notice and an opportunity to contest a denial of access, would fail First Amendment scrutiny.

104, 108–109 (1972)). To the first point, it is a "fundamental principle in our legal system" that laws or regulations "must give fair notice" of what conduct is required or proscribed. *Id.* (citations omitted). "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment" and "requires the invalidation of laws that are impermissibly vague." *Id.* As the Supreme Court has explained:

> A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." As this Court has explained, a regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved.

*Id.* (citations omitted). Thus, a person may not be punished under a policy created *after* the fact, of which the person had no notice at the relevant time. *Id.* at 254 (finding that television networks could not be penalized by the Federal Communications Commission for a policy adopted after the relevant broadcasts). This principle applies with even greater force when rules "touch upon sensitive areas of basic First Amendment freedoms." *Id.* (internal citations and quotation marks omitted).

To the second point, the Supreme Court has underscored the need for "precision and guidance" in the articulation of laws and regulations that implicate First Amendment interests to prevent their arbitrary and discriminatory enforcement. In fact, the Court has clarified that laws giving government officials "unbridled discretion" run afoul of the First Amendment. *See, e.g.*, *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988) (striking down ordinance requiring newspaper publishers to obtain annual permits to place racks on public sidewalks because it gave too much discretion to mayor in granting or denying permits). First Amendment doctrine requires "explicit" limits on such discretion, and the availability of

judicial review "cannot substitute for concrete standards to guide the decision-maker's discretion." *Id.* at 770–71 (citation omitted). In addition, the government's assurance that it will act in good faith does not remedy the constitutional violation. *Id.* at 770 (finding that court may not "presume[] the mayor will act in good faith and adhere to standards absent from the ordinance's face" for "this is the very presumption that the doctrine forbidding unbridled discretion disallows"); *F.C.C.*, 567 U.S. at 255 ("Just as in the First Amendment context, the due process protection against vague regulations does not leave regulated parties at the mercy of *noblesse oblige*.") (internal citation, quotation marks, brackets, and ellipses omitted).

Viewing these principles together and in conjunction with *Sherrill*, they require the White House to articulate a credentialing policy *before* applying that policy to deny, suspend, or revoke press passes. The policy must be clear and provide "precision and guidance" to avoid giving the White House unbridled discretion and to limit the potential for retaliatory and discriminatory denials of press passes. These standards must be consistently and equitably applied.

Here, the White House acknowledged that it "had not previously thought that a set of explicit rules was necessary to govern behavior by members of the press at White House press events." Boutrous Decl. Ex. 4 at 1. Thus, even assuming the conduct cited by the White House could constitutionally support the suspension of Karem's hard pass had explicit standards for reporter conduct been in place, the absence of any such standards means that the suspension violated settled law in this Circuit.

## II. The *Sherrill* requirement that suspensions of security credentials be pursuant to publicly known "explicit and meaningful" standards is essential for an informed electorate and an accountable executive branch.

The legal and public policy considerations here go beyond the facts of this case. As discussed above, the rule articulated in *Sherrill*—that the White House "articulate and publish an

explicit and meaningful standard governing denial of White House press passes," 569 F.2d at 131—serves profound First Amendment interests in holding the executive branch accountable through an informed and engaged electorate. As such, the press's constitutionally protected newsgathering rights demand that when media access is denied, it is done so pursuant to transparent, content- and viewpoint-neutral rules that provide adequate notice of what conduct will lead to denial.

A compelling government interest may exist in granting or denying hard passes to journalists based on either security concerns or a serious disruption to White House operations. But, as set forth above, denials must be based on publicly known standards that provide adequate notice of what conduct will warrant suspension or denial. *See* Br. Amici Curiae of the Reporters Committee for Freedom of the Press[,] the Officers of the White House Correspondents Association [and] the National Press Club in Support of Appellees at 8-9, *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977), https://www.rcfp.org/briefs-comments/sherrill-v-knight ("Certainly, the White House could, *in its published standards*, seek to exclude those persons whose presence poses a reasonable likelihood of danger to the life of the President; or those persons whose exclusion is dictated by a 'compelling state interest' because they pose a *serious and imminent* threat to the disruption of White House functions.") (emphasis added) (hereinafter "*Sherrill Amici Brief*").

The executive claims greater authorities than other branches in withholding government information from public scrutiny. *See* The Federalist No. 70 (Alexander Hamilton) (arguing for a one-person executive characterized by "[d]ecision, activity, secrecy, and dispatch"). The president may classify information, for instance, which imposes civil and criminal penalties on its unauthorized disclosure. *See, e.g.*, Exec. Order No. 13,526, 75 Fed. Reg. 707; 18 U.S.C. §

793 (2016). Over the past two administrations, the Justice Department has sought to use those powers to punish journalistic sources at a significantly increased rate. *See* Gabe Rottman, *Government Leaks to the Press Are Crucial to Our Democracy. So Why Are We Suddenly Punishing Them So Harshly?*, TIME (Nov. 1, 2018), https://perma.cc/PQ8N-V2BU. The office of the presidency also enjoys an executive privilege, which can insulate other executive action from Congressional oversight and from judicial attempts to compel the production of information. *See United States v. Nixon*, 418 U.S. 683 (1974).

For these and other reasons, courts have repeatedly recognized the crucial role of the press, and the First Amendment's protections for newsgathering, in holding the office of the presidency, in particular, accountable. In the context of foreign affairs, for instance, Justice Stewart affirmed the centrality of the press as a constitutional check in the Pentagon Papers case:

> In the absence of the governmental checks and balances present in other areas of our national life, the only effective restraint upon executive policy and power in the areas of national defense and international affairs may lie in an enlightened citizenry—in an informed and critical public opinion which alone can here protect the values of democratic government. For this reason, it is perhaps here that a press that is alert, aware, and free most vitally serves the basic purpose of the First Amendment. For without an informed and free press there cannot be an enlightened people.

*N.Y. Times v. United States*, 403 U.S. 713, 728 (1971) (Stewart, J., concurring). Justice Stewart also grounded this observation in the reality of the presidency's "enormous power in the two related areas of national defense and international relations[,]" which is "largely unchecked by the Legislative and Judicial branches" and "has been pressed to the very hilt since the advent of the nuclear missile age." *Id.* at 727. Indeed, in "many situations, the President's decisions are reviewable by no one except the electorate." *Sherrill Amici Brief* at 13. And for the press to

fulfill that "vital function," it must be free of the arbitrary denial of physical access to White House facilities. *Id.* at 14.

The rule articulated in *Sherrill*—that once the White House "voluntarily decide[s] to establish press facilities for correspondents who need to report therefrom," denials of access must be based on publicly known, meaningful standards, and denials must only come with notice and an opportunity to respond—serves to preserve this vital function. 569 F.2d at 129-30 ("Not only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information.").

The White House press corps therefore represents the forward echelon in terms of the press's ability to function as a check on the executive branch, and ease of physical access to White House facilities is central to a White House reporter's job. *See Sherrill Amici Brief* at 4 ("The White House press facilities represent perhaps the single most important resource in terms both of quantity and quality of news for the press in Washington."). Another judge in this District, in invalidating the White House's revocation of CNN reporter Jim Acosta's hard pass last November, reaffirmed the First Amendment liberty interest, which vests in the individual journalist, in such credentials:

> Moreover, the First Amendment interests, as recognized in *Sherrill*, were not vested merely in publications or agencies. They were liberties of the individual journalists themselves. For that reason, that CNN may still send another journalist or other journalist to the White House does not make the harm to Mr. Acosta any less irreparable. Each day he is deprived of that interest without the process prescribed by the court in *Sherrill*, he suffers a harm that cannot be remedied in retrospect. The Court cannot restore his access to press briefings that have already occurred or to

> conversations in the White House press facilities that have already been had.

*See Cable News Network, Inc. v. Trump*, No. 18-cv-2610, Dkt. No. 22 at 13:2-13 (D.D.C. Nov. 16, 2018) (oral ruling).

The rule in *Sherrill* thus protects First Amendment and due process interests that are of profound importance for democratic governance and an informed electorate. *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936) ("[S]ince informed public opinion is the most potent of all restraints upon misgovernment, the suppression or abridgment of the publicity afforded by a free press cannot be regarded otherwise than with grave concern."). That rule requires the public articulation of clear standards under which press access to White House facilities can be denied. And that law exists to protect the free flow of information to the electorate and to hold the executive branch accountable, interests that transcend the particular facts of this case.

## CONCLUSION

For the foregoing reasons, the First Amendment and due process require the prompt restoration of Plaintiff's hard pass.

Dated: August 22, 2019

Respectfully submitted,

/s/

BRUCE D. BROWN
(D.C. Bar No. 457317)
*Counsel of Record for Amicus Curiae*
KATIE TOWNSEND
GABRIEL ROTTMAN
SARAH MATTHEWS*
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1020
Washington, DC 20005
Telephone: 202.795.9300
bbrown@rcfp.org

*Counsel for Amicus Curiae*

**Of counsel*