**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BRIAN KAREM,

               Plaintiff,

    v.

DONALD J. TRUMP, in his individual capacity and
official capacity as President of the United States; and
STEPHANIE GRISHAM, in her individual capacity
and official capacity as White House Press Secretary,

          Defendants.

Case No.:  19-cv-2514 (KBJ)

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTIONS FOR A TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

# CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT .......................................................................................................... 4

   I.  Mr. Karem Is Likely To Succeed On The Merits. ............................................. 4

      A.  *Sherrill* Controls This Case, But Defendants Fail To Show They Provided The "Explicit And Meaningful" Published Standards *Sherrill* Requires. ...................... 4

      B.  Defendants' Brief Confirms The Unconstitutional Vagueness Of Their Newly-Minted "Professionalism" And "Decorum" Standards. ..................................... 5

      C.  Defendants Denied Mr. Karem Due Process By Withholding Evidence And Denying Him A Fair Opportunity To Be Heard. ......................................................... 14

      D.  The First Amendment Does Not Permit The White House To Selectively Deny Access To Its Press Facilities. ............................................................................. 17

   II.  The Remaining Preliminary Injunction Factors Tilt Strongly In Mr. Karem's Favor. .......................................................................................................... 22

CONCLUSION ...................................................................................................... 24

## TABLE OF AUTHORITIES

**Cases**

*2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*,
    444 F.3d 673 (D.C. Cir. 2006) ........................................................................19

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*,
    901 F.3d 356 (D.C. Cir. 2018) ....................................................................19, 20

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996) ..........................................................................................5

*Bouie v. City of Columbia*,
    378 U.S. 347 (1964) ........................................................................................13

*CannaVest Corp. v. Kannaway, LLC*,
    2015 WL 12532472 (S.D. Cal. Feb. 27, 2015) ..................................................10

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ....................................................................................5, 6, 7

*Franco v. Kluge*,
    2015 WL 1637688 (W.D. Tex. Apr. 13, 2015) ..................................................10

*FTC v. World Patent Mktg., Inc.*,
    2017 WL 3508639 (S.D. Fla. Aug. 16, 2017) ....................................................10

*Good News Club v. Milford Cent. Sch.*,
    533 U.S. 98 (2001) ..........................................................................................18

*Griffin v. Sec'y of Veterans Affairs*,
    288 F.3d 1309 (Fed. Cir. 2002) ........................................................................12

*Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*,
    389 U.S. 64 (1967) ..........................................................................................11

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
    505 U.S. 672 (1992) ....................................................................................18, 19

*Joshi v. Prof'l Health Servs., Inc.*,
    606 F. Supp. 302 (D.D.C. 1985) ......................................................................11

*Knight First Am. Inst. v. Trump*,
    928 F.3d 226 (2d Cir. 2019) ............................................................................23

*Mills v. Alabama*,
    384 U.S. 214 (1966) ..........................................................................................3

*In re Murchison*,
   349 U.S. 133 (1955)..................................................................................................16

*New York Times Co. v. United States*,
   403 U.S. 713 (1971)....................................................................................................3

*Norse v. City of Santa Cruz*,
   629 F.3d 966 (9th Cir. 2010) ....................................................................................12

*Oberwetter v. Hilliard*,
   639 F.3d 545 (D.C. Cir. 2011) ..................................................................................19

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
   460 U.S. 37 (1983)................................................................................................18, 19

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
   758 F.3d 296 (D.C. Cir. 2014) ..................................................................................14

*Reza v. Pearce*,
   806 F.3d 497 (9th Cir. 2015) ....................................................................................12

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995)....................................................................................................19

*Shuttlesworth v. City of Birmingham*,
   382 U.S. 87 (1965)........................................................................................................6

*Stewart v. Dist. of Columbia Armory Bd.*,
   789 F. Supp. 402 (D.D.C. 1992) ...............................................................................22

*Stewart v. Dist. of Columbia Armory Bd.*,
   863 F.2d 1013 (D.C. Cir. 1988) ................................................................................22

*Taggart v. Lorenzen*,
   139 S. Ct. 1795 (2019)................................................................................................11

*Telemundo of L.A. v. City of Los Angeles*,
   283 F. Supp. 2d 1095 (C.D. Cal. 2003) ....................................................................23

*United States v. Bronstein*,
   849 F.3d 1101 (D.C. Cir. 2017).................................................................................12

*Wilder v. R.J. Reynolds Tobacco Co.*,
   2013 WL 12157861 (M.D. Fla. Jan. 17, 2013).........................................................15

*Young v. U.S. ex rel. Vuitton et Fils S.A.*,
   481 U.S. 787 (1987)....................................................................................................17

**Statutes**

28 U.S.C. § 2342 ................................................................................................................17

5 U.S.C. § 554 ...........................................................................................................15, 16

7 U.S.C. § 2149 ................................................................................................................17

18 U.S.C. § 401 ................................................................................................................11

42 U.S.C. § 1995 ..............................................................................................................11

**Other Authorities**

Alexander M. Bickel, *The Morality of Consent* (1975) .................................................11

**Regulations**

31 C.F.R. § 409.1 ...............................................................................................................4

31 C.F.R. § 409.2 ...............................................................................................................2

38 C.F.R. § 1.218 .............................................................................................................12

## PRELIMINARY STATEMENT

Defendants Donald J. Trump and Stephanie Grisham offer no viable reason why Plaintiff Brian Karem's hard pass must be suspended while his constitutional claims are adjudicated. They do not claim that Mr. Karem, an award-winning reporter who has covered the White House for decades, presents a security risk.  Nor do they claim that their stated goals of "punishing" and "deterring" Mr. Karem based on events that occurred after the July 11 press event in the Rose Garden require that the suspension go into immediate effect.  In contrast, the injury to Mr. Karem—including the violation of his First and Fifth Amendment rights, the deprivation of his constitutionally protected interest in his hard pass, as well as the undeniable harm to his career— would be severe, immediate, and irreparable.  Especially because the denial of a TRO will risk mooting this dispute before Mr. Karem's claims can be decided on the merits, this Court should preserve the status quo by granting injunctive relief.

The D.C. Circuit held in *Sherrill v. Knight* that the suspension of a hard pass must be based upon meaningful, published, and explicit standards.  569 F.2d 124 (1977).  In response, Defendants—as they did in CNN correspondent Jim Acosta's case—misstate *Sherrill* and the law, asking this Court to ignore the case's plain text, which is in turn grounded in clearly established constitutional law.  The vague, ad hoc, and unwritten standards Ms. Grisham manufactured and retrospectively applied here—asserting that Mr. Karem breached norms of "decorum" and "professionalism"—blatantly violate *Sherrill*.  Just as Judge Kelly held in rejecting the Administration's attempt to suspend the hard pass of Mr. Acosta, *Sherrill* governs this situation, and requires fair notice based on clear and explicit standards, a fair process, and an impartial decisionmaker—none of which was provided here.

Instead, as Defendants' brief makes clear, their "process" consisted of Ms. Grisham watching YouTube videos of the events in the Rose Garden, obtaining a statement from a Secret

Service agent that she heavily relies on but refuses to share with Mr. Karem, and then purporting to "adjudicate" her own skewed interpretation of those events based on her own "understandings" of "decorum."  This does not come close to the due process *Sherrill* commands.  And Defendants even reject the suggestion that they were required to follow the regulations the White House enacted to ensure due process in response to *Sherrill*.  *See* 31 C.F.R. §§ 409.1, 409.2.  These regulations not only provide more robust procedural protections, but make clear that a hard pass suspension is warranted only in cases where the Secret Service deems it necessary to ensure the safety of the President and his family.

Defendants are oblivious to the immense irony and conflict between their punishing Mr. Karem for a breach of "decorum" for allegedly "insulting" guests at a press event, while at the same time endorsing acts of violence against reporters and condemning the media as "the enemy of the people."  Given their own past statements and actions, Defendants cannot credibly claim that they are sincerely intending to police norms of etiquette and good behavior, rather than inflict punishment aimed at scoring political points and sending a message to reporters whose coverage they dislike to deter them from doing their jobs.  Indeed, Defendant Grisham has tried this exact tactic before, attempting to punish a reporter for unfavorable coverage by suspending his press credentials.  *See* Ex. F.[1]

It is also telling that Ms. Grisham declined to put into the record a declaration testifying under penalty of perjury to her account of her process or the underlying reasons for her decision. Further illuminating: Defendants failed to provide any sworn statement corroborating Ms. Grisham's narrative or to grapple with any of the firsthand, eye-witness accounts Plaintiff

---

[1]  Citations to "Ex. __" using a letter are exhibits to the Declaration of Theodore J. Boutrous, dated August 26, 2019.  Citations to "Ex. __" using a number are exhibits to the Declaration of Theodore J. Boutrous dated August 20, 2019.

introduced into the record.  Defendants' unsworn and unauthenticated account of the events surrounding Mr. Gorka's confrontation of Mr. Karem is wholly one-sided and unsupported by any fair-minded assessment of the evidence.  *See, e.g.*, Karem Decl.; Feinberg Decl.; Pavlovic Decl.  Defendants do not provide (and cannot provide) any evidence to rebut this testimony or anything to support their slanted narration of what occurred on July 11.

Defendants' brief reflects their basic misunderstanding about the role a free press plays in our nation's system of government.  The press is a watchdog on the White House and "serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve."  *Mills v. Alabama*, 384 U.S. 214, 219 (1966).  When the government can invoke unpublished, subjective, and amorphous "understandings" to single out and punish reporters for breaches of "decorum" and other pretextual reasons, it ultimately harms the public by chilling the ability of the free press to act as a check on the government.  While politicians and their advisors may deem attacking reporters to be in their personal political interest, the judiciary plays a critical role in ensuring due process, enforcing the First Amendment, and protecting the ability of the free press "to fulfill its essential role in our democracy."  *New York Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring).

In light of the importance and magnitude of the constitutional questions presented, and Defendants' failure to show any reason why the suspension must be immediately enforced, this Court should maintain the status quo by issuing a TRO and preliminary injunction to allow this case to be decided on the merits.

**ARGUMENT**

**I.  Mr. Karem Is Likely To Succeed On The Merits.**

   **A.  *Sherrill* Controls This Case, But Defendants Fail To Show They Provided The "Explicit And Meaningful" Published Standards *Sherrill* Requires.**

Defendants admit that their suspension of Mr. Karem's hard pass was not based on any "publish[ed]" standards, let alone published standards that are "explicit and meaningful." *Sherrill*, 569 F.2d at 131.  That admission establishes that the suspension cannot stand under controlling D.C. Circuit authority.

Because *Sherrill* is directly on point and is devastating to their position, Defendants strive mightily to reframe the D.C. Circuit's holding.  They insist that all *Sherrill* requires is notice, an opportunity to be heard, and a written statement of decision.  Opp. 1-2.  Defendants are wrong: *Sherrill* requires all of those things, but it *also* requires that the denial or suspension of a hard pass be based on concrete published standards.  *See* 569 F.2d at 131.  That ensures reporters have fair notice of the conduct that may subject them to punishment and the severity of punishment that may be imposed for such conduct, and reduces the likelihood of a reporter losing his or her hard pass for arbitrary or pretextual reasons.  Indeed, it was this aspect of *Sherrill*'s holding—the need for published standards—that led the White House to adopt the regulations Defendants ignored in this case.  *See* 31 C.F.R. § 409.1.

Defendants note that they issued a letter to CNN's Jim Acosta that purported to articulate various standards of conduct.  *See* Ex. 2 to Opp. Br.  Not only was this letter issued to a single reporter and never provided to Mr. Karem, Karem Reply Decl. ¶ 1, but Defendants concede that these standards applied only to press *conferences*—and do not apply to "press events," such as the Rose Garden press event at issue here.  Ex. 4 at 2.  In fact, by expressly limiting the scope of

the Acosta letter to press conferences, the White House made clear that its decision that these standards would *not* govern press events was a deliberate choice.

Because Defendants cannot point to any published rules, they instead rely on what Ms. Grisham calls unwritten "understandings" of the White House press corps.  But even if this were permissible under *Sherrill*—which it plainly is not—Defendants have failed to prove any of these so-called "understandings" actually exist.  They provide no declaration or other evidence supporting their existence.  Their only "evidence" establishing these understandings is the unsworn *ipse dixit* of Ms. Grisham, who has no experience as a journalist, joined the White House press office approximately two months ago, has never held a press briefing, and offers no explanation as to how she went about divining the existence of these historic understandings before invoking them as the basis for suspending Mr. Karem's hard pass.

"[E]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996); *see* Opening Br. at 24-29 (collecting cases).  And particularly when protected First Amendment activity is at issue, "rigorous adherence to these requirements is necessary to ensure that ambiguity does not chill protected speech."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012).  Because Mr. Karem lacked any notice of the standards that Ms. Grisham would develop and then rely on to impose retroactively what she expressly labeled "punishment," the suspension cannot stand.

### B.  Defendants' Brief Confirms The Unconstitutional Vagueness Of Their Newly-Minted "Professionalism" And "Decorum" Standards.

Defendants make little effort to explain how their standards of "decorum" and "professionalism" are not unconstitutionally vague as a basis for imposing "punishment," Ex. 10

at 8.  *Sherrill* held that the "'reasons of security'" standard the government cited in that case for denying a hard pass "is unnecessarily vague and subject to ambiguous interpretation."  569 F.2d at 130.  Defendants' "decorum" and "professionalism" standards are even more general and more vague than the standard rejected in *Sherrill*.  Allowing reporters to be barred from the White House based on what the Press Secretary deems after the fact a violation of "decorum" would amount to "government by the moment-to-moment opinions of a policeman on his beat," and create an "ever-present potential for arbitrarily suppressing First Amendment liberties, . . . bear[ing] the hallmark of a police state."  *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90-91 (1965).

Defendants offer no insight into what these standards mean, or how they could be construed in a way that would give reporters fair notice as to what conduct is prohibited.  They do not seek to define these terms or consider how they are generally understood.  Instead, Defendants contend that "professionalism" and "decorum" provide a constitutionally permissible basis for punishment because Mr. Karem had "actual notice of the basic prohibition against shouting at guests or starting fights in the White House."  Opp. at 1, 23.

Defendants are wrong for many reasons.  They never identify what gave Mr. Karem "actual notice" that he was engaging in prohibited conduct, and they seriously mischaracterize the conduct in question.  Mr. Karem did not start a fight—indeed, there *was* no fight, because Mr. Karem successfully de-escalated the situation rather than taking Mr. Gorka's bait by responding in kind to Mr. Gorka's aggressive menacing and provocation.  For these reasons, Defendants fall short in attempting, in a footnote, to distinguish *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012).  Defendants argue that the regulated parties in that case lacked actual notice that their conduct would later be deemed prohibited, but the same is true here—

Defendants have never identified what put Mr. Karem on notice that the conduct in which he actually engaged would be deemed a breach of decorum that could be punished by a 30-day suspension of his hard pass.  Moreover, in *Fox,* the *statute itself* used terms far more specific than "decorum" and "professionalism"—"obscene, indecent or profane language"—but the Court found that the law was unconstitutionally vague and failed to provide fair notice as applied to "fleeting expletives and fleeting nudity."  *Id.* at 243, 249, 258.  Ms. Grisham's broad and elastic "standards," written down nowhere and announced and applied for the first time ever after the fact, fare no better here.

Defendants' suggestion that "shouting" is a breach of decorum and professional norms also belies a profound ignorance of the White House press beat.  Ms. Grisham has only been on the job for approximately two months, but the colorful history of White House-press relations shows that the White House beat can be disorderly and even raucous at times.  Reporters have banged on doors, Karem Decl. ¶ 4, flung insults, and shouted at the very highest officials in our nation.  *See* Ex. E (noting that, after Karl Rove resigned, one White House correspondent yelled "If he's so smart, why did you lose Congress?"); *see also* Ex. B; Ex. D ("His aggressiveness (read: bad behavior) made [Sam] Donaldson one of the first 'star' reporters at the White House."); Ex. C (1987 *New York Times* article noting that "[f]rustrated, reporters have become increasingly forceful—to some, ill-mannered—in efforts to pry information out of the White House. Whenever the President appears within shouting distance, he is now bombarded with high-decibel inquiries."); *accord id.* (Sam Donaldson noting "'The reason we yell at Reagan in the Rose Garden is that's the only place we see him.'"); Ex. H (noting reporter who retorted that President Nixon was "just misinformed" when Nixon stated that a particular "problem had been addressed"); Ex. I (noting that President Obama was "interrupted by heckling from [a] reporter . .

. mid-speech"); Ex. J (reflecting President Obama "scolding" a reporter for shouting a question at a Rose Garden press conference); Ex. 9 (noting that "CBS White House Correspondent Bill Plante once . . . nearly got into blows with a guest in the Rose Garden"). None of these reporters lost their hard passes as a result of this conduct.

Punishing a reporter for purportedly failing to show "decorum" is particularly disturbing coming from an administration that is openly at war with the press and from a President who encourages and displays a standard of conduct far more extreme than what Ms. Grisham contends is prohibited here. A hallmark of the President's freewheeling style is his biting, personal attacks on individual reporters and the press generally—celebrating the body slam of a reporter, mocking a reporter's disability, and his daily attacks on the "fake" and "disgusting" news media that he has branded "the enemy of the people." *See, e.g.*, Opening Br. 8-10; Ex. O; Ex. N (Tweeting on Aug. 25 "'Mr. President, why does the American media hate your Country so much? Why are they rooting for it to fail?"). Defendants never explain why the President's own statements to and about the press do not establish a relevant guidepost for what the White House considers an acceptable level of decorum, or how a reporter could be deemed on notice that he could be punished for making statements that are far less threatening and offensive than what the President says every day.[2]

---

[2] Indeed, the President and the White House Press Office have forced journalists into increasingly untenable circumstances to do their jobs gathering and reporting information to the American people about the Administration's activities, by ending daily briefings in the White House briefing room, by eliminating formal press conferences in the Rose Garden and in the East Room, by limiting the credentialed press to impromptu chaotic gaggles as the President leaves to board Marine One, and, on July 11, by relegating the credentialed reporters to a press pen in the back of the Rose Garden while conservative activists, seated up front where the credentialed journalists normally would be, heckled and mocked the press during an important policy announcement. *See* Ex. K ("[Reporters] believed the set-up on the lawn purposefully depicts media as unruly, unkempt and [un]professional . . . . 'There's no question that it works to his advantage that we look unruly and disorderly,' veteran New York Times White House reporter Peter Baker told Politico. 'It's not like standing at a podium in the East Room or the briefing room, where you can have a civilized calling on people who raise their hands.'"); Ex. G.

In imposing the suspension, Defendants relied not just on manufactured standards of conduct, but also on a manufactured version of events that is not supported by a single declaration.  Among other notable misstatements and omissions are the following:

- Defendants ignore completely that the instigators in the Rose Garden were Mr. Gorka and the other Social Media Summit guests, who, after having been riled up by the President's campaign-style rally, proceeded to taunt and insult the White House press corps assembled in the Rose Garden for what they thought would be a press conference.  Much of this conduct of the "Summit" guests preceded any of Mr. Karem's statements, and Mr. Gorka's charging across the Rose Garden shouting was an unreasonable and hostile reaction that Defendants barely mention.  Karem Decl. ¶¶ 24, 26; Feinberg Decl. ¶¶ 7-10; Pavlovic Decl. ¶¶ 12, 13-19; Exs. 37, 70.

- Defendants characterize Mr. Karem's "demonic possession" quip as an "insult[]" and accuse him of "threatening to exacerbate a verbal confrontation to a physical one."  Opp. at 39. With respect to the former, the videos of the event demonstrate that Mr. Karem was joking— he delivered the line in a light-hearted tone and it was met with laughter.  Ex. 63 at 0:08-0:10.  And the uncontradicted declarations confirm this.  Karem Decl. ¶ 27; Feinberg Decl. ¶¶ 8-10; Pavlovic Decl. ¶ 15.  With respect to the latter, as the videos make clear, and as Mr. Karem repeatedly says in his declarations, he just wanted to talk to Mr. Gorka, not fight him. Mr. Gorka, on the other hand, as the videos leave no doubt, was looking to provoke and make a spectacle at every turn.  *See* Ex. 70 (entering the Rose Garden saying "fake news panorama"); Ex. 63 at 0:22-0:25 (screaming in Mr. Karem's face "You're not a journalist!  You're a punk!"); Ex. 63 at 2:59-3:27 (shouting "You're done!" as Mr. Karem sought to make peace).

- Defendants ignore that Mr. Karem was engaging in protected speech: he was discussing and debating the meaning of journalism with the "Summit" attendees.  When Mr. Gorka said "and you're a 'journalist,' right?" with air quotes, Mr. Karem repeatedly expressed his desire to "talk" to Mr. Gorka, Ex. 63 at 0:09-0:25, and Mr. Karem subsequently engaged with conservative media figure James O'Keefe, who even stated "we're both journalists, man."  *Id.* at 0:55-1:27.  Similarly, Mr. Karem spoke with Ms. Villa about the nature of true journalism, including the need for fact checkers and to label clearly opinion pieces as such.  Ex. 64 at 0:00-0:50.

- Defendants state that Mr. Karem "left the designated press area" in the Rose Garden, Opp. at 1, 8, when in fact he remained calmly in the press area, inadvertently crossing the rope line that had fallen down at his feet.  Ex. 62 at 0:30-0:50.

- Defendants note that "certain members of the crowd yelled or chanted," while omitting the fact that the "invited guests," not Mr. Karem, were the ones urging a fight, shouting out phrases like "Hit him, Gorka!"  Karem Decl. ¶ 29; Ex. 60 at 0:30-0:38.

- Defendants omit Mr. Karem's words that were plainly intended to de-escalate the situation: "I'm not attacking anybody. I'm just asking questions."  Ex. 66 at 0:45-1:00.

9

- Defendants claim that "Mr. Karem ignored a White House staffer's instructions that 'the press are leaving now.'"  Opp. at 8.  But Mr. Karem "did not disobey any instruction from the White House staffer to leave the Palm Room."  Karem Supp. Decl. ¶ 4.  Rather, Mr. Karem was, like the other members of the press, in the process of leaving—as the descriptive statement ("the press are leaving") by the staffer suggests—when he paused on the way out to try to shake Gorka's hand and make peace.  Ex 63 at 2:59-3:28.

Despite Ms. Grisham's August 16 "final decision" letter being riddled with inaccuracies regarding the events of July 11, Defendants cite it extensively as if it were a factual record of what happened.  The background section of their brief is essentially a copy-and-paste of the letter.  However, as Mr. Karem's opening brief makes clear, that unsworn document is itself the product of an unconstitutional process and is based on a one-sided, speculative analysis of the videos by Ms. Grisham, a biased decisionmaker who was not present on July 11 and did not witness the events in question.  Because the government failed to submit actual evidence to this Court, this Court should disregard Ms. Grisham's story in its entirety.  *FTC v. World Patent Mktg., Inc.*, 2017 WL 3508639, at *14 (S.D. Fla. Aug. 16, 2017) (granting preliminary injunction where "[d]efendants fail[ed] to provide any evidence rebutting the statements contained in [plaintiffs'] declarations.  This Court will not blindly accept the contentions of counsel where such contentions are not supported by *any* evidence in the record." (emphasis in original) (internal quotation marks omitted)).[3]

Defendants point to other regulatory schemes in which "decorum" is required, such as local rules of court.  But this only illustrates the key difference:  Those rules provide notice because—unlike Ms. Grisham's unwritten understandings—they have been *published*.

---

[3]  *See, e.g.*, *CannaVest Corp. v. Kannaway, LLC*, 2015 WL 12532472, at *3 (S.D. Cal. Feb. 27, 2015) (granting preliminary injunction against trademark use where "[d]efendants have not submitted any evidence showing that they have permission to use th[e] mark" and did "not produce[] a witness to authenticate the Purported License Agreement which is thus given no weight here."); *see also Franco v. Kluge*, 2015 WL 1637688, at *7 (W.D. Tex. Apr. 13, 2015) ("Although Plaintiff's only evidence for her claim is her affidavit, Defendants have utterly failed to submit evidence contradicting the relevant allegations. Therefore, the allegations will be accepted as true for purposes of Defendants' [summary judgment] [m]otion.").

Moreover, there is a fundamental difference between, on the one hand, a formal proceeding in a courtroom, in which many different types of rules—procedural rules and evidentiary rules, among others—govern the interactions between counsel and the court, and, on the other hand, a freewheeling White House press event, in which reporters literally sometimes cannot be heard unless they shout their questions.  The Framers well understood that interactions between the press and government officials would often be intense, contentious, and occasionally disrespectful—and that this tension was not just expected but necessary to ensure citizens had the information they needed to supervise and evaluate the performance of their elected officials.  *See* Alexander M. Bickel, *The Morality of Consent* 80-81 (1975) (likening the relationship between press and government to a "contest" and "adversary game between press and government" and noting that "[i]t is a disorderly situation surely").

Defendants' analogy to contempt proceedings further undermines their own case. Contempt requires the violation of a "clear" and existing judicial order—one that allows parties subject to the order to "know what the court intends to require and what it means to forbid."  *Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967); *see also Taggart v. Lorenzen*, 139 S. Ct. 1795, 1802 (2019) ("[P]rinciples of 'basic fairness requir[e] that those enjoined receive explicit notice' of 'what conduct is outlawed' before being held in civil contempt" (citations omitted)); *Joshi v. Prof'l Health Servs., Inc.*, 606 F. Supp. 302, 305-06 (D.D.C. 1985) ("A penalty may not be imposed for disobeying a command that exists only in one's wishful thinking."); 18 U.S.C. § 401 (delineating authority to impose contempt order). Defendants identify no instance in which an individual has been held in contempt in the absence

of a court order specifying the prohibited conduct, nor do they explain by what grant of authority

Ms. Grisham obtained "contempt" power over the White House press corps.[4]

None of the cases Defendants cite supports the sanction here.  In *Norse v. City of Santa Cruz*, 629 F.3d 966 (9th Cir. 2010), the court held that an individual could be ejected from a town meeting pursuant to clearly delineated decorum rules if doing so was necessary to alleviate an "actual disruption."  *Id.* at 976.  The Ninth Circuit later clarified its decision by explaining that removing an individual from the event he is disrupting does not justify excluding that person from future events, absent concrete evidence that he would actually cause a disruption in the future or posed a risk to "public safety."  *Reza v. Pearce*, 806 F.3d 497, 506-07 (9th Cir. 2015). *Accord United States v. Bronstein*, 849 F.3d 1101, 1108 (D.C. Cir. 2017) (construing the words "harangue" and "oration" as not unconstitutionally vague where those terms applied only to actual "disruptions of the Supreme Court's order and decorum").  Defendants have never suggested that Mr. Karem is likely to disturb a future White House event or that he poses a risk to public safety.  Indeed, they make clear that his suspension is predominantly retrospective, in that he is being punished for past conduct.[5]

Further, neither Ms. Grisham in her "final decision" letter nor the Justice Department in its opposition brief argues that the suspension was based on any pattern of allegedly disruptive conduct by Mr. Karem or even a single prior act.  This was by all accounts an extraordinary and unique event, without precedent, and even if the White House believes Mr. Karem should have

---

[4]  Contempt proceedings also carry significant procedural protections, and contempt statutes include maximum sentences. *See, e.g.*, 42 U.S.C. § 1995 (setting maximum sentence for contempt at six months or $1,000).  None of these protections exists here.

[5]  Nor do *Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309, 1325 (Fed. Cir. 2002), and its discussion of 38 C.F.R. § 1.218(a)(14), help Defendants.  The "regulations requiring the preservation of dignity and decorum at national cemeteries" at issue in that case, Opp. at 26, are completely different from the unwritten standards at issue here.  The *Griffin* regulations contained nearly 200 words of detailed explication as to what "dignity and decorum at national cemeteries" meant. *See* 38 C.F.R. § 1.218(a)(14).

responded differently to this one-time circumstance, he had no notice that his effort to deal with

the situation could give rise to any punishment, let alone the suspension of his hard pass.

The vagueness problems that permeate Defendants' "decorum" and "professionalism"

standards are exacerbated by the ambiguity surrounding when—and to whom—they apply.  The

White House claims it established rules of decorum governing press *conferences* through a letter

it sent to one reporter, Jim Acosta, which it made no apparent effort to provide to other reporters.

Karem Reply Decl. ¶ 1.  But the White House "decided" that these rules would not apply to press

*events*, which are (in the White House's view) governed by unwritten understandings that may

not be known to reporters, but are known to Ms. Grisham.  Further complicating matters is that

the unwritten understandings Ms. Grisham has discovered apply to some attendees at press

events (such as Mr. Karem) but not to others (such as Mr. Gorka and Mr. Hanson).  *See* Opp. at

27 ("[W]hatever standard might be applied to guests would not necessarily apply to the press.").[6]

Defendants' explanation that Ms. Grisham can suspend reporters but is powerless to take

action against anyone else is based on a factual distinction that the President himself has rejected.

The President considered the Social Media Summit guests to be reporters, as did the guests

themselves, while characterizing the White House press corps as "fake news."  *See* Compl. ¶ 43

("[Guest Joy] Villa, identifying herself and the summit invitees as 'citizen journalists,' lectured

reporters from established news organizations, announcing that 'fake news is over' and 'you

gotta stop reporting fake news.'"); Ex. 63 at 0:30-1:00 (video of the same); Ex. 64 at 0:00-0:20

(same); Ex. 95 at 2 (statement of the President: "you're journalists" and "that's exactly what you

---

[6]  Defendants go so far as to argue that even if Mr. Karem had no notice of the standards with which his conduct
was required to comply—which he did not—due process was satisfied when Ms. Grisham clarified in her letters
the supposed rules and applied them retroactively to his conduct.  Opp. at 24.  However, under well-settled law,
the retroactive application of a new interpretation of law to impose punishment clearly violates due process.
*See Bouie v. City of Columbia*, 378 U.S. 347, 354-62 (1964).

are").  It is arbitrary and discriminatory for Ms. Grisham to ignore the aggressive and menacing

behavior of guests toward journalists at a press event on the White House grounds.  But as she

conceded in her meeting with Mr. Karem's counsel, neither she nor anyone else has taken any

action against anyone other than Mr. Karem.  Instead, President Trump himself celebrated Mr.

Gorka's "win[]" at the event with a Tweet.  Ex. 41.

### C.  Defendants Denied Mr. Karem Due Process By Withholding Evidence And Denying Him A Fair Opportunity To Be Heard.

Defendants fail to rebut the many procedural defects Mr. Karem identified in his

Complaint and motion.  One glaring example is their refusal to give Mr. Karem the statement

they obtained from the Secret Service agent—a statement that was then used throughout the

Final Decision to justify the suspension.  The D.C. Circuit has held that "disclosure of

unclassified evidence *is* required by the Due Process Clause" before a deprivation of liberty or

property occurs, *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir.

2014), and Defendants have never given a reason for their decision to conceal this evidence.

Apparently recognizing the due process implications of the concealment, Defendants

again try to have it both ways and claim that Ms. Grisham did not actually "rely" on the agent's

account.  *But see* Champion Decl. ¶ 4.  In this regard, the decision speaks for itself, repeatedly

citing the agent's alleged words and actions to buttress Ms. Grisham's analysis of Mr. Karem's

conduct.  *See* Ex. 10 at 2 & n.9, 3-4, 8.  Indeed, the public statement Ms. Grisham made after this

lawsuit was filed focused on the importance of the agent's account to her decision.  She stated

that a suspension was warranted because Mr. Karem's conduct "threatened to escalate . . . into a

physical [confrontation] *to the point that the Secret Service . . . intervene[d]*," *id.* at 8 (emphasis

added).  Mr. Karem's own witnesses reaffirmed the importance of the Secret Service agent's

role.  *See* Feinberg Decl. ¶ 18 (explaining that a Secret Service agent spoke to Karem, mistakenly

14

thinking it was Karem who had said Gorka "would kick your punk ass"). Defendants' failure to provide the agent's statement blatantly violated Mr. Karem's due process rights, as he was denied access to evidence critical to the events at issue.

An additional due process defect is that Mr. Karem was not given an opportunity to make his case before the President approved the "preliminary decision" to suspend his hard pass—and Defendants do not contend that he ever approved Ms. Grisham's final decision. Assuming that the President is the ultimate decisionmaker—as indicated by Ms. Grisham's determination that she needed to obtain his approval of her preliminary decision—there was a due process violation in that the President never approved her final decision, and approved her preliminary decision without even hearing Mr. Karem's defense.[7]

Defendants also attempt to have it both ways with respect to the Administrative Procedure Act (APA). Defendants rely on it (and associated case law) to support their exhaustion and waiver arguments but then disclaim it as convenient. *See* Opp. at 28, 29 n.7. Defendants portray Ms. Grisham's decision as a quasi-judicial adjudication, but it did not come remotely close to meeting APA requirements. For instance, the APA requires that a party in adjudicative proceedings receive "notice . . . of . . . the legal authority and jurisdiction under which the hearing is to be held." 5 U.S.C. § 554(b)(2). That did not happen here. Ms. Grisham

---

[7] Defendants attempt to use Mr. Karem's alleged lack of "contrition" against him, without providing notice that they would do so. But Mr. Karem could not possibly have known that his "contrition" or lack thereof would be a factor in deciding his punishment. *Cf.* 2018 Guidelines Manual § 3E1.1 (providing affirmative notice that "acceptance of responsibility" can reduce a criminal sentence); *see also* Champion Decl. ¶ 3 ("I also asked what type of evidence would be helpful to them that Mr. Karem might be able to provide. Mr. Philbin shrugged at that question and did not identify anything specific that they wanted Mr. Karem to provide."). Of course, if Mr. Karem had apologized to Ms. Grisham (even though he has nothing to apologize for), Defendants would no doubt have treated it as an "admission" justifying the suspension. In any event, it is impermissible to base the suspension on Mr. Karem's defending himself and asserting his innocence. *Cf. Wilder v. R.J. Reynolds Tobacco Co.*, 2013 WL 12157861, at *3 (M.D. Fla. Jan. 17, 2013) (granting motion in limine prohibiting "evidence [and] argument re[garding] punishing [d]efendants for defending themselves or failing to take responsibility," and noting "[d]efendants have a right to vigorously defend their position").

has never identified what authority gives her adjudicative powers over reporters, let alone authority to establish and enforce *ex post facto* the rules under which hard passes may be suspended.

In fact, the APA would squarely prohibit Ms. Grisham from adjudicating this case because it provides that the prosecutor cannot also be the judge. *See* 5 U.S.C. § 554(d)(2) ("An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 557 of this title, except as witness or counsel in public proceedings."); *see also In re Murchison*, 349 U.S. 133, 136 (1955) ("Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome."). But that is precisely what happened here: Ms. Grisham constructed her own record, seeking out YouTube videos and obtaining a witness statement to build her case against Mr. Karem—and then used the results of her own investigation to decide the case based on standards she created herself and announced for the first time in her decision.[8]

Moreover, Ms. Grisham is not a "hearing officer[]," Opp. at 31, and has no business adjudicating anything, let alone whether a reporter's "First Amendment liberty interest in a White House press pass" can be curtailed. Ex. 30 (*CNN* Ruling) at 6:14-15. Ms. Grisham is the White House Press Secretary and therefore is institutionally unfit to serve as a neutral and

---

[8] Defendants brush aside the fact that Mr. Karem was required to locate evidence and prepare his defense in a matter of days, contending that "Plaintiff identifies no materials he would have submitted had he been provided with additional time." Opp. at 31. But Defendants concede that "Plaintiff's belated declarations"—the product of the additional time Mr. Karem had before he was forced to commence litigation—"were not presented to the Press Secretary for consideration." Opp. at 28 n.6. Defendants cannot simultaneously claim that Mr. Karem has not identified new evidence and at the same time seek to suppress his new evidence.

unbiased adjudicator of press "decorum," given that the nature of the job demands a degree of

adversity with the press corps on behalf of a boss who has literally branded the press the

"enemy."  A press secretary is not guided by an independent understanding of the law and a

desire to see that justice is done regardless of the political consequences.  To the contrary, the

press secretary's primary responsibility is to advance the political objectives of her principal.

*See* Ex. F (reporting on Ms. Grisham's "willingness to publicly assail those who displease the

president").  The press secretary therefore cannot serve as an unbiased adjudicator of the

constitutional rights of reporters, especially reporters she perceives as hampering the President's

political objectives.  *See* Bickel, *supra*, at 87 ("The First Amendment . . . ordains an unruly

contest between the press, whose office is freedom of information and whose ambition is joined

to that office, and government, whose need is often the privacy of decision-making and whose

servants are ambitious to satisfy that need."); *see also Young v. U.S. ex rel. Vuitton et Fils S.A.*,

481 U.S. 787, 790 (1987) (holding that "counsel for a party that is the beneficiary of a court

order may not be appointed to undertake contempt prosecutions for alleged violations of that

order").[9]

### D.  The First Amendment Does Not Permit The White House To Selectively Deny Access To Its Press Facilities.

In declaring the White House a First Amendment-free zone, the government badly

misstates the law and defies the D.C. Circuit's decision in *Sherrill*.  That case makes clear that

the White House must have "compelling reasons" to exclude a reporter from its press areas (i.e.,

---

[9]  Although Defendants contend Mr. Karem had to "advance[] all . . . arguments for consideration" before Ms. Grisham, acting as self-appointed "adjudicator[]," Opp. at 28, 32, in each case cited by Defendants for that proposition, there was an underlying formal agency process with a statutory basis for appeal to federal court. *See* Opp. at 28; 28 U.S.C. § 2342; 7 U.S.C. § 2149(c).  No such formal process with corresponding statutory basis for appeal exists here.  And, in any event, Defendants themselves contend that neither the President nor the White House Press Office is an "agency" subject to a statutory review provision like the APA.  Opp. at 29.

the areas for which a hard pass grants access).  *See Sherrill*, 569 F.2d at 129.  Restrictions on

access are not reviewed under a "deferential" reasonableness standard, as Defendants would

have it.  *See* Opp. at 37 n.9.

*Sherrill* recognizes that the White House's press facilities constitute a "limited" or

"designated" public forum protected by the First Amendment.  A "limited public forum" is

"property that the State has opened for expressive activity *by part* or all of the public."  *Int'l*

*Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) (emphasis added).  The

White House press area is a limited public forum because the government "voluntarily

decide[ed] to establish press facilities for correspondents."  *Sherrill*, 569 F.2d at 129.  Those

press facilities are presumptively "open to bona fide Washington-based journalists," and

therefore access to those facilities may not be denied for "less than compelling reasons."

*Sherrill*, 569 F.2d at 129; *see also* Ex. 30 (*CNN* ruling), at 7:24-8:5 (recognizing a reporter's

First Amendment liberty interest in access "once the White House opens a portion of [its

grounds] up to reporters for their use," notwithstanding the fact "that the public doesn't have a

general First Amendment right to enter the White House grounds").[10]

Defendants are therefore wrong to insist that they can engage in content or viewpoint

discrimination in regulating access to White House press areas.  In a limited public forum, the

government may enact reasonable, content-neutral time, place, and manner restrictions that "are

narrowly tailored to serve a significant government interest[] and leave open ample alternative

channels of communication."  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37,

45-46 (1983).  But the government may not engage in viewpoint-based discrimination.  *See, e.g.*,

---

[10]  Defendants falsely claim that Mr. Karem's counsel "acknowledged that the White House's interest in ensuring decorum is a compelling one" by quoting Ms. Grisham's self-serving August 16 letter.  Opp. at 35.  Mr. Karem's counsel said no such thing.  *See* Champion Decl. at ¶ 5.

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001) ("The restriction must not discriminate against speech on the basis of viewpoint."); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (holding that the state is "forbidd[en] . . . to exercise viewpoint discrimination, even when the limited public forum is one of its own creation").  In fact, even in a nonpublic forum, the government may not enact regulations that evince a desire "to suppress expression merely because public officials oppose the speaker's view."  *Perry*, 460 U.S. at 46; *accord Int'l Soc. for Krishna Consciousness*, 505 U.S. at 679 (holding that a limitation on speech in a nonpublic forum "need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view"); *Oberwetter v. Hilliard*, 639 F.3d 545, 551-53 (D.C. Cir. 2011).

Defendants deny that they are engaging in viewpoint discrimination, claiming there is no direct evidence that the suspension was motivated by Mr. Karem's tough reporting on, and questioning of, the President.  But "the government rarely flatly admits it is engaging in viewpoint discrimination," *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 365 (D.C. Cir. 2018), and viewpoint discrimination is often proven by circumstantial evidence.  *See* Opp. at 41 (conceding that circumstantial evidence like "differential treatment can serve as evidence of pretext," and citing *2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 684 (D.C. Cir. 2006)).

Here, the singling out of Karem while overlooking the far more egregious misconduct of Mr. Gorka and others—as well as the absence of published standards, the lack of previous attempts to enforce decorum standards at White House press events, and the Administration's acknowledged attempts to weaponize hard passes to punish what it deems "fake news"—all point to impermissible viewpoint discrimination.  *See* Opening Br. at 36-37.  "[A] lack of

evenhandedness in the Government's actions . . . raises a suspicion that the stated neutral ground

for action is meant to shield an impermissible motive," and the government's "mere recitation of

viewpoint-neutral rationales (or the presentation of a viewpoint-neutral guideline) for its

decisions" to restrict the plaintiff's speech "does not immunize those decisions from scrutiny."

*Am. Freedom Def. Initiative*, 901 F.3d at 365.

Evidence of past retaliation also makes plain that the purpose of the "punishment" in this

case is to "deter" critical reporting, not disruptive conduct.  Ms. Grisham has a well-documented

history of making pretextual decisions to strip disfavored journalists of press credentials.  *See* Ex

F; *see also* Ex. L.  As the *New York Times* reported just days ago, Ms. Grisham, while serving as

spokeswoman for the Arizona House's Republican majority, "revoked The Arizona Capitol

Times's press credentials four hours after the newspaper published an article" reporting misdeeds

by the House speaker.  When Ms. Grisham's action was criticized, she tried to frame it as "a

security measure" tied to a new background check requirement that, coincidentally, barred *only*

*the Arizona Capitol Times journalist from the House floor*.  Ultimately, journalists refused to

comply with her background check requirement, and Ms. Grisham was forced to back down.

This Court is not required to accept her similarly fabricated rationale here.

Moreover, Ms. Grisham is not alone among Trump administration personnel in crafting

pretextual decisions to punish reporters for the content of their coverage—she has *admitted* that

the original rationale for the White House's prior attempt to revoke Jim Acosta's press pass was

manufactured.  When Acosta's hard pass was suspended, Trump administration officials—

relying, again, on video of the events at issue there—explained that the suspension occurred

because Acosta had "plac[ed] his hands" on a White House intern, conduct the Trump

administration called "absolutely unacceptable."  Exs. 91-92.  Indeed, Ms. Grisham's

predecessor tweeted that the White House "will . . . never tolerate a reporter placing his hands on a young woman just trying to do her job as a White house intern." Ex. 91.  As Judge Kelly noted, however, that "specific reason[] for the revocation . . . was likely untrue and was at least partly based on evidence that was of questionable accuracy"—namely, a video that was doctored to distort the nature of Mr. Acosta's actions.  Ex. 30 (*CNN* Ruling) at 11:2-8.  Now, however, to justify Mr. Karem's suspension, Ms. Grisham concedes that Acosta engaged in only "incidental and fleeting" physical contact, if any, with the intern, whereas "Mr. Karem's words and actions in this case were deliberate, intentional, and persistent."  Ex. 10 at 13.  This administration's now-admitted history of adopting pretextual rationales based only on falsehoods and on its interpretations of video (and doctored footage to boot in the Acosta case) should render Ms. Grisham's narrative of the July 11 events inherently suspect.

Finally, Defendants argue that the suspension of Mr. Karem's hard pass cannot be punishment for hostile reporting, because the White House press corps is "populated by reporters who are . . . extremely critical of the President and his policies."  Opp. at 40-41.  That argument is belied by uncontroverted evidence that Karem's reporting in particular has earned the ire of the White House and its allies.  *See* Opening Br. at 8-9; Karem Decl. ¶¶ 17-21; Exs. 24-25; *see also* Ex. 13 (Fox News host urging the White House to "rip[] press passes away" from Acosta and Karem).  Moreover, the fact that President Trump is waging war against the content of a major segment of the press—what he calls the "Lamestream Media" and "Fake News"—is hardly a defense.  Rather, it only drives home the fact Mr. Trump and his administration are targeting the press credentials of individual journalists one by one—first Acosta and now Karem—so as to "have a chilling effect on the press as a whole," Donaldson Decl. ¶ 19, as the President himself has *acknowledged*, *see* Ex. 44 ("I do it to discredit you all and demean you all

so when you write negative stories about me, no one will believe you."). On top of that, Mr. Trump touted the activists he hosted at the White House on July 11 as "journalists," Ex. 95, and, as the *New York Times* reported yesterday: "A loose network of conservative operatives allied with the White House is pursuing what they say will be an aggressive operation to discredit news organizations deemed hostile to President Trump by publicizing damaging information about journalists.  It is the latest step in a long-running effort by Mr. Trump and his allies to undercut the influence of legitimate news reporting."  Ex. M; *see also* Ex. A.

The First Amendment does not countenance the selective punishment of disfavored journalists.  *See Stewart v. Dist. of Columbia Armory Bd.*, 863 F.2d 1013, 1020 (D.C. Cir. 1988) (holding that what was represented to be a "policy" was instead impermissible "*ex post* justification for [a] decision selectively to exclude" disfavored speakers); *Stewart v. Dist. of Columbia Armory Bd.*, 789 F. Supp. 402, 406 (D.D.C. 1992) (granting a temporary restraining order and preliminary injunction to enjoin restrictions on speech where there was "at least a suggestion" that plaintiffs' speech was being restricted "because defendants disagreed with the messages contained therein").

## II.     The Remaining Preliminary Injunction Factors Tilt Strongly In Mr. Karem's Favor.

In addressing the remaining preliminary injunction factors, Defendants studiously ignore the most relevant and recent precedent—*CNN v. Trump*.  There, Judge Kelly held that the harm arising from the suspension of a reporter's hard pass is "actual," not "speculat[ive]" or "theoretical," *see* Ex. 30 (*CNN* ruling), at 12:1-8; *contra* Opp. at 43-44, and that "[c]onstitutional injuries are often considered irreparable due to their very nature," *see* Ex. 30, at 12:10-11. "[E]ach day" that Mr. Karem is deprived of his constitutionally protected liberty interest in accessing and reporting on the White House, "he suffers a harm that cannot be remedied in

retrospect":  The denial of "access to press briefings that have already occurred or to conversations in the White House press facilities that have already been had" cannot be compensated *ex post*.  Ex. 30 (*CNN* ruling), at 13:8-13.

Instead, the government argues that the suspension of *one* reporter's hard pass does not cause irreparable harm and does not contravene the public interest because "the American public will still have significant White House access through other reporters."  Opp. at 44.  But, Judge Kelly rejected that precise argument, recognizing that the liberty interest in a press pass belongs to "individual journalists themselves," and thus the fact that *other* journalists may continue to cover the White House does not make the harm to the suspended reporter "*any less irreparable*." Ex. 30 (*CNN* ruling), at 13:4-8 (emphasis added); *see also, e.g.*, *Sherrill*, 569 F.2d at 129-30 (noting the public interest "in assuring . . . that *individual newsmen* not be arbitrarily excluded from sources of information") (emphasis added); *Telemundo of L.A. v. City of Los Angeles*, 283 F. Supp. 2d 1095, 1104 (C.D. Cal. 2003) (recognizing "the public interest in diversity of coverage of newsworthy events").

As to the balance of equities, the only harm that the government identifies is the "intrusive[ness]" of a "decree ordering access to the President's official residence and personal offices."  Opp. at 45.  But this is an obvious straw man: Mr. Karem does not seek to "intru[de]" into "personal" or "residen[tial]" areas of the White House areas, but rather seeks access to the press facilities that the White House has "intentionally opened" to the public—his workplace for the last 20 years.  *Cf. Knight First Am. Inst. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019) (public forum is created when the government "intentionally open[s]" a site for "public discussion").  Granting that access does not cause any injury to the government.  Indeed, the White House admits—as it must, given that the Rose Garden events occurred well over a month before the

suspension was ordered—that the purpose of the suspension is *not* "for safety or security," Ex. 30 (*CNN* ruling) at 14:5-6—but rather to "punish[]" and "deter" Mr. Karem.  Ex. 10 at 8.

Finally, the public interest in a free press is harmed when the government makes an example of one reporter to chill unfavorable reporting by the press as a whole.  *See, e.g.*, Donaldson Decl. ¶¶ 18-19 (attesting that the White House's decision "will have a chilling effect on the press as a whole," which will no longer "feel safe from White House retaliation," if the decision "is not reversed").

## CONCLUSION

For the foregoing reasons, Mr. Karem respectfully requests that this Court issue a temporary restraining order and preliminarily enjoin Defendants, requiring them to restore Mr. Karem's hard pass.

 Dated: August 26, 2019

Respectfully submitted,

/s/ Theodore J. Boutrous, Jr.
Theodore J. Boutrous, Jr., (D.C. Bar No. 420440)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Ave.,
Los Angeles, California 90071
Tel:  (213) 229-7804
tboutrous@gibsondunn.com

Thomas H. Dupree, Jr. (D.C. Bar. No. 467195)
**GIBSON, DUNN & CRUTCHER LLP**
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel:  (202) 955-8547
tdupree@gibsondunn.com

Anne Champion (*pro hac vice forthcoming*)
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166-0193
Tel:  (212) 351-5361
achampion@gibsondunn.com

*Counsel for Plaintiff Brian Karem*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| BRIAN J. KAREM,<br><br>       Plaintiff,<br><br>   v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States and in his individual capacity; and STEPHANIE GRISHAM, in her official capacity as White House Press Secretary and in her individual capacity,<br><br>       Defendants. | **Case No. 1:19-cv-02514-KBJ** |

**DECLARATION OF THEODORE J. BOUTROUS, JR. IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

I, THEODORE J. BOUTROUS, JR., hereby declare under penalty of perjury the following:

1.      My name is Theodore J. Boutrous, Jr. I am a partner with the law firm of Gibson, Dunn & Crutcher LLP and a member of the bar of this Court.  I represent Plaintiff Brian Karem ("Karem") in the above-captioned action. By virtue of my direct involvement in this matter, I have personal knowledge of the content of this declaration, and I could and would competently testify to the truth of the matters stated herein.

2.      Attached as **Exhibit A** is a true and correct copy of an article by Charles Taylor, published by *Salon,* entitled "When Playboy was hot," dated October 9, 2002, available at https://www.salon.com/2002/10/09/playboy_2/.

3.      Attached as **Exhibit B** is a true and correct copy of an article by Greg Kandra, published by CBS News, entitled "Was That Question A Plante?," dated August 14, 2007, available at https://www.cbsnews.com/news/was-that-question-a-plante/.

4.      Attached as **Exhibit C** is a true and correct copy of an article by Steven V. Roberts, published by *The New York Times*, entitled "Washington Talk: The Presidency; Shouting Questions At Reagan," dated October 21, 1987, available at https://www.nytimes.com/1987/10/21/us/washington-talk-the-presidency-shouting-questions-at-reagan.html.

5.      Attached as **Exhibit D** is a true and correct copy of an article by Joseph Curl, published by *The Washington Times*, entitled "The White House press corps is broken beyond repair," dated June 19, 2018, available at https://www.washingtontimes.com/news/2018/jun/19/white-house-press-corps-broken-beyond-repair/.

6.      Attached as **Exhibit E** is a true and correct copy of an article by Matthew Felling, published by CBS News, entitled "Picking Bush's Brain," dated August 14, 2007, available at https://www.cbsnews.com/news/picking-bushs-brain/.

7.      Attached as **Exhibit F** is a true and correct copy of an article by Elizabeth Williamson, published by *The New York Times*, entitled "Stephanie Grisham's Turbulent Ascent to a Top White House Role," dated August 22, 2019, available at https://www.nytimes.com/2019/08/22/us/politics/stephanie-grisham-press-secretary.html.

8.      Attached as **Exhibit G** is a true and correct copy of an article by Dana Milbank, published by *The Washington Post*, entitled "Let's 'gut check' all of Trump's vulgar, unpresidential statements," dated August 23, 2019, available at

https://www.washingtonpost.com/opinions/how-beastly-is-trump-the-post-gut-checker-

investigates/2019/08/23/72b70ab2-c5b3-11e9-b5e4-54aa56d5b7ce_story.html.

9.     Attached as **Exhibit H** is a true and correct copy of an article by Ronald G.

Shafer, published by *The Washington Post*, entitled "The White House reporters who made

presidents fume long before Jim Acosta," dated November 18, 2018, available at

https://www.washingtonpost.com/history/2018/11/18/white-house-reporters-who-made-

presidents-fume-long-before-jim-acosta/.

10.     Attached as **Exhibit I** is a true and correct copy of an article by Byron Tau and

Donovan Slack, published by *Politico*, entitled "Obama interrupted by heckling reporter," dated

June 15, 2012, available at  https://www.politico.com/blogs/politico44/2012/06/obama-

interrupted-by-heckling-reporter-126301.

11.     Attached as **Exhibit J** is a true and correct copy of an article by Dave Boyer,

published by *The Washington Times*, entitled "Obama scolds reporter for asking question at press

conference," dated October 18, 2016, available at

https://www.washingtontimes.com/news/2016/oct/18/obama-scolds-reporter-question-press-

conference/.

12.     Attached as **Exhibit K** is a true and correct copy of an article by Danielle

Wallace, published by Fox News, entitled "Trump's 'chopper talk' news conference blow away

White House press corps: report," dated August 23, 2019 available at

https://www.foxnews.com/politics/trump-chopper-talks-reporters-criticize-accesible-

accountable-marine-one-helicopter-press-secretary-grisham.

13.     Attached as **Exhibit L** is a true and correct copy of a letter dated September 20,

2018, from Erica S. Hamrick, Deputy Chief of Hatch Act Unit to Noah Bookbinder, Executive

Director, Citizens for Responsibility and Ethics in Washington regarding Stephanie Grisham,

available at

https://s3.amazonaws.com/storage.citizensforethics.org/wpcontent/uploads/2018/09/21140938/G

rishamHatchLetter.pdf.

14.     Attached as **Exhibit M** is a true and correct copy of an article by Kenneth P.

Vogel and Jeremy W. Peters, published by *The New York Times*, entitled "Trump Allies Target

Journalists Over Coverage Deemed Hostile to White House," dated August 25, 2019, available at

https://www.nytimes.com/2019/08/25/us/politics/trump-allies-news-media.html.

15.     Attached as **Exhibit N** is a true and correct copy of a Tweet by President Donald

J. Trump (@realDonaldTrump), dated August 25, 2019 at 10:30 a.m., available at

https://twitter.com/realdonaldtrump/status/1165677808896507904.

16.     Attached as **Exhibit O** is a true and correct copy of an article by Jose A. DelReal,

published by *The Washington Post*, entitled "Trump denies mocking journalist who has

disability, demands an apology," dated November 26, 2015, available at

https://www.washingtonpost.com/politics/trump-denies-mocking-journalist-with-disability--and-

demands-an-apology/2015/11/26/797e011c-9492-11e5-b5e4-279b4501e8a6_story.html.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 26th day of August 2019.

_____/s/ Theodore J. Boutrous, Jr._____
Theodore J. Boutrous, Jr

# Exhibit A

×



## Up Next

BILLIONAIRE DAVID KOCH DIES
AT 79
SHIRA TARLO

DOJ SENDS LINK TO WHITE
NATIONALIST SITE
SHIRA TARLO

THE RISE OF TRUMP; THE FALL
OF THE GOP
CHAUNCEY DEVEGA

# When Playboy was hot

Once upon a time, magazines were meant to be read, not just eyeballed.
Today's readers lust for that kind of literary excitement.



**CHARLES TAYLOR**
OCTOBER 9, 2002 11:16PM (UTC)

It's December 1968 and you grab a mag at the local newsstand. The table of contents includes the following: A quartet of short stories by Alberto Moravia; a symposium on creativity with contributions from Truman Capote, Lawrence Durrell, James T. Farrell, Allen Ginsberg, Le Roi Jones, Arthur Miller, Henry Miller, Norman Podhoretz, Georges Simenon, Isaac Bashevis Singer, William Styron and John Updike; humor pieces from Jean Shepherd and Robert Morley; an article on pacifism in America by Norman Thomas; a piece on how machines will change our lives by Arthur C. Clarke; an essay on "the overheated image" by Marshall McLuhan; contributions from Eric Hoffer and Alan Watts; an article in defense of academic irresponsibility by Leslie Fiedler; a memoir of Hemingway by his son Patrick; Eldridge Cleaver interviewed by Nat Hentoff; a travel piece by the espionage novelist Len Deighton; and the first English translation of a poem by Goethe.

Yes, folks, that was Playboy. And lest you think that issue was a fluke, an overstuffed Christmas goodie, the ad for the January 1969 issue promises a story from P.G. Wodehouse, an article by Supreme Court Justice William O. Douglas, fiction from Robert Coover and Sean O'Faolain, and a never before published tale by Lytton Strachey.

Trending Articles

Sure, the reason most of us started reading Playboy was for the girls. But when the history of American magazines is written, people who said "I read it for the articles" will have the last laugh. As will Hugh Hefner, who told a reunion of Playmates in 1979, "Without you, I'd be the publisher of a literary magazine." With new editor James Kaminsky starting this week, and even Hefner saying the magazine needs to recapture its distinction, Playboy has the opportunity to be a catalyst for change in the magazine world. It can do what it did in the '60s and be a magazine with balls (and boobs), leading the moribund magazine world into a new era of editorial rebirth. A pipe dream, I know, but not a complete fantasy.

In its heyday, from roughly the mid-'60s to the mid-'70s, Playboy was one of the great American magazines in an era of great American magazines, like Esquire under Harold Hayes and the New Yorker under William Shawn. The big cliché about Playboy has long been that it benefited from "the Sexual Revolution." Duh. But the reasons it flourished went well beyond that. Playboy was lucky enough to be around when the confluence of New Journalism (practiced by, among others, Tom Wolfe, Gay Talese and Norman Mailer) and a literate, adventurous readership ready for in-depth articles rich with the writer's voice allowed editors and publishers to assume the intelligence of their readers and take all sorts of chances.

That amazing lineup of writers in Playboy's Christmas 1968 issue was not unusual for magazines in the '60s. Remembering some of what was published in that decade should bring shame to editors today. This was an era when Truman Capote's "In Cold Blood" was excerpted in the New Yorker, when 90,000 words of Norman Mailer's "Armies of the Night" appeared in Harper's, when "Fear and Loathing in Las Vegas" appeared in Rolling Stone. It was a time when fiction writers, or writers who brought a novelist's eye for character and detail to nonfiction, were routinely dispatched to cover political campaigns and conventions.

And those dispatches became Mailer's two great books on the 1968 and 1972 conventions, and Hunter S. Thompson's coruscating "Fear and Loathing on the Campaign Trail 1972." Esquire's correspondents at the disastrous 1968 Democratic convention in Chicago were William S. Burroughs, Terry Southern and Jean Genet. (The only recent book to equal Mailer's and Thompson's work is Steve Erickson's book of the 1992 campaign, "American Nomad," and Rolling Stone fired him after he had turned in just two installments.) Some of the best writing to come out of Watergate were the pieces Mary McCarthy did for the New York Review of Books (later collected as "The Mask of State").

The '60s and '70s gave forth a wealth of amazing journalism, pieces like Mailer's "Superman Comes to the Supermarket," Gay Talese's "Frank Sinatra Has a Cold," Stanley Booth's "A Hound Dog to the Manor Born" (an awful title that Booth removed when the piece was collected in his book "Rhythm Oil"), Terry Southern's "Twirling at Ole Miss," Tom Wolfe's "The Last American Hero Is Junior Johnson. *Yes!,* "the

criticism of Pauline Kael, Kenneth Tynan's profiles and essays, and on and on. The culture was springing fresh astonishments and outrages on us daily, and these writers and many others hit the ground running, determined to keep up.

Luckily, they were abetted by editors who, unlike so many editors today, had the power to tell the advertising department to go chase itself if they tried to interfere with editorial content. Editors like Shawn, Hayes and Hefner had visions of what they wanted their magazines to be and stuck to them. I'm guessing it was a mixture of guts, confidence, arrogance and a deep loathing of mediocrity that fired these men, as well as a sense that journalistic ethics required you to be something of a segregationist: the advertisers may pay the fare but they sit in the back of the bus.

And readers stuck with these men and their magazines. The letters in that December 1968 Playboy are striking. One, from a gentleman in Wilmington, Ohio, came in response to a Nat Hentoff piece about police organizations' keeping "subversive" groups under surveillance. The man writes: "I ... am grateful that so many sane, thinking people have awakened to the fact that S.D.S., the A.C.L.U., etc., are as much an enemy as the U.S.S.R." In response to a piece against premarital sex, a woman from Seattle writes: "God intended intercourse to be an act of love between a husband and a wife. Outside marriage, it is sinful and dirty." Both correspondents are obviously conservative. But they're still reading Playboy and are eager to join in the debate the articles kicked up.

All sorts of people read Playboy then. A gay friend of mine who grew up in Louisiana in the '60s was a subscriber. For him, as a teenager, the magazine "represented what all magazines represented to me, which was the city." It opened avenues of sophistication to him and, he says, since it was pro-sex, it offered a gay teen a sense that there was nothing to be ashamed of. My wife attended journalism school in the early '80s where her professors regularly advised their students to read the magazine for its editorial excellence.

The December 1968 issue of Playboy is coveted by collectors largely because of Miss December, Cynthia Myers, soon to find cult status for her role in Russ Meyer's (no relation) "Beyond the Valley of the Dolls." But to those of us old enough to remember the golden age of American magazines, the sexiest thing in that Playboy are those lovely pages and pages of unbroken, three-column type. No call-outs, no charts, no graphics. The people in charge assumed that if you were buying a magazine, you wanted to actually *read* it.

Reading is the last thing that the people who put together most mainstream magazines seem to expect their readers to do. Look at Maxim or FHM, the "lads" magazines that have been such a success with the male 18-34 audience, or even the "lifestyle" glossy InStyle. Now try to find an article. You'll have an easier time finding a Tarkovsky movie at Blockbuster. Charts, all of them with pictures crowding out

words, have replaced writing. There is nowhere for your eyes to rest on a page. Often it takes a minute to figure out the flow of type that's there -- where it begins, where one column continues.

The overwhelming message these magazines give their readers is that they don't believe the readers have either the interest or the mental ability to read articles. Ed Needham, the new editor of Rolling Stone and a former editor at FHM, put it a little more diplomatically in the New York Times recently, saying that he didn't think that people had time to read anymore. The logical response to that statement would be that magazines shouldn't be catering to the audience that doesn't have time to read.

Unfortunately, they are. Not only are venues for serious writing shrinking, the editorial space inside the magazines is too. Falling advertising revenues, the impact of celebrity journalism (not just journalism about celebrities but profiles that are arranged and preapproved by the stars' publicity agents), and the mad scramble to duplicate success formulas have had a devastating effect on journalism. There is still plenty of good writing to be found out there, and sometimes in unexpected places (Elle's book section is often good, for instance). What doesn't exist is a print magazine that's a must-read -- as opposed to a must-skim -- every month. Individual articles can still make an impact. But magazines of all stripes have become like TV shows that drag on from season to season long after the things that made them new and exciting and fun have become rote.

Sadly, Playboy is one of them. Apart from an interview with Willie Nelson and the always fun feature "The Playboy Forum" (devoted, as ever, to the encroachment on civil liberties), the November 2002 issue features barely one interesting article. And what is there doesn't reflect the sophistication the magazine once had; 20Q, a feature that could be described as the Playboy Interview Lite, features Rams running back Marshall Faulk who voices his support for gays in the NFL by saying, "I'd have nothing against anybody if they were gay, but really, I don't want to know ... I don't want to know what so-and-so did with his wife last night, so why would I want to know if he's smoking the pole?"

According to a recent article in Newsday, Playboy's current circulation is 3.2 million, the highest of any men's magazine, but that's still less than half of the 7 million highwater mark of the '70s. It's not hard to guess why. If few people are reading Playboy for the articles anymore, probably fewer are reading it for the girls. In the '60s and early '70s, Playboy was a socially acceptable way of looking at softcore porn. But with the early '70s era of porno chic, and with the appearance of Penthouse, Hustler and dozens of other skin mags, Playboy -- which has never been raunchy -- began to lose readers. Now with hardcore porn as close to being socially acceptable as it ever will be, when it can be accessed via the Internet and pay cable and by renting or buying videos and DVDs, when even Playboy's longtime competitor Penthouse features hardcore (complete with insertion and cum shots) and is teetering on the brink of extinction, Playboy's demure approach seems quaint.

Into this wasteland steps James Kaminsky, the 41-year-old executive editor of Maxim who became the editorial director of Playboy on Oct. 7. In the Newsday profile Kaminsky talked about how he grew up reading Playboy, calling it "the magazine that got me into magazines in the first place." He says he intends to keep the magazine's journalism and profiles, and you get the feeling that he has enough affection for what the magazine used to be that he really means to restore some of its glory. Hugh Hefner seems to share that desire. In a piece in the New York Observer, Hefner says that he wants the magazine to be better: "What I'm looking for is a contemporary version of what Playboy meant in the '60s and '70s."

God only knows how much Kaminsky will be able to accomplish. It will depend on whether he has a free hand against the advertising department and if he has the will, skill and stamina to really remake the magazine. And let's face it, you can't reheat a soufflé. But giving Kaminsky the benefit of the doubt, and as a disappointed admirer of Playboy, I'd like to offer him some suggestions of things he could do.

**Assume that Playboy's readers already know how to get laid.**
Nobody needs another Maxim (which recently ran an article titled "How to Pick Up a Deaf Girl"). Newsday quotes Samir Husni, a professor of journalism at the University of Mississippi, who says that Playboy should sell itself as the magazine to read "once you graduate from Maxim." Hefner says something similar in the Observer piece. Kaminsky should listen to Hef, not the marketing department.

The incredible success of Maxim and the other lads mags have people desperate to imitate them. In the Maxim world, anything that suggests sophistication or knowledge reeks of sissification. The magazine works from the assumption that women aren't really interested in sex and have to be tricked or bargained into it. It stands for a conservative, 1950s pre-Playboy sensibility -- a tittering, junior-high locker room view of sex. Essentially, Maxim and FHM and Stuff are sex-phobic, catering to men who are afraid of women instead of men who are honestly, unashamedly interested in sex. You hear that fear in the comments, quoted in the Observer, of Stuff's editor in chief Greg Gutfield, who says, "I never saw Playboy growing up. I only saw it at the barber shop, and it always creeped me out." That should be good news for Kaminsky. Surely there are plenty of men who aren't afraid of naked women.

**Not everyone who reads magazines is 18-34.**
Sure, Kaminsky is going to have to bring in young readers. But part of the attraction of magazines and books and movies for younger audiences has always been information about things they don't know. Exploit that natural curiosity. And exploit the way "older" readers are being ignored by a media intent on capturing a younger audience. Appeal to the vanity of both reader groups by seeking a sophisticated, engaged audience. And there's nothing wrong with a little arrogance. In the '70s, I received a subscription offer from U.S. News and World Report that said something like, "The idea of a nonglossy news magazine may take some getting used to. But so

Case 1:19-cv-02514-KBJ   Document 18-2   Filed 08/26/19   Page 7 of 13

did long pants." It was laughable in its arrogance, but the magazine wasn't afraid to risk losing some readers to appeal to others. That's the first step toward finding a dedicated readership.

**Clean up the cover.**

Playboy covers used to feature a shot of one of that issue's models flanked on either side by small-point type listing the contributors and some of the articles inside. Today Playboy's covers are as visually overwhelming and meaningless as the features in most magazines, with headlines buffeting each other like bumper cars. To see how elegant and alluring a good cover can be, look at some of the first issues of Harper's Bazaar that came out under the editorship of the late Liz Tilberis. No contemporary magazine offered covers as clean and simple, and the inside layouts matched that approach. Tilberis' use of a model with only the magazine's title on her first few issues was a masterstroke of confidence. It said, in effect, "We think we've got something good enough to attract you all by itself." That's the kind of confidence it takes to be a winner.

**Lose the deadwood.**

Hefner may feel loyalty to some longtime contributors, but trust me, LeRoy Neiman's artwork holds about the same appeal as putting on a Jack Jones album during a makeout session. Similarly, some of the "names" contributing to the magazine are not what they were. They don't attract readers, they don't have anything particularly interesting to say, and they reinforce the image of Playboy as an old fogey that's outlived its time.

**Cherish the written word.**

It makes me nervous to hear Kaminsky say that part of the energy he wants to bring to the magazine is graphics and call-outs. That's exactly what magazines *don't* need right now. Hefner has it right when he says, "I remember growing up, and people got their information from reading. Now it's quick hits that play well. When you tell stories or when you emphasize things that are more visual, you end up with more car crashes or murders on the air, and that passes for news."

In modern magazines, so-called features have become the province of numbers. Scan any newsstand and the features you see teased on magazine covers all have numbers: "The 30 Most Beautiful People in Hollywood"; "146 New Fall Looks"; "15 Ways to Fight Yeast Infection." Each article is reduced to small, predigested bits. If writing for the Web has taught me anything, it's that the advertisers' claim that people no longer want to read is horseshit. People are turning to the Web because magazines have left readers behind. Give your readers a meal and they'll thank you for it.

**Make a place for criticism.**

Yes, I know, to most advertisers criticism is about as welcome as a fart in an elevator. But top-notch, recurring critics on movies, books, television and music can play a key role in defining a magazine's identity. Playboy reviews were never that

long, maybe 400-650 words. But the space devoted to reviews of books, music and movies allowed plenty of things to be covered (even -- horrors! -- things that had already opened). The two or three sentences Playboy's current critics are currently allotted don't allow them to say jack. Surely, some other things could be cut back in order to expand the space given to critics. Nobody is going to miss the two pages of photos of Hef and various celebs smiling for the camera at Mansion parties. And no one's going to mourn the demise of Playboy After Hours -- "A guy's guide to what's hip and what's happening" -- in other words, the function that good critics can fulfill.

**Save the Interview.**

To its credit, Playboy has continued to run long, in-depth interviews. Unfortunately, the Playboy Interview has become almost solely the province of sports figures and media "personalities." It's time once more to make it the place for politics and culture. Looking through back issues from 1968 through the mid-'70s, I found interviews with the likes of Sam Peckinpah, Bernadette Devlin and Vladimir Nabokov. Playboy never made the mistake of thinking that airing views was tantamount to endorsing them. In one chancey instance, they sent Alex Haley to interview the head of the American Nazi Party, George Lincoln Rockwell. (Setting up the interview over the phone beforehand, Rockwell had only one question for Haley: Are you Jewish? Haley said no, Rockwell agreed to be interviewed, and was in a state of rage when Haley showed up.) The only Playboy Interview in recent years that measured up to its past glories was the fascinating interview with the Republican governor of New Mexico, Gary Johnson, who has become one of the most outspoken, articulate and sensible voices against the ruinousness of America's war on drugs. Remember the stir the Jimmy Carter interview caused? Imagine the interest in a Playboy interview with John Walker Lindh. Or Colin Powell. Or Bill Clinton. In the arts there are scores of writers, actors, musicians and directors that readers would be interested in. Playboy can do better than Fred Durst, Brit Hume and Al Michaels.

**Give good writers a place to write.**

Kaminsky can't reproduce the heyday of New Journalism. That literary culture is gone. But there are plenty of good writers who'd do a lot more for Playboy's reputation than an excerpt from the new Scott Turow novel (coming in the December issue), or Tom Arnold writing about his cable sports show (ditto). There's a reading public -- maybe some who've never bought Playboy before -- who'd be eager to read writers like Zadie Smith, David Foster Wallace, Nick Hornby, Jhumpa Lahiri, Michael Chabon, Jonathan Lethem, George P. Pelecanos, James Lee Burke, and nonfiction writers like Sarah Vowell or Philip Gourevitch. Playboy would not only confer distinction but broaden the readers beyond the target audience of heterosexual men.

**Embrace liberalism.**

I don't mean just liberal politics but the broader meaning of liberalism: fostering debate. If anything still unites people on the left and right it's that there are many who are longing for civil, substantive political discourse (as opposed to the bomb throwing of political media personalities). Why not, each month, bring together a

noted liberal and a noted conservative to debate a chosen topic? Make civility and substance the ground rules. Kaminsky might be surprised to find out how many liberals and conservatives there are who'd be relieved to find a political discussion that wasn't a shouting match.

**Keep Playboy Forum.**
This monthly section raises one hot-button topic, prints reader responses from previous installments, and scours the news to highlight the silliest infractions of civil liberties out there, like the story of a 16-year-old girl in Georgia recently sent to a boot camp for having sex with her 16-year-old boyfriend. Forum is the section where the magazine's liberal, feisty, commonsense approach to sex and to social questions still holds its head high.

**Keep the real girls.**
Ah, yes, the girls. Hefner tells the Observer that he doesn't want Playboy to compete with hardcore. And he's right. That's never been the magazine's character. But keeping to its relatively tame standards doesn't have to mean making the magazine a place for washed-up starlets to strip in hopes of reviving their careers. And it needn't mean maintaining the parade of Playmates who have been tweezed and buffed to inhuman perfection. Nobody ever believed Hefner's claim that the Playboy ideal was the girl next door, but it's startling to look through back issues and see that so many of the Playmates do look a lot more real than the current crop.

Hefner still has final say in selecting Playmates, but he needs to be encouraged to broaden his taste by featuring the type of women you might see on the street or in the mall. More men than Hefner might imagine would find that an incredible turn-on; they'd bring the fantasy of Playboy a little closer to the attainable.

Hefner is wrong when he tells the Observer that the underwear layouts in Maxim and FHM can have the same impact as a nude layout. (Nobody prefers the blue balls approach to sex.) But with second-tier TV stars stripping down to their undies, it shouldn't be tough to raise the bar and convince some famous women to pose nude for a classy layout. Some of the magazine's most memorable layouts have come from the collaboration of established photographers and famous models, like Peter Beard's layout of model Janice Dickinson in Africa, or Ellen von Unwerth's witty layout of Drew Barrymore. Playboy should also be looking for a diversity of talent behind the camera. The work of the fashion photographer Peter Lindbergh or the erotic photographer Steve Diet Goedde (whose photos are in a direct line of descent from the cheesecake art Hefner loves) would fit beautifully in Playboy.

- - - - - - - - - - - -

I said I was pipe dreaming. But none of these suggestions are radical. One thing Kaminsky could do to improve his chances of succeeding would be to actively court new advertisers who could be sold on Playboy's vision of reviving its relevance and content. They needn't all be big advertisers. Above all, Kaminsky needs the freedom

to gamble. When Harold Hayes at Esquire commissioned his first cover from George Lois, a shot of a snarling Sonny Liston in a Santa Claus hat, the magazine lost nearly a million dollars in canceled advertising and subscriptions. Hayes dug in his heels and kept Lois, whose striking, sometimes caustic covers defined the magazine's identity.

In the current market nobody can stand a million-dollar hit. But with the largest current circulation of any men's magazine, Playboy has more of a cushion than most magazines and can afford to take some chances.

And that cushion isn't only financial. The best thing Kaminsky and Hefner have going for them is the backlog of affection Playboy has built among its readers. Not just because it was the first thing many American men masturbated to, but also because there was a reason to look at the magazine, post-wank. The time has come for the magazine to show up all the jerk-offs that have risen to challenge it.

**CHARLES TAYLOR**

Charles Taylor is a columnist for the Newark Star-Ledger.

**MORE FROM** CHARLES TAYLOR

Related Topics ─────────────

Love And Sex    Sex

# Around the Web

Ads by Revcontent

**Put Your Toenail Fungus in the Past (Try This)**
World Health Trends

**Introducing: America's First Socialist President**
Stansberry Research

**90% of People Have No Idea What These Two Little Holes Are For**
Buzzworthy

**Hilarious Neighbors Finally Get Their Revenge**
Buzzworthy

**Local Used Cars for Sale - More Info is Your Advantage**
Megasavings

**Born Before 1965? Claim These 15 Senior Rebates Now**
Senior Savings - Lifestyle

## BROWSE SALON.COM COMPLETELY AD FREE, FOR THE NEXT HOUR

**Read Now, Pay Later - no upfront registration for 1-Hour Access**

Click Here

7-Day Access and Monthly Subscriptions also available    No tracking or personal data collection beyond name and email address

**Related**

   

Using "Labyrinth" to talk about sex

Losing my virginity at 37

NSFW: A queen's gift for her king

My first BDSM class, after 5 dry years

**Editor's Picks**

   

"Big Little Lies" has lost its spark

Brian Banks, the man behind the movie

A rare vision of black American life

Notes on cocktail camp

**Trending**



| Queer Eye for a purity culture survivor | Trump reopens "longline" fishing | Trump's mental state is an "emergency" |

• • •

---

**Popular in the Community**                                    ◀  ▶



| FIRING NYPD COP DANIEL PANTALEO OVER ERIC GARNER'S DEATH IS NOT | TRUMP AGAIN SAYS HE IS SERIOUSLY CONSIDERING ENDING BIRTHRIGHT | WHISTLEBLOWER GIVES EVIDENCE OF INAPPROP |
| rottenapples | okey | HINTS? |
| 1d | 1d | 5h |
| Holding the police accountable is the place to start. Making it clear in | Let's be honest: Trump doesn't give a crap if he does or doesn't | What's this hints crap Can't indict a sitting p |

---

## FEARLESS JOURNALISM
## IN YOUR INBOX EVERY DAY

**SIGN UP FOR OUR FREE NEWSLETTER**

| EMAIL ADDRESS |    SUBMIT

• • •

---

Home    About        Advertising      Contact      Corrections      Help      Investor Relations      Privacy
Terms of Service

Copyright © 2018 Salon Media Group, Inc. Reproduction of material from any Salon pages without written permission is strictly prohibited. SALON ® is registered in the U.S. Patent and Trademark Office as a trademark of Salon Media Group Inc. Associated Press articles: Copyright © 2016 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.



# Exhibit B

CBS News / CBS Evening News / CBS This Morning / 48 Hours / 60 Minutes / Sunday Morning / Face The Nation / CBSN Originals   Log In   Search

By **GREG KANDRA** / **CBS NEWS** / *August 14, 2007, 3:45 PM*

# Was That Question A Plante?

Share / Tweet / Reddit / Flipboard / Email



(CBS)

White House correspondent Bill Plante has seen a lot of presidents come and go -- many by helicopter from the South Lawn.

Yesterday, after the brief appearance President Bush made with Karl Rove, Bill decided to do what correspondents sometimes do: he yelled a question. That attracted no small amount of attention in the blogosphere, and Bill has now written about yesterday's experience over at Public Eye:

> Rove has been a controversial figure in this administration, the man most often credited or blamed with framing support for the war by politicizing terrorism.
>
> There was no time to frame that question because the event this morning was a statement, not a news conference. So I asked a more direct one. I thought it unlikely that they would answer, but it's always worth a try.
>
> This isn't the first time I've been blasted for yelling. Twenty or so years ago, I yelled a question at President Reagan as he left the Rose Garden after the annual Teacher of the Year ceremony.
>
> One woman wrote to tell me that I was a guest in the President's house and ought to be behave as one.
>
> Ten years ago, I asked President Clinton a question which brought a red-faced angry response.
>
> The point is that reporters are not here as guests. We're here to ask questions.

Check out the rest of the story and draw your own conclusions.

One thing is sure: we haven't heard the last of Karl Rove. Or Bill Plante.

© 2007 CBS Interactive Inc. All Rights Reserved.

Share / Tweet / Reddit / Flipboard / Email

Case 1:19-cv-02514-KBJ   Document 18-3   Filed 08/26/19   Page 4 of 4



Maddy Freking wows fans at
2019 Little League World
Series



# Exhibit C

# The New York Times

# Washington Talk: The Presidency; Shouting Questions At Reagan

**By Steven V. Roberts, Special To the New York Times**

Oct. 21, 1987



*About the Archive*
*This is a digitized version of an article from The Times's print archive, before the start of online publication in 1996. To preserve these articles as they originally appeared, The Times does not alter, edit or update them.*

*Occasionally the digitization process introduces transcription errors or other problems. Please send reports of such problems to archive_feedback@nytimes.com.*

After a day of economic crisis and uncertainty, President Reagan commented tonight on the state of the economy. But his remarks were made not in a prime-time address to the nation or at a formal news conference, but on the back lawn of the White House, shouted at reporters over the roar of a Presidential helicopter.

Such chaotic exchanges have become the primary way that Mr. Reagan communicates with the press corps these days. Formal news conferences, announced well in advance and held in a decorous setting, are practically an endangered species.

The White House says the President will answer questions soon, probably by the end of the month, but few reporters would be surprised if the date slips. Despite repeated hints that he would submit to questioning, Mr. Reagan has not held a nationally broadcast, prime-time news conference in more than seven months.

Frustrated, reporters have become increasingly forceful - to some, ill-mannered - in efforts to pry information out of the White House. Whenever the President appears within shouting distance, he is now bombarded with high-decibel inquiries. A Purpose in Answering

Often, the President does answer a shouted question, and usually he has a specific purpose in mind. Today, for instance, he used the occasion to accuse Congress of causing the budget deficit that has helped undermine investors' confidence in the stock market. At other times, his remarks can cause him problems. Last week, he angered Democrats on Capitol Hill with an off-the-cuff answer at a photo-taking session that impugned the intelligence of his Senate critics.

Although these shouting matches occasionally produce useful information, few reporters believe they are a good way of finding out what the President thinks. ''Progressively, during Reagan's two terms, it's gotten worse,'' said Sam Donaldson, White House reporter for ABC News. ''The reason we yell at Reagan in the Rose Garden is that's the only place we see him.''

The impression is also developing in the press corps that Mr. Reagan's aides are shielding him from news conferences because they are afraid he cannot handle the high-stakes gamble of such a televised appearance. Reporters say that the President's hearing seems to have deteriorated and that his command of spe-The Presidency Shouting Questions At Reagan By STEVEN V. ROBERTS WASHINGTON, Oct. 20 - After a day of economic

crisis and uncertainty, President Reagan commented tonight on the state of the economy. But his remarks were made not in a prime-time address to the nation or at a formal news conference, but on the back lawn of the White House, shouted at reporters over the roar of a Presidential helicopter.

Such chaotic exchanges have become the primary way that Mr. Reagan communicates with the press corps these days. Formal news conferences, announced well in advance and held in a decorous setting, are practically an endangered species.

The White House says the President will answer questions soon, probably by the end of the month, but few reporters would be surprised if the date slips. Despite repeated hints that he would submit to questioning, Mr. Reagan has not held a nationally broadcast, prime-time news conference in more than seven months.

Frustrated, reporters have become increasingly forceful - to some, ill-mannered - in efforts to pry information out of the White House. Whenever the President appears within shouting distance, he is now bombarded with high-decible inquiries. A Purpose in Answering

Often, the President does answer a shouted question, and usually he has a specific purpose in mind. Today, for instance, he used the occasion to accuse Congress of causing the budget deficit that has helped undermine investors' confidence in the stock market. At other times, his remarks can cause him problems. Last week, he angered Democrats on Capitol Hill with an off-the-cuff answer at a photo-taking session that impugned the intelligence of his Senate critics.

Although these shouting matches occasionally produce useful information, few reporters believe they are a good way of finding out what the President thinks. ''Progressively, during Reagan's two terms, it's gotten worse,'' said Sam Donaldson, White House reporter for ABC News. ''The reason we yell at Reagan in the Rose Garden is that's the only place we see him.''

The impression is also developing in the press corps that Mr. Reagan's aides are shielding him from news conferences because they are afraid he cannot handle the high-stakes gamble of such a televised appearance. Reporters say that the President's hearing seems to have deteriorated and that his command of specific facts also seems to be slipping.

In an interview with Cable News Network last week, Mr. Reagan attacked three Democratic Senators he said were leading a ''lynch mob'' against Judge Robert H. Bork, his Supreme Court nominee. He named Edward M. Kennedy and Joseph R. Biden Jr., but blanked on the third. Finally, after saying ''I'm sitting here desperate,'' he came up with the name: Howard M. Metzenbaum.

Marlin Fitzwater, the President's spokesman, dismisses as ''nonsense'' the theory that aides fear having a news confernce. He said, however, that reporters had a ''legitimate'' complaint about the lack of news conferences. ''It's been tough for us to handle because of Iran-contra,'' he explained, noting that the final report on the Congressional inquiry would not be out until the end of this month. ''We made a conscious decision not to talk to the press because we didn't want to add to the testimony. But from a press relations standpoint, we paid a price.''

But to many students of government, Mr. Reagan's determined aversion to press questioning does ''a fundamental disservice to the Presidency,'' in the words of Fred I. Greenstein, a professor of politics at Princeton University. ''It does put him in what seems to be a far more defensive position,'' the scholar said.

Marvin Kalb, a former network correspondent who directs the Joan Shorenstein Barone Center on the Press, Politics and Public Policy at Harvard, has invited a group of journalists, academics and politicians to spend the next year studying the problem and to make recommendations to the next President.

''I start with a simple proposition,'' Mr. Kalb wrote in describing the project. ''The Presidential news conference is a critically important means of communication between the President and the American people. And yet it seems to be in a state of acute disrepair.''

One sign of that disrepair was visible recently when Mr. Reagan presided over a Rose Garden ceremony honoring outstanding schools. As he started to leave, reporters shouted questions about Judge Bork.

Mr. Reagan was prepared to answer, but several teachers in the audience took offense, with one of them shouting back at the reporters, ''You're taking away the joy of the whole occasion for us.''

Reporters who cover the White House say the shouting sessions are caused mainly by their lack of contact. Mr. Reagan has held 40 news conferences in 80 months in office. In 1987 he has held only two, one last March after the Tower Commission issued its report on the Iran-contra affair, the other in June after the economic summit in Venice.

By contrast, former Presidents Jimmy Carter and Gerald R. Ford averaged more than one news conference a month. And both were far more accessible on an informal basis.

''With Carter, we would see him two or three times during a working day,'' Mr. Donaldson noted, ''and he'd always answer two, three, four questions.''

Bill Plante, the senior White House reporter for CBS News, says the White House likes all the shouting and actually promotes it, for it gives the President a chance to answer a question when it suits his purpose and to stay silent when it does not.

''And what does the public see?'' Mr. Plante wrote in a recent Op-Ed article in The Washington Post. ''A genial Ronald Reagan, skillfully parrying the thrusts of an unruly mob of reporters.''

Mr. Fitzwater has a different view of the shouting. ''The phenomenon is almost totally television,'' he said. ''It's primarily a function of the intense competition and economics of the business. Correspondents are paid so much money it forces them to go to extraordinary lengths, not for quality information, but just to get on the air with something.''

That competition got so heated recently that Mr. Donaldson and Chris Wallace, a White House reporter for NBC News, engaged in a shoving match over positions in the briefing room to broadcast their reports.

To Mr. Fitzwater, competition among the network stars has been intensified by the growth of smaller television operations that have their own crews at the White House and are bidding for more of the market. The Importance of Pictures

Some television reporters agree that the nature of their business encourages them to compete for the President's attention. But the reason, they say, is that information is of little use to them unless they have pictures to go with it. A President saying even one word on camera is worth 1,000 words on paper.

''We're talking videotape!'' Mr. Donaldson said.

To reporters covering the White House, a news conference remains the only way to obtain certain kinds of information. When a President is not reading from a prepared script, he is more likely to provide a glimpse of his true emotions or priorities.

Moreover, news conferences offer a rare chance to evaluate a President's physical and mental well-being. ''There's a kind of humanizing quality to a President being out there,'' Professor Greenstein said. ''It shows he's healthy, he hasn't gone out to lunch psychologically. We've come to expect the chance to check the vital signs of a President periodically.''

A version of this article appears in print on Oct. 21, 1987, Section B, Page 4 of the National edition with the headline: Washington Talk: The Presidency; Shouting Questions At Reagan

# Exhibit D

# The White House press corps is broken beyond repair

By Joseph Curl   - - Tuesday, June 19, 2018

**ANALYSIS/OPINION:**

It all really began with Sam Donaldson. Back in the days of Ronald Reagan, the brash and cantankerous reporter with the worst toupee in television history made his name by yelling at the president. He'd yell at him at White House events, on the South Lawn (where Reagan would pretend he couldn't hear Donaldson over the chopper blades of Marine One), even in the Rose Garden.

His aggressiveness (read: bad behavior) made Donaldson one of the first "star" reporters at the White House. (He was voted best television correspondent in 1986, '87, '88 and '89 by readers of the Washington Journalism Review.) Sure, there had been other famous reporters (early Helen Thomas, Bill Plante, Merriman Smith), but all of them conducted themselves with the proper decorum and respect when covering the White House.

Since then, it's only gotten worse. Bill Clinton got a pass from the mostly liberal mainstream media, but when George W. Bush took office, the White House press corps went to hell.

Chief among the "journalists" who sought fame covering the White House was NBC News' David Gregory. He rudely interrupted Mr. Bush at press conferences and berated White House press secretary Scott McClellan at daily briefings. Mr. Bush had a name for it: "Peacocking." And it worked for Mr. Gregory: He blasted up the ladder at NBC and eventually took over as host of "Meet the Press" (at least until the show's ratings got so bad that the network canned him).

And now, with Donald Trump as president, it's all exploded. There's no decorum at all at the White House anymore. "Journalists" routinely go on extended rants, yell at the press secretary, and grandstand in the briefing room with lengthy (and heavily biased) speeches.

Like last week, when Brian Karem, who the Daily Mail says is "a Playboy magazine writer who covers the White House for a tiny Maryland newspaper," went on a tirade.

When press secretary Sarah Sanders explained the administration's stance on immigration, Mr. Karem jumped in, yelling at Mrs. Sanders.

"You're a parent! Don't you have any empathy? Come on, Sarah!" he yelled. "You're a parent! Don't you have any empathy for what these people are going through? They have less than you do! Sarah, come on! Seriously!"

Mrs. Sanders was cool. "Brian. Gosh. Settle down. I'm trying to be serious, but I'm not going to have you yell out of turn." As she tried to move on, Mr. Karem yelled over the room. "'You're telling us this is the law, and these people have nothing! They come here with nothing!" he shouted.

Mrs. Sanders got the last word. "I know you want to get some more TV time, but that's not what this is about. I'm not going to recognize you," she said.

The next day, CNN actually interviewed Mr. Karem about his outburst. He offered a self-serving (and pretentious) apology, then declared: "I am extremely angry at this administration that has lied to me, continues to lie to me. ... I'm sorry that as a reporter for so long I thought that I ... I forgot that my job is to comfort the afflicted, afflict the comfortable and ask questions for those that have no voice."

Mr. Karem is following the lead of CNN's Jim Acosta, who routinely attacks Mrs. Sanders and interrupts Mr. Trump. While Mr. Trump was signing a document with North Korean leader Kim Jong-un last week, Mr. Acosta shouted: "Mr. President, did we agree to denuclearize?" After the two leaders exited, Mr. Acosta was caught on a hot mic saying, "Hey, if they're not going to let me in the f–ing meeting, then that's what happens," according to The Gateway Pundit.

The new fame seekers in the White House are following the lead of liberals nationwide, like late-night talk show hosts, B-list actors and mediocre comedians. After comedian Samantha Bee called first daughter Ivanka Trump a "feckless c—t," Kathy Griffin — who made headlines when she released photos showing her holding a bloody decapitated head that looked like Trump — came out and called first lady Melania Trump a "feckless piece of s—t."

The Trump White House, fed up with the "peacocking," experimented with off-air briefings. Everything was on the record, but with no cameras, they reasoned, there'd be no grandstanding. It didn't work.

Mr. Trump, who has decried fake news for years, even once suggested pulling the White House passes from some "journalists."

"The Fake News is working overtime," he tweeted in May. "Just reported that, despite the tremendous success we are having with the economy & all things else, 91% of the Network News about me is negative (Fake). Why do we work so hard in working with the media when it is corrupt? Take away credentials?"

But that won't work, either. The new paradigm is attack — as crudely and profanely as possible — in the esteemed mission to "ask questions for those that have no voice."

The idea now is, make headlines. BE the news. Yes, America, that's the state of journalism today. Fake news indeed.

*• Joseph Curl covered the White House and politics for a decade for The Washington Times. He can be reached at josephcurl@gmail.com and on Twitter @josephcurl.*

Copyright © 2019 The Washington Times, LLC. Click here for reprint permission.

be #1 priority at G-7                                                               READ MORE »

# Exhibit E

G-7 Summit  |  Kid Influencer Documentary  |  Moulton Drops Out  |  Taylor Swift Interview  |  WATCH: Hot C

☰                                  ◉CBS NEWS

# Picking Bush's Brain

BY MATTHEW FELLING
AUGUST 14, 2007 / 9:56 AM / CBS NEWS



(CBS)

*One of the accidental subplots to Karl Rove's underline departure yesterday was a question directed to President Bush by CBS White House correspondent Bill Plante at Rove's farewell press event. His question was picked up by a DC media blog and generated many responses. So we asked Bill for his side of the story, which follows.*

As the President and Karl Rove walked away from the lectern after their emotional announcement of Rove's resignation, I yelled a question.

"If he's so smart, why did you lose Congress?"

**LIVE**

The President, as usual, didn't answer.

## Trending News

That's OK - he doesn't have to if he doesn't want to.

But judging by some of the reaction, you'd think I had been shouting obscenities in church!

"Unprofessional;" "Inappropriate;" "Unbecoming;" "Doesn't show much class;" "you are a total idiot;" "Shill for the liberal Democrats."

People who sympathize with the President - no matter who the President happens to be - always seem to think it's impolite to yell questions. Or they argue that the question is inappropriate at the moment. That may sometimes be true, but not [this time].

Rove has been a controversial figure in this administration, the man most often credited or blamed with framing support for the war by politicizing terrorism.

There was no time to frame that question because the event this morning was a statement, not a news conference. So I asked a more direct one. I thought it unlikely that they would answer, but it's always worth a try.

This isn't the first time I've been blasted for yelling. Twenty or so years ago, I yelled a question at President Reagan as he left the Rose Garden after the annual Teacher of the Year ceremony.

One woman wrote to tell me that I was a guest in the President's house and ought to be behave as one.

Ten years ago, I asked President Clinton a question which brought a red-faced angry response.

The point is that reporters are not here as guests. We're here to ask questions.

Why?

Because if we were ever to agree to "behave," we'd be walking away from our First Amendment role – and then we really would be the shills we're so often accused of being.

# Exhibit F

POLITICS                     The New York Times

# Stephanie Grisham's Turbulent Ascent to a Top White House Role

By Elizabeth Williamson

Aug. 22, 2019

WASHINGTON — Stephanie Grisham doled out fast food and tracked lost gear as a press wrangler on President Trump's 2016 campaign, far from the in-crowd flying on the gold-plated Trump jet. An early and hard-working convert to Mr. Trump's cause, she told a reporter at one point that she was "riding it until the money runs out," eager to return home to Arizona.

Instead, Ms. Grisham, 43, rode all the way to Washington with Mr. Trump. And now, after serving in the press office and as Melania Trump's spokeswoman, she occupies one of the most prestigious roles in American politics, as White House press secretary and communications director for both the president and the first lady.

For a public relations specialist who once churned out news releases on traffic safety, the White House is the loftiest stop in a turbulent career trajectory that has mixed toughness and loyalty to her bosses with professional scrapes, ethical blunders and years spent alternately wooing and pounding the press on behalf of scandal-prone Arizona Republicans.

"I've always had a picture of the White House and it would always sit right in front of my desk" in the Arizona Capitol, Ms. Grisham told a local television interviewer from the state shortly after joining the administration. "Whenever I was having a hard day I could look at it and remember what my goal was."

While Ms. Grisham is still developing her working relationship with the president, she has been less focused on crafting and delivering the White House's message than on acting as a behind-the-scenes organizer for a president intent on selling and defending himself.

*[One of Ms. Grisham's predecessors, Sarah Huckabee Sanders, is joining Fox News as a contributor.]*

In the nearly two months since Ms. Grisham was named to her current role, she has not held a single on-camera briefing. She has most recently been in the news for suspending a reporter's White House pass for a month.

In an interview last week with Eric Bolling of Sinclair Broadcast Group, the only interview she has granted since her move to the West Wing, Ms. Grisham said it was up to the president whether to reinstate the daily White House briefing. "He's so accessible, so right now I think that that's good enough," she said.

Ms. Grisham is the latest example of Mr. Trump's tendency to value loyalty and an embrace of his unorthodox style ahead of other credentials when filling top jobs.

POLITICS



Ms. Grisham is the latest example of President Trump's tendency to value loyalty and an embrace of his unorthodox style ahead of other credentials when filling top jobs.
Doug Mills/The New York Times

Her career history contains red flags that most administrations might deem troubling. They include losing a private-sector job after being accused of cheating on expense reports, a later job loss over plagiarism charges and two arrests for driving under the influence, the second while working on Mr. Trump's campaign.

Colleagues say that on the campaign and in the White House, Ms. Grisham has been a coolheaded, encouraging presence. "When we were tired, she'd tell us, 'Keep going,'" said Hannah Salem, a White House aide. "She was one of our biggest cheerleaders on the road."

After Mr. Trump took office, Ms. Grisham joined the White House press office, but soon fled its upheaval and infighting for a job as Mrs. Trump's communications director, becoming a staunch protector of the first lady.

Ms. Grisham, who repeatedly declined to respond to questions for this article, keeps a low public profile in Washington. Twice divorced, she is the mother of two sons, one in his early 20s and one in grade school.

From her bosses, Ms. Grisham "gets a lot of praise for being loyal," said David Bodney, a media lawyer in Arizona who tangled with Ms. Grisham over reporter access to public records when she worked in state government there.

"But her job is to make information available," Mr. Bodney said. "She's now in a unique position to either serve or frustrate the public interest. Unfortunately, her tenure in Arizona does not bode well."

Ms. Grisham got her start in national politics as a press aide on Mitt Romney's 2012 presidential campaign. But she had worked for some time before that in public relations, including a job with the AAA auto club in Arizona, which hired her in late 2006 to help with "public relations, traffic safety initiatives and legislative efforts," according to an announcement in The Tucson Citizen.

Ms. Grisham was gone within about a year. A former AAA employee with direct knowledge of the matter said Ms. Grisham left after accusations that she filed false claims for travel and other expenses. A spokeswoman for AAA Arizona declined to discuss personnel matters.

Ms. Grisham lost a subsequent job after an accusation of plagiarism.

She had gone to work for an advertising agency in Arizona whose clients included a start-up called GarageFly, an online service that helps car owners find auto repair shops. While making a presentation to the Arizona Governor's Office of Highway Safety, GarageFly's founder showed off his website. In an interview, he said he was quickly informed by a furious attendee from AAA that the website included material lifted verbatim from AAA.

POLITICS                    The New York Times

Ms. Grisham got her start in national politics as a press aide on Mitt Romney's 2012
presidential campaign.  Stephen Crowley/The New York Times

GarageFly's founder said he had not known because the website was created by GarageFly's ad agency, Mindspace. And the Mindspace employee responsible for placing the AAA material on the GarageFly website turned out to be Ms. Grisham, according to two other people involved in the matter. Ms. Grisham lost her job. The agency's owner, Brent Shetler, confirmed Ms. Grisham's employment but declined to discuss the reasons for her departure.

Ms. Grisham declined to address questions about her departures from AAA and Mindspace.

Ms. Grisham shifted toward politics, working from 2008 to mid-2010 as a spokeswoman for the Arizona Charter Schools Association and in 2011 as a spokeswoman for Tom Horne, Arizona's attorney general.

In 2012, Ms. Grisham took time off to work as a press aide on Mr. Romney's presidential campaign. There, colleagues praised her organizational skills and sense of humor.

After Mr. Romney's loss, "I was devastated for about a month," Ms. Grisham said in the 2017 television interview. She returned to the attorney general's office, where in 2014, Ms. Grisham fielded national press inquiries about a botched execution by the state. She described the condemned prisoner, who did not die for nearly two hours after being given a lethal injection, as "snoring" and said of the scene, "It was quite peaceful."

Mr. Horne spent much of his tenure under investigation for alleged campaign finance violations.

When reporters from The Arizona Republic asked for public records related to the case, Ms. Grisham criticized their requests as "overreaching, an invasion of privacy and abusive use of your role in the media." Mr. Horne lost his re-election bid and was fined in the campaign finance case.

Ms. Grisham next worked as a spokeswoman for the Arizona House's Republican majority. In 2016 she revoked The Arizona Capitol Times's press credentials four hours after the newspaper published an article, written by Hank Stephenson, detailing allegations that the House speaker, David Gowan, had traveled at state taxpayers' expense while campaigning for Congress.

The fight culminated in Mr. Gowan requiring that reporters covering the Legislature submit to a personal and criminal background check. Those with convictions for serious crimes — and oddly, misdemeanor trespass — would be barred from the House floor.

Ms. Grisham billed the edict as a security measure. But Mr. Stephenson was the only Statehouse reporter with a trespassing charge on his record, related to a tavern fracas. Reporters refused to comply, and Mr. Gowan backed down.

Mr. Stephenson said he does not hold anything against Ms. Grisham, who often socialized with reporters in Phoenix, and even starred in a 2015 video made by The Capitol Times that spoofed her role as spin master.

POLITICS                        The New York Times

Ms. Grisham intends to remain a behind-the-scenes player, a change from her predecessor as press secretary, Sarah Huckabee Sanders.  Doug Mills/The New York Times

"She's fun," Mr. Stephenson said. "She has a reputation as someone who puts out fires. But she starts a number of fires herself."

In mid-2015 Ms. Grisham began working for Mr. Trump's campaign.

In December 2015 in Arizona, Ms. Grisham was arrested for driving under the influence. She pleaded guilty and was fined, and in August 2016 the court ordered her into a treatment program. It was a second offense: In 2013 she was arrested for driving under the influence, speeding and driving with an invalid license.

The 2013 charges were reduced in 2014 to reckless driving, according to court records. Ms. Grisham has told The New York Times that she complied with all sanctions and disclosed both episodes to the White House.

Last year, while working in the East Wing, she helped launch "Be Best," the first lady's anti-cyberbullying, anti-opioid campaign. When news emerged that a Be Best guide called "Talking With Kids About Being Online" was actually created in 2009 by the Obama administration, Ms. Grisham began a fierce defense against the plagiarism charge.

"I encourage members of the media to attempt to Be Best in their own professions," she said.

In the West Wing, friends and former co-workers say, Ms. Grisham intends to remain a behind-the-scenes player. But she has shown a willingness to publicly assail those who displease the president.

"People who survive and thrive in Trump world are the people who come to grips with the reality that you're just going to have to go where Trump wants to go, and echo what the president says," said Cliff Sims, a former White House aide and friend of Ms. Grisham's.

On Mr. Trump's trip to Asia in June, Ms. Grisham earned plaudits from reporters after confronting North Korean guards trying to bar American journalists from Mr. Trump's meeting with the country's leader, Kim Jong-un.

During a news conference with Mr. Trump and the South Korean president, the Korean hosts asked Ms. Grisham to select an American reporter to ask a question. "I'm going to let our president choose," she responded.

Mr. Trump beamed. "She's learned very well," he said.

Maggie Haberman contributed reporting. Kitty Bennett contributed research.

A version of this article appears in print on Aug. 23, 2019, Section A, Page 1 of the New York edition with the headline: Turbulent Rise For New Voice Of Oval Office

READ 273 COMMENTS

# Exhibit G

The Washington Post

**Opinions**

# Let's 'gut check' all of Trump's vulgar, unpresidential statements

By Dana Milbank

It was an exemplary week for presidential misbehavior.

President Trump had an international tantrum over Denmark's refusal to sell him Greenland.

He invoked the anti-Semitic trope that American Jews have a dual loyalty to Israel.

He proclaimed himself the Messiah.

Along the way, he used shooting victims for self-promotion, said he wanted a medal for military valor, and more.

In this divided land, there is broad agreement on one thing: Our president is unpresidential.

A Post/ABC News poll released last month found that two-thirds of Americans find Trump "unpresidential" and only 28 percent say his actions are "fitting and proper." Trump himself has acknowledged that some of his behavior is "not at all 'Presidential'."

It's hard to say for sure whether Trump was more undignified this week compared with most others. This is, after all, a man who boasted publicly about his genitals, uses words such as "bull----," "p---y," "goddamn" and "little Schitt" in public, misspells tweets, talks of women bleeding, proclaims himself a "stable genius" with a "very large brain," "fell in love" with North Korea's dictator, paid hush money to a porn actress, shoved a prime minister, wore an ill-fitting vest to visit Queen Elizabeth and praised the "shape" of France's first lady.

He also let Kanye West loose in the Oval Office, prayed for higher ratings for "The Apprentice" at a prayer breakfast , spoke of "raking" forests, hugged an American flag, dragged toilet paper from his shoe, suggested the Clintons murdered Jeffrey Epstein, described neo-Nazis as "very fine people," and, when told by a rape victim that the Islamic State killed her family, replied: "Where are they now?"

But maybe there is a way to calibrate vulgarity. Post Fact Checker Glenn Kessler and his team have documented more than 12,000 false or misleading statements by Trump using the Pinocchio system: from one Pinocchio for "shading" facts to four for "whoppers." Rare, unexpectedly true statements earn a Geppetto.

Instead of a fact check, I propose a "gut check" of how unpresidential Trump is. Instead of Geppetto and Pinocchio, this uses Beauty and the Beast. Where Kessler's work is objective and researched, this will be arbitrary and slapdash — like Trump's policies.

One Beast: Routinely unpresidential.

Two Beasts: Extra gross, vulgar, narcissistic.

Three Beasts: Downright beastly, uncouth, uncivilized.

Four Beasts: A wild rumpus. We weep for our country.

On the rare instances when he behaves in a "presidential" manner (usually a teleprompter is involved), he will be assigned a "Beauty."

**This week, the Gut Checker awards Trump one Beast each for:**

● Again describing the "evil" free press with the Stalinist phrase "Enemy of the People."

● Promoting Sean Spicer on "Dancing With the Stars."

● Boasting about breaking Elton John's crowd-size record.

● Badgering the Federal Reserve chairman he appointed as the "enemy" and "a golfer who can't putt."

● Describing Fox News's Juan Williams as "pathetic," sycophantic, "nasty and wrong."

● Threatening not to let Fox News host a presidential debate because he didn't like his favorite network's latest poll.

● Threatening to release Islamic State fighters into Germany and France.

● Claiming Google "manipulated" some 16 million votes in 2016.

All routine breaches of decorum for Trump. All unpresidential.

**The Gut Checker awards two Beasts each for:**

● Telling reporters he might not vacate the White House for "maybe 10 or maybe 14" years — regardless of what the Constitution says; and using imaginary powers to say U.S. companies are "hereby ordered" to find alternatives to Chinese markets.

● Resuming his attacks on four nonwhite women in Congress, mocking one's "tears" and accusing her of being "violent."

● Calling former aide Anthony Scaramucci a "highly unstable 'nut job' " and a "mental wreck" guilty of "gross incompetence."

**Three Beasts:**

● Saying hospitalized victims of mass shootings paid tribute to him. "They love their president," he said, in an "unparalleled" way. "They were pouring out of the rooms. The doctors were coming out of the operating rooms."

● Expressing desire to receive the Medal of Honor, the highest award for valor against an enemy force, despite draft deferments for bone spurs. "I wanted one, but they told me I don't qualify. . . . I'd say, 'Can I give it to myself anyway?' They said, 'I don't think that's a good idea.' "

● Tweeting the words of a racist conspiracy theorist who said Israelis view Trump like "the King of Israel" and "the second coming of God." He later claimed he's "the chosen one."

**Four Beasts:**

● Canceling his trip to Denmark and twice calling its prime minister "nasty" because she labeled as "absurd" Trump's absurd plan to buy Greenland.

● Accusing nearly 80 percent of American Jews of ignorance or "great disloyalty," and after an outcry by Jewish leaders, repeating the slander.

One week, zero beauties and 31 beasts — a full herd and, by any measure, an impressive stable of rude, crude and undignified behavior. But if we as a nation can agree that our president is unpresidential, experience should also allow us to agree on this: Next week might well be worse.

*Read more from Dana Milbank's archive, follow him on Twitter or subscribe to his updates on Facebook.*

## Read more:

Catherine Rampell: Trump's tendency to double down on bad ideas doesn't bode well for the economy

Megan McArdle: When will Trump supporters finally say, 'Okay, this is not normal'?

Marc A. Thiessen: Trump's idea of buying Greenland is far from absurd

Eugene Robinson: Trump is increasingly untethered from reality

**Dana Milbank**
Dana Milbank is an op-ed columnist. He sketches the foolish, the fallacious and the felonious in politics. **Follow** 🐦

# Exhibit H

The Washington Post

Retropolis

# The White House reporters who made presidents fume long before Jim Acosta

Before the CNN correspondent, there was Gannett's May Craig, ABC's Sam Donaldson and UPI's Helen Thomas

By Ronald G. Shafer
November 18, 2018

"What have you done for women?" one persistent reporter pressed then-President John F. Kennedy.

"Well, I'm sure we haven't done enough," Kennedy responded with a laugh to Gannett's May Craig in November 1961.

The exchange was much more friendly than the recent confrontation between President Trump and CNN's Jim Acosta that prompted the administration to ban the reporter from the White House. On Monday, CNN dropped its lawsuit against the White House after officials told the network that they would restore Acosta's press credentials as long as he followed a new set of rules. The move follows a federal judge's order on Friday that the reporter's credentials be restored.

Acosta isn't the first White House reporter to make waves at presidential news conferences. Craig, wearing a hat with flowers, was one of the first attention-getting reporters. Sarah McClendon and Helen Thomas posed tough questions for decades. ABC's Sam Donaldson also drew notice with his aggressive questioning of presidents. But none were banned from the White House.

Reporter banishment is a new chapter in presidential news conferences, which began with Woodrow Wilson in 1913. President Eisenhower started the first televised news conferences in 1955, but these were recorded and selected clips that were released to the press later.

Kennedy began live televised news conferences on Jan. 25, 1961. He often called on 72-year-old Craig, who was a seasoned war correspondent. On the woman question, Kennedy answered further: "I must say I am a strong believer in equal pay for equal work, and I think that we ought to do better than we're doing. And I'm glad that you reminded me of it, Mrs. Craig."

McClendon, who headed a group of small newspapers in Texas, brought what she called "a pushy and sometimes confrontational" style to news conferences. In 1958, she pressed Eisenhower on why his administration wasn't doing more to combat the recession. The president's face reddened, and he clenched his fist as he began his answer: "Now, look ..."

McClendon's tactics sometimes got results. At a news conference in early 1974 she complained to then-President Richard Nixon that some Vietnam veterans were running into delays getting government checks to pay for college. When Nixon said the problem had been addressed, McClendon retorted: "No, you're just misinformed."

The president later said in a radio broadcast that because of questions from "a very spirited reporter" he had ordered changes. "Sarah McClendon," Nixon once said, "asks questions that no man would ever think of."

Not everybody appreciated the "little lady with the big voice," as McClendon described herself. President George H.W. Bush warned her, "The loudest voice won't always get recognized because it isn't fair to the

others." Eric Sevareid of CBS News said McClendon was a "lady who has been known to give rudeness a bad name at times." McClendon died in 2003 at age 92.

Thomas started covering the Kennedy White House for United Press International in 1961. She immediately gained a reputation as a tough questioner. Kennedy said of her, "Helen would be a nice girl if she'd ever get rid of that pad and pencil."

Thomas didn't stop asking pesky questions. When President Clinton called on Thomas to ask the first question following revelations about his sexual relationship with Monica Lewinsky, Thomas said, "You may not like it." She then pressed Clinton about his previous denials of any involvement. When George H.W. Bush announced that the defense budget wouldn't be cut after the collapse of the Soviet Union and the fall of the Berlin Wall, Thomas asked him, "Who's the enemy?" In 2006, she asked President George W. Bush, "Why did you really go to war" in Iraq?

In 1975, Thomas became the first female president of the White House Correspondents' Association. She quit UPI in 2000 and soon joined the Hearst newspapers. Her long career abruptly ended under a cloud of controversy in 2010 after Thomas, who was of Lebanese descent, said Jews should leave Palestinian territories. She died in 2013 at age 92.

ABC's Donaldson became known for shouting questions at presidents Jimmy Carter and Ronald Reagan. Donaldson was all business all the time. When Reagan talked to reporters about his meeting with Mother Teresa, Donaldson bellowed: "What about the tax bill?"

Some confrontations took place in the press briefing room that Nixon had installed over the White House swimming pool. Reagan's press secretary James Brady joked the president planned to install a button on his podium that he could press to open a trap door under reporters "who got out of line." The briefing room is now named after Brady, who was shot and badly wounded during the 1981 attempted assassination of Reagan. Brady died in 2014.

Donaldson's bluster never led to his being banned. Indeed, Reagan seemed to enjoy the confrontations. Once when the TV newsman asked Reagan whether he took any blame for the lingering recession in the early 1980s, the president quipped, "Yes, because for many years I was a Democrat." Donaldson, who retired in 2013, is supporting the CNN lawsuit challenging the White House ouster of Acosta after Trump called the reporter "a rude, terrible person." Donaldson, now 84, said, "President Harry Truman summed up the necessary interplay between a president and the press corps when he advised government officials at every level: 'If you can't take the heat, get out of the kitchen.'"

Even some journalists say Acosta sometimes draws too much attention to himself, but that pushing for answers is the job of White House reporters. As Thomas once said, in the arena of presidential news conferences, "There are no rude questions."

*Ronald G. Shafer is a former Washington political features editor for the Wall Street Journal.*

**Read more on Retropolis:**

Sex, hush money and an alleged poisoning: Before Trump and Stormy Daniels, a wild presidency

A president's secret letters to another woman that he never wanted public

The thin-skinned president who made it illegal to criticize his office

How Harry S. Truman went from being a racist to desegregating the military

Move over, Trump. This president's two lions set off the greatest emoluments debate.

**Ronald G. Shafer**

Ronald G. Shafer is a former editor at the Wall Street Journal and the author of "The Carnival Campaign: How The Rollicking 1840 Campaign of Tippecanoe and Tyler Too Changed F

# Exhibit I

**POLITICO**

# POLITICO

## POLITICO44 Blog
*POLITICO44*

---

## Obama interrupted by heckling reporter

By BYRON TAU and DONOVAN SLACK | 06/15/2012 02:32 PM EDT

In a surprising breach of etiquette, President Barack Obama's Rose Garden remarks on Friday were interrupted by heckling from reporter Neil Munro of the website Daily Caller, whose editor-in-chief is conservative commentator Tucker Carlson.

Obama, announcing a change of policy that would allow the children of illegal immigrants to avoid deportation if they meet certain criteria, was interrupted mid-speech by Munro.

"Why'd you favor foreigners over Americans?" Munro shouted.

"Excuse me, sir, but it's not time for questions," Obama responded.

"Are you going to take questions?" Munro asked.

"Not while I'm speaking." Obama said.

(Also on POLITICO: Tucker Carlson defends heckler)

While it's not unusual for Obama to be interrupted by occasional hecklers at big public events, the fact that a reporter brought Obama's speech to a halt startled members of the White House press corps.

Obama, who generally ignores shouted questions from reporters at the end of press events, later addressed Munro's question after finishing his remarks uninterrupted.

"In answer to your question, sir — and the next time I'd prefer you'd let me finish my statement before you ask that question — is this is the right thing to do for the American people," Obama told Munro.

Mobbed by reporters after the event, Munro was asked if he would give his name.

"Yeah, but you'll misspell it," he said.

Munro, according to his Twitter bio, has worked as a reporter for Defense News, Washington Technology and the National Journal.

"As a general matter, reporters are there to ask [questions]," Carlson told The New York Times's Brian Stelter. Carlson did not immediately respond to a question from POLITICO. The Daily Caller's account later tweeted that the organization was "proud" of Munro.

UPDATE: In a statement, Munro said he misjudged when Obama was ending his speech.

"I timed the question believing the president was closing his remarks, because naturally I have no intention of interrupting the President of the United States," Munro said in a statement posted on the Caller's website. "I know he rarely takes questions before walking away from the podium. When I asked the question as he finished his speech, he turned his back on the many reporters, and walked away while I and at least one other reporter asked questions," he said.



President Obama reacts to being interrupted during Rose Garden remarks. | Donovan Slack/POLITICO

Close

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

RSS

Site Map

Terms of Service

Privacy Policy

_____

© 2019 POLITICO LLC

# Exhibit J

# Obama scolds reporter for asking question at press conference

TOP ARTICLES     1/5

President Obama scolded a journalist Tuesday for shouting out a question — at a press conference — about illegal immigration from Central America.

"I appreciate you shouting out a question, since I'm sure there are a lot of colleagues of yours who would like to do the same," Mr. Obama told the reporter sarcastically.

The president was wrapping up a news conference with Italian Prime Minister Matteo Renzi in the White House Rose Garden when the scolding came. By arrangement, Mr. Obama and Mr. Renzi had agreed to take only four or five questions from Italian and American journalists who were selected by the leaders' staff beforehand.

**PHOTOS: See Obama's biggest White House fails**

Mr. Obama was discussing the challenges of illegal immigration when Washington Post reporter David Nakamura, who wasn't on the pre-approved list of questioners, called out a question for Mr. Obama about his policies on illegal immigration from Central America.

"That's what I just said, I said on Central America they have increased. Why are you —" Mr. Obama asked with a tone of irritation.



When the reporter persisted, Mr. Obama replied, "Actually, David, they [illegal immigrants] spiked heavily in 2014, went down significantly in 2015, have gone back up this year in part because there's still desperation in Central America. But they're still not at the levels they were in 2014."

**PHOTOS: 13 Things Liberals Want To Ban**

Nearly 409,000 illegal immigrants were nabbed at the U.S.-Mexico border in fiscal 2016 — up from about 331,000 a year earlier. Homeland Security officials say the increased arrests also mean an increase in the number that are sneaking by them.

The number of illegal immigrants traveling as families also rose, reaching a record high of 77,674.

**SIGN UP FOR DAILY NEWSLETTERS**

Email Address          Submit

Copyright © 2019 The Washington Times, LLC. Click here for reprint permission.

**The Washington Times Comment Policy**

The Washington Times welcomes your comments on Spot.im, our third-party provider. Please read our Comment Policy before commenting.

Case 1:19-cv-02514-KBJ   Document 18-11   Filed 08/26/19   Page 4 of 4

# Exhibit K

Login    Watch TV    ☰

**WHITE HOUSE** · Published 2 days ago

# Trump's 'chopper talk' news conferences blow away White House press corps: report

By Danielle Wallace | Fox News



**Fox News Flash top headlines for August 23**

Fox News Flash top headlines for August 23 are here. Check out what's clicking on Foxnews.com

Some reporters are complaining that President Trump's recent "gaggles" on the White House lawn -- as Marine One's helicopter rotors blare in the background -- make it more difficult for them to hold the president accountable and paints them in an unprofessional light, according to a report.

"If he was at a podium, we would be pressing him after he answers the question, we would be correcting him, we would be pointing out discrepancies in previous answers, and we're not able to do that in the chaotic setting of a departure," CBS News White House correspondent Weijia Jiang told Politico. "Many times I've tried to ask a follow-up question, but he's already pointed to somebody else.

> **"Many times I've tried to ask a follow-up question, but he's already pointed to somebody else."**
>
> — Weijia Jiang, CBS News

"He'll just hear a word that catches his attention like 'racism' or 'the Squad' or whatever the topic is, and he'll just deliver what he's probably already been tweeting about and what he already firmly believes so that can be difficult," Jiang said.

**PLAYBOY'S BRIAN KAREM FILES LAWSUIT AGAINST TRUMP, GRISHAM FOR SUSPENDING WHITE HOUSE PASS**

But others say the brief, near-daily news conferences, dubbed "chopper talks" by late-night host Stephen Colbert, make the president more accessible than his predecessors who delegated the role of talking to reporters to their White House press secretaries during far-less frequent on-camera West Wing briefings.

"President Trump communicates directly with the American people more than any president in history," White House press secretary Stephanie Grisham told Politico, when asked about Trump's interactions with the media. "The fact that the White House press corps can no longer grandstand on TV is of no concern to us."

> **"President Trump communicates directly with the American people more than any president in history. The fact that the White House press corps can no longer grandstand on TV is of no concern to us."**

— Stephanie Grisham, White House press secretary

Grisham said she does not "know what any of the press could complain about" given they have nearl-daily access to the president when he stops to take their questions on the White House lawn.

Trump's "chopper talks" can last as briefly as a few minutes to as long as about a half-hour. The president scans a crowd of reporters, calling on some while ignoring others, and shouts answers over the noise — the wind often whipping his tie over the shoulder — before he then walks off all while the cameras are rolling.

According to CBS News White House correspondent Mark Knoller, who keeps detailed records of the presidency, Trump has stopped to answer reporter questions -- both departing or arriving to the White House on Marine One and on the tarmac before or after riding Airforce One -- more than 80 times. He said he found only three instances when former President Barack Obama similarly spoke to reporters in transit and, during such times, he used a podium.

While several reporters interviewed by Politico said they appreciated the frequent access, they believed the set-up on the lawn purposefully depicts media as unruly, unkempt and professional. Jiang described how she often has to do "a lot of gymnastics" and duck under tripods and over equipment to get close enough. The noise of the chopper also makes their questions inaudible on broadcasts, reporters said.

"There's no question that it works to his advantage that we look unruly and disorderly," veteran New York Times White House reporter Peter Baker told Politico. "It's not like standing at a podium in the East Room or the briefing room, where you can have a civilized calling on people who raise their hands."

**CLICK HERE TO GET THE FOX NEWS APP**

The Trump administration has not held a formal White House press briefing in more than five months, Politico reported. When Trump first took office, press secretary Sean Spicer held frequent briefings. The amount and lengths of briefings dwindled under Sarah Huckabee Sanders. Grisham has not hosted a briefing since taking the job in June.

Former President Obama held 24 solo news conferences during his first 30 months in office, compared to Trump's eight during that time span, Knoller said. Obama's administration held daily news briefings, while Trump takes to Twitter almost every day to communicate with the public.

## U.S.

Crime

Military

Education

Terror

Immigration

Economy

Personal Freedoms

Fox News Investigates

## Opinion

## Entertainment

Celebrity News

Movies

TV News

Music News

Style News

Entertainment Video

## Lifestyle

Food + Drink

Cars + Trucks

Travel + Outdoors

House + Home

Fitness + Well-being

Style + Beauty

Family

## World

U.N.

Conflicts

Terrorism

Disasters

Global Economy

Environment

Religion

Scandals

## Politics

Executive

Senate

House

Judiciary

Foreign policy

Polls

Elections

## Business

Markets

Politics

Technology

Features

Business Leaders

## Science

Archaeology

Air & Space

Planet Earth

Wild Nature

Natural Science

Dinosaurs

## Tech

Security

Innovation

Drones

Computers

Video Games

Military Tech

## Health

Healthy Living

Medical Research

Mental Health

Cancer

Heart Health

Children's Health

## TV

Shows

Personalities

Watch Live

Full Episodes

Show Clips

News Clips

## About

Contact Us

Careers

Fox Around the World

Advertise With Us

Ad Choices

Media Relations

Compliance

## Other

Fox Nation

Fox News Shop

Fox News Go

Fox News Radio

Newsletters

Alerts

Podcasts

Apps & Products

Terms of Use    Updated Privacy Policy(What's Changed)    Closed Captioning Policy    Help    Contact Us

This material may not be published, broadcast, rewritten, or redistributed. ©2019 FOX News Network, LLC. All rights reserved. All market data delayed 20 minutes.

# Exhibit L



**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 218
Washington, D.C.  20036-4505
202-804-7000

September 20, 2018

Mr. Noah Bookbinder
Executive Director
Citizens for Responsibility and Ethics in Washington
455 Massachusetts Avenue, N.W.
Washington, DC  20001

    Re:  <u>OSC File No. HA-18-4852</u>

Dear Mr. Bookbinder:

    This letter is in response to a complaint you filed with the U.S. Office of Special Counsel (OSC) alleging that Stephanie Grisham, Deputy Assistant to the President and Communications Director for the Office of the First Lady, violated the Hatch Act.  Specifically, it was alleged that Ms. Grisham violated the Hatch Act when she used her official "@StephGrisham45" Twitter account to post a message that included #MAGA and a photograph of a 2015 campaign rally. For the reasons explained below, OSC has concluded that Ms. Grisham's tweet violated the Hatch Act.  In response, we have issued her a warning letter.

    The Hatch Act restricts certain political activities of federal executive branch employees, except for the President and the Vice President.  5 U.S.C. §§ 7321-7326.  Accordingly, as Deputy Assistant to the President and Communications Director for the Office of the First Lady, Ms. Grisham is covered by the Hatch Act and prohibited from, among other things, using her official authority or influence for the purpose of interfering with or affecting the result of an election.  *Id.* § 7323(a)(1).  For example, under this provision, Ms. Grisham may not use her official title while engaging in political activity or her official position to advance or oppose candidates for partisan office.  Political activity is defined as activity directed toward the success or failure of a political party, partisan political group, or candidate for partisan political office. 5 C.F.R. § 734.101.

    We understand that Ms. Grisham uses the "@StephGrisham45" Twitter account in her official capacity as Communications Director for the Office of the First Lady.  At issue is a message she tweeted from that account on July 11, 2018, which read:  "Three years ago today I listened to my gut & joined the Trump team in #PHX . . . & life has never been the same.  So proud to work for both @POTUS @realDonaldTrump & @FLOTUS 🇺🇸 #MAGA."  Included with this message was a photograph from one of President Trump's earlier campaign rallies.

**U.S. Office of Special Counsel**
Page 2


Because Ms. Grisham uses the "@StephGrisham45" Twitter account for official purposes, the Hatch Act prohibits her from using that account to engage in political activity.[1]  Tweeting a campaign slogan of a current candidate for partisan political office constitutes political activity for purposes of the Hatch Act.  Thus, because President Trump is a candidate for reelection,[2] Ms. Grisham engaged in political activity when she tweeted #MAGA (i.e., Make America Great Again) on July 11, 2018.  Accordingly, OSC has concluded that Ms. Grisham violated the Hatch Act when she tweeted this message from her official Twitter account.

Once Ms. Grisham became aware that her tweet may have violated the Hatch Act, she deleted the post.  And OSC has found no evidence that she engaged in any additional prohibited political activity via Twitter.  Thus, although we have concluded that Ms. Grisham violated the Hatch Act, we have decided not to pursue disciplinary action and are closing this file without further action.  Ms. Grisham has been advised that if in the future she engages in prohibited political activity while employed in a position covered by the Hatch Act, we will consider such activity to be a willful and knowing violation of the law, which could result in further action.

If you have any questions, you may contact me at 202-804-7054.


Sincerely,

Erica S. Hamrick
Deputy Chief
Hatch Act Unit

---

[1] *See* OSC's February 2018 "Hatch Act Guidance on Social Media," pg. 9, *available at*:
https://osc.gov/Resources/HA%20Social%20Media%20FINAL%20r.pdf.
[2] *See* OSC's March 5, 2018 "Updated Guidance Regarding the Hatch Act and President Trump Now That He Is Officially a Candidate for Reelection," *available at:*
https://osc.gov/Resources/Candidate%20Trump%20Hatch%20Act%20Guidance%203-5-2018.pdf.

# Exhibit M

POLITICS                    The New York Times

# Trump Allies Target Journalists Over Coverage Deemed Hostile to White House

By Kenneth P. Vogel and Jeremy W. Peters

Aug. 25, 2019

WASHINGTON — A loose network of conservative operatives allied with the White House is pursuing what they say will be an aggressive operation to discredit news organizations deemed hostile to President Trump by publicizing damaging information about journalists.

It is the latest step in a long-running effort by Mr. Trump and his allies to undercut the influence of legitimate news reporting. Four people familiar with the operation described how it works, asserting that it has compiled dossiers of potentially embarrassing social media posts and other public statements by hundreds of people who work at some of the country's most prominent news organizations.

The group has already released information about journalists at CNN, The Washington Post and The New York Times — three outlets that have aggressively investigated Mr. Trump — in response to reporting or commentary that the White House's allies consider unfair to Mr. Trump and his team or harmful to his re-election prospects.

Operatives have closely examined more than a decade's worth of public posts and statements by journalists, the people familiar with the operation said. Only a fraction of what the network claims to have uncovered has been made public, the people said, with more to be disclosed as the 2020 election heats up. The research is said to extend to members of journalists' families who are active in politics, as well as liberal activists and other political opponents of the president.

It is not possible to independently assess the claims about the quantity or potential significance of the material the pro-Trump network has assembled. Some involved in the operation have histories of bluster and exaggeration. And those willing to describe its techniques and goals may be trying to intimidate journalists or their employers.

But the material publicized so far, while in some cases stripped of context or presented in misleading ways, has proved authentic, and much of it has been professionally harmful to its targets.

It is clear from the cases to date that among the central players in the operation is Arthur Schwartz, a combative 47-year-old conservative consultant who is a friend and informal adviser to Donald Trump Jr., the president's eldest son. Mr. Schwartz has worked with some of the right's most aggressive operatives, including the former Trump adviser Stephen K. Bannon.

"If the @nytimes thinks this settles the matter we can expose a few of their other bigots," Mr. Schwartz tweeted on Thursday in response to an apologetic tweet from a Times journalist whose anti-Semitic social media posts had just been revealed by the operation. "Lots more where this came from."

POLITICS



The operation is the latest step in a long-running effort by President Trump and his allies to undercut the influence of legitimate news reporting.
Anna Moneymaker/The New York Times

The information unearthed by the operation has been commented on and spread by officials inside the Trump administration and re-election campaign, as well as conservative activists and right-wing news outlets such as Breitbart News. In the case of the Times editor, the news was first published by Breitbart, immediately amplified on Twitter by Donald Trump Jr. and, among others, Katrina Pierson, a senior adviser to the Trump campaign, and quickly became the subject of a Breitbart interview with Stephanie Grisham, the White House press secretary and communications director.

The White House press office said that neither the president nor anyone in the White House was involved in or aware of the operation, and that neither the White House nor the Republican National Committee was involved in funding it.

The Trump campaign said it was unaware of, and not involved in, the effort, but suggested that it served a worthy purpose. "We know nothing about this, but it's clear that the media has a lot of work to do to clean up its own house," said Tim Murtaugh, the campaign's communications director.

The campaign is consistent with Mr. Trump's long-running effort to delegitimize critical reporting and brand the news media as an "enemy of the people." The president has relentlessly sought to diminish the credibility of news organizations and cast them as politically motivated opponents.

Journalism, he said in a tweet last week, is "nothing more than an evil propaganda machine for the Democrat Party."

The operation has compiled social media posts from Twitter, Facebook and Instagram, and stored images of the posts that can be publicized even if the user deletes them, said the people familiar with the effort. One claimed that the operation had unearthed potentially "fireable" information on "several hundred" people.

"I am sure there will be more scalps," said Sam Nunberg, a former aide to Mr. Trump who is a friend of Mr. Schwartz.

Mr. Nunberg and others who are familiar with the campaign described it as meant to expose what they see as the hypocrisy of mainstream news outlets that have reported on the president's inflammatory language regarding race.

Arthur Schwartz, a conservative consultant who is a friend and informal adviser to the president's eldest son.
Sylvain Gaboury/Patrick McMullan, via Getty Images

POLITICS                    The New York Times

"Two can play at this game," he said. "The media has long targeted Republicans with deep dives into their social media, looking to caricature all conservatives and Trump voters as racists."

But using journalistic techniques to target journalists and news organizations as retribution for — or as a warning not to pursue — coverage critical of the president is fundamentally different from the well-established role of the news media in scrutinizing people in positions of power.

"If it's clearly retaliatory, it's clearly an attack, it's clearly not journalism," said Leonard Downie Jr., who was the executive editor of The Post from 1991 to 2008. Tension between a president and the news media that covers him is nothing new, Mr. Downie added. But an organized, wide-scale political effort to intentionally humiliate journalists and others who work for media outlets is.

"It's one thing for Spiro Agnew to call everyone in the press 'nattering nabobs of negativism,'" he said, referring to the former vice president's famous critique of how journalists covered President Richard M. Nixon. "And another thing to investigate individuals in order to embarrass them publicly and jeopardize their employment."

A. G. Sulzberger, the publisher of The Times, said in a statement that such tactics were taking the president's campaign against a free press to a new level.

"They are seeking to harass and embarrass anyone affiliated with the leading news organizations that are asking tough questions and bringing uncomfortable truths to light," Mr. Sulzberger said. "The goal of this campaign is clearly to intimidate journalists from doing their job, which includes serving as a check on power and exposing wrongdoing when it occurs. The Times will not be intimidated or silenced."

In a statement, a CNN spokesman said that when government officials, "and those working on their behalf, threaten and retaliate against reporters as a means of suppression, it's a clear abandonment of democracy for something very dangerous."

The operation is targeting the news media by using one of the most effective weapons of political combat — deep and laborious research into the public records of opponents to find contradictions, controversial opinions or toxic affiliations. The liberal group Media Matters for America helped pioneer close scrutiny of public statements by conservative media personalities.

Those familiar with the campaign described it as meant to expose what they see as the hypocrisy of mainstream news outlets that have covered the president's inflammatory language regarding race. George Etheredge/The New York Times

The New York Times

The conservative operative James O'Keefe has twisted that concept in ways inconsistent with traditional journalistic ethics, using false identities, elaborate cover stories and undercover videos to entrap journalists and publicize embarrassing statements, often in misleading ways, to undercut the credibility of what he considers news media biased in favor of liberals.

In the case of the pro-Trump network, research into journalists is being deployed for the political benefit of the White House. It is targeting not only high-profile journalists who challenge the administration, but also anyone who works for any news organization that members of the network see as hostile to Mr. Trump, no matter how tangential that job may be to the coverage of his presidency. And it is being used explicitly as retribution for coverage.

Some reporters have been warned that they or their news organizations could be targets, creating the impression that the campaign intended in part to deter them from aggressive coverage as well as to inflict punishment after an article has been published.

Trained as a lawyer, Mr. Schwartz has endeared himself to members of the president's family by becoming one of their most aggressive defenders, known for badgering and threatening reporters and others he believes have wronged the Trumps.

He has publicly gone after Republicans he views as disloyal, including the former White House chief of staff Reince Priebus, about whom he admitted spreading an unsubstantiated rumor. He has called himself a "troll on Twitter," which is where he has boasted of being aware of, or having access to, damaging information on dozens of journalists at CNN and The Times that could be deployed if those outlets ran afoul of Mr. Trump or his allies.

The operation's tactics were on display last week, seemingly in response to two pieces in The Times that angered Mr. Trump's allies. The paper's editorial board published an editorial on Wednesday accusing Mr. Trump of fomenting anti-Semitism, and the newsroom published a profile on Thursday morning of Ms. Grisham, the new White House press secretary, which included unflattering details about her employment history.

One person involved in the effort said the pro-Trump forces, aware ahead of time about the coverage of Ms. Grisham, were prepared to respond. Early Thursday morning, soon after the profile appeared online, Breitbart News published an article that documented anti-Semitic and racist tweets written a decade ago by Tom Wright-Piersanti, who was in college at the time and has since become an editor on the Times' politics desk. The Times said it was reviewing the matter and considered the posts "a clear violation of our standards."

Mr. Schwartz tweeted a link to the Breitbart piece before 7 a.m., which Donald Trump Jr. retweeted to his 3.8 million followers — the first of about two dozen times that the president's son shared the article or its contents. Other prominent Republicans, including Senator Ted Cruz of Texas, joined in highlighting the report.

Mr. Schwartz is a friend and informal adviser to Donald Trump Jr., the president's eldest son. Erin Schaff/The New York Times

Breitbart's article quoted several people or groups with close ties to Mr. Schwartz, including Richard Grenell, Mr. Trump's ambassador to Germany, and the Zionist Organization of America. It was written by the site's Washington political editor, Matthew Boyle, whose relationship with Mr. Schwartz started when Mr. Bannon ran the website.

Mr. Boyle's article included a reference to the Times profile of Ms. Grisham, which it characterized as "attacking White House Press Secretary Stephanie Grisham." Mr. Wright-Piersanti was uninvolved in the editing of the article about Ms. Grisham.

The tweets revealed in the Breitbart article quickly spread to other conservative outlets favored by the president and his allies, including the radio shows of Rush Limbaugh and Mark Levin.

Mr. Wright-Piersanti apologized on Twitter on Thursday morning and deleted offensive tweets. Mr. Schwartz then issued his warning that he had further damaging information about Times employees.

Mr. Wright-Piersanti, 32, said the tweets, posted when he was a college student with a Twitter following consisting mostly of personal acquaintances, were "my lame attempts at edgy humor to try to get a rise out of my friends."

But he said "they're not funny, they're clearly offensive," adding, "I feel deep shame for them, and I am truly, honestly sorry that I wrote these."

He said he had forgotten about the tweets as he started a career in journalism.

"For my generation, the generation that came of age in the internet, all the youthful mistakes that you made get preserved in digital amber, and no matter how much you change and mature and grow up, it's always out there, waiting to be discovered," Mr. Wright-Piersanti said.

Like Mr. Wright-Piersanti, other targets of the pro-Trump network have been young people who grew up with social media and wrote the posts in question when they were in their teens or early 20s, in most cases before they became professional journalists.

The photojournalist Mohammed Elshamy in 2014 in South Sudan. Tweets he wrote in his teens became the basis for articles in conservative news outlets.  Andrei Pungovschi

A week after a White House reporter for CNN sparred with Mr. Trump during a news conference, Mr. Schwartz highlighted a tweet by the reporter from 2011, when the reporter was in college, that used an anti-gay slur. Other similar tweets quickly surfaced, and the reporter apologized, though Mr. Schwartz has continued to antagonize the reporter on Twitter.

In recent months, Mr. Schwartz highlighted a nearly decade-old tweet in which a reporter for The Post had repeated in an

ambiguous manner a slur used by a politician.　　　　**The New York Times**

In March, Mr. Schwartz tweeted a link to an article from Breitbart, written by Mr. Boyle, about a reporter from Business Insider whose Instagram account included anti-Trump references and a photograph of the reporter demonstrating against the president.

In July, around the time CNN published an article exposing old posts by a Trump appointee spreading suggestions that Barack Obama was a Muslim whose loyalty to the United States was in question, Mr. Schwartz resurfaced anti-Semitic tweets from 2011 by a CNN photo editor. Mr. Schwartz suggested that a CNN reporter who specializes in unearthing problematic archival content should "look into the social media activities of your employees."

The tweets became the basis for several articles in conservative news outlets and hundreds of tweets from conservatives targeting the photo editor, Mohammed Elshamy, which did not stop even after he resigned under pressure from CNN and apologized.

"It felt like a coordinated attack," said Mr. Elshamy, who said he had received death threats. "It was overwhelming."

Mr. Elshamy, who is now 25, said he posted the tweets when he was 15 and 16 years old, growing up in Egypt, when he was still learning English and did not fully grasp the meaning of the words.

"I was repeating slogans heard on the streets during a highly emotional time in my nation's history," he said. "I believe that my subsequent work and views over the years redeems for the mistakes I made as a kid."

While he said he understands "the severity and harm of my comments," he questioned the motivation of the campaign that cost him his job. "It is a very dirty tactic that they are using to cause as much harm as they can to anyone who is affiliated with these media outlets," he said. "It actually feels like a competition and every termination or vilification is a point for them."

Mr. Bannon, at the time the head of Breitbart, oversaw the site's efforts in 2015 to attack Megyn Kelly, then of Fox News, after she called out Mr. Trump for tweets disparaging women as "fat pigs," "dogs" and "slobs." In an interview, he said the work that Mr. Schwartz was undertaking should be seen as a sign that Mr. Trump's supporters were committed to executing a frontal assault on news media they considered adversarial.

"A culture war is a war," he said. "There are casualties in war. And that's what you're seeing."

A version of this article appears in print on Aug. 26, 2019, Section A, Page 1 of the New York edition with the headline: Trump's Allies Scour Internet To Punish Press

# **Exhibit N**



**Donald J. Trump** ✔
@realDonaldTrump

Follow

The question I was asked most today by fellow World Leaders, who think the USA is doing so well and is stronger than ever before, happens to be, "Mr. President, why does the American media hate your Country so much? Why are they rooting for it to fail?"

10:30 AM - 25 Aug 2019

**37,259** Retweets   **133,399** Likes



💬 70K      ⟲ 37K      ♡ 133K

# Exhibit O

The Washington Post

**Politics**

# Trump denies mocking journalist who has disability, demands an apology

By Jose A. DelReal
November 26, 2015

A day after he was widely rebuked for mocking a reporter with a physical disability, business mogul and reality TV star Donald Trump on Thursday denied that he had done so and accused the reporter of "using his disability to grandstand."

Trump also demanded an apology from the New York Times, the reporter's employer, which earlier in the week issued a statement condemning Trump for ridiculing "the appearance of one of our reporters."

The incident occurred Tuesday at a rally in South Carolina, as Trump was defending his recent claim that he had witnessed thousands of Muslims cheering in New Jersey on Sept. 11, 2001, as the World Trade Center towers collapsed. On stage, Trump berated Times investigative reporter Serge Kovaleski for his recent recollection of an article he wrote a few days after the attacks, which Trump has been citing to defend his claim.

Trump appeared to mock Kovaleski's physical condition; the reporter has arthrogryposis, which visibly limits flexibility in his arms.

"Now, the poor guy — you've got to see this guy, 'Ah, I don't know what I said! I don't remember!' " Trump said as he jerked his arms in front of his body.

Trump's assertions about Muslims celebrating in 2001 have been fact-checked and discredited by law enforcement and government officials who were in New Jersey in the days and weeks after the terrorist attacks.

Trump has defended his recollections by citing a 2001 article by Kovaleski, who worked for The Washington Post at the time and wrote that "authorities detained and questioned a number of people who were allegedly seen celebrating the attacks and holding tailgate-style parties on rooftops while they watched the devastation on the other side of the river."

Those allegations were never corroborated but have persisted in online rumors in the 14 years since the attacks. In an interview on CNN this week, Kovaleski said he did not recall "anyone saying there were thousands, or even hundreds, of people celebrating."

That is the statement that apparently drew Trump's ire on Tuesday.

"The sad part about it is, it didn't in the slightest bit jar or surprise me that Donald Trump would do something this low-rent, given his track record," said Kovaleski, who frequently covered Trump while reporting for the New York Daily News between 1987 and 1993.

In a statement Thursday, Trump adamantly denied that his comments or gestures were meant to mock Kovaleski. He also denied remembering Kovaleski at all — "despite having one of the all-time great memories."

"Kovaleski must think a lot of himself if he thinks I remember him from decades ago — if I ever met him at all, which I doubt I did," Trump said. "He should stop using his disability to grandstand and get back to reporting for a paper that is rapidly going down the tubes."

Kovaleski said in an interview this week that he's sure Trump remembers him — and his disability. Trump indicated as much himself in the speech Tuesday, when he said, before he began an apparent impersonation with a series of jerking arm movements, that the article had been "written by a nice reporter."

In his statement Thursday, Trump said: "I have no idea who this reporter, Serge Kovalski [sic] is, what he looks like or his level of intelligence. I don't know if he is J.J. Watt or Muhammad Ali in his prime — or somebody of less athletic or physical ability. Despite having one of the all-time great memories I certainly do not remember him."

Trump added that he thought Kovaleski's recollections about his 2001 article "seemed like (again without knowing what he looks like) he was groveling and searching for a way out from what he wrote many years before."

In Kovaleski's comments to CNN and other news organizations, the reporter pointed out that there were never any reports of thousands or even hundreds of Muslims celebrating, as Trump has claimed to have witnessed. Kovaleski has not contradicted the 14-year-old article.

Kovaleski's friends and colleagues took to social media this week to excoriate Trump.

"The measure of men. Know this: Serge Kovaleski, aka @sergenyt, is a journalistic rock star and one great colleague," Times reporter Dan Barry wrote on Twitter.

"@sergenyt is one of the best reporters — and best people— I know. This is despicable," ESPN reporter and author Don Van Natta Jr. wrote.

Trump took specific aim at the Times in his statement Thursday.

"They should focus on the survival of their newspaper and not on dishonest and very bad reporting about me," he said. "The New York Times has become more and more irrelevant and rapidly becoming a total joke — sad!"

A Times representative declined Thursday to add to the paper's earlier statement.

---

💬 **3680 Comments**

**Jose A. DelReal**

Jose DelReal was a national correspondent covering America's rural-urban divide, the USDA and HUD. He left The Washington Post in June 2017.  **Follow** 🐦

---

The Washington Post

## Support the work.

**Special offer |** Try unlimited access for ~~$10~~ $1.

Try 1 month for $1

Send me this offer

Already a subscriber? **Sign in**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| BRIAN KAREM,<br><br>       Plaintiff,<br><br>  v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States and in his individual capacity; and STEPHANIE GRISHAM, in her official capacity as White House Press Secretary and in her individual capacity,<br><br>       Defendants. | **Case No. 19-cv-2514 (KBJ)** |

**DECLARATION OF ANNE CHAMPION
IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION**

I, ANNE CHAMPION, hereby declare under penalty of perjury the following:

1.      My name is Anne Champion.  I am a partner with the law firm of Gibson, Dunn & Crutcher LLP, a member of the bars of the State of New York and multiple federal courts.  My motion to appear pro hac vice for Brian Karem in this action is pending before this Court.  I have personal knowledge of the content of this declaration, and I could and would competently testify to the truth of the matters stated herein.

2.      On August 8, 2019, I along with my partner Thomas H. Dupree Jr., attended a meeting at the White House regarding the "preliminary decision" to suspend Mr. Karem's press pass with Press Secretary Stephanie Grisham, Deputy White House Counsel Patrick Philbin, and a colleague of Mr. Philbin's.  The description of our meeting reflected in Ms. Grisham's "final decision" contains many inaccuracies and omissions, some of which I will address here.

3.     During the meeting, I repeatedly asked Ms. Grisham and Mr. Philbin what Mr. Karem's procedural rights were.  They refused to respond to those questions and in fact said it would be "unproductive" to discuss that.  I also asked what type of evidence would be helpful to them that Mr. Karem might be able to provide.  Mr. Philbin shrugged at that question and did not identify anything specific that they wanted Mr. Karem to provide.  I also asked for the identity of attendees of the event, as we had been unable to identify more than a handful of them, and they declined to provide that information.  I also repeatedly asked that they provide documents relating to the decision to suspend Mr. Karem's press pass, including any documents relied upon to make the decision, including witness statements, and any documents relating to the procedures followed in reaching the decision.  All of those requests were denied.

4.     During the meeting, Ms. Grisham and Mr. Philbin referenced a statement they had obtained from a Secret Service Officer present at the event, who had approached Mr. Karem following the confrontation with Mr. Gorka, and whom they contended had asked Mr. Karem to step back behind the rope line, which had fallen.  Mr. Philbin was referencing a document that he had in front of him during this description, apparently a copy of the Secret Service Officer's statement.  Mr. Dupree asked, "and did the Secret Service Officer say that he obeyed that instruction?"  To which Mr. Philbin responded, "Yes," again referencing the document in front of him.  Ms. Grisham and Mr. Philbin refused to provide a copy of the Secret Service Officer's statement when specifically asked.  They also refused to identify the Secret Service Officer by name when asked.

5.     Contrary to the assertion in their brief, at no time during this meeting did I or Mr. Dupree "acknowledge[]" that the White House had a compelling interest in ensuring "decorum" among the press corps.  Opp. at 35.

2

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 26th day of August 2019 at Saranac Lake, New York.

_____
Anne Champion

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

BRIAN KAREM,

       Plaintiff,

  v.

DONALD J. TRUMP, in his official capacity as
President of the United States and in his individual
capacity; STEPHANIE GRISHAM, in her official
capacity as White House Press Secretary and in her
individual capacity,

       Defendants.

**Case No.: 19-cv-2514 (KBJ)**

---

### REPLY DECLARATION OF BRIAN KAREM IN SUPPORT OF
### PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER
### AND PRELIMINARY INJUNCTION

I, Brian Karem, hereby declare under penalty of perjury the following:

1.      I have never seen the November 19, 2018 Letter from then Press Secretary Sarah

Sanders to Jim Acosta attached to Defendants' Memorandum Of Points And Authorities In

Support Of Defendants' Opposition To Plaintiff's Motion For A Temporary Restraining Order

And Preliminary Injunction (the "Opposition") as Exhibit 2, or the purported standards embodied

therein (Dkt. 15-2), nor was it ever provided to me by the White House Press Office as a member

of the White House press corps or as a hard pass holder.  Nor am I "aware" of the specific

"norms" or "widely shared understandings" that the Government claims exist, including a

purportedly "basic prohibition against shouting at guests or starting fights in the White House."

2.      As set forth in my Declaration and in the Declaration of Sam Donaldson, all sorts

of things happen at the White House, it is not uncommon for people to raise their voices,

including in order to be heard, and verbal sparring between reporters, on the one hand, and the President, government officials, lawmakers, and other White House guests, on the other hand, is par for the course. In the last 30 years I have witnessed and been a part of many spirited debates, briefings, press conferences and appearances of the President and other members of several administrations. Some have been contentious. It is a part of doing business. It is a part of free speech.

3.       As for "starting fights," I have never tried to start a fight in any sense at the White House. At no time while at the White House on July 11, 2019 did I "pick a fight" with anyone, including Sebastian Gorka. As I have repeatedly stated, I was asking him to have a conversation after he began picking a fight with me. Indeed, I believe that I avoided a physical confrontation with Mr. Gorka, who clearly wanted to have one, by maintaining my calm and inviting him to talk.

4.       At no time did I refuse to comply with any instruction by any officer of the Secret Service or any White House staffer, and the White House provides no statement from either of these individuals alleging that I did. I did not disobey any instruction from the White House staffer to leave the Palm Room. The staffer in question was simply announcing, "All press is leaving now," while the journalists, including me, were in the process of leaving, and did leave. It is common for the wranglers to yell at reporters (not that this staffer even approached yelling in this instance). This is such a minor point I hardly understand it being mentioned unless it is to make mountains out of molehills.

5.       Ms. Grisham displays a fundamental misunderstanding of journalism when she claims that there could have been no "journalistic purpose" in my having a conversation with anyone at the Social Media Summit, regardless whether the formal event was "over." Opp. at

39.  As a journalist, a large part of my job is to talk to people.  When I am at the White House I try to talk to as many people as possible, including government officials and lawmakers, and people attending White House events, not just the President.  As I said in my first declaration, "reporters aren't scribes."  My job as a White House Correspondent is not simply to record what the President says, when he happens to speak to the press, and indeed, the video cameras do a far better job of that than I could.  My job does not end when he departs the stage and no journalist who confined him or herself to reporting the President's public remarks would ever break news.  Indeed, the most valuable newsgathering opportunities at the White House often take place outside the confines of official events or press conferences.  So the Press Secretary is simply wrong when she asserts that my "First Amendment interest in reporting the news" is "diminished," when the "press event is over."  Opp. at 39.

6.      Ms. Grisham is also wrong in her assertion that a 30-day suspension of a hard pass is a "modest" sanction.  The language she sets forth makes it clear that she seeks, through punishing me, a diminished role for all reporters who could, in the future, face sanctions and press pass suspension for merely asking a question loudly or in a manner the administration arbitrarily decides is improper.  This is a naked power play by the administration to quiet and subjugate the press.  As set forth in my prior declaration, the loss of my hard pass has had an immediate negative impact on my ability to do my job, and unless my hard pass is restored immediately, I believe this suspension will severely hamper the rest of my career and render me unable to work as a White House correspondent due to the stigma and the threat that this retaliation by the White House will be repeated.  Nor did I have "actual notice" that "the revocation of [my] press pass by the Press Secretary was a possible punishment for violations of professional conduct and decorum."  Opp. at 23.  Indeed, in nearly 40 years as a political

reporter, I have never heard of any such attempted suspension except for the recent attempt by this same administration to suspend Jim Acosta's hard pass, which was quickly reversed in court.

7.      At no time during this process was I ever advised what materials I could submit in my defense, and all of my requests for information related to the Press Secretary's decision, in my written responses and in requests by my attorneys, were denied.  I would have been happy to provide them with additional materials had they requested them, but compiling evidence and witness statements such as was done for the filing of this case, takes time.  The Press Secretary was free to talk to anyone who was at the event, including two reporters who were standing close to me and who provided witness statements in support of this motion, Ksenija Pavlovic McAteer and Andrew Feinberg.  But my understanding is that the Press Secretary did not speak with them or anyone else before rendering her "preliminary decision," and only spoke with a single, unidentified Secret Service Officer, *after* that "preliminary decision."  She then refused to disclose the identity of that Secret Service Officer or even to provide a full copy of his statement to my counsel, even though I understand she has admitted that it supports the fact that I never disobeyed any instruction from the Secret Service.

8.      Rational individuals may well question what, if anything, is believable in the Administration's response to my motion based on its track record of lying to the American public.  Ms. Grisham's role as Press Secretary for a President who constantly lies to the American public, and her own documented history of dishonest conduct as recently reported by the *New York Times*, render her incapable of serving as a fair and neutral adjudicator and judging my credibility as she purports to do in her August 16, 2019 "Final Decision."

9.      I do not understand the White House Press Secretary's role to be "regulating the conduct of [the] press," as the Government asserts.  Opp. at 32.  Rather, her role is to disseminate

information regarding the President and the Administration and their activities to the press, and

to facilitate the press's access to the President and his Administration.  Mike McCurry, Clinton's

former press secretary, and the man who instituted the televised briefings saw the role between

the press and the administration as a symbiotic relationship of contention.  He said he learned

from critical questions and those questions sometimes led to policy changes.  He viewed his job

as being a conduit of information from the press to the President and the President to the press.

President Reagan's acting press secretary Larry Speakes famously said, "Don't tell us how to

stage the news and we won't tell you how to report the news."  Every previous press secretary

before this administration understood they were not there to punish or control the press—though

many of them often criticized the press.  They were there to work with the variety of reporters

who covered the White House and provide information to the American public.  All of the

previous press secretaries before this administration helped—to a varying degree—secure

interviews and provide access even if they didn't like what was being written about the

President.  All of them understood the adversarial nature of the press without weaponizing press

passes in order to punish reporters the administration didn't like.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 26th day of August 2019 in Washington, D.C.

Brian Karem