## IN THE UNITED STATES DISTRICT COURT
## FOR THE  DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BRIAN KAREM, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 1:19-CV-02514-KBJ |
| | : | |
| DONALD J. TRUMP, in his official capacity as President of the United States and in his individual capacity; and STEPHANIE GRISHAM, in her official capacity as White House Press Secretary and in her individual capacity, | : | |
| | : | |
| Defendants. | : | |

**BRIEF OF THE WHITE HOUSE CORRESPONDENTS' ASSOCIATION AS AMICUS CURIAE SUPPORTING PLAINTIFF'S MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**I.      INTEREST OF AMICUS CURIAE**

Amicus curiae is the White House Correspondents' Association (the "WHCA"), a nonprofit association incorporated in the District of Columbia, whose primary mission is to advocate for the newsgathering rights of the press on behalf of journalists who cover the White House and on behalf of Americans who rely on the press to provide information about the activities of their elected officials.  Founded over 100 years ago, in February 1914, the WHCA has consistently and effectively worked to ensure that the men and women who gather and report the news from the White House have the ability to seek answers from powerful officials, up to and including the President of the United States.  The WHCA has 439 regular members and 152

associate members who represent over 100 different print, television, radio, and online journalism outlets.

The WHCA was founded on the belief, as expressed by this country's Founders and enshrined in the First Amendment, that an independent news media is vital to the health of the republic. The ability of the press to question elected officials vigorously and regularly and to report freely on the activities of these officials is fundamental to our democracy. When government officials—including the President of the United States here—attempt to restrict, curtail, intimidate, or silence the press in its news gathering activities, the rights of the people and the press, as guaranteed by the First Amendment, are infringed, and our democratic form of government is placed in jeopardy.

Plaintiff in these proceedings, supported by the Amicus Reporters Committee for Freedom of the Press, has outlined in compelling detail the constitutional violations caused by the President's actions. Amicus WHCA submits this brief to highlight the extent and breadth of the danger posed to all journalists, and to the American public, if either of the following legal arguments are permitted to stand: (1) the President's assertion that he has absolute discretion to pick and choose those journalists who report from the White House; and (2) the President's assertion that the White House Press Secretary may exclude from the White House any journalist whose conduct she deems unprofessional.

## II.    ARGUMENT

Just as he did last year in *CNN v. Trump*, the President of the United States again asserts, without any authority, that he has absolute, unbridled discretion to decide who can report from inside the White House. Insisting that his administration somehow falls outside of the clear dictates of *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977), he baldly states that "[n]either the

Due Process Clause nor the First Amendment constrain the White House Press Secretary's authority to regulate journalists' access to the White House." *See* Gov't Br. at 1, 15-16, 41-42. Under the President's view of the law, if he does not like a question that a journalist asks him, he can deny that journalist access to the White House. If he does not like the content of an article that a journalist writes about him, he can deny that journalist access to the White House. If he does not like the viewpoint that a journalist expresses about him, he can deny that journalist access to the White House. If he decides that a journalist's story is "fake news," he can deny that journalist access to the White House. And if he or his Press Secretary determine that a particular journalist's behavior is "unprofessional," he can deny that journalist access to the White House. Moreover, he claims that he can take any or all of these actions without providing any process whatsoever.

As this Court recognized in the *CNN* case, the President's view of the law is wrong. It is also reckless and threatens to undermine core democratic values protected by the First Amendment. While the President may have absolute discretion to exclude a member of the press from his Trump Tower residence, he does not have absolute discretion to exclude a member of the press from the White House. Indeed, in the words of the National Park Service, "the White House stands as a symbol of democracy . . . serv[ing] not only as the seat of the executive branch of government of the United States of America, but also as an iconic place for civil discourse." *See President's Park (White House)*, National Park Service, https://www.nps.gov/whho/index.htm. The White House is the People's House, and the First Amendment does not permit the President to pick and choose which journalists do—and do not—cover him there. *See The People's House | The White House: Inside Story*, PBS, https://www.pbs.org/video/white-house-inside-story-peoples-house/. Far from it, the First

Amendment requires a compelling government interest—not whim, prejudice, or dislike—for the President to strip a journalist of his or her ability to report from the White House.

Perhaps mindful that his assertion of unbridled authority would not be sufficient in the eyes of the Court, the President, in this case, asserts as a fallback position that it would be constitutional to empower his Press Secretary to deny White House access to any reporter who she determines, in her sole discretion, has acted "unprofessionally."  But this fallback position is cold comfort to journalists covering the White House, as it should be to the public at large.  After all, the White House Press Secretary is the President's agent for dealing with the press—an institution that the President has branded an "evil" "enemy of the state" and purveyor of "fake news," due in large part to his perception of negative coverage that he and his administration have received.  Therefore, particularly in the current climate, would a journalist necessarily feel safe asking a tough question or an aggressive follow-up question at the White House knowing that the Press Secretary was free to bar any journalist simply because she deemed that journalist's conduct "unprofessional"?

The WHCA urges the Court to grant Plaintiff the relief that he seeks and, in doing so, to roundly reject the President's dangerous legal positions.

**A.    The administration does not have absolute discretion to pick and choose who reports from the White House.**

The President's claim that his administration has absolute discretion to decide which journalists have access to the White House is foreclosed by *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977).  In *Sherrill*, the court made clear that, regardless of whether the President has discretion to select those journalists to whom he grants interviews, a journalist's First Amendment rights *are* implicated by the denial of a White House press pass and a President therefore is *not* free to deny press passes as he or she sees fit.  *See id.* at 129 (explaining that

"arbitrary or content-based criteria for press pass issuance are prohibited under the first amendment" and then discussing other "first amendment considerations" raised by press pass denial); *id.* at 130 ("[T]he interest of a bona fide Washington correspondent in obtaining a White House press pass is protected by the first amendment.").  As the D.C. Circuit put it, "White House press facilities having been made publicly available as a source of information for newsmen, the protection afforded newsgathering under the first amendment guarantee of freedom of the press requires that this access not be denied arbitrarily or for less than compelling reasons." *Id.* at 129 (internal citations omitted).  Indeed, the court stressed, "[n]ot only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information." *Id.* at 129-30.  The court then unequivocally held that, "[g]iven these important first amendment rights implicated by refusal to grant White House press passes to bona fide Washington journalists, such refusal must be based on a compelling government interest." *Id.* at 130.

        In addition to being at odds with binding First Amendment precedent, the President's legal position threatens the free flow of information about our elected officials that is so crucial to the functioning of our democratic system.  As explained by Todd J. Gillman—a WHCA Board Member and Washington Bureau Chief for *The Dallas Morning News*—in his Declaration attached to Plaintiff's injunction papers, "[a] hard pass is critical for anyone who reports regularly on the White House."  ECF No. 2-8, Gillman Decl. ¶¶ 1, 2, 9.  It is no exaggeration to say that, without one, a White House correspondent simply cannot do his or her job effectively.  For example, without a hard pass, it would be impossible for a White House

correspondent to interact in real time with White House officials, including the President, as an important national emergency or crisis unfolds, and accurately report on such an event.

Beyond the impact that a denial of a hard pass has on the individual Plaintiff in this case, the Court cannot ignore the effect that a decision ratifying the President's sweeping claim of discretion would have on other journalists and news outlets that regularly cover the White House.  If the administration were to have the absolute discretion to strip a correspondent of a hard pass, the chilling effect would be severe, and the First Amendment protections afforded to journalists, to gather and report news on the activities of the President, would be largely eviscerated.  White House correspondents would have to choose between avoiding questioning and reporting that could upset the President, on the one hand, and risking the loss of a hard pass—a requirement to do their job—on the other hand.  Forcing those who cover the President to make such an untenable choice is not something that the First Amendment can tolerate.  Nor can the First Amendment—or our democracy as a whole, for that matter—tolerate yielding to the President the power to effectively choose who does and who does not cover him.

**B.    The White House Press Secretary must not be permitted to exclude journalists from the White House simply because she deems their conduct "unprofessional."**

The President maintains that, even if *Sherrill* applied here and his administration lacked the absolute discretion that he claims, it would be constitutional to empower the White House Press Secretary to strip White House access from any journalist who, in her opinion, violated a "widely-shared understanding" of "professional[ism]" and "decorum."  Gov't Br. at 17.  It is critical that this argument be rejected as well.

Even in pre-Trump times, the relationship between the press and the White House was often adversarial.  This is only natural, given that, as the Supreme Court put it, "the press serves and was designed to serve as a powerful antidote to any abuses of power by governmental

officials, and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills v. Alabama*, 384 U.S. 214, 219 (1966).  During the current administration, that adversarial relationship has, of course, risen to an unprecedented level.  The President regularly doles out to the media reproaches of "fake news" and "enemy of the state."  And as Plaintiff  highlights in his brief, the President recently labeled the entire field of journalism "evil":  "'Journalism' has reached a new low in the history of our Country.  It is nothing more than an evil propaganda machine for the Democrat Party.  The reporting is so false, biased and evil that it has now become a very sick joke."  Pl. Br. at 20.

By all appearances, in the eyes of the President and his administration, asking tough questions, bringing to light abuses of power, and airing criticisms of the administration is "unprofessional"—indeed, "evil"—press conduct.  But in the eyes of the press and the Supreme Court, such conduct is precisely what the job of a journalist demands.

A framework that permits the White House Press Secretary—an agent of the President—to exclude a journalist from the White House based on her own evaluation of that journalist's "professionalism" and "decorum" thus fares no better than a framework that permits the President absolute discretion to exclude any journalist that he pleases.  Either scenario leaves White House correspondents with the same untenable, unconstitutional, speech-chilling choice: avoid questioning and reporting that could reflect negatively on the President or risk losing a hard pass.  In the Press Secretary's own words, she suspended Mr. Karem's hard pass in order to "*deter* Mr. Karem and other members of the press" from engaging in further conduct that she might deem unprofessional.  Pl. Br., Ex. 10 at 8-9 (Aug. 18, 2019 Grisham Letter) (emphasis added).  That desired and likely "deter[rent]"—AKA chilling—effect makes it essential that this

Court step in now to help ensure the continued free flow of information from and about the White House.

## III.    CONCLUSION

For all of these reasons, the White House Correspondents' Association requests that the Court grant Mr. Karem the relief that he seeks and reject the President's dangerous legal positions.

Dated:  August 26, 2019                                            Respectfully submitted,

/s/ George A. Lehner
George A. Lehner (D.C. Bar. No. 281949)
PEPPER HAMILTON LLP
Hamilton Square
600 Fourteenth Street, N.W.
Washington, D.C.  20005-2004
Phone: 202.220.1416
Fax: 202.220.1665
lehnerg@pepperlaw.com

Eli Segal (*pro hac vice* forthcoming)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
Phone: 215.981.4239
Fax: 215.981.4750
segale@pepperlaw.com

*Counsel for White House Correspondents'*
*Association*