**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BRIAN J. KAREM,<br><br>    *Plaintiff*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States and in his individual capacity; and STEPHANIE GRISHAM, in her official capacity as White House Press Secretary and in her individual capacity,<br><br>    *Defendants*. | Civil Action No. 19-cv-2514 (KBJ) |

**BRIEF OF *AMICUS CURIAE* PEN AMERICAN CENTER, INC. IN SUPPORT OF
PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND
<u>PRELIMINARY INJUNCTION</u>**

**CORPORATE DISCLOSURE**

Pursuant to Federal Rule of Civil Procedure 7.1, *amicus curiae* certifies that it has no parent corporation and no publicly held company owns 10% of its stock.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE ................................................................................................. i

TABLE OF CONTENTS ........................................................................................................ ii

TABLE OF AUTHORITIES ................................................................................................. iii

INTERESTS OF *AMICUS CURIAE* ..................................................................................... 1

INTRODUCTION ................................................................................................................... 2

ARGUMENT ........................................................................................................................... 3

    I.   The Suspension of Mr. Karem's Hard Pass Is Another Act in Furtherance of President Trump's Ongoing Censorship-and-Retaliation Scheme Against the Press .......................... 3

    II.  The Four Factors Guiding the Grant of Preliminary Relief Weigh in Favor of Immediate Redress ................................................................................................................................ 7

        A.  Mr. Karem is likely to succeed on the merits and will suffer irreparable harm unless injunctive relief is granted ................................................................................................ 8

        B.  The public interest and balance of equities favor enjoining the suspension of Mr. Karem's hard pass ........................................................................................................... 9

            1.  *The public interest in preventing irreparable harm to Mr. Karem's readers and other journalists* ............................................................................................................ 10

            2.  *The public interest in a functioning press* ............................................................ 11

CONCLUSION ..................................................................................................................... 11

## TABLE OF AUTHORITIES

**Cases** *Page(s)*

*Backpage.com, LLC v. Dart*,
   807 F.3d 229 (7th Cir. 2015) ................................................................................................... 5

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) ............................................................................................................... 5, 9

*City of Lakewood v. Plain Dealer Publ'g Co.*,
   486 U.S. 750 (1988) ................................................................................................................. 6

*CNN v. Trump*,
   No. 18-cv-2610 (D.D.C.) ..................................................................................................... 6, 8

*Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*,
   274 F.3d 377 (6th Cir. 2001) ................................................................................................... 9

*Elrod v. Burns*,
   427 U.S. 347 (1976) ................................................................................................................. 8

*Grosjean v. Am. Press Co.*,
   297 U.S. 233 (1936) ............................................................................................................... 11

*Hartman v. Moore*,
   547 U.S. 250 (2006) ................................................................................................................. 5

*Heffernan v. City of Paterson*,
   136 S. Ct. 1412 (2016) ............................................................................................................. 5

*In re Application of Dow Jones & Co., Inc.*,
   842 F.2d 603 (2d Cir. 1988) .................................................................................................. 10

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ............................................................................................................... 10

*Laird v. Tatum*,
   408 U.S. 1 (1972) ..................................................................................................................... 9

*Lamont v. Postmaster Gen. of U.S.*,
   381 U.S. 301 (1965) ................................................................................................................. 9

*Lozman v. City of Riviera Beach*,
   138 S. Ct. 1945 (2018) ........................................................................................................... 11

*Nebraska Press Ass'n v. Stuart*,
    423 U.S. 1327 (1975) ..................................................................................................... 9

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ..................................................................................................... 11

*NRA v. Cuomo*,
    350 F. Supp. 3d 94 (N.D.N.Y. 2018) ............................................................................. 5

*Okwedy v. Molinari*,
    333 F.3d 339 (2d Cir. 2003) .......................................................................................... 5

*Pearson v. Shalala*,
    130 F. Supp. 2d 105 (D.D.C. 2001) ............................................................................... 9

*PEN American Ctr., Inc. v. Trump*,
    No. 18-cv-9433 (S.D.N.Y.) ....................................................................................... 3, 6

*PHE, Inc. v. U.S. Dep't of Justice*,
    743 F. Supp. 15 (D.D.C. 1990) ...................................................................................... 9

*Pursuing America's Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) ....................................................................................... 9

*Quad-City Cmty. News Serv., Inc. v. Jebens*,
    334 F. Supp. 8 (S.D. Iowa 1971) ................................................................................... 8

*Stevens v. New York Racing Ass'n, Inc.*,
    665 F. Supp. 164 (E.D.N.Y. 1987) ................................................................................ 8

*The Chicago Reader v. Sheahan*,
    141 F. Supp. 2d 1142 (N.D. Ill. 2001) ........................................................................... 8

*Times-Picayune Pub. Corp. v. Lee*,
    No. CIV.A. 88-1325, 1988 WL 36491 (E.D. La. Apr. 15, 1988) .................................. 8

*United Teachers of Dade v. Stierheim*,
    213 F. Supp. 2d 1368 (S.D. Fla. 2002) .......................................................................... 8

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008) ........................................................................................................... 7

*Zieper v. Metzinger*,
    474 F.3d 60 (2d Cir. 2007) ............................................................................................ 5

## INTERESTS OF *AMICUS CURIAE*

PEN American Center, Inc. ("PEN America" or "PEN") is a nonprofit organization that represents and advocates for the interests of writers, both in the United States and abroad. PEN America is affiliated with more than 100 centers worldwide that comprise the PEN International network. Its Membership includes more than 7,300 journalists, novelists, poets, essayists, and other professionals, to include Members who hold or have previously held White House press credentials, or who work for organizations that hold such credentials. PEN America's Members also include Plaintiff Brian Karem, and two other journalists, Jim Acosta and Dana Milbank, whose hard passes have been suspended by the White House in retaliation for their coverage of the Trump administration.

PEN America stands at the intersection of journalism, literature, and human rights to protect free expression and individual writers facing threats for their speech. PEN America has a particular interest in opposing censorship schemes in all forms that inhibit creative expression and critical journalism. PEN champions the freedom of people everywhere to write, create literature, convey information and ideas, and express their views, recognizing the power of the word to transform the world. Its mission and mandate include fighting for the right to speak critically of a governmental body without retaliation, and for all of the rights associated with a free press, both core elements of a democracy and free expression. PEN America supports the First Amendment right of journalists to produce news coverage that is critical of the government without fear of loss of their access to sources, and of readers to receive news coverage that is unfettered by government censorship.

In furtherance of these interests, and to protect itself and its Members against an ongoing censorship-and-retaliation scheme by the President, PEN America filed a lawsuit against

President Trump that is currently pending in the Southern District of New York. PEN America submits this brief in support of Plaintiff's motion for a temporary restraining order and preliminary injunction because immediate redress is necessary to prevent this latest unconstitutional act from furthering Trump's ongoing scheme of censorship.

## INTRODUCTION

Political reporter Brian J. Karem alleges in his Complaint that President Trump and White House Press Secretary Stephanie Grisham have violated his First and Fifth Amendment rights by summarily suspending his "hard pass" for 30 days in retaliation for his critical coverage. *See* Compl. ¶¶ 15–84. A hard pass is the credential that gives a reporter access to the White House, and without it, Mr. Karem will be unable to work as a White House correspondent. *Id.* ¶¶ 4, 22–25, 35, 49, 73, 81.

Plaintiff has moved for a temporary restraining order and preliminary injunction, and *amicus* PEN America submits this brief to support the motion and to underscore the importance of immediate redress. The suspension of Mr. Karem's hard pass violates the First Amendment for all of the reasons laid out in plaintiff's brief. *See* Pl.'s Mem. of P. & A. in Supp. of Pl.'s Mot. for a TRO & Prelim. Inj. ("Pl.'s Br.") at 32–37. But it is not an isolated instance of abuse of power. Instead, it is part and parcel of President Trump's broader and unconstitutional censorship-and-retaliation campaign against the press, which is the subject of PEN America's own lawsuit against the President. *See* Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Dismiss at 6–10, *PEN American Ctr., Inc. v. Trump* ("*PEN America v. Trump*"), No. 18-cv-9433 (S.D.N.Y. May 10, 2019), ECF No. 48. In short, the President routinely uses the power of his office to punish perceived critics in an attempt to silence them. *Amicus* submits this brief to highlight that the suspension of Mr. Karem's hard pass is intended to both punish Mr. Karem and silence other

journalists. Only by preventing Mr. Karem's suspension from taking effect can this Court redress the constitutional injury the President seeks to inflict.

## ARGUMENT

**I.    The Suspension of Mr. Karem's Hard Pass Is Another Act in Furtherance of President Trump's Ongoing Censorship-and-Retaliation Scheme Against the Press**

A hallmark of the Trump presidency has been open hostility to an independent press, effected through actual and threatened use of government power to intimidate and silence both news organizations and particular journalists. As PEN America's own amended complaint catalogues, President Trump and officials acting at his direction have:

- restricted access, threatened to revoke credentials, and revoked credentials for members of the White House Press corps for asking critical questions;

- revoked and threatened to revoke security clearances from former government officials who have engaged in public commentary, including on CNN and NBC, because they expressed criticism of the current Administration;

- threatened to rescind NBC's broadcast license for coverage critical of the current Administration;

- issued an executive order to raise postal rates to punish online retailer Amazon.com because Jeff Bezos, its chief Shareholder and CEO, owns *The Washington Post*, whose coverage the President finds objectionable; and

- directed the Department of Justice to challenge a vertical merger between Time Warner and AT&T because of the President's antagonism towards Time Warner subsidiary CNN for its coverage of his Administration.

Am. Compl. ¶¶ 4, 29–92, *PEN America v. Trump*, No. 18-cv-9433 (S.D.N.Y. Feb. 6, 2019), ECF No. 38.

Since PEN America filed its amended complaint, the President has continued his unlawful campaign unabated. In February, the White House abruptly banned four journalists from covering President Trump's dinner with Kim Jong Un after they questioned Trump earlier

3

in the day.[1] In May, the White House rolled out a new standard for maintaining a hard pass to the White House which designated as unqualified almost the entire White House press corps, including all seven of *The Washington Post*'s reporters.[2] It allowed credentials to be restored for many under subjective and poorly defined exemptions for "senior journalists" and those who meet "special circumstances."

During an interview in June, the President threatened to send *Time Magazine* journalists to prison after one asked him about Special Counsel Robert Mueller's report.[3] The President had shown the reporters a letter from Kim Jong Un and, when a photographer attempted to take a photo of the letter, then-White House press secretary Sarah Sanders told him he couldn't. Later in the interview, a reporter asked about sworn testimony in the Mueller report that President Trump had attempted to limit Mueller's investigation to "future election meddling." Instead of answering the question, the President told the reporter, "you can go to prison, instead" for having attempted to photograph the letter from Kim Jong Un.

In July, reports surfaced that the President was interested in "scuttling" the Department of Defense's award of a $10 billion, 10-year contract to Amazon for cloud computing services.[4]

---

[1] Phillip Rucker & Josh Dawsey, *White House Bans Four Journalists From Covering Trump-Kim Dinner Because of Shouted Questions*, Wash. Po. (Feb. 27, 2019), https://www.washingtonpost.com/politics/white-house-bans-four-journalists-from-covering-trump-kim-dinner-because-of-shouted-questions/2019/02/27/36e1d26c-3a8d-11e9-a2cd-307b06d0257b_story.html.

[2] *See* Dana Milbank, *The White House Revoked My Press Pass. It's Not Just Me – It's Curtailing Access For All Journalists*, Wash. Po. (May 8, 2019), https://www.washingtonpost.com/opinions/the-white-house-has-revoked-my-press-pass-its-not-just-me--its-curtailing-access-for-all-journalists/2019/05/08/bb9794b4-71c0-11e9-8be0-ca575670e91c_story.html.

[3] Colby Itkowitz, *Trump Threatens Reporters With Prison Time During Interview*, Wash. Post (June 21, 2019), https://www.washingtonpost.com/politics/trump-threatens-reporter-with-prison-time-during-interview/2019/06/21/b622b84c-9420-11e9-b58a-a6a9afaa0e3e_story.html.

[4] *See* Michael Warren, Kylie Atwood & Alex Rogers, *Exclusive: Inside the Effort to Turn Trump Against Amazon's Bid For A $10 billion Contract*, CNN (July 27, 2019), https://www.cnn.com/2019/07/26/politics/oracle-trump-amazon-defense-contract-conspiracy/index.html?no-st=1564177550.

The President followed through on August 1, personally intervening to put a halt to the contract.[5] The President's intervention appears to be yet another attempt to punish Jeff Bezos for *The Washington Post*'s critical coverage.[6]

Each of the President's threats and acts recounted here violates the First Amendment in its own right. The First Amendment prohibits the actual or threatened use of government power to intimidate or censor freedom of speech or of the press. *Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1418 (2016); *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–68 (1963); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015); *Okwedy v. Molinari*, 333 F.3d 339, 343–44 (2d Cir. 2003). Government officials—including the President—violate the First Amendment when they "encourag[e] the suppression of speech in a manner which can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Zieper v. Metzinger*, 474 F.3d 60, 65–66 (2d Cir. 2007) (internal quotation marks omitted). Government officials further violate the First Amendment if they actually use government power to penalize a person or entity for the exercise of their First Amendment rights. *Heffernan*, 136 S. Ct. at 1418–19.

But President Trump's efforts to silence critical journalists and media organizations amount to more than a series of discrete First Amendment violations. He is engaged in a broad and "cohesive censorship-and-retaliation campaign." *NRA v. Cuomo*, 350 F. Supp. 3d 94, 112 (N.D.N.Y. 2018). Through his unconstitutional threats and retaliatory acts, President Trump is

---

[5] Aaron Gregg & Josh Dawsey, *After Trump Cites Amazon concerns, Pentagon Reexamines $10 Billion JEDI Cloud Contract Process*, Wash. Post (Aug. 1, 2019), https://www.washingtonpost.com/business/2019/08/01/after-trump-cites-amazon-concerns-pentagon-re-examines-billion-jedi-cloud-contract-process/.

[6] *See* Bryan Pietsch, *Two Democratic Senators Question Pentagon Delay On Cloud Contract*, Reuters (Aug. 5, 2019), https://www.reuters.com/article/us-amazon-com-jedi/two-democratic-senators-question-pentagon-delay-on-cloud-contract-idUSKCN1UV2C7.

effectuating what Congress could never enact: a scheme of censorship in which the President alone, exercising unbridled discretion, decides who may speak and what may be said. *Cf. City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759–62 (1988).

The suspension of Mr. Karem's hard pass is but the latest act in furtherance of President Trump's unconstitutional scheme of censorship. After revoking CNN correspondent Jim Acosta's press pass in November 2018, President Trump warned that there could be "others also" whose press passes could be revoked.[7] Mr. Acosta's hard pass was restored only after he filed suit in this District and obtained a temporary restraining order.[8]

Unfortunately, this Court's order did not prevent the Administration from signaling its plans to engage in similar retaliatory acts to deny press access in the future. Three days later, then-White House Press Secretary Sarah Sanders sent an email to the White House press corps issuing generalized guidelines for asking questions and vaguely threatening that she could issue additional grounds for hard pass revocation "[i]f unprofessional behavior occurs" at the White House.[9] As PEN America explained in February in its Amended Complaint, those

> rules are a pretext for future content-based restrictions on the speech of journalists who seek to cover the White House and a limitation on the ability of listeners to hear that speech. They place all members of the White House press corps at greater risk of retaliation, including [PEN]'s members who hold White House credentials, and chill the speech of those journalists.

Am. Compl. ¶ 48, *PEN America v. Trump*, No. 18-cv-9433 (S.D.N.Y. Feb. 6, 2019), ECF No. 38.

---

[7] Brian Stelter, *President Trump Threatens to Pull More Reporters' Credentials*, CNN (Nov. 9, 2018), https://www.cnn.com/2018/11/09/media/white-house-press-pass-threat/index.html.

[8] Minute Order, *CNN v. Trump*, No. 18-cv-2610 (D.D.C. Nov. 16, 2018).

[9] Bart Jansen & William Cummings, *White House Backs Down From Fight With CNN, Restores Press Credential for Reporter Jim Acosta*, USA Today (Nov. 19, 2018), https://www.usatoday.com/story/news/politics/2018/11/19/jim-acosta-suspension-possibly-permanent/2053073002/.

On August 2, 2019, nearly a year later and without the White House ever issuing additional written rules, White House Press Secretary Stephanie Grisham issued her initial decision to revoke Karem's hard pass for violations of "basic norms ensuring decorum and order." Grisham's letter added that "[t]he President is aware of this preliminary decision and concurs." Decl. of Theodore J. Boutrous, Jr. in Supp. of Pl.'s Mot. for a TRO & Prelim. Inj. ("Boutrous Decl."), Ex. 4, ECF No. 3-4. The letter says the revocation was triggered by an altercation involving Mr. Karem and Trump loyalist Sebastian Gorka in the Rose Garden in early July. *Id.* But circumstances suggest it was in fact prompted by a question Mr. Karem asked the President hours before receiving the letter—he had asked the President to comment on Bernie Sanders's assertion that the President was a "pathological liar." Boutrous Decl., Ex. 42, ECF No. 4-11.

The retaliatory suspension of Mr. Karem's press pass is not aimed solely at Mr. Karem. The final decision affirming the suspension confirmed it was a "sanction" that was intended to "punish[]" and "deter" Karem and other journalists. Boutrous Decl., Ex. 10 at 8, ECF No. 3-10. The President is once again making an example of someone—this time, Mr. Karem—in order to send a message to would-be critics: cross me and pay the price. That is precisely the sort of government censorship the First Amendment was intended to prevent.

II. **The Four Factors Guiding the Grant of Preliminary Relief Weigh in Favor of Immediate Redress**

This Court should grant a temporary restraining order or preliminary injunction because Mr. Karem has shown (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable injury in the absence of preliminary relief; (3) that the balance of the equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); Pl.'s Br. at 20 (collecting authorities). Mr. Karem meets these factors easily

7

for the reasons laid out in Plaintiff's brief. *See* Pl.'s Br. at 21–41.  In addition, *amicus* posits the following in support of injunctive relief:

### A. Mr. Karem is likely to succeed on the merits and will suffer irreparable harm unless injunctive relief is granted

With respect to the first two factors, *amicus* underscores that there can be no serious legal question that retaliatory denial of press credentials violates the First Amendment and that Mr. Karem will be irreparably harmed unless injunctive relief is granted. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Numerous courts have found irreparable harm to a journalist whose press pass has been unlawfully revoked or denied, or who has otherwise been unlawfully denied access to public officials. *See, e.g.*, *United Teachers of Dade v. Stierheim*, 213 F. Supp. 2d 1368, 1376 (S.D. Fla. 2002); *The Chicago Reader v. Sheahan*, 141 F. Supp. 2d 1142, 1147 (N.D. Ill. 2001); *Stevens v. New York Racing Ass'n, Inc.*, 665 F. Supp. 164, 177 (E.D.N.Y. 1987); *Quad-City Cmty. News Serv., Inc. v. Jebens*, 334 F. Supp. 8, 18 (S.D. Iowa 1971); *Times-Picayune Pub. Corp. v. Lee*, No. CIV.A. 88-1325, 1988 WL 36491, at *11 (E.D. La. Apr. 15, 1988). As this Court found most recently when the Trump Administration tried to revoke Jim Acosta's hard pass, "[e]ach day that [Acosta] is deprived of [his hard pass] without the process prescribed by the court in *Sherrill*, he suffers a harm that cannot be remedied in retrospect. The Court cannot restore his access to press briefings that have already occurred or to conversations in the White House press facilities that have already been had." Boutrous Decl., Ex. 30 (*CNN* ruling) at 13, ECF No. 3-30. The same is equally true here.

More generally, the retaliatory suspension of Mr. Karem's press pass effects at least three kinds of First Amendment violations: restraining him from covering the White House, furthering President Trump's scheme of censorship of journalists more broadly, and interfering with Mr.

8

Karem's and other journalists' readers' right to receive information. The Supreme Court has made clear that each of those First Amendment wrongs cause irreparable harm warranting immediate injunctive relief. *See, e.g.*, *Nebraska Press Ass'n v. Stuart*, 423 U.S. 1327, 1329 (1975) (prior restraints); *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 307 (1965) (abridgments of the right to receive information); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (schemes of informal censorship).

### B. The public interest and balance of equities favor enjoining the suspension of Mr. Karem's hard pass

The third and fourth factors strongly support the grant of preliminary relief in this case. This Court has long understood "it is in the public interest to uphold a constitutionally guaranteed right." *PHE, Inc. v. U.S. Dep't of Justice*, 743 F. Supp. 15, 26 (D.D.C. 1990); *see Pearson v. Shalala*, 130 F. Supp. 2d 105, 119 (D.D.C. 2001) ("[I]t is clearly in the public interest to ensure that [the] government[] . . . fully compl[ies] with the law, especially when that law concerns the parameters of a party's First Amendment rights . . . ."). As the D.C. Circuit has stressed, allowing unconstitutional government action to stand "is always contrary to the public interest," which lies in "protecting First Amendment rights." *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511–12 (D.C. Cir. 2016) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)). The balance of equities also favors injunctive relief because "no substantial harm to others can be said to inhere" in allowing a violation of constitutional rights to continue. *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 400 (6th Cir. 2001).

In this connection, there is a strong public interest in enjoining official actions that chill First Amendment freedoms. *See Laird v. Tatum*, 408 U.S. 1, 11 (1972) ("[C]onstitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall

9

short of a direct prohibition against the exercise of First Amendment rights."). The retaliatory suspension of Mr. Karem's hard pass will abridge and chill First Amendment freedoms for at least two reasons. First, the suspension also causes irreparable harm to third parties, including Mr. Karem's readers and *other* journalists, separate and apart from any irreparable harm to Mr. Karem. Second and relatedly, the suspension will further Trump's efforts to undermine a functioning free press.

### 1. *The public interest in preventing irreparable harm to Mr. Karem's readers and other journalists*

As an initial matter, Mr. Karem's readers have a First Amendment interest in receiving ideas that would be served by enjoining the suspension of his access to the White House. "It is now well established that the Constitution protects the right to receive information and ideas." *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972). Government action that unlawfully prohibits a journalist from communicating with their audience violates the audience's First Amendment rights, as well as those of the journalist. *See In re Application of Dow Jones & Co., Inc.*, 842 F.2d 603, 607 (2d Cir. 1988) (collecting authorities).

In addition, the retaliatory suspension of Mr. Karem's press pass will chill the First Amendment freedoms of other journalists, including PEN America's members. PEN America's members include journalists and other media personnel who hold White House press credentials, and who work for *The Washington Post*, CNN, NBC, and other news outlets. As PEN America's own Amended Complaint recounts, the President's ongoing scheme of censorship-and-retaliation has chilled and continues to chill its members' First Amendment rights. Am. Compl. ¶¶ 27, 38– 48, 93–101, 121, 123, 128, 130, *PEN America v. Trump*, No. 18-cv-9433 (S.D.N.Y. Feb. 6, 2019), ECF No. 38.

### 2. *The public interest in a functioning press*

Beyond the irreparable harm to Mr. Karem's readers and other journalists, injunctive relief is necessary to protect the free press as an institution. No institution is more crucial to maintaining our democratic system of government than a free press. "[S]ince informed public opinion is the most potent of all restraints upon misgovernment, the suppression or abridgement of the publicity afforded by a free press cannot be regarded otherwise than with grave concern." *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936).

That is particularly so where government action is calculated to handicap the free press. As the Supreme Court recently explained, government action that amounts to "[a]n official retaliatory policy is a particularly troubling and potent form of retaliation." *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954 (2018). It can be "long term and pervasive," "difficult to dislodge," and leave victims with "little practical recourse." *Id.* "[W]hen retaliation against protected speech is elevated to the level of official policy, there is a compelling need for adequate avenues of redress." *Id.*

To protect and vindicate our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), it is critical that this Court prevent the President from punishing one journalist in order to silence others.

## CONCLUSION

For the reasons stated above and those laid out in Plaintiff's own briefing, *amicus* PEN America requests that this Court grant Plaintiff's motion for a temporary restraining order and preliminary injunction.

Dated: August 26, 2019

Respectfully submitted,
THE PROTECT DEMOCRACY PROJECT, INC, DAVIS WRIGHT TREMAINE LLP AND MEDIA FREEDOM & INFORMATION ACCESS CLINIC

By: /s/ Benjamin Berwick

Robert Corn-Revere
Ronald G. London
Chelsea T. Kelly
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave., N.W., Suite 800
Washington, D.C. 20006
Telephone: (202) 973-4200
BobCornRevere@dwt.com
RonnieLondon@dwt.com
ChelseaKelly@dwt.com

David A. Schulz
MEDIA FREEDOM AND INFORMATION
   ACCESS CLINIC
FLOYD ABRAMS INSTITUTE
   FOR FREEDOM OF EXPRESSION
Yale Law School[10]
1675 Broadway, 19th Floor
New York, NY 10019-5820
Tel: (212) 850-6103
Fax: (212) 223-1942
david.schulz@yale.edu

Francesca Procaccini
George Wang, *law student intern*
MEDIA FREEDOM AND INFORMATION
   ACCESS CLINIC
FLOYD ABRAMS INSTITUTE
   FOR FREEDOM OF EXPRESSION
Yale Law School
P.O. Box 208215
New Haven, CT 06520
Telephone: (203) 436-5828
Facsimile: (203) 432-3034
francesca.procaccini@yale.edu

Benjamin Berwick (D.D.C. Bar No. MA0004)
Laurence M. Schwartztol (D.D.C. Bar No. MA0007)
Justin Florence (D.D.C. Bar No. 988953)
THE PROTECT DEMOCRACY PROJECT, INC.
15 Main St., Suite 312
Watertown, MA 02472
Telephone: (202) 579-4582
Facsimile: (929) 777-8428
ben.berwick@protectdemocracy.org
larry.schwartztol@protectdemocracy.org
justin.florence@protectdemocracy.org

Kristy Parker (D.C. Bar No. 1542111)
John Langford
THE PROTECT DEMOCRACY PROJECT, INC.
2020 Pennsylvania Avenue., NW, #163
Washington, DC 20006
Telephone: (202) 579-4582
kristy.parker@protectdemocracy.org
john.langford@protectdemocracy.org

Ian Bassin
THE PROTECT DEMOCRACY PROJECT, INC.
Telephone: (202) 579-4582
222 Broadway, 19th Floor
New York, NY 10038
ian.bassin@protectdemocracy.org

Steven A. Hirsch, *Consultant*
THE PROTECT DEMOCRACY PROJECT, INC.
633 Battery Street
San Francisco, CA 94111-1809
Telephone: (415) 676-2286
sahirsch2@gmail.com

*Counsel for Amicus Curiae*

---

[10] This *amicus* brief has been prepared in part by a clinic associated with the Abrams Institute for Freedom of Expression and the Information Society Project at Yale Law School but does not purport to present the school's institutional views, if any.